

FILED

SEP 3 0 2014

CLERK, US DISTRICT COURT
NEWPORT NEWS, VA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| Jamesina Crawford,<br>529 PAGEWOOD DRIVE<br>Newport News, VA 23602 | **CIVIL ACTION COMPLAINT** |
| Frantz Edouard<br>232 N. 1st Street<br>Hampton, VA 23664 | **JURY TRIAL DEMANDED** |
| Willie Kershaw<br>8875 Woodridge Ct.<br>Jonesboro, GA. 30238 | Case No.: 4:14cv130 |
| Lamar Holliman,<br>3105 Sir Meliot Drive<br>Chesapeake, VA 23323 | |
| Mark Barnett,<br>113 Pine Creek Dr<br>Hampton, VA 23669 | |
| Reggie Holliman,<br>4239 Morgate Lane<br>Portsmouth, VA 23703 | |
| David Swain<br>267 Backwoods Road<br>Roper, NC 27970 | |
| Ron Valentine,<br>550 Coral Ct.<br>Newport News, VA. 23606 | |
| **Plaintiffs** | |
| vs. | |
| Newport News Industrial<br>Corporation,<br>182 Enterprise Drive<br>Newport News, VA 23603 | |
| **Defendant** | |

## COMPLAINT

For their Complaint against Newport News Industrial Corporation, Plaintiffs Jamesina Crawford, Frantz Edouard, Willie Kershaw, Lamar Holliman, Mark Barnett, Reggie Holliman, David Swain and Ron Valentine, by counsel, state as follow:

### NATURE OF THE CASE

1.    This is an employment discrimination case alleging a racially hostile work environment, and disparate pay based on race, and retaliation, pursuant to 42 USC §1981, and a gender discrimination and retaliation case, brought under 42 U.S.C. § 2000e, et seq. ("Title VII").

### Parties, Jurisdiction and Venue

2.    Plaintiffs Jamesina Crawford, Frantz Edouard, Willie Kershaw, Lamar Holliman, Mark Barnett, Reggie Holliman, David Swain, and Ron Valentine ("Plaintiffs"), are current and former African-American employees of Newport News Industrial Corporation ("NNI").

3.    Defendant Newport News Industrial Corporation ("NNI" or "Defendant"), is a subsidiary of Huntington Ingalls Industries, Inc. Its facility is located in Newport News, Virginia.

4.    This Court has jurisdiction pursuant to 28 U.S.C. Sec. 1343, and 42 U.S.C. §§ 2000e, et seq. With respect to Plaintiff Crawford's claims pursuant to 42 USC 2000e, Plaintiff filed a Charge of Discrimination with the EEOC, which issued a Notice of Right to Sue. The instant Complaint is being filed less than 90 days from receipt of said Notice.

5.    Venue is proper in this District, pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1331, because the conduct complained of herein took place within this judicial district and the defendant is subject to personal jurisdiction and are headquartered here.

**Violation of the Fair Pay and Safe Workplaces Executive Order**

6.     NASA, the U.S. Department of Energy and the U.S. Department of Defense, are major customers of Defendant.

7.     The conduct alleged herein violates the Fair Pay and Safe Workplaces Executive Order issued by President Obama on July 31, 2014, and a judgment on this action would require that NNI be barred by the Department of Labor from receiving federal contracts.

## ORGANIZATIONAL STRUCTURE OF NEWPORT NEWS INDUSTRIAL CORPORATION

8.     NNI fabricates tanks, pressure vessels, and piping. It installs and replaces plant components on-site. It services pumps, hydraulic equipment, turbines, diesels and other plant equipment. It provides <u>engineering</u>, <u>shock analysis and testing</u>, laboratory testing, services, and sells certain related products. It has specific expertise in welding to the standards required on nuclear submarines and aircraft carriers.

9.     NNI employs approximately 200 to 300 employees. Approximately less than one-third of NNI's employees are "permanent" employees. "Permanent" employees at NNI receive health and retirement benefits. Approximately two-thirds employees are "temporary" employees. "Temporary" employees do not receive health and retirement benefits. "Temporary" employees are laid off about every eleven months and rehired after about thirty days.

10.     As of January 2013, less than ten African-American employees at NNI were "permanent" employees, including secretaries and support staff.

11.     Peter Daikun is the President of Newport News Industrial Corporation and the Vice President of Newport News Shipbuilding.  He has been in this position since 2012. Steve Napiecek is the Vice President of Newport News Industrial Corporation and its General Manager.  He has been in this position since 2010.

12.     Superintendents report to the Vice President. They are responsible for managing projects and supervising production and maintenance employees, including foremen and tradespeople.  Superintendents at NNI have included, from 2008 to the present, Richard Tally and Scott Davis.  On information and belief, NNI has approximately 3 superintendent positions. Superintendents have the authority to hire and fire employees.   No African-American has occupied a superintendent position at NNI in at least the last six years.

13.     Foremen are production and maintenance employees. They directly supervise teams of tradespeople including welders, machinists, and fitters.   Foremen report to superintendents. Foremen at NNI have included, Kevin Angle, a welding foreman, Jeff Riley, a welding foreman, Tommy Jaffeux, a fitter foreman, and Wayne Jackson, a fitter foreman. On information and belief, NNI has approximately 10 to 15 foremen.  For over the past six years at least, only two African-Americans had occupied a foreman position. One of these African-American foremen was later demoted.

14.     Make-up supervisors or step-up supervisors are production and maintenance employees. They are temporarily authorized to supervise teams of tradespeople when Foremen are unavailable or more supervisors than are available are needed on a project.  Over the past six years, no African-American has occupied a make-up supervisor or step-up supervisor position.

15.     NNI employs approximately 150 to 200 tradespeople. Tradespeople at NNI are production and maintenance employees. They include, but are not limited to, structural welders, structural fitters, pipefitters, pipe welders, machinists, electricians, and laborers.

16.     NNI production and maintenance employees perform physically demanding work. They fabricate large metal structures spanning hundreds of feet.  Tradespeople at NNI often specialize in specific trades and seek to gain skill and experience within a particular field.

4

Laborers are unspecialized entry level positions. They perform physical labor in support of specialized tradespeople. Customarily, as a tradesperson improves in skill and experience his increased proficiency is recognized by title or rank. For example, as a welder gains greater skill and experience, he is promoted from third class, or entry level welder, to second class, or semi-skilled welder, to first class, advanced welder. Progress from a basic skill level to an advanced skill level can take ten years or more. Employees work with the goal of increasing their skill level, title or rank, and consequently, their rate of pay.

17.     Maintenance and production employees have primarily worked at four locations at NNI: the Main Building, at 182 Enterprise Drive, Newport News, VA, outside the Main Building,  space that was shared with Swisslog Logistics, known as the "Swiss Log," at 161 Enterprise Drive, Newport News, VA and the Warehouse.  Other areas at NNI include, but are not limited to, a facility near Fort Eustis and a facility on Jefferson Ave near Newport News.

18.     The Main Building is subdivided into workspaces for the various trades.  It also houses NNI's administrative offices. Workspaces in the main building include, but are not limited to, a workspace for fitters and welders, a workspace for machinists, known as the machinists' shop, a workspace for pump makers, known as the pump shop, and a workspace for electricians, known as the electricians' shop.

19.     The area outside the Main Building is used for large projects.

20.     The Swiss Log was closed in or around 2013. It was primarily used as a workspace by welders and fitters.  It was located directly across the street from the Main Building.

21.     The warehouse is located at a ten minute car ride from the main building. It is a storage space.

5

I.    **Pattern or Practice Allegations**

**RACIALLY HOSTILE WORK ENVIRONMENT**

22.    Supervisors use racial epithets to refer to African-Americans, including the N-word.    They routinely make demeaning remarks about African-American craftsmanship. Supervisors constantly threaten the jobs of African-Americans. At meetings, supervisors openly make derogatory remarks about the "kinky" hair of African-Americans, their "lazy" work ethic, and imply that African-Americans have drug and alcohol problems.

23.    Plaintiffs' complaints to NNI's Vice President and NNI's management about NNI's hostile work environment have been ignored. African-American workers are subject to retaliation for complaining. Supervisors that openly harass African-American workers are promoted by NNI. Confederate flags are freely displayed by workers at NNI while t-shirts supporting Obama have been prohibited.

24.    Jeff Riley, a Foreman employed by NNI from March 2010 to mid-2012, was among those who harassed Plaintiffs and other African-American workers on a daily basis. He mocked the mannerisms of African-Americans, grabbing his crotch and affecting a "pimp stroll." Riley frequently made generalized racist comments about African-Americans workers at group meetings for welders.  He made remarks about how African-American's dressed, what they drank and their problems with punctuality. For example, Riley would ask, "why ya'll black people can't ever be on time, "why're you always late," or "why are y'all people always lazy, after you eat."  He does not address Caucasian workers in this way.

25.    Riley mocked Kevin Smith, a welder, and his African-American coworkers' speech and gait. He frequently used "yo,yo,yo," "bubba" and "boy" to refer to Smith and his African-American coworkers.  Additionally, Riley made derogatory remarks about Smith's long

hair. For example, he would say, "y'all with your nappy hair."

26.    Tom Jaffeux, a Foreman presently employed at NNI, also regularly harasses African-American workers. He treats workers African-American workers with condescension, and regularly demeans African-American workers. At morning meetings, Jaffeux unfairly threatens the jobs of African-Americans, saying, "I'm going to get rid of somebody." He does not treat Caucasian workers in this way. He refers to African-American workers as "bitches." Jaffeux routinely reprimands African-American workers while ignoring the infractions of Caucasian workers.

27.    Jaffeux frequently treated Kevin Smith and his African-American coworkers in a derogatory manner. For example, he would remark to Smith and his African-American coworkers, "y'all brain dead, and y'all know who I'm talking to, I'm going to leave it like that." At morning meetings, Jaffeux gave Caucasian fitters their assignments prior to African-American workers. They were already at their work stations, dressed for work, when Smith and his African coworkers were given their assignments.

28.    Wayne Jackson, a Site Manager, was promoted by NNI in or around 2011 from Foreman. He is a current employee of NNI. He has a reputation for firing African-American employees. Jackson has bragged to NNI employees that he has a black book listing the names of African-American employees he has fired. African-American workers believe they are targeted for termination when they are transferred to Wayne Jackson's supervision. Wayne Jackson monitors African-American workers' bathroom breaks and follows them to the bathroom to tell them they are taking too long. He reprimands African-American employees for getting coffee in the morning, while ignoring Caucasian employees doing the same. Jackson uses racial epithets to

refer to African-Americans, including calling them gang members and bitches. He does not treat Caucasian workers in this way.

29.     Steve Sheg, a supervisor, currently employed at NNI, also regularly harasses African-Americans workers.  He was promoted by NNI to a supervisor from make-up supervisor. Sheg has used the N-word on multiple occasions to refer to African-American workers. He has made abusive comments to African-Americans, for example, calling African-American workers faggots, and telling them to "suck my dick." Sheg regularly threatens the jobs of African-Americans.  African-American workers are subjected to extreme scrutiny while working for him. Sheg has followed workers to the bathroom to tell them to get back to work.  He has said "you better hurry up or I'll stick a pipe up your ass." He does not treat Caucasian workers in this way.

30.     Tom Hines, a make-up supervisor, also harasses African-Americans on a regular basis. He displays confederate flags on the back window of his car and his license plate. He constantly threatens the jobs of African-American workers. He yells at African-American workers to get back to work when they are on break. He demeans African-American workmanship. For example, he has commented that a majority of African-American welders employed at NNI are not capable of good work. He does not treat Caucasian workers in this way.

31.     Plaintiffs' coworkers routinely engage in racial harassment. Confederate flag t-shirts and scarves are openly worn by employees.  They are displayed on cars, lockers and toolboxes.

32.     Plaintiffs' coworkers make racially hostile remarks. They regularly use racial epithets, including n*gger, and refer to African-Americans as "bitches." Caucasian workers remark that "all blacks look alike." Their jokes demonstrate a callous disregard for African-

8

Americans. For example, one worker remarked, "what's the difference between a black man in the road and a dog in the road, skid marks in front of the dog."

