# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

| | |
|---|---|
| **JAMESINA CRAWFORD,** *et al.***,** | |
| | |
| **Plaintiffs,** | |
| | |
| **vs.** | **Case No. 4:14-cv-00130–AWA-LRL** |
| | |
| **NEWPORT NEWS** | |
| **INDUSTRIAL CORPORATION** | |
| | |
| **Defendant.** | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO SEVER OR BIFURCATE

## I.      INTRODUCTION

Defendant urges this Court to create a litigation nightmare: thirty-seven separate trials, at each of which witnesses would present duplicative testimony proving the pattern or practice of discrimination against African-Americans at NNI that is alleged by each and every Plaintiff in this case. NNI's request for severance or bifurcation is not only premature-the factual record is developing - but contrary to fundamental considerations of fairness and wasteful in the extreme.

## II.     FACTS

Plaintiffs are thirty-seven African-American current or former employees of Newport News Industrial Corporation ("NNI"), a military contractor.  Plaintiffs' Second Amended Complaint ("SAC"), Dkt. No. 15, ¶¶1, 10.  NNI builds and repairs energy infrastructure and other industrial facilities for customers such as commercial nuclear energy facilities and government agencies.[1]  It has specific expertise in welding to the standards required on nuclear submarines and aircraft carriers. SAC ¶12.  Plaintiffs worked or work as production and maintenance employees, such as welders, machinists, electricians, laborers, and other tradespeople.  SAC ¶18.  NNI employs approximately 150-200 such employees.  Id.

Each and every Plaintiff alleges that NNI engaged in a systemic, company-wide pattern or practice of discrimination against its African-American employees: "Racial segregation, harassment, disparagement and abuse of African-American workers, and starkly different pay, training and promotion opportunities, permeates employment at NNI....This pattern or practice reflects the beliefs of NNI's managers that African-Americans are inferior to whites."  SAC ¶¶46-47.  Each and every Plaintiff brings a claim of racial harassment in violation of 42 U.S.C. Sec. 1981 based upon the company-wide hostile work environment.  SAC ¶¶1238-1241.  Each and

---

1   *See* Newport News Industrial Corporation "At a Glance," http://nni.huntingtoningalls.com/At_A_Glance.html.

every Plaintiff brings a claim of disparate treatment based upon race in violation of 42 U.S.C. Sec. 1981. SAC ¶¶1242-1245. Sixteen of the Plaintiffs—that is, nearly half of them—allege they were terminated or constructively terminated due to their race, one part of Defendant's overall pattern or practice of race discrimination. SAC ¶¶1246-1250. NNI has terminated an additional six employees, and others have been constructively discharged[2]. Fifteen of the Plaintiffs allege they were retaliated against for complaining about race discrimination—another manifestation of Defendant's discriminatory pattern or practice. SAC ¶¶1251-1256. The SAC also includes a claim of gender discrimination and retaliation on behalf of Plaintiff Jamesina Crawford, and one FMLA claim on behalf of Plaintiff Dennis Smith, SAC ¶¶1257-1273, both of whom bring racially hostile work environment and disparate treatment claims along with all of the other Plaintiffs, as described above. In other words, every single Plaintiff in the case shares claims based upon NNI's systemic, company-wide pattern or practice of discrimination against African-American workers.

Plaintiffs allege multiple, specific aspects of NNI's systemic pattern or practice of race discrimination, such as: racial harassment permeating NNI (SAC ¶46); a pattern or practice of hiring African-American tradespeople at wage rates lower than white tradespeople of similar or lesser skill (SAC ¶109); a pattern or practice until March 2014 of hiring almost all African-Americans as "temporary" workers and almost all white employees as "permanent" workers, with associated benefits and greater job security (SAC ¶¶67-70); a pattern or practice of awarding higher-paying off-site work to Caucasian workers more frequently than qualified African-American workers (SAC ¶112); a pattern or practice of denying qualified African-

---

2   At footnote 12 of NNI's brief, it contends that "approximately half" the original 38 Plaintiffs were still employed "as of our last check in 2015." Considering that NNI employs or employed Plaintiffs this statement is incomprehensible. In fact, only 11 Plaintiffs remain. NNI affirmatively discharged six more Plaintiffs; others were constructively discharged.

American workers promotion (SAC ¶114); a pattern or practice of failing to post job openings, or only posting such openings after decisions to hire or promote non-African-American candidates have already been made (SAC ¶116); a pattern or practice of giving African-American employees fewer training opportunities (SAC ¶117); a pattern or practice of imposing unwritten requirements upon African-American workers but not white employees seeking the same job (SAC ¶117); a pattern or practice of subjecting African-American employees to harsher work conditions than white employees (SAC ¶185); and a pattern or practice of retaliating against African-Americans for opposing racial discrimination (SAC ¶1222).

All Plaintiffs were under the authority of the same Huntington-Ingalls Shipyard Human Resources (hereafter "NNI HR"). SAC ¶571. As workers in the trades, NNI HR approved the pay rate of each Plaintiff. SAC ¶109. The same NNI Human Resources policies applied to all Plaintiffs, including contract workers who were placed by an agency, like Plaintiffs Harris and Marshall, and all Plaintiffs had the same NNI HR Representative. *See* Excerpts from "Welcome to Huntington Ingalls Industries Newport News Industrial" Orientation Materials, Ex. A; Excerpts from Huntington Ingalls Industries Code of Ethics and Business Conduct, Ex. B (Sec. 11); Ex. C, Beddingfield Dep. 108/22-109/4 (explaining that the same HR representative "works both buildings[,]" the Main Building and Oyster Point).

All Plaintiffs worked at NNI's facility in Newport News, Virginia. SAC ¶2. The facility was comprised by a Main Building (also referred to as "OIP" or "Enterprise") and the outdoor area surrounding it, a building across the street called the Swiss Log, the Oyster Point building (also referred to as "OPIP" or "Jefferson") about a fifteen minute drive away, and a Warehouse approximately a ten minute drive away that served as a storage space. SAC ¶20, 23-24; Ex. D

(email listing facility addresses).  These areas all functioned as part of NNI's single, integrated facility.  NNI workers have access to every NNI building using their company-issued badge.  *See, e.g.,* Ex. C, Beddingfield Dep. 108/21-109/13 (workers stationed at the main building are able to get into the Oyster Point building using badge). The "pin jig" is an area immediately outside the Main Building.  Ex. E, Edouard Dep. 59/4-10; 59/21-60/3.  Workers regularly moved between the pin jig area and the Main Building—for example, for morning meeting, to use the restroom, to take a break, to warm up indoors, to eat lunch, to get coffee, or when smoking cigarettes.  See, e.g., Ex. E 88/8-89/5 (describing taking a break indoors to warm up, and being sent back outdoors to return to work), 59/12-18 (morning meetings held indoors).  At times, a supervisor was stationed inside while workers on his crew were stationed outside.  *See, e.g.,* Ex. F, Walker Dep. 177/23-178/24 (describing part of a supervisor's crew working outside while others worked inside); Ex. G, Incident Report (supervisor describing instructing his workers inside shop, then going outdoors to check on workers he had assigned to outside work).  The "Swiss Log" was separated from the Main Building by under 100 yards, according to NNI's counsel.  Ex. H, Crawford Dep. 239/1-3. These were the areas where Plaintiffs primarily worked. SAC ¶20.