33.    Employees wear racially offensive t-shirts. For example, one worker wore a t-shirt captioned redneck fishing.  The t-shirt depicted a Caucasian man fishing by holding a black man upside down and underwater.

34.    As part of the harassment, NNI assigns more physically intense, more dangerous, and dirtier work to African-American production and maintenance employees relative to Caucasian production and maintenance employees. From approximately 2009 or earlier to 2011, African-American production and maintenance employees at NNI were assigned to the "pin jig" project.   The "pin jig" is an area where a ship's curved hull surfaces are assembled. Approximately more than 90% of tradespeople assigned to the "pin jig" project were African-American.  The "pin jig" project was located outside the main building. Tradespeople assigned to the "pin jig" project were required to work in extreme weather conditions, dirty conditions, and wet conditions.

35.    The "pin jig" project was referred to as junk work by workers at NNI because it required little skill and limited the ability of workers to develop their craft to progress in their trades. When working on the "pin jig" project, African-American tradespeople were given less break time than Caucasian workers assigned to other projects.  They were not able to drink coffee during work hours unlike Caucasian workers assigned to other projects. They were not able to snack while working unlike Caucasian workers assigned to other projects.

36.    African-American workers on the "pin jig" project were unable to obtain overtime work on other projects, unlike Caucasian workers, who were able to obtain overtime work on all projects, including the "pin jig" project.

37.     African-American workers on the "pin jig" project were required to stand for long hours, unlike Caucasian workers on other projects who were able to sit while working.

38.     After the "pin jig" project was completed, African-American workers on the project were terminated; Caucasian workers on other projects were not treated in the same or similar manner.

39.     Another way in which NNI created a hostile work environment for African-American workers was by assigning them to work at the Swiss Log. From approximately 2009 or earlier to approximately mid-2013, African-American production and maintenance employees at NNI were assigned to work at the Swiss Log.  Welders, fitters and laborers were the primary trades assigned to work at the Swiss Log.  Large welding and fitting projects were initiated in the Swiss Log and transferred to the main building for further more detail-oriented work. Approximately 80% of tradespeople assigned to work at the Swiss Log were African-American. In comparison, approximately 85% of the tradespeople assigned to work at the main building were Caucasian.  The work at the Swiss Log was more physically demanding and dirtier than that at the Main building.  Furthermore, the types of work given to welders and fitters at the Swiss Log required less skill than the work available at the Main building, and limited the ability of African-American workers to develop their skills to progress in their trade.

40.     When working at the Swiss Log, African-American workers were given less break time than Caucasian workers assigned to other projects.  Even the workers' bathroom breaks were timed and workers were reprimanded for taking too long in the bathroom.  African-American employees were not able to drink coffee during work hours unlike Caucasian workers assigned to other projects. They were not able to snack while working unlike Caucasian workers assigned to other projects.

41.     African-American workers at the Swiss Log were required to stand for long hours, unlike Caucasian workers on other projects, who were able to sit while working.

42.     Another way in which NNI creates a hostile work environment for African-American workers is by assigning them arc welding work. From approximately 2009 or earlier to the present, African-American welders have been assigned significantly more arc welding work than Caucasian workers. Arc welding is the process of fusing two metals together with heat. The process is dangerous because it produces carbon monoxide as a by-product.  Caucasian welders are generally assigned to arc welding work only if an African-American welder is unavailable.

43.     Another way in which NNI creates a hostile work environment for African-American workers is by depriving them of the things that make dangerous, repetitive work, more tolerable. Coffee facilities on NNI premises are closed to African-American tradespeople but open to Caucasian tradespeople. In 2011, when African-American tradespeople attempted to share the coffee facilities to which Caucasian tradespeople had access, the facilities were shifted to the supervisors' work area. Supervisors began closely monitoring those that were accessing the coffee facilities. African-Americans were explicitly told that they could not get coffee in the morning. Caucasian workers were able to drink coffee in the morning and have access to the facilities throughout the day.

44.     African-American tradespeople are not allowed to talk to coworkers during work hours unlike Caucasian tradespeople, assigned the same or similar work, who are able to congregate and socialize throughout the day.  Caucasian tradespeople, unlike African-Americans, are able to take personal calls while working and are able to text on their cellphones throughout the day.

11

45.     African-American tradespeople are monitored while taking bathroom breaks, or not able to use the bathroom at all, unlike Caucasian tradespeople, assigned the same or similar work, who are free to take frequent and lengthy bathroom breaks.

46.     African-American tradespeople are expected to stand throughout the day, or if they are able to sit, to sit on the floor or on buckets while Caucasian tradespeople, assigned the same or similar work, are able to sit on chairs while working.

## RACIAL DISCRIMINATION IN COMPENSATION

47.     NNI has a pattern or practice of hiring African-American tradespeople at wage rates lower than Caucasian tradespeople of similar or lesser skill.  Wage rate differentials at hire between African-American workers and Caucasian workers of similar skill can exceed four dollars per hour.

48.     Supervisors evaluate candidates and negotiate rates of pay with the newly hired workers. The rates of pay are then then approved by the Human Resources Department.

49.     Tradespeople are told at hire that their work will be evaluated over a four month period and they will receive raises over that period to reach their final hourly wage.  They are promised that they will be evaluated four times over their initial year  of hire, within 30 days, 90 days, 120 days and 150 days. They are told that at each satisfactory evaluation they will receive a raise to ultimately reach their final hourly wage.

50.     NNI has a pattern or practice of delaying or omitting evaluations and raises for African-American tradespeople. Additionally, in spite of an African-American workers' satisfactory evaluations, the raises tied to the evaluations are often omitted or decreased from rates initially agreed upon. In contrast, Caucasian employees are more promptly evaluated and

more regularly given raises. Wage rate differentials at NNI between African-American tradespeople and Caucasian tradespeople of similar skill widen over time.

51.    An experienced African-American tradesperson is paid $24/hour while an experienced Caucasian tradesperson is paid $28/hour or more.

52.    The differential in wage rates between inexperienced African-American tradespeople and inexperienced Caucasian tradespeople is even wider.  Plaintiff Willie Kershaw, was hired at $13/hour, while his Caucasian coworker "John," also a laborer, was hired at $22/hour.  These wage rate differentials widen as Caucasian workers are promoted at accelerated rates, and African-American workers remain in the same positions in which they were hired.

53.    NNI has a pattern or practice of annually laying off "temporary" employees and rehiring them after thirty days. African-American tradespeople are laid off for thirty days or more while Caucasian tradespeople are laid off for less time.

54.    NNI has a pattern or practice of failing to hire African-Americans into "permanent" positions.  "Permanent" workers have health insurance, a pension plan and are not subject to annual lay-offs. Although the temporary pool of workers is 40 percent African-American, permanent workers are only 10 percent African-American.

55.    NNI has a pattern or practice of awarding off-site work to Caucasian workers more often than qualified African-American employees.  Off-site work is often paid at a higher hourly wage rate than on-site work and includes a per diem stipend.

56.    A supervisor is responsible for making decisions which affect compensation. NNI has a policy and practice of permitting supervisors discretion in deciding whom to promote and discriminatory bias against African-Americans is the common mode of exercising that discretion.

## RACIAL DISCRIMINATION IN PROMOTION

57.     NNI has a pattern or practice of denying African-Americans promotions for which they are qualified. Few African-American tradespeople have been promoted to a higher rank or position at NNI, from the position at which they were originally hired. Within the last six years, only two African-Americans have held the position of foreman and few African-Americans have been hired as permanent employees.

58.     In contrast, multiple Caucasian employees hired within the last six years with little or no experience in the trades have been promoted to supervisory positions and assigned to supervise African-American tradespeople with over twenty years of experience.

59.     NNI has a pattern or practice of failing to post position openings on bulletin boards in its facilities or in advertisements, or only posting such openings after decisions to hire or promote non-African-Americans have already been made, denying African-Americans a meaningful opportunity to apply for promotion.

60.     NNI has a pattern or practice of placing greater requirements on African-American tradespeople to obtain promotions relative to Caucasian tradespeople of similar or lesser skill. Unwritten requirements, such as additional certifications and training are required of African-American tradespeople relative to Caucasian employees applying to the same job.

61.     NNI has a pattern or practice of giving African-Americans fewer opportunities for training in the skills required to increase their eligibility for promotion.

62.     A supervisor is responsible for selecting an individual for promotion. NNI has a policy and practice of permitting supervisors discretion in deciding whom to promote and discriminatory bias against African-Americans is the common mode of exercising that discretion.

14

## RACIAL DISCRIMINATION IN OVERTIME WORK ASSIGNMENTS

63.    NNI has a policy or practice of awarding more overtime work to Caucasians than to African-Americans. Caucasians are given preference for overtime work over African-American workers of similar skill and experience.

64.    When African-American workers are able to obtain overtime work, they are restricted to the least desirable projects. For example, when the "pin jig" project was underway, African-Americans were able to obtain overtime work on that project but were passed over for others. Caucasian employees, in contrast, were able to obtain overtime work on the "pin jig" project and given preference for overtime work on other projects at NNI.

65.    A supervisor is responsible for making decisions which affect overtime compensation. NNI has a policy and practice of permitting supervisors discretion in deciding whom to promote and discriminatory bias against African-Americans is the common mode of exercising that discretion.

## OTHER RACIAL DISCRIMINATION

66.    When an accident occurs at NNI, those involved in the accident are required to be drug tested. This rule is consistently applied against African-American tradespeople but inconsistently applied to Caucasian tradespeople assigned the same or similar work. For example, when Don Pierce, an African-American, and Wayne Jackson, a Caucasian worker, were operating a crane and dropped a heavy metal object, Pierce was subjected to drug testing, but Jackson was not. Additionally, on a number of occasions when Caucasian workers had serious accidents on premises, they were not subjected to drug testing. Jarvis Lee, a Caucasian employee, crashed a company truck on premises and was not subjected to a drug test. When Ron Valentine reported that he smelled alcohol on Richard Tally's breath, Tally, a Caucasian worker,

was not required to undergo urine analysis. Plaintiffs Valentine, Crawford, and Holliman were all subjected to drug testing when they had accidents at NNI.

67.     African-American workers suffer more severe consequences for a positive drug test than Caucasian tradespeople assigned the same or similar work.   African-American tradespeople are often fired for a positive drug test while Caucasian tradespeople often suffer no consequences.   For example, "Nate," a Caucasian employee, was able to continue to work for NNI despite a positive drug test.   "Josh" also failed a urine analysis and continued to work for NNI. Reggie Holliman, a Plaintiff, was fired when he had a positive drug test.

68.     Caucasian workers are overwhelmingly selected for crane training and certification, while African-American workers are not. Without crane certification,  African-American tradespeople must wait for crane certified employees to move heavy steel materials with which tradespeople commonly work.  African-American workers are compelled to choose between waiting for others to move heavy materials and risk reprimand by their supervisors for being too slow, or to move the heavy materials by hand and risk injury.

69.     NNI fails to accommodate the injuries of African-American tradespeople and the jobs of African-American workers are threatened if they seek accommodation. In comparison, Caucasian tradespeople with the same or similar work are regularly accommodated for their injuries.  For example, Plaintiff Jamesina Crawford, and Kevin Smith were not accommodated for their medical conditions even after submitting doctors' notes to their supervisors.  Crawford was diagnosed with a kidney infection, caused by the lack of a woman's restroom at the Swiss Log where she worked.  Even after she submitted a doctor's note, she was not given access to a women's restroom. Kevin Smith suffered from a back injury and requested accommodation. Even with a doctors' note, his injury was not accommodated.

70.    African-American workers are fired for minor infractions, while Caucasian workers often suffer no consequences for the same infractions. For example, Willie Kershaw was fired for leaving slag on his weld. "Luis," an African-American employee, was fired for leaving a grinder plugged-in. Caucasian employees were rarely subject to reprimand, let alone fired, for leaving slag on welds or leaving equipment plugged-in.