Plaintiffs were frequently moved from one location to another within the NNI facility, and were transferred among different projects, supervisors, and shifts.  Isaac Pruden, an Operations Superintendent for NNI, testified that workers are moved from building to building, supervisor to supervisor on a "daily" or multiple times per week basis.[3]  *See, e.g.*, Ex. I, Blow Dep. 55/25-59/24 (describing moving at various times among work for Wayne Jackson and Jeff Riley at Swiss Log; Eric Tucker, Astro Bren, and Mike Debord at Main Building; and Doug Todd

---

3   The transcript of Isaac Pruden's deposition is not yet available.

at Oyster Point building); Ex. J, Alfred Joyner Dep. 130/4-19 ("We went back and forth across the street [between Main Building and Swiss Log] depending on where they need the work personnel"), 131/6-16 (describing move from work at Main Building and Swiss Log to Oyster Point building); Ex. K, Swain Dep. 95/18-97/5 (describing work for supervisors Wayne Jackson, Scott Ruel, Tommy Hines, Ben Vogel, Ryan Scott, and Jay Adams on an "as needed" basis during workday, because a worker "might end up working for another supervisor because the workflow is low in your crew"), 97/22-98/5 (this happened a lot, "depend[ing] on what was going on[,]" and a worker might work "multiple days in a row for the other supervisor" or one at a time).  Nearly all of the Plaintiffs (34 out of 37 of them, or 92%) had at least three different supervisors over the course of their employment with NNI.[4]  Some had significantly more: fourteen of the Plaintiffs (that is, not quite 40%) had at least five supervisors over the course of their employment—and three of the Plaintiffs tallied at least <u>seven</u> supervisors each (Plaintiffs Valentine, Kevin Smith, and Payton).  In other words, it would be extremely rare for a production employee to work on only one project, with one supervisor, in one location, for their entire period of employment.  Rather, the various physical areas and shifts at NNI experienced a continuous flux of supervisors and employees that made them a single, interconnected workspace.  The majority of the Plaintiffs' tenure at NNI also overlapped, with 32 out of the 37 Plaintiffs working at NNI at some point during the period from 2012-2014.[5]

All Plaintiffs worked under the supervision of Scott Jones, NNI Operations Manager. SAC ¶15. Jones engaged in racially discriminatory behavior, such as laughing about a white

---

4   This number is based upon the allegations in the Second Amended Complaint and Plaintiffs' depositions.  Similar numbers that follow, which summarize how many plaintiffs worked under particular supervisors or experienced particular events, are based upon the same sources.  For brevity, Plaintiffs are not citing in this Brief every paragraph number of every allegation and deposition transcript that was counted to produce these summaries.
5   Only five Plaintiffs' employment, out of 37, ended before 2012.

employee threatening to stab one of the African-American plaintiffs in the neck with a pen, and while walking through the facility, directing supervisors to get African-American employees back to work if they were not physically working, but doing nothing to comparable white employees.  SAC ¶83-85.  Superintendents, who manage projects and supervise production and maintenance employees, report to Operations Manager Jones.  SAC ¶15.  Doug Todd, a superintendent who has supervised 10 of the Plaintiffs, made racially offensive remarks such as: calling a plaintiff's dreadlocks "shitlocks;" saying "you people are always sagging your pants," asking a plaintiff "you bangin' a gang?," and constantly calling African-Americans "you people." SAC ¶89.  Doug McKercher, a superintendent who has supervised eight of the Plaintiffs, constantly monitored the African-American Plaintiffs' whereabouts, would demand to know why if they were not in their area, and regularly told them to "get back to work," but did not engage in this behavior toward white workers.  SAC ¶86-87. The SAC alleges that "[n]o African-American has occupied a superintendent position at NNI in at least the last six years."  Id.

Reporting to the Superintendents are foremen, who are themselves production and maintenance employees, and who directly supervise the teams of tradespeople performing work. SAC ¶16.  There are only approximately 10-15 foremen.  Id.  Prior to January 2013, according to the SAC, there had never been a single African-American foreman.  Id.  As of January 2013, when the original Plaintiffs in this case sent NNI's President a notice advising that they planned to sue for racial harassment and discrimination, the workforce of production employees was more than one-third African-American, yet there was not even one African-American foreman, supervisor, superintendent, or manager at NNI.  SAC ¶46.

Multiple supervisors engaged in open, offensive racial conduct without consequences.[6]

_____

6   There are facts relevant to this subject and others for which Plaintiffs do not yet have deposition testimony

Foreman Wayne Jackson supervised nearly all of the Plaintiffs at some point during his employment--34 out of 37 Plaintiffs. Jackson signs his name as "General Jackson" or "Stonewall Jackson" on his weld inspections, and has accused three Plaintiffs of gang activity.  SAC ¶93; Ex. J, Alfred Joyner Dep. 207/22-208/13 (describing how Jackson would "write it [Stonewall Jackson] on certain jobs that – that he would get his workers to do"); Ex. K, Swain Dep. 169/14-19 ("Wayne used to put his name on the module as General Jackson").  Among other conduct, he called African-American workers "boy."  *See, e.g.*, Ex. L, Marshall Dep. 126/3-13 (telling Marshall and other African-American workers "hey, boy, get back to work"), 134/23-135/3 (calling African-Americans "boy"); Ex. F, Walker Dep. 61/1-4 (calling Walker "boy").  He also frequently left his area of responsibility and approached African-Americans not under his supervision, to comment negatively on what they were doing, while not doing the same to white employees.  *See, e.g.*, Ex. M, Broughton Dep. 49/10-16; 51/10-52/24.

Jackson was only one of the supervisors who engaged in regular racially offensive conduct.  Foreman Jeff Riley, who has supervised 10 of the Plaintiffs, called Plaintiffs "yo,yo,yo" "bubba" and "boy;" greeted them with "what's up my nig" or "my n*gger," and affected a stereotyping "pimp stroll" to mock African-Americans.  SAC ¶91.  Foreman Tom Jaffeux, who has supervised 12 of the Plaintiffs, referred to African-American workers as "bitches," regularly reprimanded them while ignoring white workers' infractions, and would remark to African-American workers "y'all brain dead, and y'all know who I'm talking to, I'm going to leave it like that."  SAC ¶92. Foreman Tom Hines, who has supervised nine of the Plaintiffs, displays confederate flags on the back window of his car and his license plate, and

_____

citations, because discovery is ongoing.  Plaintiffs have also not yet had the opportunity to elucidate certain facts relevant to this analysis at deposition, because numerous depositions in this case have not yet been taken.

parks it in the NNI lot where all employees can view it; he has commented that a majority of African-American welders at NNI are not capable of good work; and called African-American workers "boy".  SAC ¶96; Ex. L, Marshall Dep. 101/22-102/25 (calling Plaintiff Marshall "boy"); 111/20/-112/1, 113/4-10 (calling African-American workers "boy"). Foreman Donald Harwick, who has supervised five of the Plaintiffs, referred to a group of African-American workers as "n*ggers," referred to NNI plant closures as "plantation" shutdowns, wore Confederate flag shirts, called African-Americans "boy," and displayed a noose to a plaintiff. SAC ¶¶136-141; Ex. N, Lamarr Joyner Dep. 121/23-123/1.

Not only are production workers routinely moved between buildings, projects, shifts and supervisors, according to sworn testimony by Operations Superintendent Corey Beddingfield, supervisors moved freely within the building they were working in at any given time, and were regularly moved to different buildings for different jobs, or transferred from one shift to another:

> Q.....within a building, [supervisors] can walk the floor or walk around, they can become aware of various issues in various parts of the building, right?
> A. Yes, ma'am.
> Q. And sometimes they will get moved to other buildings for different jobs, right?
> A. Yes, ma'am.
> Q. And that is not irregular, right?
> A. No, ma'am.
> ....
> Q. There is nothing prohibiting moving from day shift to night shift or night shift to day shift, right?
> A. There is nothing prohibitive. If we had a certain job that had to be worked on night shift, then we would move that person....
> Q. I think you said, for example, Wayne Jackson used to be day shift and now he is the actinggeneral foreman of the night shift, right?
> A. Yes, ma'am.