71.    A supervisor is responsible for making decisions which disparately affect African-Americans at NNI. NNI has a policy and practice of permitting supervisors discretion in deciding whom to promote and discriminatory bias against African-Americans is the common mode of exercising that discretion.

## NNI'S INEFFECTIVE ANTI-DISCRIMINATION EFFORTS

72.    NNI is aware of the highly segregated work environment at NNI. The high degree of segregation at NNI is observable.  The more physically demanding work required of the workers on the "pin jig" project was easily apparent. No other workers were required to work outside routinely in extreme temperatures and wet conditions. Caucasian workers are able to congregate, smoke, and sit while working; African-American workers are not.  NNI moved its coffee facilities to an area where supervisors congregate to be able to more closely monitor the employees accessing coffee.  It is aware that African-Americans are not able to drink coffee in the mornings while Caucasian workers are. For example, Tom Castle, a Caucasian tradesperson, remarked to Reggie Holliman," I don't think the guys like ya'll people," referring to NNI's treatment of African-Americans. On another occasion, Foreman Jeff Riley acknowledged the disparate treatment of African-Americans at NNI, saying,  "I know they tight on ya'll," to Reggie Holliman.

17

73.     NNI is aware that African-Americans' injuries are less likely to be accommodated relative to Caucasian workers' injuries, that it applies different standards to Caucasian workers with positive drug tests and African-American workers with positive drug tests and that African-American workers are fired, and Caucasian workers are retained.

74.     NNI is aware of the disparate salaries of African-Americans relative to Caucasians. Disparities in salaries are significant between $4/hour to $8/hour.

75.     NNI is aware of the disparate rates of promotion for African-Americans relative to Caucasians. African-Americans are rarely promoted.  African-Americans are rarely hired into permanent positions.  Only two African-Americans were supervisors from 2009 or earlier to 2014. One of these supervisors was demoted.

76.     NNI has a pattern or practice of ignoring or failing to act promptly to investigate racial harassment complaints. Where it does conduct investigations into harassment complaints, NNI has a pattern or  practice of conducting inadequate and non-independent investigations, which are biased against finding any violation. Where there is a finding of discrimination following a harassment complaint, NNI has a pattern or practice of not carrying out any effective deterrent or corrective measures. NNI has a pattern or practice of retaliating against African-American who complain about racial discrimination or harassment.

77.     NNI Vice Presidents, Superintendents and Foremen, have actual knowledge of the racially discriminatory remarks and conduct of plaintiffs' coworkers. They witness supervisors' and coworkers' racially harassing behavior towards African-American. At times they encourage it, by laughing along or responding favorably to their comments.

78.     Plaintiffs have complained to Superintendents, Foremen, human resource employees, and senior executives about the racial harassment to which they are subjected, without result.

79.     Employees engage in racially hostile behavior openly. The behavior is widespread. NNI managers are able to observe the overtly hostile environment on a daily basis, in common work areas.

### RETALIATION

80.     NNI maintains a pattern or practice of retaliating against class African-Americans for opposing racial discrimination. NNI has retaliated by subjecting plaintiffs to disparate terms and conditions of employment; subjecting them to discipline in response to their complaints; and/or terminating them in retaliation for their complaints.

81.     For example, in November 2011, Jamesina Crawford complained to the Vice President of NNI about the racial discrimination she was experiencing.  After her complaint, the conditions under which she was working deteriorated. She was told to sweep up around NNI's building even while her shoulder was injured. Jeff Riley and Wayne Jackson constantly threatened her job.  Within two months of complaining, she was terminated by NNI.

82.     NNI failed to adequately investigate her complaints. The supervisors against whom Crawford had lodged her complaints, Jeff Riley and Wayne Jackson, suffered no consequences because of their actions.

83.     In April 2012, Lamar Holliman complained to Superintendent Richard Tally that he was subjected to racial harassment by Steve Sheg's.  NNI failed to adequately investigate the allegations.  Holliman's work conditions deteriorated.  He was closely scrutinized.  He was

harassed on a daily basis. His coworkers told him that he was targeted for firing. Holliman could not tolerate the impossible conditions and constructively discharged.

84.     In August 2011, when Willie Kershaw complained about the nature of his work assignments, he was transferred to the supervision of Wayne Jackson. Wayne Jackson subjected Kershaw's work to greater scrutiny, monitored his bathroom breaks and constantly threatened his job. Other workers indicated to Kershaw that he was targeted for termination by NNI. Within months of his complaint, Kershaw was fired for leaving slag on a weld, a relatively minor infraction for which a Caucasian would not have been fired.

85.     African-American workers at NNI observed that workers complaining of racial harassment were routinely retaliated against. Wayne Jackson boasted that he had fired many African-American workers. Workers that complained of racial harassment were often transferred to Wayne Jackson's supervision and targeted for termination.

86.     NNI's actions were intended to chill participation in opposing discrimination by other African-Americans.

## II.     Allegations of Named Plaintiffs

### JAMESINA CRAWFORD

#### *Race and Gender Based Hostile Work Environment*

87.     Jamesina Crawford is an African-American female. She was employed by NNI from August 2010 to January 2012. She is a first class welder with more than 26 years of welding experience.

88.     At hire, around August 2010, Crawford was assigned to work in the Swiss Log. Her job duties included welding large metal pieces to be installed at refineries, nuclear plants,

industrial facilities, and on ships. Additionally, she was assigned to teach welding skills to multiple entry level workers, a responsibility for which she received no additional compensation.

89.     From her hire to the end of her employment at NNI, Crawford's supervisors and coworkers subjected her to a hostile work environment based on her race.

90.     Jeff Riley, a Foreman, primarily supervised Crawford during her employment with NNI.

91.     Riley mocked African-Americans, by engaging in stereotypical mannerisms, on a daily basis. For example, he frequently made racially derogatory remarks, such as stating that a Caucasian worker, "JJ," was a "poor excuse for a Caucasian man." He frequently told racially offensive jokes, such as comparing Caucasian women to black women.

92.     Additionally, Riley routinely made racially tinged sexual comments to Crawford. He remarked, "I can't mess around with a sister, a sister is too loud and they don't know when to shut up." He spontaneously told Crawford about sexual experiences, talking about "hitting it," and having sex under the influence of cocaine. He remarked to Crawford, "I wouldn't hit that fat nasty thing now," referring to a female NNI employee. Riley's comments were overheard by other Foremen, including Wayne Jackson and Tommy Jaffeux.

93.     One example of the type of offensive racial remarks Riley made occurred one year into her employment with NNI, in or around November 9, 2011. Riley asked Crawford to build an area to train welders. When Riley saw the area Crawford had built he remarked, "that's some African built shit." Crawford was shocked and offended by his remark.

94.     Approximately one week after Riley's comment, Wayne Jackson, a superintendent, also made derogatory comments to Crawford. While Crawford was welding a submarine foundation, a process which requires skill and concentration, Jackson approached

21

Crawford. He said, referring to Crawford's trainee John, "you know I'm gonna have some fun with John when he gets over here. I'm gonna tell him 'hey John, you're learning how to weld from a bitch!' and he's going to be like Ms. Crawford is not a bitch.'" Crawford became upset at Jackson's comment and injured her shoulder while welding.

95.    After her welding injury on November 9, 2011, Crawford was still in pain the next day. She reported the injury to Riley.  Riley asked, "what are you gonna do?" adding, "if you go to the doctor they're going to drug test you." Crawford understood Riley's remark to imply that she was taking illegal drugs. The racist belief that African-American employees were all on illegal drugs was widespread among NNI's supervisors and upper management.

96.    Crawford reported the offensive comments made by Jeff Riley and Wayne Jackson on or about November 9, to Steve Napiecek, the Vice President of NNI, within two weeks of the incidents.  She provided the details of the comments made by Riley and Jackson, including that Riley had referred to her welding area as "African built shit," Jackson had called her a "bitch," and Riley had implied that she was taking drugs.  Though the Vice President stated, "don't worry I'll take care of it," Crawford continued to be subjected to racial harassment. She was not made aware of any investigations into her complaints.

97.    Crawford continued to hear Riley make offensive racial jokes on a daily basis. He continued to imitate and mock African-American mannerisms. He continued to make racially derogatory statements.

98.    For instance, after being injured, Crawford was required to take a vision and hearing test to transition from her restricted work schedule to a regular work schedule. On the day of the vision and hearing test  she forgot paperwork relevant to the testing at home. She asked Riley for a copy of the paperwork and  Riley telephoned the test administrator.  The female

22

administrator responded, and Crawford overheard her say, "what am I gonna do with them." Both Riley and the female on the phone started laughing. He turned to Crawford and repeated the racist comment, saying, "she said, what am I gonna do with THEM."

99.     Referring to African-Americans in the third person in the context of a derogatory remark, and implying "they" were outsiders, was common among supervisors at NNI.

100.    Throughout the time Crawford was employed at NNI, Crawford saw employees with confederate flags on their cars (parked in NNI's lot), caps and shirts. At least one supervisor, Tommy Hines, had a confederate flag on his car.  The racially offensive symbol was openly displayed in full view of NNI's management and supervisors.

101.    Crawford was subjected to inhumane treatment on account of her race and gender. Crawford complained to Riley on a daily basis about the Swiss Log's lack of a female restroom. Riley did not make any arrangements for Crawford to use a bathroom located at the main building. Crawford was required to wait until after work to go to the bathroom or use the Men's restroom with her coworkers standing guard. The treatment was typical of NNI's policy and/or practice of subjecting African-American employees to harsher work conditions than Caucasian workers and ignoring their basic needs.

102.    In 2011, Crawford had a kidney infection because she was not able to go to the bathroom regularly. She brought in a doctor's note to Riley indicating her condition.  At that time, Riley said that she could drive to the Main Building to use the bathroom. Within two weeks, however, Tom Jaffeux, a supervisor, and Riley announced that Swiss Log workers were not allowed to go to the main building. Crawford continued to be subjected to inhumane work conditions.

103.    On November 9, 2011, Plaintiff's shoulder was injured while welding. After attempting to dissuade Crawford from seeing a doctor, Riley handed Crawford a list of doctors preferred by NNI. He warned that if she missed work she would lose her job.

104.    That same day, Crawford visited the NNI preferred physician and was prescribed sedatives and pain medications. She was placed on restricted work duties and not allowed to drive or operate machinery. Crawford returned to work groggy and in pain. She requested Riley's permission to go home. Unlike Caucasian workers who were able to take time off when injured, Crawford was not able to go home. Riley threatened that she would lose her job if she missed work. He assigned her to read paperwork. When Crawford would nod off because of the strong sedatives, Riley would kick her chair to wake her up.

105.    Crawford continued to work on a restricted schedule throughout November and December 2011. Riley assigned Crawford to sit in the tool room and hand out tools.  Robert Talley, the Superintendent, observed Crawford sitting and working. Within thirty minutes of Talley seeing her, Wayne Jackson, the general foreman, came over and reassigned her to a different task. He said, "you take this paintbrush and sweep out the side of the building." Plaintiff protested that she couldn't bend over because of her injury. He responded, "take a barrel and sit on it or whatever." Crawford felt humiliated. She said, "you wouldn't have anybody else doing that," Jackson responded that "I'm just trying to keep your job."

### *Disparate Pay*

106.    Plaintiff was hired at a wage rate considerably lower than the wage rate at which Caucasian employees with similar skills and experience were hired. The disparity between her rate of pay and the rate of pay of Caucasian employees with similar skills and experience

24

widened over time as Caucasian workers were given raises and promoted. Ultimately, she was paid $3/hour to $6/hour less than Caucasian employees with similar skill and experience.

107.    Plaintiff was hired at a wage rate of $21/hour with 26 years of welding experience. Her rate of pay at hire was lower than the starting rate of Caucasian employees she trained. For example, "John" was hired at a rate of pay of $22/hour with little experience working in the trades.  Crawford was assigned to teach him welding skills.