Ex. C, Beddingfield Dep., 123/6-124/5.  Isaac Pruden, Operations Superintendent, testified that supervisors are moved from building to building on an as needed basis.[7]  *See also* Ex. O (email

---

7   The transcript of Mr. Pruden's deposition is not yet available.

describing foreman splitting time between Main Building and Oyster Point, and ordering multiple supervisors to be moved between the buildings); Ex. P (email describing supervisor Ryan Scott transferring from one building to another and trading crews with supervisor Wayne Jackson).  Other managers testified to regularly walking the floors within a facility and moving between facilities at various times.[8]  A particular supervisor's harassing conduct therefore was not confined to a single part of the NNI facility, a particular production crew, or a particular shift; rather it affected various subsets of the African-American employee population at various times.

Plaintiffs' coworkers openly wore confederate flag T-shirts and bandannas in the NNI facility, displayed confederate flags on their lockers and toolboxes, and displayed confederate flags on their cars parked in the NNI lot, all in plain view of supervisors.  SAC ¶97.  Thirty out of the 37 Plaintiffs—that is, 80% of them—have seen the Confederate flag displayed in the workplace.  Fourteen of the Plaintiffs (nearly 40% of them) have been subjected to hearing the N-word in the workplace.  Seven of the Plaintiffs have witnessed a coworker wear a T-shirt captioned "redneck fishing," depicting a white man fishing by holding a black man upside-down and underwater.  SAC ¶97.  NNI bathrooms, which Plaintiffs and supervisors used depending on which building they were working in at any given time, contained offensive racial graffiti such as the following:  "n*ggers go home," "**N**o **N**\*ggers **I**n-house," "I hate n*ggers," "n*ggers go back to Africa," "white power, black power sucks," "fuck you n*ggers," and "hate n*ggers."  SAC ¶169.  *See* Ex. Q, Cross Dep., 152/17-154/8 (describing "No N*ggers In-house" graffiti in Oyster Point bathroom used by "all the shop workers" including "welders, machine shop, pump shop, valve shop, generally, any, any – anybody, you know, any man."); Ex. R, Richard Payton Dep. 89/6-10, 257/12-23 (N-word was written "all over the bathrooms.  Inside the bathroom, outside"

---

8   Plaintiffs do not yet have deposition transcripts for these witnesses.

at the Main Building), 258/1-259/6 (N-word was in "[a]ll the stalls" of the shop floor bathroom

and was "never taken down" during entirety of his employment); Ex. S, Alvarez Dep. 80/14-

81/21 (describing graffiti reading "n*ggers" in the sole porta potty outside the Main Building).

Several Plaintiffs found a noose hanging in the workplace.  SAC ¶148-152.  Overall at

least 12 Plaintiffs—that is, a third of them—have seen a noose in the workplace, and three more

heard about the presence of a noose while at work.[9] The Second Amended Complaint contains

numerous additional examples of the offensive racial conduct that permeated NNI's facility.

Supervisors could observe this offensive conduct because they moved freely through the facility

while walking around observing employees' work.  *See, e.g.,* Ex. C, Beddingfield Dep. 116/8-15

("Q....do you do anything to monitor the [workers'] assignments?  A. Just walking around and I

see what each person is doing every day....").  Plaintiffs also complained to supervisors including

Scott Jones, NNI Operations Manager, about the hostile work environment, to no avail.  *See, e.g.*,

Ex. R, Richard Payton Dep. 351/17-352/9, 353/5-12 (Payton saw N-word in graffiti in the

restrooms "every day" and complained about it to Wayne Jackson, telling him "There's a lot of

'N' words in the bathroom.  It's not just in one stall.  It's in all stalls."), 353/19-354/2 (Jackson did

not do anything about it); 354/3-7 (Payton complained about the N-word graffiti in the bathroom

to Scott Jones).

## III.    ARGUMENT

### A.    Joinder of Plaintiffs' Claims is both Permissible and Critical to Promoting Judicial Economy and Fairness to the Parties

Defendant has failed to overcome the strong policy favoring joinder of Plaintiffs' claims.

---

9  NNI's statement that only seven of the Plaintiffs saw a noose in the workplace is incorrect based upon Plaintiffs' deposition transcripts.  Def. Mem. 14.  Plaintiffs who saw a noose include Bostic, Blow, Gordon, Alfred Joyner, Lamar Joyner, Nichols, Chris Payton, Richard Payton, Stewart, Swain, Valentine, and Wiltz; and Plaintiffs who heard about a noose at work include Alvarez, Piece, and Hooker.

Under Fed. R. Civ. P. 20, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *King v. Ralston Purina Co.*, 97 F.R.D. 477, 479-80 (W.D.N.C. 1983), *quoting United Mine Workers v. Gibbs*, 383 U.S. 715 (1966). Therefore, "Rule 20 is to be liberally construed in the interest of convenience and judicial economy." *King*, 97 F.R.D. at 479-80; *see also Rumbaugh v. Winifrede R.R. Co.*, 331 F.2d 530, 537 (4th Cir. 1964) (stating the foundation of Rule 20(a) lies in "avoiding a multiplicity of suits and expediting the final determination of litigation").

### 1.      Plaintiffs Are Properly Joined Under Rule 20

The Plaintiffs here meet the conditions for permissive joinder set forth in Rule 20(a). *See Hanna v. Gravett*, 262 F.Supp.2d 643 (E.D. Va. 2003). Plaintiffs may join together in one action if "(A) they assert any right to relief....with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). However, each plaintiff need not "be interested in obtaining....all the relief demanded. The court may grant judgment to one or more plaintiffs according to their rights[.]" Fed. R. Civ. P. 20(a)(3). Each of the Plaintiffs in this case brings claims arising out of the single, core allegation that they were subject to a systemic pattern or practice[10] of race-based discrimination at NNI, requiring determination of the common

---

10 Plaintiffs use the phrase "pattern or practice" as it is used in other individual employment discrimination suits like those cited in this Brief, to describe NNI's company-wide policy of discrimination that is central to each and every Plaintiff's claim. However, the claims of systemic discrimination and harassment here are amenable to class pleadings, under the Fourth Circuit's recent *Brown v. Nucor* decision: in a class action, "for a liability determination in a disparate treatment claim, the workers' statistical and anecdotal evidence, especially when combined, thus provide precisely the 'glue' of commonality that *Wal-Mart* demands. *See Brown I*, 576 F.3d at 156. Such a claim requires proof of a "systemwide pattern or practice" of discrimination such that the discrimination is "the regular rather than the unusual practice."" *Brown v. Nucor Corp.*, 785 F.3d 895, 914 (4th Cir. 2015), *quoting Teamsters*, 431 U.S. at 336; *Cooper*, 467 U.S. at 875-76 (remanding to district court to certify class of African American steelworkers promotion claims, across six departments, where "(1) statistics indicate that promotions at Nucor depended in part on whether an individual was black or white; (2) substantial anecdotal

question whether "the threat of a racially discriminatory policy hangs over" African-American employees at Defendant.  *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir. 1974). This common origin of their claims and the common questions of fact and law applicable to all Plaintiffs make joinder proper.