108.    By her third month of employment, Crawford was making $24/hour, the rate she was paid until the end of her employment. Caucasian employees with less skill and experience made between $3/hour to $6/hour more than she did. For example, "Josh," a welder with 6 to 7 years of experience, made approximately $28/hour. "Evan," an unskilled grinder, also made approximately $27/hour.

109.    Over the course of Crawford's employment, she was given significant responsibility. She was asked to train four to five Caucasian welders to weld. She was praised by her supervisor and the Vice President on her work product.

110.    Despite positive reviews of her work, plaintiff was compensated at a considerably lower rate than Caucasian employees with similar skills and experience. In fact, at her prior job at Newport News Shipbuilding she was compensated at $28.50/hour.

111.    Crawford routinely asked Riley for raises.  After her initial raise, from $21/hour to $24/hour, Riley ignored her requests.

### *Disparate Promotion*

112.    Plaintiff Crawford was hired as a first class welder with 26 years of experience. Her skill and expertise at welding earned her the additional responsibility of training four to five entry level welders.

113.    Crawford was not additionally compensated for her supervisory role.

114.    She was not given the title of supervisor or step up supervisor.

115.    In the beginning of 2011, Joanne, a Superintendent complimented Crawford's work. She said, "you'd make a good supervisor, have you ever thought about doing that." Riley responded, "if they make you a supervisor, I quit." His comment exemplified the entrenched bias towards African-Americans.

116.    In 2011, a 23-year old employee with no prior experience in the trades, Daniel Cummings, was promoted to make-up supervisor. Cummings had started working as a welder in approximately November 2010. Within 4 to 6 months of working, Cummings was promoted above Crawford. Crawford had trained Cummings to weld.

117.    Cummings position was not posted or advertised. Cummings was preselected for the position. Crawford found out about the position opening when Cummings was promoted into it.

118.    Crawford would have applied to the position of step-up supervisor had she known about it.

119.    Crawford did not see postings of job openings at the Swiss Log throughout the time she was employed. Crawford was qualified for a supervisory positions and would have applied for the position had she known about them.

### *Retaliation*

120.    In November 2011, Plaintiff Crawford complained to Vice President Steve Napiecek about the Jeff Riley and Wayne Jackson's racist statements. She also complained about NNI's failure to accommodate her injury.  After her complaint, Jeff Riley, her supervisor began treating her even more harshly. Within two months of her complaint, Crawford was terminated.

In addition to terminating her, NNI gave a negative reference to prospective employers, making it more difficult for her to obtain another job.

## WILLIE KERSHAW

### *Racially Hostile Work Environment*

121.    Willie Kershaw is an African-American male. He was employed by NNI from April 2010 to December 2011. Kershaw was hired as a laborer. Within three months of hire, Kershaw acquired his welding certificate. His job duties as a laborer included, assisting welders, assisting fitters, grinding welds, cleaning welds, organizing work areas, painting, and cleaning. After attending welding school and getting additional training, Kershaw was assigned to a limited number of welding projects.

122.    Initially Kershaw reported to Jeff Riley. Riley, Kershaw's other supervisors, and coworkers engaged in frequent racist remarks, racist offensive jokes and racist offensive conduct. By way of example, supervisors and coworkers called Kershaw, among other racial epithets, "boy."

123.    Another example of the type of remarks Kershaw heard frequently was that all African-Americans "looked alike."

124.    For example, one coworker who was responsible for dropping gas off at NNI joked to Kershaw, "what's a black guy on a bicycle? Someone who stole a Caucasian guy's bicycle." The same coworker exclaimed, "look at him, he's turning Caucasian!" Kershaw was offended by the coworker's jokes and asked him, "are you racist or something?"

125.    Another example of the type of offensive comment he heard frequently was when Kershaw overheard a Caucasian coworker describing how his father often uses the N-word. He

was defending his father. The coworker also admitted that when he has road rage he uses the N-word, and remarked that this was not offensive behavior.

126.    Instead of prohibiting coworkers from making racially harassing remarks, Supervisor Jeff Riley encouraged the offensive behavior.  For example, in or around October or November 2010, Kershaw's coworker asked, "why does a black guy always hold his crotch like this?" Kershaw responded, "I don't even want to know." Riley spoke up and said, "Well tell me, I want to know!"

127.    On another occasion, Riley commented to Kershaw that JJ, a Caucasian worker, was a poor excuse for a Caucasian man.

128.    In addition to his offensive remarks, Jeff Riley mocked what he believed were stereotypical African-American mannerisms. On a daily basis, Riley walked around holding his crotch, walking with a slouch, trying to act like a rapper.

129.    Whenever Riley made offensive remarks, Kershaw complained to Riley about the remarks. Riley, however, ignored Kershaw's complaints, and continued to make racist remarks and engage in racist behavior.

130.    Kershaw was transferred to Jaffeux's supervision. Under Jaffeux's supervision, Kershaw was assigned to work in multiple locations, including the Swiss Log and outside the main building. His job duties included grinding welds and cleaning up after welders.

131.    Within the first three weeks of working under Jaffeux, Kershaw was subjected to racially offensive remarks. Jaffeux was speaking with three NNI employees and exclaimed, "he has him a Caucasian bitch," indicating a newly hired employee, Cummings, then turning to Kershaw, saying, "and now he needs him a black bitch." Kershaw responded, "don't look at me." Jaffeux's statement was typical of the remarks he directed at Kershaw.

28

132.    When Kershaw attempted to converse with his African-American coworkers, Jaffeux would get upset and tell Kershaw to get back to work. Caucasian employees were able to openly converse with one another.

133.    Even though Kershaw was a certified welder, Jaffeux routinely assigned Kershaw to menial work. The job assignments given to him by Jaffeux made Kershaw believe that he had been *de facto* demoted.

134.    In or around August 2011, after Jaffeux ignored his complaints about his work assignments, Kershaw complained to Richard Tally, Superintendent.

135.    Following his complaint to Tally, Kershaw was transferred to work under Wayne Jackson. Wayne Jackson was the supervisor NNI used to fire African-American employees.

136.    Jackson constantly supervised Kershaw. When Kershaw would use the bathroom, Jackson would follow him into the restroom to check if Kershaw was in fact going to the bathroom. Jackson's treatment of Kershaw was typical of the harassing treatment African-Americans were subjected to by Jackson.

137.    Around October 2011, Kershaw saw a Caucasian worker wearing a t-shirt with the caption "Redneck fishing." Pictured on the t-shirt was a Caucasian man holding a black man by his feet. The black man's head was underwater. He had goggles on and was holding a flashlight. Kershaw was deeply offended by the t-shirt. His coworkers, including Ron Valentine, had seen the employee wear the t-shirt on multiple occasions. Kershaw complained to a Human Resources representative about the t-shirt, however, he continued to see the employee wearing it.

138.    Between April 2010 to January 2011, Kershaw was employed on the "pin jig" project. Workers on the "pin jig" project were overwhelmingly African-American. The "pin jig" project was also referred to by workers at NNI as "junk work" or "garbage work," the

29

designations reflecting the inferior status of the work. The project was considered less desirable work because it was more physically demanding than other work and subjected workers to harsh weather conditions.

139.    Throughout the time Kershaw was employed at NNI, his breaks were monitored. If he was seen speaking to an African-American employee he was told to get back to work. Caucasian workers at NNI were able to take breaks at their leisure, they were able to talk to one another, and were not under constant scrutiny.

140.    The workers on the "pin jig" project were praised for their efficiency. After it was completed, NNI posted a sign indicating that the workers had finished the project early. In spite of this, the overwhelming majority of the African-American workers on the project were terminated.

### *Racially Disparate Pay*

141.    Kershaw was paid less than Caucasian workers with similar skill and training.

142.    Kershaw was hired at a rate of $13/hour. He had prior work experience as a laborer and was training to be a welder. Caucasian laborers with less experience were hired at a higher wage rate than Kershaw.  For example, "John," also a laborer, was hired at a rate of $22/hour.

143.    At hiring, Kershaw was told that he would be given an evaluation at intervals of 30 days, over four months, and a raise would be given at each evaluation until his final wage rate was attained. Kershaw received his first evaluation and raise within thirty days. His wage rate was increased by $1/hour. Kershaw's second evaluation was delayed by four months and was given in September 2011. Kershaw was given a raise of $3/hour at his second evaluation. All subsequent evaluations and raises were omitted.

144.   Because of the delay in Kershaw's second evaluation and the omission of his last two evaluations, the gap between his wage rate and the wage rate of Caucasian employees of similar skill and experience widened.

145.   By July 2011, Kershaw had completed welding school, had obtained a welding certificate and had been assisting welders on the job. He was not given a raise or promotion for his increased skill.

146.   After his initial year at NNI, Kershaw was no longer chosen for off-site work assignments. Off-site work paid a higher wage rate and had a daily allowance for expenses. Caucasian workers who had less experience than Kershaw were preferred over Kershaw for off-site work. Kershaw had taken and passed a week-long valve tech training course required for off-site assignments at nuclear facilities. "Josh," a Caucasian coworker, who had failed the training course exam, was preferred over Kershaw for out of town nuclear facility assignments. Kershaw's treatment by NNI was typical of other African-Americans who were unlikely to be chosen for off-site assignments.

### Disparate Training and Promotion

147.   Kershaw routinely asked for training opportunities and job openings for a welder position. His requests were routinely denied.

148.   Kershaw was told that he would be able to qualify for welding training at NNI if he obtained a welding certificate. After he obtained the certificate he was denied training through NNI. Other Caucasian laborers were given welding training through NNI without welding certificates. Cummings and "John," two Caucasian workers, were assigned to be trained by Jamesina Crawford to weld. When Crawford asked to train Kershaw, Riley responded, "he has other things to do, you just need to shut your mouth." NNI's preference of Caucasian workers for

31

placement in training programs over Kershaw was typical of its treatment of African-Americans. The additional requirements placed on Kershaw relative to Caucasian employees to obtain training through NNI were also typical of NNI's treatment of African-Americans.

149.    In less than a year after being hired as a laborer, Cummings became a step-up supervisor for Jaffeux, supervising fitters. Cummings' position of step-up supervisor was not posted or advertised. NNI's failure to post or advertise open positions and the pre-selection of Caucasian employees for openings was typical of NNI's treatment of African-Americans.

150.    Around August 2011, when Kershaw was working under Jaffeux, he was no longer getting challenging work relative to Caucasian coworkers, such as "John" and Cummings. He complained to Jaffeux about the menial jobs he was being given relative to Caucasian workers. When Jaffeux was unresponsive to his complaint, he complained to Superintendent Richard Tally.  NNI's management was unresponsive to his complaints and retaliated against him.

151.    Kershaw was given menial work assignments by Jaffeux compared with his Caucasian coworkers with similar skills and work experience. He was no longer able to drive forklifts. Though he had a welding certificate, and had been welding under Riley's supervision, he was relegated to sweeping, cleaning and grinding welds.

### *Retaliation*

152.    Around August 2011, when Kershaw complained to Jaffeux and Tally about the quality of his work assignments he was transferred to Wayne Jackson's supervision. Jackson harshly scrutinized Kershaw's work. He followed Kershaw around while he worked. He followed Kershaw to the bathroom to see if he was actually using it. Caucasian workers under

Jackson's supervision were not scrutinized in the manner that African-American employees were.

153.    In November 2011, Kershaw complained to Human Resources about the racist tee shirt.

154.    In or around December 2011, NNI terminated Kershaw. Wayne Jackson explained that he was fired for leaving slag on his weld. Slag is waste material separated from metal during the welding process. Kershaw indicated that he was not finished with the project, but Jackson ignored his explanation. Plaintiffs are unaware of any Caucasian worker or any worker who has not engaged in protected activity who has been fired for leaving slag on his weld.

155.    Subsequently, Kershaw met with Richard Tally. Kershaw pleaded with Tally to give him his job back. Tally responded, "you think about that next time you're in a disagreement with your supervisor."