> a.   Each Plaintiff Brings Claims Arising Out of Defendant's Company-Wide Pattern or Practice of Discrimination against African-Americans

The requirement that joined plaintiffs' claims arise out of the same transaction or occurrence "'permit[s] all reasonably related claims for relief by or against different parties to be tried in a single proceeding." *Mosley*, 497 F.2d at 1333.  However, "[a]bsolute identity of all events is unnecessary."  *Id*.  To be "reasonably related," there merely must be "some logical connection or relationship between the transactions or occurrences."  *Johnson v. City of Fayetteville*, 2015 U.S. Dist. LEXIS 68393, *5 (E.D.N.C. May 27, 2015) (emphasis added). Analogizing to Rule 13(a) to assist in interpreting Rule 20, the federal courts have stressed that "'transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Alexander v. Fulton County*, 207 F.3d 1303 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003), *citing Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926).

Numerous federal courts have held that an allegation of a pervasive, company-wide pattern or practice of discrimination satisfies the requirement that joined plaintiffs' claims arise out of the same transaction.  *Mosley*, 497 F.2d at 1333-34 (finding that "a company-wide policy

---

evidence suggests discrimination in specific promotions decisions in multiple plant departments; and (3) there is also significant evidence that those promotions decisions were made in the context of a racially hostile work environment"). Certainly, where the Plaintiffs' allegations would form the basis for a class action suit, the Plaintiffs' claims cannot be said to have been improperly joined.

purportedly designed to discriminate against blacks in employment....arises out of the same series of transactions and occurrences[,]" *quoting United States v. Mississippi*, 380 U.S. 128, 142 (1965); *Blesedell v. Mobil Oil Co.*, 708 F. Supp. 1408, 1422 (S.D.N.Y. 1989) ("A company-wide policy purportedly designed to discriminate against females in employment arises out of the same series of transactions or occurrences."); *King v. Pepsi Cola Metro. Bottling Co.*, 86 F.R.D. 4, 6 (E.D. Pa. 1979) ("Allegations of a pervasive policy of discrimination by [the employer] would bring the complaints of the individual plaintiffs under the rubric of the 'same series of transactions.'"); *Alexander,* 207 F.3d at 1324 (noting that "Plaintiffs' claims stem from the same core allegation that they were subject to a systemic pattern or practice of race-based discrimination"); *Lott v. Eastman Kodak Co.*, 1999 U.S. Dist. LEXIS 5833 (N.D. Tex. Apr. 15, 1999) (denying motion to sever, holding that "[t]he evidence before the Court indicates that Plaintiffs' Complaint may be based on individual instances of discriminatory conduct as well as a pattern or practice of discriminatory conduct. That conduct can constitute the 'series of transactions or occurrences' required by Rule 20(a)"); *Madison v. Hennepin County*, 2003 U.S. Dist. LEXIS 11715 (D. Minn. 2003) (denying motion to sever based upon plaintiffs' allegation "that they were injured by the [defendant's] 'company-wide policy' of discriminating against Black employees"); *Jones v. Culver Franchising Sys.*, 12 F. Supp. 3D 1079 (N.D. Ill. 2013) (holding plaintiffs' claims arose out of same series of transactions or occurrences where they alleged defendant "engaged in a pattern and practice of intentional racial discrimination against both them specifically and African-American franchisees generally").

Plaintiffs in this case allege a company-wide pattern or practice of discriminating against African-American employees.  This is explicitly stated in their Second Amended Complaint:

under the heading "Pattern or Practice Allegations," Plaintiffs plead that "[r]acial segregation, harassment, disparagement and abuse of African-American workers, and starkly different pay, training and promotion opportunities, permeates employment at NNI...This pattern or practice reflects the beliefs of NNI's managers that African-Americans are inferior to whites."  Second Am. Compl., Dkt. No. 7, ¶¶ 46-47.  The SAC goes on to extensively detail **numerous** examples of this pervasive pattern or practice of discrimination.  These allegations are sufficient to show that Plaintiffs' claims arise out of a single set of transactions for the purposes of joinder.

The fact that a pervasive hostile work environment was one manifestation of NNI's pattern or practice of discrimination even more strongly supports the appropriateness of joinder: where plaintiffs allege a discriminatory hostile work environment, their claims arise out of a single transaction.  *See, e.g.*, *Smith v. Northeastern Ill. Univ.*, 2002 U.S. Dist. LEXIS 3883, *8 (N.D. Ill. 2002) ("The allegations of a hostile work environment are tantamount to allegations that there was a widely held policy of discrimination at [defendant]. This constitutes a single transaction.") (collecting cases); *Patterson v. County of Cook*, 2003 U.S. Dist. LEXIS 13187, *5-6 (N.D. Ill. July 30, 2003) ("when a plaintiff alleges that defendants created, perpetuated, or encouraged an hostile work environment courts have concluded that plaintiffs have adequately alleged that there was a widely held policy of discrimination....In this case, Plaintiffs have alleged both an hostile working environment and a policy of retaliation for opposing that environment, either of which sufficiently demonstrates that their claims are part of the same transaction...."); *Foster v. Fleetwing Corp.*, 2006 U.S. Dist. LEXIS 53674, *1-2 (M.D. Fla. Aug. 2, 2006) ("Plaintiffs jointly claim that Defendant subjected them to a racially hostile work environment and retaliated against them...The allegations in the Complaint confirm that

14

Plaintiffs' common claims are tantamount to allegations that there was a widely held policy of discrimination, satisfying Rule 20's requirement that their claims arise from the same transaction....) (internal citation omitted).

The fact that the plaintiffs in this case allege a pervasive, hostile work environment distinguishes it from two cases heavily relied upon by NNI where courts found plaintiffs' claims did not arise out of a single transaction, *Grayson v. K Mart Corp.*, 849 F.Supp. 785 (N.D. Ga. 1994) and *Bailey v. Northern Trust Co.*, 196 F.R.D. 513 (N.D. Ill. 2000).  NNI falsely states that the *Grayson* court "held that harassment....claims involving different managers do not arise out of the same transaction or occurrence"-- in reality, there were **no** harassment allegations whatsoever in *Grayson.* The decision does not even mention the word "harassment."  Def. Mem. 20.  As the *Smith* court pointed out, the lack of a hostile work environment claim in *Grayson* or *Bailey* makes them "less than helpful[.]"  *Smith,* 2002 U.S. Dist. LEXIS 3883 at *13.  In fact, the *Bailey* court specifically noted that"[t]here is no allegation that the defendant had a common discriminatory practice or policy[,]" *Bailey,* at 514, making it completely inapplicable to the case at bar.  Nor was there any allegation of a hostile work environment in *Blassingame v. City of Anderson*, 1999 U.S. Dist. LEXIS 21894 (D.S.C. Feb. 22, 1999), one of the only other cases Defendant cites on this point.[11]

Plaintiffs' workplace, though superficially divided into several departments or areas,