156.    The reason given for Kershaw's firing was pretextual. Kershaw was in fact fired for complaining about discrimination against African-Americans.

## RON VALENTINE

### *Racially Hostile Work Environment*

157.    Ron Valentine is currently employed at NNI as a first class welder.  He began working at NNI in November 2009. He has over 30 years of experience welding.

158.    Tom Hines was Valentine's primary supervisor when Valentine began working at NNI in November 2009.  Hines harassed Valentine on a daily basis. He unjustifiably threatened Valentine's job. When Valentine asked to be switched to an indoor assignment from the "pin jig" project because of frigid temperatures, Hines remarked, "I didn't hire you to work in here." Hines made demeaning remarks to African-American employees at morning meetings. When

workers were given break time, Hines would run up to African-American employees to ask, "Why aren't you working."

159.    Wayne Jackson supervised Valentine intermittently within the first three months of Valentine's employment at NNI. Jackson harassed Valentine on a daily basis because of his race. Jackson scrutinized Valentine's work. He timed Valentine's bathroom breaks. If Valentine was in the bathroom for too long, he followed him inside and told him to get back to work.  Jackson did not treat Valentine's Caucasian coworkers in the same manner as he treated African-Americans.

160.    Encouraged by Jackson's discriminatory treatment, Valentine's coworkers also engaged in racial harassment. Tom Castle made racial remarks on a daily basis to Valentine. For example, Castle remarked, "what's the difference between a dog in the street and a black man in the street? Skid marks in front of the dog." Castle's remarks were overheard by supervisors and other NNI employees, including Keith Chisholm,  Don Pierce, and Foreman Jeff Riley. Jeff Riley laughed at Castle's racist statements.

161.    In or around March 2010, Valentine complained to Thomas Jaffeux about Tom Castle's racial remarks.  Castle continued to make racially offensive statements even after Valentine's complaint.  Other employees, including Keith Chisholm and Don Pierce, also complained about Castle's racial comments. Castle was not prohibited from making racist remarks even after the employees' complaints and continued to make them until he left with an injury in 2011.

162.    Jeff Riley acted in a racially offensive manner on a daily basis when he supervised Valentine.  He mocked African-American mannerisms. He would make a fist and say, "what's up brother." He would grab his genitals as he walked. Valentine and other African-American workers were offended by Riley's conduct.  African-American employees complained to Riley

34

saying, "why are you acting like you're black." Foreman Wayne Jackson, and Tommy Hines, a make-up supervisor, laughed at Jeff Riley's behavior. Riley continued acting in a racially offensive manner even after employees' complaints.

163.    Riley made derogatory statements to Valentine about Frantz Edouard's dreadlocks, saying, "why do black people wear dreads." When he was handing out job assignments to African-American workers and mistakenly switched assignments between African-American workers, he would remark, "y'all look alike." If he saw African-American workers talking to one another, he would say, "hey, hey, hey, I'm going to fire both a ya'll." Caucasian workers were not treated in the same manner by Riley.

164.    In or around February or March 2011, Valentine was working outside the main building and had already received his work instructions from his supervisor, Jeff Riley. Wayne Jackson, knowing that Jeff Riley had already instructed Valentine, repeated to Valentine that he needed to wear his safety goggles. Valentine indicated to Jackson that he should speak with Riley. In response, Jackson exclaimed, "why are you acting like a gang member?" Shocked by Jackson's racist remark, Valentine asked, "what did you just say to me?" Riley pulled Valentine away, stating that Valentine would be fired for questioning Jackson.

165.    That same day, Valentine complained to Superintendent Richard Tally that Jackson was making offensive racial statements and had called him a gang member. Tally defended Jackson by saying, "Wayne was doing what he was told to do." Jackson was not reprimanded for his statement.

166.    Typical of the comments he heard daily, on another occasion, on or around February 2012, Valentine and two African-American employees were speaking with "Lewis," a coworker, about a job assignment. Tally walked by and told "Lewis" to close the door. He

exclaimed, "you have enough people here to keep you warm," nodding to the African-American employees.  Valentine understood the comment to refer to the southern myth that African-Americans draw heat.

167.    On May 16, 2012, Valentine's make-up supervisors, Steve Sheg and Wayne Jackson, attempted to unjustifiably terminate Valentine. Sheg was substituting as Valentine's supervisor. Fifteen minutes before the end of Valentine's shift, Sheg asked Valentine if he would be finished with his welding assignment by the end of the shift. Valentine responded that he would not. Subsequently, Jackson approached Valentine saying that NNI no longer had work for him. When Valentine contacted his supervisor Kevin Angle, Angle was confused.  Angle contacted Joanne, a superintendent, and had Valentine transferred to Jaffeux's supervision. The make-up supervisors' impulsive attempt at firing Valentine and their disregard for the significant consequences of their actions exemplifies the callous disregard with which NNI treats its African-American workers.

168.    Again, on or around December 2013, Valentine was told by Richard Tally, a superintendent, that he would be laid off in two days. One day before he was to be laid off, Valentine was told that the company had changed its mind.

169.    On a daily basis, continuing to the present time, Valentine sees NNI employees wear confederate flags on their caps, shirts, and headbands. Tommy Hines, a make-up supervisor, displays a confederate flag on his front license plate and on his back window. These racially offensive symbols are clearly visible to NNI supervisors.

170.    At least once a week until 2012, Valentine saw "Benny" wear a t-shirt with the caption "redneck fish finder."  Pictured on the shirt was a Caucasian man on a boat holding a African-American man underwater by his feet.  The black man had a flashlight and was looking

for fish.  Even after Kershaw had complained about it, Valentine saw "Benny" wear the t-shirt four or five more times. "Benny" was not reprimanded for wearing the racially offensive t-shirt at NNI.

171.    Valentine complained on multiple occasions to his supervisors about the hostile work environment at NNI. In spite of his complaints, NNI continued to treat its employees in a racially offensive manner.

172.    Ron Valentine was employed on the "pin jig" project for over a year, beginning on or about December 2009. Approximately 90% of those employed on the "pin jig" project were African-American.  Caucasian workers who were employed on the project either were new employees who were rotated out of the project within a week or were employees who had requested overtime hours.  The "pin jig" project was less desirable work because  it was dirtier and more physically demanding.  The project was exposed to the outside temperatures and workers were required to work in very hot temperatures in the summer, freezing temperatures in the winter, and wet conditions when it was raining.

173.    If Valentine or his African-American coworkers try to take a short break they are told to get back to work. For example, on February 3, 2012, at a safety meeting, Tommy Hines stated that Robert Tally had discovered two employees talking to one another. He warned that if employees were found talking to one another they would be fired. Valentine pointed out that Caucasian employees gathered and smoked all day long without reprimand. Hines did not respond to Valentine's complaint.  Even after Valentine's complaint, Caucasian employees continued to gather and smoke without reprimand.

174.    Caucasian employees are not always required to visit a doctor or take drug tests when they have accidents, while African-Americans are.  On January 2012, Ricky Penrod fell

37

down at the Swiss Log. He was not required to take a drug test or visit the doctor. In contrast, when Ron Valentine was injured, he was required to visit the doctor and take a drug test.

175.    Supervisors took machinery Valentine was using; they would not treat Caucasians in a similar manner. For example, on April 9, 2012, "Dan," a supervisor, asked Valentine if he was using a sucking machine. Valentine responded that he was;  Valentine had been using the same sucking machine for over three months. When Valentine was away from his work station, Dan had Willie Kershaw take Valentine's sucking machine. Valentine was required to find an alternate ventilation source before he could continue his work. Protocol at NNI was to borrow another workers' equipment only if the worker indicated that he was not using the machine.

### *Racially Disparate Pay*

176.    Ron Valentine was offered $18/hour at hiring. He was able to negotiate his salary to $22/hour.  Valentine was hired at a considerably lower wage rate than Caucasian employees of similar skill and experience. He had over 30 years of experience as a welder and was paid at the same rate as Caucasian laborers such as "John" who had no experience working in the trades at hire.  A Caucasian welder with approximately 20 years of experience at NNI, "Josh," was hired at a wage rate of $28/hour.

177.    After hire, Valentine was told that he would receive evaluations every month for four months and would be given raises at each evaluation to reach his final wage rate. In spite of his excellent work, Valentine did not receive any raises in his first four months of work.

178.    Valentine received smaller and less frequent raises than his Caucasian coworkers. Valentine received yearly raises of $0.50/hour to $1.00/hour  to reach his current wage rate of $25.50/hour.  Valentine continues to make considerably less than Caucasian employees with similar skill and experience even after working for approximately five years at NNI.

179.    When the pin jig project was underway, Valentine and his coworkers were able to obtain overtime opportunities on that project but were passed over for others. Caucasian employees, in contrast, were able to obtain overtime work on the "pin jig" project and given preference for overtime work on other projects at NNI.

180.    After the pin jig project was completed, in or around February 2011, Caucasian employees are given preference over African-American employees in overtime opportunities.

181.    Every eleven months of work, Valentine is required to sit out one month because he is a "temporary" employee.   Caucasian employees who were hired on a contract or "temporary" basis are required to sit out less time than Valentine.

### *Racially Disparate Promotion and Training*

182.    Ron Valentine is among the most experienced welders at NNI.  He has not been given any promotion opportunities or training opportunities since he was hired.

183.    Valentine would have applied for promotion opportunities had he been made aware of job openings. NNI routinely fails to post or advertise job openings for permanent positions.   NNI preselects employees to promote to permanent positions, almost always Caucasians.

184.    Over the past five years that Valentine has been working for NNI, he has not seen any African-American employee promoted into a higher position than the position at which the employee was hired. Caucasian employees with less skill and experience than Ron Valentine and other African-American employees are routinely selected for promotion by NNI.

185.    For example, Daniel Cummings, a Caucasian employee, was hired by NNI in 2010. He had been working at Burger King prior to coming to NNI. He had no prior experience in the trades. He began as a laborer at NNI. Within two years, he was promoted to a step-up

supervisor position where he supervised African-American employees with greater skill and experience. The opening for a step-up supervisor was not advertised or posted.

186.    "Penny," a Caucasian employee, was hired with 6 to 8 years of experience as a structural welder. She was promoted to night shift supervisor. The opening was not advertised or posted.

187.    Jaffeux's son was hired by NNI in 2011. He had no experience in the trades. Within two years he became a welding inspector. The opening was not advertised or posted.

188.    Ron Valentine has not been chosen for training opportunities likely to increase his odds of promotion. Supervisors routinely select Caucasian employees for training opportunities leading to promotion. Cummings was selected for multiple training opportunities at NNI that resulted in his promotion to step up supervisor.

189.    Jaffeux's son was selected for multiple training opportunities at NNI that resulted in his promotion to welding inspector.

## MARK BARNETT

### *Racially Hostile Work Environment*

190.    Mark Barnett was employed at NNI as a first class welder from November 2009 to February 2011. Barnett had over 20 years of work experience and was among the most experienced welders at NNI.

191.    Barnett was subjected to a racially hostile work environment by his supervisors and coworkers.

192.    Tom Hines harassed Barnett on a daily basis. He constantly threatened Barnett's job. Barnett was harassed if he took a break during work. Even when Barnett was permitted to take a break, Hines would approach him and ask, "why aren't you working?" He disparaged the

work of African-American welders.  On one occasion, Hines pulled Ron Valentine and Barnett aside and said, "you guys are good welders, and I have no problem with your work, but some of these other guys want to follow you but they are not capable of doing that type of work." It was clear to Barnett that Hines was finding fault with the work of African-American coworkers. Barnett's Caucasian coworkers were not treated in the same manner by Hines.

193.    Jeff Riley subjected Barnett to racial harassment on a daily basis.  Riley would make racially offensive jokes multiple times per week. Riley regularly imitated African-American employees and mocked their mannerisms. He frequently referred to Barnett, and his African-American coworkers as "you people" or "y'all." For example,  Riley would ask Barnett questions like, "why are y'all people always lazy after you eat," "why do you people dress like that," and "why do you people drink."   If an African-American worker was late to a meeting, Riley would say, "why all black people can't ever be on time, why're y'all always late."