---

11  The other two cases cited by NNI are similarly inapplicable.  In one, the court did not appear to be doing a misjoinder analysis at all; rather, it severed the plaintiffs' claims because under the specific facts, "the risk of jury confusion and prejudice [was] greater than any potential benefit to maintaining consolidation of the claims."  *Engler v. Harris Corp.*, 2012 U.S. Dist. LEXIS 149747, *10 (D. Md. Oct. 18, 2012).  In the other, the court's ruling was based in part upon the fact that the "plaintiffs have not disputed defendants allegations that the claims require different, individualized witnesses and proof, 'with limited duplication . . . and very little overlap in witnesses,' and in fact concede that different evidence is required for each's claim." *Goodyear v. Dauterive Hosp.*, 2007 U.S. Dist. LEXIS 51023, *15 (W.D. La. July 13, 2007).  By contrast, in the instant case Plaintiffs have alleged a company-wide hostile work environment resulting in significant overlap of witnesses and facts among the plaintiffs.  *See also, infra.*

constitutes a single, unified hostile work environment, as described *supra,* with overlapping supervisors/harassers, fluid movement of workers and supervisors/managers between projects, facilities, and shifts. However, courts have specifically held that even in cases where plaintiffs work in different departments, or under different supervisors, their allegation of a company-wide policy of discrimination still unites their claims as part of a single transaction for purposes of Rule 20. In *King v. Pepsi Cola Metro. Bottling Co.*, 86 F.R.D. 4 (E.D. Pa. 1979), the court held that the plaintiffs' claims arose out a single transaction because their "complaint alleges that specific instances of discrimination occurred against each of named plaintiffs as well as a general and pervasive corporate policy of discrimination by Pepsi against blacks. Thus, the allegations of a pervasive policy of discrimination by Pepsi would bring the complaints of the individual plaintiffs under the rubric of the 'same series of transactions'." *Id*. at 6. The court specified that the claim arose out of the same transaction despite the fact that one of the plaintiffs "was assigned to a separate department within the company with different supervisors [from the other plaintiffs]. It is conceded that his case will involve evidence different from the others in some respects. However, his claim is united with the others by the allegations of a company policy of discrimination." Id. *See also King v. Ralston Purina Co.*, 97 F.R.D. at 480 (Where three plaintiffs worked in different places and divisions, "each alleges that he was discriminated against as part of a pattern and practice of unlawful age discrimination conducted by defendant throughout its many regions and divisions....Common sense says that claims alleged to be part of a 'pattern and practice' satisfy both the 'transaction' and the 'common question' requisites of Rule 20(a)."); *Porter v. Milliken & Michaels, Inc.*, 2000 U.S. Dist. LEXIS 11366, *8 (E.D. La. Aug. 1, 2000) ("[A]ll three plaintiffs assert they were subject to a pattern or practice of discrimination

16

against black employees....Although [one plaintiff] worked for a different supervisor and on a different floor, his claim arises from the same pattern or practice of discrimination, which this Court finds to be dispositive."). Here, Plaintiffs frequently moved between supervisors and locations, just as supervisors and managers moved between facilities. Yet, even to the extent the Plaintiffs worked in various departments or on different shifts, their claims of a pervasive, company-wide pattern or practice of discrimination arise out of a single transaction.

Just as differing physical departments do not defeat a single "transaction" where Defendant maintained a pattern or practice of discrimination, the fact that plaintiffs have differing work histories and individual factual scenarios also does not. *See Lee v. Dell Prods., L.P.*, 2006 U.S. Dist. LEXIS 75573 (M.D. Tenn. Oct. 16, 2006). Quite similarly to Defendant NNI claiming that Plaintiffs have alleged "discrete, separate acts of alleged discrimination" which are "widely varied[,]" Def. Mem. 21, the defendant in *Lee* argued that the plaintiffs' claims in that case did not arise from a single transaction because they were "based on each of their separate work histories and unrelated factual scenarios involving different time frames, different jobs and departments and various individuals." *Lee* at *22. Nonetheless, the court held that the common allegation of race discrimination among all the plaintiffs united their claims as part of a single transaction: "[T]he acts of discrimination, while different have enough similarities that this factor also weighs against severance....Plaintiffs allege that based on their race they were: denied promotions and/or training opportunities, harassed by co-workers and/or supervisors, and ignored by Human Resources and other management when the issues of racial discrimination in the workplace were reported. **While the specific actors in the allegations might have been different, the common allegation that each Plaintiff's supervisor treated him or her**

17

**differently because of his or her race is significant**." *Id.* at \*28 (emphasis added).  The

specific manifestations of the practice will inevitably differ for each individual plaintiff, but the

pervasive, company-wide pattern or practice of race discrimination is the single transaction out

of which all of the plaintiffs' claims arise.  Joinder of plaintiffs' claims is  appropriate.

> b.  <u>Plaintiffs' Claims Share the Common Question of Law or Fact</u>
> <u>Whether Defendant Engaged in a Pattern or Practice of</u>
> <u>Discrimination Against African-American Employees</u>

Plaintiffs' allegation that Defendant engaged in a pattern or practice of race discrimination

not only shows that their claims arise out of a single transaction, but is also a central common

question of law and fact shared by all of the Plaintiffs.  Rule 20 "does not require that **every**

question of law or fact in the action be common among the parties; rather, the rule permits party

joinder whenever there will be at least **one** common question of law or fact." *John S. Clark Co.*

*v. Travelers Indem. Co.*, 359 F. Supp. 2d 429, 438 (M.D.N.C. 2004), *citing* 7 Charles A. Wright,

Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 1653, at 413 (3d ed.

2001) (emphasis added).  The question whether Defendant engaged in a pattern or practice of

discrimination against African-Americans satisfies that minimal requirement:

> Although the actual effects of a discriminatory policy may thus vary throughout the class,
> the existence of the discriminatory policy threatens the entire class. And **whether the**
> **Damoclean threat of a racially discriminatory policy hangs over the racial class is a**
> **question of fact common to all the members of the class.**

*Mosley,* 497 F.2d at 1333, *quoting Hall v. Werthan Bag Corp.*, 251 F. Supp. 184, 186 (M.D. Tenn.

1966) (emphasis added); *King*, 97 F.R.D. at 480 ("Common sense says that claims alleged to be

part of a 'pattern and practice' satisfy both the 'transaction' and the 'common question' requisites

of Rule 20(a)."); *Porter*, 2000 U.S. Dist. LEXIS 11366 at \*8 ("all three plaintiffs assert they were

subject to a pattern or practice of discrimination against black employees....defendant's alleged

discriminatory conduct is common to each plaintiff's recovery."); *Madison*, 2003 U.S. Dist. LEXIS 11715 at *11 ("Plaintiffs' right to relief, at least as to plaintiffs' section 1981 claims, depends upon the ability to demonstrate that each plaintiff was injured by a discriminatory policy or custom. This presents a common question of law[.]"); *Jones*, 12 F. Supp. 3d at 1091 ("[C]ourts have concluded that an alleged company-wide policy of racial discrimination is sufficient to establish a common question of fact[.]").

Allegations of a pervasive hostile work environment, in particular, constitute a common question of law or fact. *See Amie v. City of Jennings*, 2005 U.S. Dist. LEXIS 28674, *8 (W.D. La. Nov. 8, 2005) ("Plaintiffs allege common questions of law or fact. The plaintiffs all claim hostile work environment. They claim that the defendants' behavior was unwelcome, severe and pervasive. There is a common legal theory by all the plaintiffs in this case."); *Lee,* 2006 U.S. Dist. LEXIS 75573 at *29-30 ("....the remaining eight African-American Plaintiffs in the case at bar have clearly established that a common question of law exists, i.e., whether [defendant] discriminated against them on the basis of race, as well as a common question of fact, i.e.,whether [defendant] actually failed to promote and/or train and harassed these eight African-American Plaintiffs, and ignored their reports of discrimination, also on the basis of race.").  In the instant case, because the question basic to each of Plaintiffs' claims is whether they were subject to Defendant's pattern or practice of discriminating against African-American employees, Plaintiffs share common questions of law or fact sufficient for permissive joinder.

Defendant's arguments that Plaintiffs' claims require "individualized proof" are unavailing.  Def. Mem. 21.  Defendant's discriminatory pattern or practice is a common question of law and fact even where plaintiffs experienced different **manifestations** of that practice.