194.    In the mornings and at meetings, Riley regularly made derogatory remarks about Frantz Edouard, Barnett's coworker, in Barnett's presence. He would ask Edouard, "what is that you got on your head, that kinky long dready stuff?" Riley would also demean Edouard's Haitian heritage, saying, "Haitian, we gotta watch out for yall, them Haitian people."  If Edouard was late to a meeting, he would say, "ah, look at this Haitian! Here he come, here he is? Oh you been drinking that wine?"

195.    Riley also made derogatory sexual remarks about African-American women in Barnett's presence.  When "Nicole," a young African-American female, would walk by he would say, "oh look what she got on, she showing it eh, mmm."  He would comment about her body and her clothes.  Riley did not treat Caucasian women in the same manner.

196.    Barnett complained to Riley about his racially offensive remarks.  He said, "you need to watch your mouth, some of that stuff you say." Riley responded dismissively. Barnett reiterated, "some of the stuff you say could be directed at me too, you do know that. That type of stuff is offensive to people."   Riley continued to treat African-Americans in a derogatory manner and continued to make derogatory remarks about African-Americans (including Barnett), in Barnett's presence.

197.    Wayne Jackson subjected Barnett and his African-American coworkers' work to greater scrutiny than Caucasian workers. He timed Barnett and his African-American coworkers' bathroom breaks.   He closely monitored Barnett and his African-American coworkers' movements, routinely asking them where they were going.

198.    In or around October 2010, Barnett complained to Kevin Angle about Jackson's treatment.  Angle responded, "I'm glad you told me." Even after Barnett's complaint, Jackson's offensive treatment of African-American employees continued.

199.    Caucasian employees at NNI wore confederate flag doo-rags, and affixed stickers of the confederate flag to their toolboxes. The offensive symbols were conspicuously displayed in open view of supervisors.

200.    For approximately one year from on or about December 2009, Barnett was assigned to the "pin jig" project.  Workers assigned to the "pin jig" project were not able to get overtime work inside the main building or Swiss Log. Conversely, Caucasian workers assigned work in the main building and Swiss Log were able to obtain overtime work on the "pin jig" project.   Approximately, 85% of the workers assigned to work in the main building were Caucasian. The main building was a preferable location to work because it was indoors and had a coffee room.

201.    Sometime around the early part of 2011, Barnett learned that the main building had a coffee room. Prior to work, around 6 A.M., he and his African-American coworkers on the "pin jig" project began getting coffee from the coffee room. Within days of Barnett's using the coffee room, the coffee pot in the main building was moved. African-American workers were told that they could not have coffee in the morning. Caucasian employees continued to get coffee from the main building.

202.    Throughout Barnett's employment at NNI, he was frequently assigned arc welding work. Arc welding is the process of fusing two metals together with heat. The process is dangerous because it produces carbon monoxide as a by-product. African-American welders were required to do much more arc welding work than Caucasians. On one occasion, Riley remarked to Barnett, "Tommy Hines told me you're the arc man." Barnett responded, "No, I'm a welder."

203.    Barnett complained to Riley that he was routinely assigned to arc welding work. Even after Barnett's complaint, African-American workers were overwhelmingly used for arc welding work.

204.    Throughout Barnett's employment at NNI, Caucasian workers were allowed to take lengthy breaks. They were allowed to sit in groups and talk. African-American workers were reprimanded if they took breaks. They were not allowed to talk to one another or sit in groups.

205.    After the "pin jig" project ended, Barnett and his African-American coworkers were told that NNI had no work for them. Whites, with the exception of a few who were disliked, continued to have employment at NNI. Barnett was terminated because of his race, African-American.

### Racially Disparate Pay

206.    Barnett had over 20 years of welding experience when he was hired by NNI. He had graduated from high school and attended welding school. Barnett was offered $18/hour at hire. He was able to negotiate the rate to $22/hour.

207.    Barnett was hired at a starting rate equal to or less than the starting rate of Caucasian welders with less skill and experience. For example, "John" a Caucasian welder, was hired at a starting rate of $22/hour with no prior experience in welding.

208.    After hire, Barnett was told that he would receive evaluations every month for four months and raises at each evaluation to reach his final wage rate. Despite receiving positive evaluations, Barnett received no raises over the first four months of his employment.

209.    In fact, Barnett received only one raise of $1.50 over the entire time he was at NNI. Caucasian workers with less skill and experience made between $3/hour to $5/hour more than Barnett.

210.    Every eleven months of work, Barnett was required to sit out one month because he was a contract employee. Caucasian employees who were hired on a contract basis were required to sit out less time than Barnett.

### Racially Disparate Training and Promotion

211.    Barnett was among the most experienced welders at NNI. He was not given any promotion or training opportunities while at NNI.

212.    NNI routinely failed to post or advertise openings for permanent positions. Had he been aware of a job opening for a permanent position at NNI, Barnett would have applied to the position. NNI preselects Caucasian employees to promote to permanent positions.

44

213.    For example, Daniel Cummings began working at NNI in 2009 with no experience in the trades. Within six months of being hired, he was working as a step-up supervisor. Within two years he was a permanent employee at NNI. The step-up supervisor position and the permanent employee position were not advertised.

214.    NNI failed to select Barnett for training opportunities available to Caucasians.

### FRANTZ EDOUARD

#### *Racially Hostile Work Environment*

215.    Frantz Edouard is an African-American structural welder. He was employed by NNI from July 2010 to January 2011. At the time of hire, Edouard had approximately 7 years of experience as a welder.

216.    Edouard was subjected to a racially hostile work environment by his supervisors and coworkers.

217.    Jeff Riley primarily supervised Edouard while he was employed at NNI. Riley frequently directed racially offensive remarks at Edouard. He made derogatory comments about Edouard's hair and his Haitian heritage, and mocked African-American behaviors.  For example, Riley stated that Edouard's hair reminded him of rile worms. He said, "You need to cut them worms out of your head."  Ron Valentine, Mark Barnett and other workers overheard Riley's offensive remarks about Edouard's hair. Riley also harassed Edouard about his Haitian heritage. He would remark, "that's some Haiti shit!" When Edouard was late for a meeting, Riley commented to everyone at the meeting, "ah, look at this Haitian! Here he come, here he is. Oh you been drinking that wine."  Riley's racist remarks were made in the presence of supervisors and employees, including but not limited to Wayne Jackson, a superintendent, Ron Valentine, a

coworker, Mark Barnett, a coworker, Keith Chisholm, a coworker, and Willie Kershaw, a coworker.

218.    Riley also mocked African-American mannerisms. He walked with a swagger, grabbing his crotch. He would say to Edouard and his coworkers, "why y'all think you're thugs." Edouard was offended by Riley's statements and conduct.

219.    Edouard was assigned to work at the Swiss Log. Tom Jaffeux supervised Edouard at the Swiss Log. Jaffeux also subjected Edouard to racist behavior. For example, Jaffeux would greet Edouard by raising a fist and saying "hey brother." Edouard was offended by Jaffeux's conduct.

220.    In or around December 2010, Edouard went to work over the weekend. He was assigned to work inside the main building to weld small parts. Wayne Jackson was also working that day. He saw Edouard and began following him.  Jackson paced back and forth around Edouard's work station. When Edouard left his work station to see if welders outside the main building needed help, Wayne Jackson followed him. Unexpectedly, Jackson began yelling at Edouard, asking Edouard why he wasn't working.   Before Edouard could say anything, Jackson ordered Edouard to go home.

221.    Edouard complained to Riley about Wayne Jackson's strange behavior and that he was unreasonably sent home. Riley responded that Edouard should "let it go." Jackson suffered no consequences for harassing Edouard and sending him home with no justification.

222.    Edouard was offended because NNI employees openly wore confederate flags on their caps, shirts, and cars.

223.    When Edouard was hired he was assigned to work outside the main building on the "pin jig" project.  African-American workers constituted 90% of the workforce assigned to

46

work on the "pin jig" project. Workers on the "pin jig" were required to work through rain, sleet, and snow. Of his 15 coworkers at the "pin jig," Edouard recalls only two Caucasian workers. The two Caucasian workers were disfavored by management and assigned to the "pin jig" because of their association with African-American employees. For instance, Jeff Riley referred to "JJ," a Caucasian employee stationed on the "pin jig," as a poor excuse for a Caucasian man. Other Caucasian workers were only temporarily stationed at the "pin jig" and were rotated out within a week.

224.    At 6 A.M., it was common for Caucasian employees to gather at the main building to get coffee. When Edouard and his African-American coworkers attempted to get coffee at 6 A.M. they were reprimanded. Riley, their supervisor, and Wayne Jackson, the general foreman, would say, "There are no breaks at the shipyard, get back to work, can't be hanging out." Caucasian employees openly conversed and drank their coffee without reprimand. Eventually, supervisors shifted the coffee pot to a trailer outside the main building, away from the Swiss Log. African-American workers were prohibited from getting coffee from the trailer. Caucasian workers continued to be able to get coffee.

225.    Caucasian employees were also allowed to take smoke breaks, longer lunch breaks and breaks to talk to coworkers. While Edouard was at the Swiss Log, he routinely saw 8 to 10 Caucasian welders taking smoking breaks and coffee breaks while supervisors were present. Edouard and his African-American coworkers were reprimanded anytime they were seen taking breaks.

226.    In January 2011, when the "pin jig" project ended, Edouard was told that there was no more work for him or his African-American coworkers at NNI. Edouard was terminated because of his race, African-American.

### *Racially Disparate Pay*

227.    Edouard was hired at a wage rate of $18.00/hour. He had 7 years of welding experience, including four years of military training in welding and two years of welding school. He underwent two weeks of rigorous testing administered by NNI prior to being hired.

228.    After being hired, Edouard was told that he would receive evaluations every month for four months and would be given raises at each evaluation to reach a maximum of $27.50/hour.

229.    Edouard was given a raise of $1.50/hour at his first evaluation on or about September 2010. At his second evaluation, on or about October 2010, he was given a raise of $2.00/hour.

230.    Edouard was not given a raise at his third evaluation, on or about November 2010. Riley explained that this was because Edouard was getting coffee in the morning.   Edouard asked Riley what he could do to ensure that he would get a raise at his next evaluation. Riley responded, "work even harder." He was told this even though he was more productive than his Caucasian coworkers and took fewer breaks than his Caucasian coworkers.

231.    At his fourth evaluation, on or about December 2010, Edouard was given a raise of $.0.50/hour. His final rate of pay was $22/hour.

232.    Edouard's rate of pay was between $3/hour to $4/hour less than "Josh's," a Caucasian coworker Edouard worked alongside. "Josh" regularly took breaks from work and was less productive than Edouard. Additionally, the quality of "Josh's" work was poorer than Edouard's.

### *Racially Disparate Training and Promotion*

233.    Edouard was hired as a welder. He regularly asked Riley for further training opportunities. Caucasian employees were regularly offered training opportunities over African-American employees.

234.    For example, Daniel Cummings was given numerous training opportunities at NNI. Edouard was not given similar opportunities. In fact, Edouard was asked to teach welding skills to Cummings. Cummings and other Caucasian employees were also trained by Jamesina Crawford to weld.

235.    Edouard regularly asked Riley for promotion opportunities.

236.    Caucasian employees were regularly given promotion opportunities not available to African-American employees. For example, in or around January 2011, Daniel Cummings, a laborer with less experience than Edouard, was promoted to make-up supervisor. Cummings position was not advertised prior to his promotion. Edouard did not know of the position opening prior to Cummings' promotion.

## **REGGIE HOLLIMAN**

### *Hostile Work Environment*

237.    Reggie Holliman was employed as a first class fitter at NNI from February 2010 to September 2011. He has a two year degree in applied sciences and, at the time, had 7 to 8 years of experience as a fitter.

238.    His job duties at NNI included reading blue prints, cutting metal, welding metal and fitting together large pieces of metal to build parts for ships, power plants, military facilities and industrial facilities.