19

*Mosley* at 1334 ("The discriminatory character of the defendants' conduct is thus basic to each plaintiff's recovery. The fact that each plaintiff may have suffered different effects from the alleged discrimination is immaterial for the purposes of determining the common question of law or fact."); *see also Blesedell*, 708 F. Supp. at 1422 (holding the same); *Alexander*, 207 F.3d at 1324 ("The fact that the Plaintiffs suffered different effects--in this case, discrimination in promotions, transfers, assignments, or discipline--from the alleged policy of discrimination did not preclude the trial court from finding a common question of law and fact.").  Rather than being based on "separate and distinct employment decision[s,]" Def. Mem. 21, Plaintiffs' claims are united by the common question whether they were subject to a pattern or practice of discrimination against African-American employees. Plaintiffs' claims arise out of a single transaction, and share common questions of law or fact, thus Rule 20 is appropriate.

### 2.     Severance of Plaintiffs' Claims Would Cause Expense, Delay, Serious Risk of Inconsistent Verdicts, and Would Prejudice Plaintiffs

Defendant urges this Court to create a litigation disaster:  thirty-seven separate trials, at each of which each Plaintiff would call the same witnesses to present identical, repetitive testimony thirty-seven times proving the pattern or practice of discrimination against African-American employees at Defendant.  This is not only unnecessary, but inappropriate and contrary to considerations of fundamental fairness.

Where joinder is permissible under Rule 20(a), as it is here, Defendant's only remaining route to severance is to argue it should be granted "on such terms as are just" under Fed. R. Civ. P. 21.  In deciding whether to grant severance under Rule 21, courts "look to fundamental fairness, judicial economy, prejudice, undue delay, as well as the dual threat of duplicitous litigation and inconsistent verdicts."  *Carmine v. Poffenbarger*, 2015 U.S. Dist. LEXIS 172735

(E.D. Va. Dec. 29, 2015), *quoting Tinsley v. Streich*, 2015 U.S. Dist. LEXIS 153529 (W.D. Va. Nov. 12, 2015).  The federal rules are "meant to give district courts discretion to structure cases in a manner that will promote fairness to parties, trial convenience, and efficient administration of justice. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724...[]...(1966) ("[T]he impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."). As such, Rule 21 discretion "should be exercised sparingly." *Tinsley* at \*27-28, *citing Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 838 (1989).  See also *Jonas v. Conrath*, 149 F.R.D. 520 (S.D.W.Va. 1993) (noting the trend toward joinder of claims, parties, and remedies).

> a. Joinder is Essential to Prevent the Massive Waste of Court Resources

In a case where multiple plaintiffs allege a company-wide hostile work environment, evidence proving the hostile work environment is relevant to each Plaintiff's claim.  *See, e.g., Alexander v. Alcatel NA Cable Sys., Inc.*, 50 F. App'x 594, 595 (4th Cir. 2002) ("The district court deemed irrelevant evidence that the employer had failed to investigate and check harassment of other women that had occurred before the events that aggrieved the plaintiff. This was error."). Federal courts have repeatedly recognized that judicial economy is best served by presenting this common evidence only once instead of numerous times.  As the *Patterson* court explained: "the proof necessary to establish that individual Plaintiffs were subjected to an hostile working environment within [defendant] overlaps, for **each Plaintiff must demonstrate that within [defendant] was a climate of racism and/or sexism sufficiently severe that a reasonable person would find the work environment abusive or hostile**. Judicial resources are scarce, and it makes little sense to parade the same set of witnesses to repeat the same testimony in fourteen

individual trials when the witnesses could be called but one time." *Patterson*, 2003 U.S. Dist. LEXIS 13187 at *7 (emphasis added).  Even more broadly, where multiple plaintiffs' joined claims are based upon an alleged pattern or practice of race discrimination, courts recognize that every plaintiff is entitled to put on evidence of that pattern, making it extremely inefficient and repetitive to try the claims separately.  *See King,* 97 F.R.D. at 479-80 (denying defendant's motion to sever, in part because "**[e]ach plaintiff is entitled to put on evidence of the alleged pattern and practice**....and each clearly intends to do so. If the claims were severed, the same evidence including....the testimony of all three plaintiffs, would have to be presented in three separate trials. It is far more convenient and economical for this evidence to be heard in one trial") (emphasis added), *citing Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir. 1977) (vacating judgment dismissing appellant's personal claims of discrimination, which had been brought together with class claims, because "the District Court, by excluding substantial relevant evidence of discriminatory patterns and practices by [defendant], may well have so circumscribed the evidence that it robbed appellant's case of the setting necessary to give credibility to her personal claims of discrimination"); *Alexander*, 207 F.3d at 1325 (upholding denial of severance: trying eighteen plaintiffs' race discrimination claims together promoted judicial efficiency, since "each of the Plaintiffs' claims and the evidence of discrimination undoubtedly are relevant to every other plaintiff's core allegation of systemic discrimination").

If this case were severed into thirty-seven separate trials, each and every Plaintiff would put on identical evidence on subjects including, but <u>far</u> from limited to, the following: (1) NNI's HR policies; (2) NNI's management hierarchy; (3) training of supervisors and managers on discrimination policies; (4) notice to NNI regarding the hostile work environment, both generally

(e.g. unremediated N-word graffiti, open and obvious harassment in the presence of supervisors) and with respect to specific notice events involving each plaintiff; (5) notice to NNI of discrimination on the basis of race, again both generally and specifically; (6) expert testimony regarding NNI's practice of hiring African-American workers into temporary positions and white workers into permanent positions through March 2014; (7) testimony regarding Scott Jones (manager of all Plaintiffs); (8) NNI's policies relating to hiring, (9) evaluations (frequency thereof, methods, requirements, etc), (10) raises (both policies concerning and actual receipt/reasons for), (11) eligibility for and receipt of training by African-American workers compared to Caucasian workers, (12) eligibility for promotions, and (13) advertising available positions;  (14) NNI's policies relating to overtime and eligibility for overtime, among other subjects; (15) comparitor evidence for similarly situated employees; and (16) evidence of disparate treatment by supervisors, such as Wayne Jackson and others rushing African-American workers back to work, while allowing Caucasian workers to take breaks, and following African-American workers to the bathroom to monitor them, while not doing the same for Caucasian workers.  In addition, for each and every Plaintiff harassed by a particular individual, that Plaintiff would put on the repetitive testimony of every other Plaintiff who was present for each specific instance of harassment; every other Plaintiff who experienced other harassment by that same individual; any and all third parties who experienced harassment by that individual; every other Plaintiff with knowledge of that individual's harassing or discriminatory conduct; each and any Plaintiff who complained about that individual to NNI supervisors or management; and any and all facts relating to NNI's response to such complaints or lack thereof.  Just as a single example, because 34 out of the 37 Plaintiffs were supervised by Wayne Jackson, each and every

23

one of those 34 alleging discrimination by Jackson would be entitled to, and would, put on

testimony and evidence regarding every other Plaintiff's experiences of harassment and

discrimination involving Jackson, Jackson's practice of signing his welds as "General Jackson,"

each and every complaint to or about Jackson by other Plaintiffs and third parties regarding his

discriminatory conduct and any response thereto, etc.

Defendant cites *Johnson v. United Airlines, Inc.*, 2013 U.S. Dist. LEXIS 110640 (E.D. Va.

Aug. 2, 2013) for the proposition that "one Plaintiff cannot rely on another Plaintiffs' [sic]

experiences to establish harassment," to support its claim that evidence of one Plaintiff's

harassment would be inadmissible for any purpose on any other Plaintiff's harassment claim.