239.    Holliman was subjected to a racially hostile work environment throughout his employment at NNI. Jaffeux directed racially offensive remarks at Holliman approximately three times a week. He would address Holliman and his African-American coworkers as "y'all people." At morning safety meetings with fitters, Jaffeux would be friendly with Caucasian workers and disdainful of African-American workers. He would threaten Holliman and his African-American coworkers by saying, "I'm going to get rid of someone." If African-American employees were smoking, he'd say, "y'all people gots to stop smoking," ignoring the Caucasian employees smoking.  Whenever Holliman and his African-American coworkers took a short break, Jaffeux would say, "y'all get back to work." The disparate treatment was so obvious that Tom Castle, a Caucasian coworker, commented to Holliman about the supervisors' treatment of African-Americans, saying "I don't think the guys like ya'll people."

240.    Other workers, encouraged by the supervisors' derogatory comments and harsh treatment also made offensive racial jokes. For example, Castle also frequently made racially offensive remarks in the presence of Jaffeux.  On multiple occasions, he joked, "Caucasian, black, Chinese, and a police car, who ran? Wasn't the Caucasian because he followed rules, Chinese thinks first, Black man's always running."  Workers in positions of authority, such as "Jerry," a Caucasian lead fitter, would laugh at Castle's joke. Castle's jokes deeply offended Holliman.

241.    Jeff Riley also supervised Holliman. He made racially offensive remarks to Holliman on a daily basis. He made derogatory comments about African-American women, he mocked African-American mannerisms, and used racial epithets. He walked in an exaggerated manner that reminded Holliman of a pimp stroll. He used exaggerated hand gestures. He addressed African-American employees by saying "what's up my brothers," but not Caucasian

employees. He remarked to Holliman, "yall not educated enough." He would greet Holliman with, "what's up my nig," or "my n\*gger." He would say, "your women have the best fat asses," recounting occasions when he had sex with African-American women.

242.    Wayne Jackson, a superintendent, made racist remarks which offended Holliman. For example, he said to "Josh," a Caucasian coworker of Holliman's, "you're not going to let a black woman out-weld you."

243.    Under Jaffeux's supervision, Holliman was given menial work assignments. In spite of his years of experience as a fitter, he was asked to sweep the floor, take foundations across the street to be shipped, and drive a forklift. Caucasian fitters of similar or lesser skill were given job assignments suitable to their skill and experience.

244.    At morning safety meetings, Holliman and his African-American coworkers were briefed after Caucasian workers. Caucasian workers were already stationed at their assigned areas when African-American workers were briefed. This guaranteed that the Caucasians received the best assignments.

245.    During the day, Caucasian workers would sit around for one to three hours talking in groups while Holliman and his African-American coworkers worked. When Jaffeux saw Caucasian workers sitting around, he would walk past them without comment. If Holliman or his African-American coworkers took any breaks, Jaffeux would tell them to get back to work. Caucasian workers were able to take smoking breaks, but if Holliman or his African-American coworkers took smoking breaks their jobs were threatened.

246.    Caucasian tradespeople, but not African-American tradespeople, were allowed to take coffee breaks. The coffee room was moved to an area where supervisors congregated so that supervisors could specifically monitor workers who were taking coffee breaks.

### *Disparate Pay*

247.    Reggie Holliman was hired at a pay rate of $18/hour. He had a high school diploma and two years of applied sciences training. Additionally, he had 6 to 7 years of work experience as a fitter.

248.    Holliman was hired at a lower rate of pay than Caucasian workers with less work experience. For example, "John," a Caucasian worker was hired as a laborer for $22/hour.

249.    Holliman was promised at hire that his work would be evaluated over a four month period and he would be able to make up to $24/hour.  Every month he would receive an evaluation and a raise. After four months he would be at his final rate of pay.

250.    Holliman's evaluations were delayed longer than Caucasian workers' evaluations and the raises given were less than those given to Caucasian workers of similar experience and skill.

251.    Holliman received his first evaluation within thirty days of being hired. He was given a $1/hour raise.  His second evaluation was two to three weeks late. He received a $1/hour raise after his second evaluation. His third evaluation was three months late. He received a raise of $1/hour at his third evaluation. His fourth evaluation was given three months after his third evaluation. At his fourth evaluation, he received a raise of $0.50. Holliman's final rate of pay was $21.50/hour.

252.    Holliman's final rate of pay was between $3.50 to $6.50 less than Caucasian workers of similar or lesser work experience and skill. This wage rate differential was typical of the differential between Caucasian workers and African-American workers. For example, Ricky Penrod, a Caucasian fitter, who did not have a high school diploma made between $25/hour -

$26/hour. "Josh," a Caucasian welder, with approximately 5 to 7 years of experience, made $28/hour.

253.    While he was working for Jaffeux, from June 2010 to May 2011, Holliman regularly requested overtime work. He was not given overtime work. Caucasian employees were overwhelmingly preferred over African-American employees for overtime work.  For example, JJ and Ray Ray, two Caucasian workers, regularly received overtime work under Jaffeux.

### Disparate Training And Promotion

254.    Reggie Holliman was hired as a fitter. He regularly requested further training opportunities.

255.    Caucasian tradespeople were regularly offered training opportunities over African-American employees.

256.    For example, Daniel Cummings advanced in his career from a laborer to a first class fitter within two years, an unusually fast rate of promotion for the industry, with the help of training opportunities from NNI. Cummings was Holliman's coworker and received an overwhelming level of training support from NNI.  No African-American, including Holliman, received an equivalent level of training support from NNI.

257.    Reggie Holliman requested off-site job assignments, such as job assignments at nuclear plant shutdowns, and the biotech team.  Off-site work paid a higher hourly wage and was accompanied by a daily allowance.

258.    Caucasian workers were overwhelmingly preferred for off-site work over African-American workers.

259.    Reggie Holliman regularly asked about promotion opportunities.

260. Caucasian employees were regularly given promotion opportunities not available to African-American employees.

261. NNI failed regularly to post and advertise promotion opportunities.

262. NNI preselected Caucasian employees for promotion opportunities when it did post or advertise those opportunities.

263. For example, over two years' time, Daniel Cummings was promoted from laborer, to fitter, to make-up supervisor. The promotion opportunities made available to Cummings were not advertised prior to his promotion.

### *Racially Disparate Discipline And Termination*

264. Drug testing rules were disparately enforced against African-Americans. Caucasian employees were not always required to undergo urine analysis after work accidents, unlike African-American workers. Even if Caucasian employees had a positive urine test, they were not always fired. Also, Caucasian employees were still eligible for rehire even with a positive urine test.

265. Reggie Holliman was terminated in or around September 2011 after he crushed his hand on a steel plate and was required to take a urine test. His urine tested positive for marijuana. He explained to the Richard Tally, NNI superintendent, that the urine test was an aberration and that he had been going through a difficult time after his grandmother had passed away. He was fired by NNI and told that he was ineligible for rehire.

266. Unlike Holliman, "Lee," a Caucasian worker who crashed a company truck was not required to undergo urine testing. Another Caucasian employee, "Josh," tested positive for illegal drugs when he was sent off-site to work at a nuclear shutdown. NNI continued to employ "Josh." A third Caucasian employee, "Nate" had a positive urine test. He was rehired by NNI.

## LAMAR HOLLIMAN

### *Hostile Work Environment*

267.    Lamar Holliman was employed as a structural welder at NNI from November 2011 to April 2012. He had 10 years of experience as a welder prior to being hired.

268.    Tom Hines was Holliman's initial make-up supervisor and subjected Holliman to racial harassment.  Hines spoke condescendingly to Holliman on a daily basis. When Holliman received his first raise, Hines remarked, "you didn't deserve your raise," even though it was Kevin Angle who was responsible for evaluating Holliman and giving him raises.    When Holliman was not given a raise with his second evaluation, he was told by Hines, "you don't deserve any more money, if you're going to get a raise, then you need to do more and better work."    Hines was speaking objectively in either case, he was expressing his bias against African-Americans.

269.    Steve Sheg, who was initially Holliman's coworker, became his make-up supervisor around January 2012. He harassed Holliman on a daily basis. For example, when talking about Holliman to others, Sheg would say, "bring his black ass here." He used the N-word at least three times to address Holliman.  He would remark, "you better hurry up and do that or I'll stick this pipe up your ass." He would tell Holliman to "suck my dick."  He called Holliman a "faggot." He did not believe Holliman was homosexual, and there is no reason to believe Sheg had a sexual interest in Holliman. He made these statements to express his contempt for Holliman because of his race.

270.    When Holliman bought a 2012 Camero, around March 2012,  Sheg commented, "I don't know how you're going to afford that car, because I'm going to get you out of here when

I become supervisor." Another Caucasian coworker exclaimed, "what are you doing with a car like that? How did you get a car like that."

271.    Around March 2012, Sheg began moving Holliman to different work locations in the Main Building. Holliman was moved to 4 or 5 different work stations. He was unable to become proficient in the work assigned to him at any specific station because he was moved so frequently.  His work was scrutinized by Sheg. Sheg would tell Holliman to hurry his work and then criticize him for being done too early. Sheg would time Holliman's bathroom breaks. On one occasion, Sheg came into the bathroom while Holliman was using it and told him to come out of the bathroom and get back to work.

272.    Eventually, Sheg moved Holliman to Wayne Jackson's supervision.  Wayne Jackson was Holliman's make-up supervisor from approximately March 2012 to April 2012. Jackson harassed Holliman on a daily basis.

273.    In or around March 2012, NNI's clients were inspecting Holliman's work. Because he could not weld while others were at his work station, Holliman went to assist a coworker. Jackson saw Holliman and remarked, "you're an embarrassment to the company."  He said, "Ya'll just sitting here talking and yall aren't supposed to be talking." When Holliman pointed out that other Caucasian workers were also talking, and complained, "why aren't you saying anything to them?" Jackson walked away.

274.    On another occasion, when Holliman didn't come to work on a Saturday, which was optional, Jackson remarked to another employee, "I'm gonna get on Lamar's ass for not showing up on Saturday."

275.    Around April 2012, Holliman complained to Steve Sheg about Steve Sheg's harassing conduct.  Holliman asked Sheg about whether he was trying to fire him. Sheg denied trying to fire Holliman.

276.    Subsequently, around April 2012, when Sheg's harassment continued, Holliman complained to Richard Tally, the NNI superintendent,  about Sheg's offensive conduct. He complained that Sheg routinely made racially offensive remarks. Within a day or two, Tally arranged a meeting between Sheg and Holliman.  Sheg denied making racially offensive remarks.  Tally stated, "Me and Steve, we've known each other for a long time and he was with me for a long time, so I'm going to take his side on this."

277.    Employees at NNI openly displayed confederate flags on their lockers and toolboxes, which Holliman saw, and found offensive.  They wore t-shirts and scarves depicting the confederate flag. Tom Hines, a supervisor, displayed the confederate flag on his truck which he parked in NNI's lot.

278.    Holliman requested  a  transfer to a Welding Inspection position, but was denied. All Welding Inspectors at NNI were Caucasian. The job duties of Welding Inspectors included inspecting welds and evaluating welds. Work conditions of Welding Inspectors were more desirable than the work conditions of Welders because they were less physically burdensome and cleaner.

279.    Holliman requested training in Crane Operation but was denied. The overwhelming majority of Holliman's Caucasian coworkers were certified by NNI to operate cranes, but the overwhelming majority of Holliman's African-American coworkers were not. Cranes are essential to welding. Without a crane, workers must move heavy equipment by hand and are more likely to be injured. Additionally,  workers without cranes are more likely to be

reprimanded for delays in their work because they must wait for crane operators when they cannot move equipment by hand.

280.    Throughout the time he was employed at NNI, Caucasian workers were allowed to take frequent work breaks. They were able to talk to one another while working and were able to congregate to talk in groups.  In contrast, if Holliman or his African-American coworkers took short breaks they were told to get back to work.  Holliman and his African-American coworkers were not allowed to talk to one another.