Def. Mem. 14.  This obfuscates the court's real holding.  The *Johnson* court noted that

"[c]omments or conduct of which Plaintiffs had no direct knowledge cannot be said to have

made their work environment hostile[,]" 2013 U.S. Dist. LEXIS 110640 at *10-11, but this is <u>far</u>

from holding that such comments or conduct are not relevant to proving Defendant's liability for

harassment.  On the contrary, each Plaintiff is entitled to rely on proof of discrimination against

himself or herself, against other Plaintiffs, and against other African-American employees, to

establish a discriminatory workplace, because it is relevant to whether Defendant's motives were

discriminatory, whether and when Defendant was on notice of discrimination, and whether

Defendant took prompt and adequate remedial action in response to that notice, among other

issues.  *See Alexander*, 50 F. App'x at 595 (holding that evidence employer had failed to

investigate harassment complaints by other women was relevant to plaintiff's harassment claim);

*Sprint/United Management Co. v. Mendelsohn*, 128 S.Ct. 1140 (2008) ("The question whether

evidence of discrimination by other supervisors is relevant in an individual ADEA case is fact

based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case"). Defendant cannot short-circuit admissibility decisions with respect to each Plaintiff's claim by simply asserting that none of this evidence is admissible at this early stage.

To avoid the nightmare litigation scenario of thirty-seven separate trials, each involving identical testimony and documentary evidence proving Defendant's pattern or practice of discrimination against African-American employees, it is essential that Plaintiffs' claims remain joined. Instead of a trial lasting several weeks, NNI is seeking <u>many</u> months of the Court's time to try the claims of 37 Plaintiffs, where an extraordinary amount of duplicative testimony and evidence would be required. For example, if the Court were to sever or bifurcate the claims, and if each trial lasted only one week, which is *highly* unlikely, the Court would spend 37 weeks in trial; if each trial lasted two weeks, which is also unlikely, the Court would spend one and a half **years** in trial on Plaintiffs' claims. To say that severance or bifurcation would waste scarce judicial resources does not even begin to describe the inefficiency of NNI's request.

> b. <u>Severance Would Prejudice Plaintiffs' Ability to Prosecute Their Case and Create the Risk of Inconsistent Verdicts</u>

Severing Plaintiffs' claims into thirty-seven trials, each requiring substantial repetition of testimonial and documentary evidence from the other trials to prove a company-wide pattern or practice of race discrimination, would also drastically increase Plaintiffs' expenses. Plaintiffs would be forced to bear the monetary and time costs of calling back the same witnesses thirty-seven times to prove the existence of a hostile work environment, and disparate treatment. Courts recognize that this type of burden militates against severance, because there is a real risk it will prevent plaintiffs from being able to prosecute their case at all. *See King v. Ralston*

25

*Purina Co.*, 97 F.R.D. at 480 ("Hearing the pattern and practice evidence in a single proceeding will be more convenient and economical for everyone involved. To require plaintiffs to present this evidence in separate trials in three different districts would put them and defendant to a great deal of unnecessary expense and might well limit plaintiffs' ability to put on this evidence at all.").[12]  Further, putting on trial thirty-seven times the identical question of fact or law whether this Defendant engaged in a pattern or practice of race discrimination would pose an inevitable risk of inconsistent verdicts.  *King,* 97 F.R.D. at 480 (denying severance in part because "it would expose Plaintiffs to the risk of inconsistent judgments").  In every one of the thirty-seven trials, the jury would have to determine whether Defendant was on notice of the hostile work environment due to, among other things, racial slur graffiti in the bathrooms, employee complaints about specific harassing incidents and supervisor/manager observations. Further, Plaintiffs would present evidence of a discriminatory practice of maintaining a temporary workforce of African-American employees (prior to March 2014), while hiring Caucasian employees as permanent. If a jury in any one case came to a different conclusion from the others, an unacceptable inconsistent verdict would result..

     c.   Proper Jury Instructions Will Guard Against Any Risk of Jury Confusion or Prejudice to Defendant

     The huge gains in judicial economy from joinder of Plaintiffs' claims in the instant case are not overcome by any unusual risk of prejudice to Defendant.  Time and again in multi-

---

12 *Arnold v. Eastern Air Lines*, 712 F.2d 899 (4th Cir. 1983), cited by NNI to support its argument that Plaintiffs would not be prejudiced by severance of their claims, actually concerned the failure to sever personal injury claims from indemnification actions, and does not stand for that proposition. Def. Mem. 29.  It did not address potential prejudice to a plaintiff from severance at all.  Its only relevance is its general discussion of the importance of considering "harmful and serious prejudice" to a party when deciding whether to consolidate or refuse to sever claims. *Arnold*, 712 F.2d at 906.  The harmful and serious prejudice to Plaintiffs that would result from severing their claims in this case supports their argument that the claims should remain joined.  The other case cited by NNI to support its point, *CVI/Beta Ventures v. Custom Optical Frames*, 896 F. Supp. 505 (D. Md. 1995), concerned a plaintiff's successful motion to sever a defendant's counterclaim in a patent infringement case. Def. Mem. 29.  It has no relevance to Defendant's argument.

plaintiff harassment cases, federal courts have held that proper jury instructions and verdict forms can prevent jury confusion or undue prejudice to the Defendant. *See, e.g., Hicks v. Maruchan Virginia, Inc.*, 1996 U.S. Dist. LEXIS 13754 (E.D. Va. Sept. 3, 1996) (denying motion to sever where defendant argued that if nine plaintiffs' harassment claims were tried together, it was "likely that a single jury will infer discrimination solely from the sheer number of plaintiffs under a 'where there's smoke, there's fire' rationale;" holding that "it would be a waste of judicial resources to conduct nine separate trials....The fact that each Plaintiff must prove liability and damages as to the Defendant can be addressed by the Court through jury instructions and verdict forms."); *Nelson v. Chertoff*, 2008 U.S. Dist. LEXIS 82981, *18 (N.D. Ill. Sept. 10, 2008) (separate trials would require a significant amount of overlapping testimony); *Ward v. Johns Hopkins University*, 861 F. Supp. 367, 379 (D. Md. 1994) (denying defendant's severance motion in sexual harassment and retaliation case, "not[ing] that any undue prejudice to the [defendant] can be eliminated at trial by giving the jury a limiting instruction"); *Amie*, 2005 U.S. Dist. LEXIS 28674 at *9 ("The defendant argues that severance is necessary to prevent prejudice....[because] there is a danger that the jury will find the defendant liable solely because of the sheer number of witnesses against it and because the jury will be confused by evidence relevant to some, but not all plaintiffs. The plaintiffs argue that these potential problems can be addressed by jury instructions and the court concurs.").  Plaintiffs' claims concerning company-wide harassment at Defendant can be handled similarly, with appropriate jury instructions.

Courts have held that limiting jury instructions are adequate to guard against the potential for any undue prejudice not only in harassment cases, but also in other cases where plaintiffs bring related and overlapping claims. *See, e.g., Duke v. Uniroyal Inc.*, 928 F. 2d 1413, 1420-21

(4th Cir. 1991) (affirming the trial court's rejection of defendant's severance motion in ADEA case because the district court stemmed any prejudice when it "described the separate claims of each of the plaintiffs to the jury, and the ….[verdict form] called for a separate finding with respect to each plaintiff"); *Alexander,* 207 F.3d at 1325-26 ("Given the common core of [the eighteen plaintiffs'] allegations, the substantial overlap of the particular claims, and the logical interconnection of several of the different forms the alleged discrimination took, we are satisfied that the district court did not abuse its discretion in finding that the efficiency of a consolidated trial outweighed the potential for unfair prejudice or jury confusion."); *see also Hanley v. First Inv'rs Corp.*, 151 F.R.D. 76, 80 (E.D. Tex. 1993) (denying defendant's motion to sever because "it seems well within the jury's abilities to distinguish between the idiosyncrasies of each case."). Here, where Plaintiffs have alleged a pattern or practice of systemic race discrimination, jury instructions and verdict forms will be adequate to prevent undue prejudice against Defendant while preserving the tremendous advantages in judicial economy stemming from joinder.