281.    Additionally, throughout the time Holliman was working, Caucasian workers were able to get coffee in the morning and eat while working. Holliman and his African-American coworkers  were not permitted to have coffee in the mornings and were not allowed to eat except at lunch.

### *Racially Disparate Pay*

282.    Holliman was paid less than Caucasian workers of similar skill and experience. Holliman was hired as a structural welder by NNI at $20/hour.  At the time of hire he had ten years of welding experience.  Caucasian employees of similar or lesser skill and experience were hired at a higher wage rate than Holliman. For example, "John," a Caucasian employee with little to no background in welding, was hired  at $22/hour.

283.    When Holliman was hired, he was told that his wage rate would be increased pending an evaluation period. He would be given four evaluations at intervals of thirty days with raises at every evaluation to reach his final pay rate. His estimated final pay rate was $27/hour to $28/hour.

284.    Holliman's evaluations were delayed or omitted. Holliman's first evaluation was delayed by 3 to 4 months.   He was given a raise of $3 at his first evaluation. His second

evaluation was also delayed by 3 to 4 months. He was given a raise of $1 at his second evaluation. He never received his third and fourth evaluations. Holliman's final wage rate was $24/hour.

285.    Caucasian employees with similar skill and experience as Holliman had been making $3/hour to $4/hour more than Holliman after their first four months of employment at NNI.

### *Racially Disparate Training and Promotion*

286.    Holliman regularly requested promotion and transfer opportunities. Promotion and transfer opportunities were regularly available to Caucasian employees but unavailable to African-American employees.

287.    Even when promotion and transfer opportunities were ostensibly made available to African-American employees, additional unwritten requirements were enforced against African-Americans but not against Caucasian employees.

288.    For example, in or around March 2011, Holliman saw an advertised position for a welding inspector. He asked Kevin Angle, his supervisor, to be transferred to the position. Holliman explained to Angle that he was taking classes to be certified as a Welding Inspector. Angle admitted that openings existed for the welding inspector position, however, Angle stated that Holliman needed certification to be transferred.

289.    The certification requirement was not mentioned in the job's advertisement. Additionally, Holliman knew that Caucasian workers had been transferred to the position without certification. Specifically, an approximately 50 year old worker with no prior experience in welding or welding inspection was transferred to the position from an administrative position while Holliman was at NNI.

*Retaliation/Constructive Discharge*

290.    In or around April 2012, Holliman complained to Richard Tally, the NNI superintendent, about the racial harassment he was subjected to by Steve Sheg. Tally stated, without an adequate investigation, that he didn't believe Holliman. After his complaint, Holliman's treatment at work worsened. He was harassed on a daily basis. His work was closely scrutinized. He was told by his coworkers that NNI was trying to fire him. Holliman's working conditions had become intolerable and in or around April 2012, Holliman was constructively discharged.

## DAVID SWAIN

### *Hostile Work Environment*

291.    David Swain was hired as a welder in May 2012. He had 13 years experience and been a First Class Welder working in shipyards in the Tidewater area. Swain has been subjected to a racially hostile work environment throughout his employment at NNI.

292.    Swain has witnessed his Caucasian supervisors treat African-Americans in demeaning ways. For example, he witnessed Ben Vogel, his make up supervisor, say "git down here," to Tim Bodie. Swain complained to his Foreman that Vogle was speaking to Bodie like a dog.

293.    When Swain showed Vogle pictures of his children, Vogle said "I bet your wife is fat too." Vogle had previously told Swain that African-American men end up with the women that Caucasian men do not want, those who are fat or ugly.

294.    Vogle frequently expresses his belief that there is no point in African-Americans applying for training or promotion at NNI because they are not going to get those opportunities.

Swain hears similar comments from Josh Vanderberg and Christian Watson, Caucasian coworkers.

295.    Wayne Jackson regularly uses "you people," when addressing Swain and other African-Americans.

296.    He frequently makes comments about his African-American subordinates, such as "he's too stupid," which he does not say about Caucasians.

297.    Jackson accused one of his African-American subordinates, Troy, of looking like a gang member, which Swain found offensive.

298.    Jackson has made some absurd accusations against Swain, which reflect his belief in the stereotype that African-Americans are lazy.

299.    For example, Jackson accused Swain of sleeping while Swain was operating a band saw.

300.    When Swain pointed out that it was impossible that he was sleeping, Jackson threatened him, that he would take him to the Foreman's office "and I will win."

301.    Swain witnessed Jackson harass a diabetic African-American worker named Richard Bostic.

302.    Bostic was required to take several breaks a day, in order to eat, to control his blood sugar.

303.    Jackson hounded him mercilessly, although it was obvious then man was not slacking off.

304.    Swain was extremely offended by this mistreatment.

305.    Jackson does not treat Caucasians in this manner.

306.    Foreman Kevin Angle has called Swain "Gilligan," a disparaging name which he does not use for Caucasian workers.

307.    Swain and other African-American workers are harassed by their Foremen and supervisors, whenever they take even a momentary break from their work, or use the restroom. Caucasian workers are allowed to take breaks without being yelled at.

### Disparate Pay

308.    Swain was hired at $23 per hour. He presently makes $25 per hour.

309.    A less qualified Caucasian welder, Josh Vanderberg, who has only about four years experience, is paid $29 per hour.

310.    Vogle, who is completely incompetent, and literally cannot weld, is paid at least $1 an hour more than Swain.

311.    Swain receives less overtime work than his Caucasian peers. Swain's Foreman assigns work that will run into the weekend to Caucasians but rarely to African-American, and only when there are no Caucasians available.

### Disparate Training and Promotion

312.    Caucasian tradespeople are regularly offered training and promotion opportunities over African-American employees.

313.    Swain is presently only been given stick and flux welding, and grinding, to perform. He has been asking to be given tests, to qualify for more advanced welding, which he has performed at prior employers, and has been trained for. He has complained to Kevin Angle, his Foreman, and to Scott Jones, Superintendent, that Caucasians are being allowed to take these tests, and that he is being denied the opportunity. He has told them this is racially discriminatory.

Angle has said "I'll get to it when I get to it." Jones promised to talk to Angle, but that was two months ago, and nothing has changed.

314.    Angle has said that he will not test Swain for other welding qualifications so long as he keeps asking to be tested. Angle does not deny Caucasian welders the testing needed for additional qualifications, or make similar statements about Caucasian welders.

315.    Vogle, Swain's make up supervisor, was hired in September 2013, with no prior experience welding. Prior to working at NNI, Vogle had been in swimming pool cleaning and maintenance.

316.    Vogle is incapable of passing a welding test without cheating, yet he is supervising Swain, who has been helping to train Vogle.

317.    Mike Johns did the welding which allowed Vogle to pass his welding test.

318.    Vogle cannot even tack weld competently. Swain has to clean up his tack welds, or re-weld them.

319.    Vogle is not allowed to sign his welds because he is not qualified.

320.    Clinton, who is Caucasian, was hired at the end of 2013. He had no prior welding experience.

321.    He is already a Make Up Supervisor.

## COUNT I

### Hostile Work Environment in Violation of 42 USC 1981

322.    All Plaintiffs incorporate by reference all preceding paragraphs.

323.    Defendant NNI engaged in illegal discrimination on the basis of race by creating a hostile work environment.

324.    As a consequence of Defendant's conduct, Plaintiffs suffered severe emotional distress.

325.    Defendant's actions proximately caused Plaintiffs' injuries.

## COUNT II

### Disparate Treatment based on Race, in Violation of 42 USC 1981

326.    All Plaintiffs incorporate by reference all preceding paragraphs.

327.    NNI discriminated against Plaintiffs by paying them less than equally or less qualified Caucasians were paid, and denying them promotions and training provided to Caucasian peers.

328.    As a consequence of Defendant's conduct, Plaintiffs suffered economic injury, and emotional distress.

329.    Defendant's actions proximately caused Plaintiffs' injuries.

## COUNT III

### Termination Because of Race in Violation of 42 USC 1981

### Plaintiffs Barnett, Edouard and Reggie Holliman

330.    Plaintiffs Barnett, Edouard and Reggie Holliman, incorporate by reference all preceding paragraphs.

331.    Plaintiffs Barnett and Edouard were terminated following their work on the pin jig, because of their race, and Reggie Holliman was subjected to disparate discipline—ie, termination—because of his race.

332.    As a consequence of Defendant's conduct, Plaintiffs suffered economic injury, and severe emotional distress.

333.    Defendant's actions proximately caused Plaintiffs' injuries.

## COUNT IV

### Retaliation in Violation of 42 USC 1981

### Plaintiffs Crawford, Kershaw and Lamar Holliman

334.    Plaintiffs Crawford, Kershaw and Lamar Holliman incorporate by reference all preceding paragraphs.

335.    Plaintiffs Crawford, Kershaw and Lamar Holliman engaged in protected activity by complaining of discrimination.

336.    Plaintiffs Crawford and Kershaw were terminated because of their protected activity, and Lamar Holliman was constructively terminated because of his protected activity.

337.    As a consequence of Defendant's conduct, Plaintiffs suffered economic injury, and severe emotional distress.

338.    Defendant's actions proximately caused Plaintiffs' injuries.

## COUNT V

### Violation of 42 U.S.C. § 2000e, et seq. ("Title VII")

### Gender Discrimination

339.    Plaintiff Jamesina Crawford incorporates by reference all preceding paragraphs.

340.    On or about November 13, 2012, plaintiff Jamesina Crawford filed a charge of discrimination with the EEOC, alleging that she was denied equivalent rest room facilities as men, causing a medical condition, and that she was fired for complaining about the discrimination, and given a bad job reference, in retaliation for protected activity.

341.    On or about August 29, 2014, Plaintiff Jamesina Crawford received a Notice of Right to Sue from the EEOC. The instant Complaint was filed less than 90 days from receipt of the Notice of Right to Sue.

342.    Plaintiff Jamesina Crawford was denied equivalent rest room facilities as men, causing a medical condition.

343.    The discrimination cause her physical and emotional pain and suffering.

344.    Defendant's actions proximately caused Plaintiffs' injuries.

## COUNT VI

### Violation of 42 U.S.C. § 2000e, et seq. ("Title VII")

### Retaliation

345.    Plaintiff Jamesina Crawford incorporates by reference all preceding paragraphs.

346.    Plaintiff Jamesina Crawford was fired because of complaining about gender discrimination.

347.    BAE gave Plaintiff Jamesina Crawford was a bad job reference, because she complained about the discrimination.

348.    The retaliation caused her emotional pain and suffering, and economic injury.

349.    Defendant's actions proximately caused Plaintiff's injuries.

### JURY DEMAND

350.    Plaintiffs demand a trial by jury for all issues in this action for which a jury is available.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Court grant the following relief:

A.    Declare Defendant's conduct complained of herein to be in violation of the Plaintiffs' rights as secured by 42 U.S.C. §1981 and 42 U.S.C. §2000e;

66

B.    Award the Plaintiffs compensatory damages to be determined by the jury at the time of trial;

C.    Award the Plaintiffs back pay and front pay to be determined at the time of trial;

D.    Award the Plaintiffs punitive damages to be determined by the jury at the time of trial;

E.    Award the Plaintiffs reasonable attorneys' fees and costs, including the fees and costs of experts, incurred in prosecuting this action; and

F.    Grant such further relief as the Court deems necessary and proper.

Dated: September 30, 2014

Respectfully submitted,

By: _____
James H. Shoemaker, Jr., VSB No. 33148
Jason E. Messersmith, VSB No. 77075
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: (757) 223-4500
Facsimile: (757) 223-4518
jshoemaker@phwd.com
jmessersmith@pwhd.com

By: _/s/ Joshua Friedman_____
Joshua Friedman
Law Offices of Joshua Friedman PC
1050 Seven Oaks Lane
Mamaroneck, NY 10543
888-369-1119 x8
Fax: 866-731-5553
josh@joshuafriedmanesq.com

*To Be Admitted Pro Hac Vice*

67