> d. <u>Joinder is Appropriate Where the Vast Majority of Plaintiffs' Claims Concern the Systemic Pattern or Practice of Race Discrimination</u>

Nearly all of Plaintiffs' claims stem from Defendant's systemic pattern of practice of race discrimination, including their claims for hostile work environment, disparate treatment based on race, and retaliation or constructive discharge for complaints about race discrimination.  Given the tremendous overlap in these claims, the few remaining claims brought on other bases by certain individual Plaintiffs, such as Plaintiff Jamesina Crawford's claims of discrimination based on gender, do not warrant severance.  *See Patterson*, 2003 U.S. Dist. LEXIS 13187 at *7-8 ("[M]erely because some Plaintiffs allege discrimination based upon gender or disability in addition to or even instead of discrimination based upon race is insufficient to require

severance."). Contrary to Defendant's claim that severance is appropriate where "all counts are

not joined by all plaintiffs[,]" Def. Mem. 28, the cases Defendant cited actually involved claims

against <u>multiple defendants</u>, a completely different factual scenario than the instant case. *See*

*Houston v URS Corp.*, 591 F. Supp. 2d 827 (E.D. Va. 2008) (severing claims of two plaintiffs

against two unrelated defendants, because each plaintiff had a claim against a different

defendant, with no overlap); *Grigsby v. Kane*, 250 F. Supp. 2d 453 (M.D. Pa. 2003) (granting a

motion to sever two plaintiffs' claims that was brought <u>by</u> one of the plaintiffs, and where each

plaintiff had brought claims against different groups of defendants); *Thornapple Associates, Inc.*

*v. Izadpanah*, No. 1:14-cv-00767 (E.D. Va. Dec. 17, 2014) (denying <u>plaintiff's</u> motion to sever

claim brought pursuant to a third-party complaint by defendant). Here, where all plaintiffs solely

bring claims against one Defendant, and where nearly all claims arise out of Defendant's pattern

or practice of race discrimination, joinder of all Plaintiffs' claims is appropriate.

### B.    Defendant's Request to Bifurcate Trials is Both Premature and Unsupported

Making no new arguments, Defendant prematurely requests that this Court bifurcate trial

of Plaintiffs' claims. Discovery in this case is ongoing. Depositions of defense witnesses are still

taking place. Deposition transcripts for key witnesses are not yet available, and important

depositions have not yet been taken. Discovery does not close until June 29, 2016. Dispositive

motions have not yet been filed—the parties do not even know whether all  claims will proceed.

Defendant's request to bifurcate is therefore premature, and this issue should not be decided until

the factual record is fully developed and the issues for trial have been clearly established,

permitting Plaintiffs to show specifically why it is appropriate to proceed with joint trial of their

claims. See, e.g., *Miller v. Hygrade Food Prods. Corp.*, 202 F.R.D. 142 (E.D. Pa. 2001) (finding

plaintiffs' claims are properly joined, and motion was premature).

Not only is the request to bifurcate premature, but Defendant has failed to meet its burden to show bifurcation is appropriate.  The bifurcation of a trial is "not the usual course of events," and "[n]othing else appearing, a single trial will be more expedient and efficient." *F&G Scrolling Mouse, L.L.C. v. BM Corp.*, 190 F.R.D. 385, 387 (M.D.N.C. Oct. 26, 1999). As such, "the burden rests on the party seeking bifurcation to show that it is proper." *Rodin Properties-Shore Mall v. Cushman & Wakefield of Pennsylvania, Inc.*, 49 F. Supp. 2d 709, 721 (D. N.J. 1999) (internal quotations omitted).  "The party requesting separate trials bears the burden of convincing the court that such an exercise of its discretion will (1) promote greater convenience to the parties, witnesses, jurors, and the court, (2) be conducive to expedition and economy, and (3) not result in undue prejudice to any party."  *F&G Scrolling Mouse, L.L.C.*, 190 F.R.D. at 387. As set forth in detail above, Plaintiffs' claims arise out of a pattern or practice of pervasive discrimination against African-American employees at Defendant, therefore trial of each of their claims involves a large proportion of overlapping evidence—concerning, for example, NNI's HR policies, management hierarchy, training, notice of the hostile work environment both generally (including unremediated N-word graffiti) and with respect to specific notice events, notice of race discrimination, testimony concerning racial bias of Scott Jones (manager of all Plaintiffs), and more.  A court will "likely decline to bifurcate if there will be a significant overlap of evidence at the two trials which would make separation inefficient and inexpedient." *Id*. at 387. The same considerations of prejudice to Plaintiffs from severance, risk of inconsistent judgments and waste of judicial resources make it inappropriate to bifurcate Plaintiffs' claims for trial, particularly at this early stage of the case.[13]

---

13  The case cited by Defendant to support its argument that separate trials for every Plaintiff are warranted due to

IV.     **CONCLUSION**

Plaintiffs respectfully request that NNI's motion be denied.

**RESPECTFULLY SUBMITTED**,


By:     */s/ James H. Shoemaker, Jr.*
        James H. Shoemaker, Jr.,
        Virginia State Bar No. 33148
        Jason E. Messersmith
        Virginia State Bar No. 77075
        Patten, Wornom, Hatten & Diamonstein, L.C.
        12350 Jefferson Avenue, Suite 300
        Newport News, Virginia 23602
        Telephone:  (757) 223-4500
        Facsimile:  (757) 223-4518
        jshoemaker@phwd.com
        jmessersmith@pwhd.com

        Joshua Friedman
        Rebecca Houlding
        Effat Hussain
        Jesse Centrella
        Law Offices of Joshua Friedman PC
        1050 Seven Oaks Lane
        Mamaroneck, NY 10543
        Telephone:  (888) 369-1119 x 8
        Facsimile:  (866) 731-5553
        josh@joshuafriedmanesq.com
        rebecca@joshuafriedmanesq.com
        effat@joshuafriedmanesq.com

        *Counsel for Plaintiffs*

---

the "risk of prejudice....alone" is totally inapposite.  Def. Mem. 30.  It simply involved severance of a claim for fees and costs from the rest of the case, in a case brought by one plaintiff against one defendant.  *See St. John's African Methodist Episcopal Church v. Guideone Specialty Mut. Ins. Co.*, 902 F. Supp. 2d 783 (E.D. Va. 2012) ("Because the question of bad faith under § 38.2-209 is reserved to the court and is properly considered only after judgment has been entered against an insured on a substantive cause of action, this Court finds that bifurcation of Saint John's....request for fees and costs from its breach of contract claim is appropriate.")

## CERTIFICATE OF SERVICE

I, James H. Shoemaker, Jr., hereby certify that on the 12th day of April, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing (NEF) to all counsel of record and parties unrepresented.

By:   */s/James H. Shoemaker, Jr.*
James H. Shoemaker, Jr.,
Virginia State Bar No. 33148
Jason E. Messersmith
Virginia State Bar No. 77075
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone:  (757) 223-4500
Facsimile:  (757) 223-4518
jshoemaker@phwd.com
jmessersmith@pwhd.com