## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NEWPORT NEWS DIVISION

| | |
|---|---|
| **JAMESINA CRAWFORD, *et al*.,** | \| |
| | \| |
| **Plaintiffs,** | \| |
| | \| |
| **vs.** | \| **Case No. 4:14-cv-00130–AWA-LRL** |
| | \| |
| **NEWPORT NEWS** | \| |
| **INDUSTRIAL CORPORATION** | \| |
| | \| |
| **Defendant.** | \| |

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' PAY, PROMOTION AND OTHER DISPARATE TREATMENT CLAIMS

Friedman & Houlding LLP
1050 Seven Oaks Lane
Mamaroneck, NY 10543
Tel (212) 308-4338 x 5
Fax (866) 731-5553

   **On the briefs:**
   Joshua Friedman
   Effat Hussain
   Jesse Centrella
   Rebecca Houlding
   *Admitted Pro Hac Vice*

James H. Shoemaker, Jr.
Virginia State Bar No. 33148
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone:  (757) 223-4500
Fax:  (757) 223-4518
*Local Counsel to Plaintiffs*

I.      **DISCRIMINATION INFECTED NNI'S PROCESS IN MAKING IN PAY, PROMOTION AND PERMENANCY DECISIONS.**

Disparate treatment claims, whether for pay, promotion, or other forms of mistreatment, may be proved with direct or circumstantial evidence sufficient raise a genuine issue of fact as to whether discrimination played a role in the decisions, or by the burden shifting formula set out initially in *McDonnell Douglas, infra.* The ultimate issue is whether the defendant intentionally discriminated against the plaintiff. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792  (1973). The standard  applicable to Title VII or Section 1981 claims is the same. *Goode v. Cent. Va. Legal Aid Soc'y*, 2014 U.S. Dist. LEXIS 111650, *8-9 (E.D. Va.  2014). To establish a claim of race discrimination, a plaintiff may either follow the burden-shifting framework of *McDonnell Douglas Corp,* at 802, or offer other sufficient evidence that gives rise to an inference of discrimination, in other words, "under conditions which, more likely than not, were based upon impermissible racial considerations." *Gairola v. Commonwealth of Virginia Department of General Services*, 753 F.2d 1281, 1286 (4th Cir. 1985); *Young v. Lehman*, 748 F.2d 194, 196 (4th Cir. 1984).

The burden of showing a prima facie case is not an "onerous" one.  *Burdine,* at 253. Once the plaintiff shows *that an adverse event occurred "under circumstances which give rise to an inference of unlawful discrimination," id.; Young,* at 197, the burden then shifts to NNI to articulate some legitimate, nondiscriminatory reason for its actions. *Burdine,* 450 U.S. at 254. If it meets this burden, the plaintiff must then show that the legitimate reasons offered  were not true and were merely a pretext for discrimination.  *McDonnell Dougla*s, 411 U.S. at 802.

The prima facie case is flexible and fact dependent. *Laudenslager*, 1996 U.S. Dist. LEXIS 16632, at *8 citing *McDonnell Douglass,* 411 U.S. at 802 n.13; *Alvarado v. Board of*

*Trustees*, 928 F.2d 118 (4th Cir. 1991) (prima facie test varies).  The essence of the court's inquiry should be whether the plaintiff has made a prima facie case which "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254 (quotation omitted).

> **A.      NNI argues only that Plaintiffs cannot show similarly-situated employees were treated better, but that is not the sole means of defeating summary judgment, and in any event, they do show similarly-situated employees were favored.**

There is no requirement to demonstrate a similarly situated person was treated better to make out a discrimination case. *Haywood v. Locke*, 387 F. App'x 355, 358-60 (4th Cir. 2010),[1] citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc*., 333 F.3d 536, 545 (4th Cir. 2003); *see also infra,* discussing myriad ways of showing discrimination. It is only where a plaintiff seeks to rely *exclusively* on a comparator to raise a presumption of discrimination that a comparator must be sufficiently similar. *Id.*  In *Haywood,* Plaintiffs argued that the district court had incorrectly found that the comparator's position and job duties were substantially different and therefore was not similarly situated. *Id.,* at 358. Whether someone is similarly situated *may* include evidence that they dealt with the same supervisor, were subject to the same standards and engaged in

---

[1]In each of its motions, NNI fails to recognize that demonstrating a similarly situated comparitor is not the exclusive means of surviving summary judgment. Thus, by failing to discuss any other evidence, and focusing exclusively on comparitor evidence (typically comparitors who plaintiffs themselves identified in deposition or the SAC), NNI does not meet its burden of demonstrating an absence of disputed facts. Even if Plaintiffs were required to demonstrate similarly situated employees who were treated better – which they are not -- they would not be constrained to rely on only those whom each particular plaintiff identified. *Compare Nguyen v. Dalton*, 94 F.3d 642 (4th Cir. 1996) (speculation or opinion as to comparitors not enough). The question is whether Plaintiffs, through discovery, have adduced evidence raising a disputed issue of fact as to whether discrimination played a role in the decision at issue. *Supra/infra.*

similar conduct "without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id., citing Mitchell*, 964 F.2d at 583 (emphasis added). In a failure to promote claim, the Court upheld the district court's analysis where plaintiff's position belonged to a separate job family and series, had different responsibilities, and was at a substantially higher grade.

> Though a comparator need not be an exact match, the only similarities between the comparitor and the plaintiffs are that they all worked for the USPTO in the early 2000s and applied for accretion-of-duties promotions. This is simply not enough. There are by no means 'enough common features between the individuals to allow [for] a meaningful comparison.'

*Id.,* at 359-360 *quoting Humphries v. CBOCS West, Inc*., 474 F.3d 387, 405 (7th Cir. 2007), aff'd on other grounds, 553 U.S. 442 (2008). It is important to assess *all* the circumstances in determining whether someone is similarly situated, not apply a rote test.

The Court did <u>not</u> hold that Plaintiffs' claims had failed because they only pointed to <u>one</u> comparitor; although NNI occasionally argues that more than one comparitor is required to survive summary judgment, that is not the law. *Id.,* at 359 (Plaintiffs are not required as a matter of law to "point to <u>a</u> similarly situated comparator" to succeed on a discrimination claim)(emphasis added).

Indeed, a Plaintiff need not rely on the *McDonnell Douglas* burden shifting at all. *See Worldwide Network Servs., LLC v. DynCorp Int'l, LLC*, 365 F. App'x 432, 442-43 (4th Cir. 2010); *Haywood, supra*. In *Worldwide Network Servs.*, the Court upheld a plaintiff's verdict, finding that § 1981 liability required proof that race actually motivated the decision to terminate, that is, that race "'actually played a role in the . . . decisionmaking process and had a determinative influence on the outcome.'" *Id., quoting Reeves*, 530 U.S. at 141. The Court upheld the verdict because there was sufficient evidence from which a reasonable jury could conclude that four people

collectively made the adverse decisions, two of whom harbored racial animus. That evidence

included one of the four's use of a racial slur, among other things. *Id.* In other words, a decision

maker's use of a racial slur provided evidence of race-based decision making, without resorting

to the *McDonald Douglas* burden shifting. *See also, Smith v. Lockheed Martin*, 644 F.3d 1321

(11th Cir. 2011) ( A circumstantial evidence case of discrimination need not rest on the

McDonnell-Douglas model of proof. Any "convincing mosaic of circumstantial evidence" is

enough to overcome summary judgment. "The plaintiff will always survive summary judgment if

he presents circumstantial evidence that creates a triable issue concerning the employer's

discriminatory intent." Though the existence of a comparator is one method of proof, a

comparator is never an absolute requirement.); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736

(7th Cir. 1994) (Posner, C.J.) (noting the myriad ways of proving discrimination, including that a

comparator is not needed, event where there is no "direct evidence")(collecting cases)

Pay (or promotion or other disparate treatment) decisions must simply be evaluated to

determine whether there are circumstances giving rise to an unlawful inference of discrimination.

*Chan v. Montgomery Cty. Md.*, 2013 U.S. Dist. LEXIS 58449, at *12-15 (D. Md. Apr. 24, 2013).

Evidence that may be probative includes:

> (i)stereotypical remarks, code words, or other communication probative of ... animus, see
> *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S. Ct. 1775, 104 L. Ed. 2d 268
> (1989) (plurality opinion); *Tasciyan*, 820 F. Supp. 2d at 674; (ii) underrepresentation, see
> *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S. Ct. 1817, 36 L. Ed. 2d 668
> (1973) (citations omitted); (iii) statistical evidence and/or analysis, see *Int'l Bhd. of
> Teamsters v. United States,* 431 U.S. 324, 339, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977);
> (iv) evidence of discrimination against employees based on the same protected trait (i.e.,
> "me too" evidence), see *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388, 128
> S. Ct. 1140, 170 L. Ed. 2d 1 (2008); and, of course, (v) comparative evidence, see *Oncale
> v. Sundowner Offshore Servs*., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2D 201
> (1998).

*Chan*, at *12-15;  *Moore v. Nat'l Tire & Battery*, Civil Action No. 13-cv-01779 AW, 2013 U.S.

4

Dist. LEXIS 145805, at *6 (D. Md. Oct. 9, 2013) (reciting types of evidence)

Further, for status-based discrimination claims like these, the employee must only "show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216-17 (4th Cir. 2016), *citing Univ. of Texas Sw. Med. Ctr. v. Nassar*,  133 S. Ct. 2517, 2523 (2013).

In *Brown v. Nucor*, the Court discussed the interplay between a hostile environment and evidence of bias in promotions. There, bias in one plant "diminished the promotional opportunities for black workers in all the departments — including those who wanted promotions into the infected department and those who sought promotions to other departments and needed their supervisors' recommendations." 785 F.3d 895, 911(4th Cir. 2015). Discriminatory promotion approvals also carried the "effects of discrimination from one department and supervisor to another, by systemic tolerance, acquiescence or design." *Id.*

The Court found that the evidence of a hostile work environment also supported Plaintiffs' disparate promotion and pay claims. "It strains the intellect to posit an equitable promotions system set against that cultural backdrop, particularly in light of the other evidence presented," *id., at* 912, explicitly countering the dissent's rejection that a racially hostile environment could help establish a claim for disparate treatment in promotions decisions finding that the dissent's perspective is "perplexingly divorced from reality and the history of workplace discrimination. It is difficult to fathom how widespread racial animus of the type alleged here, an animus that consistently emphasized the inferiority of black workers, bears no relationship to decisions whether or not to promote an employee of that race." *Id., at 912.*

       i.      **Plaintiffs' Statistical Evidence is Sufficient to Defeat Summary Judgment as**

5

### to Pay, Promotion,Permanency and Other Disparate Treatment Claims

Plaintiffs have alleged, and demonstrated, that NNI paid African-American workers less than Caucasian workers because of race, collectively and individually, failed to promote them because of race, collectively and individually, and made them permanent less frequently, collectively and individually. Statistical evidence alone can defeat NNI's motions for summary judgment.  "It is clear that a regression analysis[, even one] that includes less than "all measurable variables"[,] may serve to prove a plaintiff's case." *Bazemore v. Friday,* 478 U.S. 385 (1986).  "A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence. *Id., citing Burdine,* 450 U.S. at 252. So long as a court may conclude, based on the statistical analysis, alone or with other evidence, that it is more likely than not that impermissible discrimination exists, summary judgment should be denied. *Bazemore,* at 401; *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994) ("Statistics can provide important proof of employment discrimination.") (*citing Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307 (1977). In disparate treatment cases, statistical evidence is "unquestionably relevant." *Carter, quoting Ardrey v. UPS*, 798 F.2d 679, 684 (4th Cir. 1986) (internal quotes omitted). Such evidence may be used to establish an inference of discrimination as an element of plaintiff's prima facie case, or to demonstrate that an employer's stated nondiscriminatory reason for its action is in reality a pretext. *Carter,* at 456 (citations omitted).

In *Tyson v. Bouphakeo*, an overtime class action brought pursuant to FRCP 23(b), the Supreme Court analyzed the utility of a statistical analysis for a representative case, assessing whether the sample could have been used to establish liability in an individual action. Contrasting *Walmart v. Dukes,* a Rule 23 hostile environment class action, which involved stores

6

nationwide, the Court held that the proffered statistical study could have been sufficient to sustain a jury finding as to hours worked if it were introduced in any employee's individual action. "While the experiences of the employees in Wal-Mart bore little relationship to one another, in this case each employee worked in the same facility, did similar work, and was paid under the same policy. … [U]nder these circumstances the experiences of a subset of employees can be probative as to the experiences of all of them." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048-49 (2016)[2]

Here, as described (with citations) in Plaintiffs' global statement of facts in connection with the hostile work environment, Plaintiffs worked in the same three facilities, which for all purposes relevant to pay, and promotion, are one facility. In other words, employees were subjected to the same policies, the same decision makers, the same form of pay evaluation/determination, and the same promotion opportunities (or lack of). The same supervisors moved fluidly between shifts and buildings, directly and indirectly supervising Plaintiffs and their cohort of fitters, welders, laborers and other co-workers who held the same job titles as Plaintiffs. The decision makers had the same authority to make pay and promotion decisions.[3]  Thus, the statistical analysis – a regression analysis – compares apples to apples. The results are **statistically significant**, strong evidence that in terms of annual salary, African-

---

[2]"Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury."*Id.,* at 137. In *Tyson,* reasonable minds could differ as to the whether the statistical evidence offered was probative of the actual time worked by each person, but "[r]esolving that question, however, is the near-exclusive province of the jury." *Id.*

[3]In addition, at least up to the rollover, NNI Manager Richard Blont reviewed all pay setting decisions at hire, ensuring that managers were making offers within a set "band" - a range of pay for e.g. welders. Blount essentially signed off if the offer was within the range. Tally, Jackson, Lynn, Jones and others made the recommendation, and he approved, although he did not personally cross check resumes.  Ex. 62, Blount Dep., 27/13-30/2; 31/13-17.

American workers in the NNI Spreadsheet Data *(see infra),* are disadvantaged relative to Caucasian employees who are the same in terms of these independent variables. See Ex. 116, Killingsworth Report.

By way of overview and background, Dr. Killingsworth found that for those in "temporary" job titles between 2008 and 2013, a greater percentage of African-Americans were in temporary job titles in four of the first six years of the relevant time period (2008-2013)[4]. Id. Par. 14.  In 2008, the ratio of white to black permanent employees was 3.4 to one (24/7), whereas the ratio of white to black temporary employees was somewhat less, 2.8 to one (14/5).  In contrast, by 2013, there were four white permanent employees for every black permanent employee (48/12), whereas the ratio of white to black temporary employees had actually fallen to slightly under two to one (77/39). Id. at par. 14. In other words, Caucasian workers were more likely to be permanent as compared to African-American workers.

In Table 4, Dr. Killingsworth presented data on the average annual salaries of the plaintiffs in this litigation and of Caucasian workers at NNI. Until 2015, the average annual salary of the plaintiffs was "**substantially** less than the average salary of white workers at NNI as of each of the year-end dates considered in the table.  For example, in 2010, the 14 plaintiffs present as of the end of the year had an annual salary of $40,432, on average, vs. $47,327 for white employees – a difference of about **$6,900**." Id. Par, 15. (emphasis added). Similarly, an evaluation of average annual salaries of black and white workers at NNI in 2008 through 2015 showed that the "average annual salary of black workers was **substantially** less than the average salary of white workers at NNI as of each of the year-end dates considered in the table.  For

---

[4] NNI "rolled" temporary employees to permanent status in March 2014.

example, in 2010, the 45 black workers present as of the end of the year had an annual salary of

$40,491, on average, vs. $47,327 for white employees – a difference of more than $6,800." Id.

Par. 16 (emphasis added). In other words, Plaintiffs specifically and African-American workers

generally made significantly less on average than Caucasian workers.

Three regression analyses were conducted. "The first uses, for independent variables, a

limited set of "basic variables" which refer to employees' race, sex, age, and years of service at

NNI.  The second regression model adds variables identifying employees' different job groups to

the basic variables.  Finally, the third regression model adds variables for employees' actual job

titles to the basic variables." Ex. 116, Killingsworth Report, par. 21. Looking at 2008, for

example, blacks' annual salaries were approximately **13.54 percent less** than those of whites

who were the same in terms of the basic variables.  "Because this is the equivalent of 2.29

standard errors (and is therefore greater than 1.96), this regression coefficient is also statistically

significant." Id. Looking at the:

> results for the same population in 2008 (i.e., 53 workers, of which 12 were black) for a
> regression using both the basic variables and variables for job group.  Here, the black-
> white difference in salary was -16.29 percent.  Because this regression coefficient is
> negative, it indicates that blacks' annual salaries were approximately **16.29 percent less**
> than those of whites who were **the same** in terms of the basic variables and were in the
> **same job group**.  Because this is the equivalent of 2.63 standard errors (which is
> therefore greater than 1.96), this regression coefficient is also statistically significant.

Id. par. 26. (emphasis added)

> Finally, the third column in Table 6 for 2008 presents results for the same
> population based on regressions that use both the basic variables and variables for job
> title. Here, the black-white difference in salary was -16.69 percent.  This regression
> coefficient is negative, which therefore indicates that blacks' annual salaries were
> approximately **16.69 percent less** than those of whites who were the same in terms of the
> basic variables and held the same job title.  Because this is the equivalent of 2.46
> standard errors (which is therefore greater than 1.96), this regression coefficient is also
> statistically significant.

9

Id. par. 27. (emphasis added)

  Summarizing the tables, Dr. Killingsworth found that a

substantial majority of the regression coefficients in Table 6 are negative (indicating salary differences adverse to blacks relative to whites who are same in terms of the independent variables considered in the regression), statistically significant (i.e., unlikely to have been the result of random or chance factors), and large in the ordinary language sense. Specifically, all 21 of the racial differences in annual salary are negative (implying that blacks' annual salaries are lower than those of whites who are the same in terms of the other variables considered in the regression analysis (age, sex, etc.)).  Twelve of the differences are 10% or greater; and 17 of them are statistically significant at conventional test levels.  I believe that this is strong statistical evidence that overall – i.e., **for workers in all positions (including "other" job titles as well as "relevant" titles), black workers in the NNI Spreadsheet Data are disadvantaged in terms of annual salary relative to whites who are the same in terms of these independent variables.**

Id. at par. 39. (emphasis added).

  Dr. Killingsworth considered not just workers in "relevant" job titles, but workers in "other" job titles, as well as workers in "relevant job titles only," and performed the same three regression analyses, finding "strong statistical evidence that, in terms of annual salary, black workers in the NNI Spreadsheet Data in the relevant job titles are disadvantaged relative to whites who are the same in terms of these independent variables." Id., par. 30, 31.

  Again, a "substantial majority of the regression coefficients in Table 7 are negative (indicating annual salary differences adverse to blacks relative to whites who are same in terms of the independent variables considered in the regression), statistically significant (i.e., unlikely to have been the result of random or chance factors), and large in the ordinary language sense." Id., par. 31. All 21 of the racial differences in annual salary are negative, 15 of the differences are 10% or greater; and 17 of them are statistically significant at conventional test levels." Id.

  Lastly, Dr. Killingsworth assessed racial differences in job rankings, where each was ranked according to the average salary of the incumbents in each. The job with the lowest

average pay would be lowest-ranked, the job with the next-lowest pay would be next-lowest ranked.  Id. At 33. First, he analyzed the entire population of NNI incumbents, regardless of whether in "relevant" or "other job titles, and then analyzed only incumbents in the relevant titles. For the first group, 14 of 16 coefficients were negative, and in the second, 16 of 16 coefficients were negative, meaning as compared to whites, black employees are in jobs that are lower ranked. In the first group, seven of the coefficients were statistically significant; for the second, four were statistically significant. Remarkably, for 2014 and 2015, [after NNI was on notice of this lawsuit] for the first group, the coefficients were negative, statistically significant and large. In 2015, the mean salary is -1.91, meaning that relative to otherwise-similar whites, "blacks were in jobs that were almost two levels lower in terms of their mean salary." Id., par. 36.

It is not an overstatement to say that this evidence pushes Plaintiffs over the summary judgment hurdle of demonstrating disputed issues of fact as to all pay decisions for all Plaintiffs. This evidence, alone/or in conjunction with the evidence set forth below, allows a reasonable jury to find that discrimination infected the decision making process and that determinations regarding every Plaintiffs' pay were racially biased. *See Bazemore, Tyson, Teamsters, Chan, supra,* at 626. *See also Smith v. Va. Commonwealth Univ.,* 84 F.3d 672, 676-77 (4th Cir. 1996)(en banc) (reversing grant of summary judgment for university, where six male professors challenged school's affirmative action attempt to remedy gender imbalance in pay, because there remained questions of fact as to whether there was a manifest imbalance in compensation between the male and female faculty, where the defendant relied solely on statistical evidence to support its affirmative action plan, because plaintiffs could challenge the statistical analysis at trial, even though plaintiffs did not submit their own statistical evidence; jury could find for

defendant on the evidence, but matter could not be resolved at summary judgment). The statistical evidence here prevents summary judgment.

### ii.      Racial Animus Of Decision Makers Provides Further Evidence of Discrimination

Plaintiffs have more than statistical evidence, which itself raises an inference of discrimination in all pay-related decisions. Decision-makers involved in the pay, promotion and other adverse decisions made stereotypical remarks (e.g. "N" word, "boy"), used "code" words (e.g. "gang"), and otherwise communicated racial animus, which allows a jury to find intentional discrimination in decision making. *See Worldwide Network Servs., LLC, supra; Chan, supra, citing Price Waterhouse; see also, Young v. UPS,* 135 S.Ct. 1338, 1346, 1355 (2015)(indicating Young had evidence that others were treated more favorably, including manager's statement that she was "too much of a liability").

In *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010), the Court discussed the animus of the relevant decision maker. Noting that the "views of others are no proof of the views of [the decision maker], at some point the corporate environment in which he worked places [his] own selective use of the [racially neutral program]...in a less neutral context." *Id.* (where plaintiff had put forward the kind of "'evidence that clearly indicates a discriminatory attitude at the workplace and . . . illustrate[s] a nexus between that negative attitude and the employment action" and holding that plaintiff's evidence showing a discriminatory attitude at [her company of employment] toward female managers" sufficient to "allow a trier of fact to conclude that these discriminatory attitudes led to [plaintiff's] ultimate termination.") citing *Lettieri v. Equant, Inc.*, 478 F.3d 640, 649 (4th Cir. 2007). Finding that summary judgment was inappropriate, the Court then stated,

12

> At this point, it is perhaps worthwhile to take a step back. We fully acknowledge that the elusive factual question of intentional discrimination is inevitably tough and rarely clear cut. Our holding is not about setting tripwires whenever an employer fails to dot its "i's" or cross its "t's" in following a policy. It is not about taking a fine-toothed comb to the record in the hopes of unearthing some minor discrepancy in an employer's story. And it is certainly not about infusing fear and trembling into a company's every employment decision. But the alleged facts here are too problematic to overlook. Evidence of a good employee record combines with evidence of an impermissible company attitude to form a lethal concoction. Old Dominion fired an employee who was, according to the district court, "able to do her job without assistance and in a satisfactory manner," due to a treatable ankle injury, while hiding behind the results of a selectively administered physical fitness test that did not even purport to test the injury, and while dubiously claiming that its decision was compelled by a late-blooming policy, all in the context of, to put it mildly, a sexually stereotyped work environment. In this case, it is not any single piece of evidence but rather the evidence taken in its entirety that leads us to believe Merritt deserves a trial.

*Merritt*, 601 F.3d at 301-02.

As in *Merritt,* Plaintiffs' statistical evidence underscores the "the corporate environment" that cannot be ignored or foisted off on to individual decision makers making individual, isolated, decisions. On top of the compelling statistical evidence, another form of evidence demonstrates that the corporate environment was populated by decision makers whose own discriminatory attitudes and bias affected evaluation and pay-setting decisions.

Pay, promotion and/or disciplinary decisions of the Plaintiffs were affected by the following supervisors/managers, all of whom have made discriminatory or racially disparaging remarks, from which a jury could find that decisions as to each and every Plaintiff were biased. For example, as set forth (with citations) in Plaintiffs' MOL-HWE, among other comments[5] Jackson referred to African-American workers as "this 'n'", "n*gger," "fat Jamaican bitch", "boy", "bitch", "you people", "you black people",  and "gangster" among things, and talked about sending "your black ass home". Jeff Rilee referred to workers as "n*ggers", "my nig",

---

[5]This list is <u>not</u> exhaustive.

13

"monkeys", referred to Crawford as "black bitch", talked about "African built shit", and made many among other racial remarks. Jaffeux referred to workers as "stupid ass n*gger", "dumbass n*gger", "black monkey"; Doug Todd referred to Joyner's dreadlocks as "shitlocks", referred to Payton as a "gangbanger", and said African-Americans were only "fit" to be laborers. Hines parked at NNI with a confederate flag on his truck, referred to African-Americans as "you people" and "boy", and said he would "fire you boy". Scheg also referred to African-Americans as "boy", "you people", said "bring your black ass here" and "what's up my nigga"; used the word "n*gger" in front of Lamar Holloman, and said "stop acting like a dumb n*gger". Tally would say "y'all black guys"; Harwick dangled a noose in front of Plaintiffs, said he ought to "hang all the n*ggers", freely used the word "n*gger", called people "boy", and routinely wore a confederate flag shirt. Jay Adams, who was a make up supervisor, called an African-American worker "dumb ass n*gger"; Matt Grahan, who was also a make-up, referred to Hooker and two other African-American workers as his "brown posse," and "black ass bitch." This evidence, particularly in combination with the atmosphere of discrimination, the stark statistical evidence, as well as evidence of pretext, *infra,* even where not directly tied to a particular pay, promotion, training, evaluation, raise or other decision, is relevant to the question of intentional discrimination, and makes all decisions ripe for jury resolution.

### iii. Evidence of Discrimination Against "Other Employees" Is Relevant and Demonstrative of Bias

Plaintiffs have abundant other evidence as well. "As a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent." *Calobrisi v. Booz Allen Hamilton, Inc.,* 2016 U.S. App. LEXIS 15451, at *7 (4th Cir. Aug. 23, 2016), *quoting Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir.

1990) (reversing district court's across the board exclusion of "other employee" [also referred to as "me-too" evidence or "pattern and practice"] evidence, that is, testimony of seven former employees who also claimed to have been targeted similarly to plaintiff). Here, there is abundant "me too" evidence which also allows Plaintiffs' pay, promotion and other disparate treatment claims to go to a jury. In other words, Plaintiffs who testified about Wayne Jackson harassing them is relevant to other Plaintiffs who are proving their own claims of harassment by him. See citations, Pl. MEM-HWE. Similarly, discriminatory pay decisions for one Plaintiff supports discriminatory pay claims of all, particularly although not exclusively where the same decision maker's bias is at play. As described in more detail below, (and incorporated herein by reference), the evidence of discrimination, including the evidence of outward racial animus described in section iii, above, as well as evidence of race-based decision making of any Plaintiff, is relevant to all other Plaintiffs, and raises an inference of discrimination. *See Chan, supra, citing Sprint.*

### iv. African-Americans and Hispanics are Under-represented

Further, African-American and Hispanics have been clearly under-represented in a variety of positions, from top management positions, to superintendent and foreman positions, through to supervisor and make-up supervisor positions, down even to raises stemming from so-called "Job Family Reclassifications," which contributes to a reasonable jury finding discrimination. *Chan, supra*, (citing *McDonnell Douglass*). There was an uptick in promotions of minority workers following Plaintiffs' Document Preservation Letter in January 2013 and/or following the filing and attendant publicity of the instant suit in October 2014, which the jury may consider as well. Ex. 117, Pl.'s Doc. Preservation Ltr.; Ex. 118, Peter Dujardin, *Lawsuit Alleges Race Discrimination at Division of Huntington Ingals*, Dailypress.com (Oct. 9, 2014)

First, NNI's President, Vice President, Program Director, and Operations Manager over

15

Plaintiffs are Caucasian (0% African-American or Hispanic). Ex. 80, Jones Dep. 33-34 (indicating that Steve Napiecek is NNI's Vice President, Bob Schatzel is NNI's Program Direct, and Scott Jones is NNi's Operations Superintendent); *see also See* Ex. 120, Def.'s Supp. Resp. to Crawford's Interrog. No. 17 (indicating race of Operations Manager, Scott Jones, and General Manager, Bob Schatzel).

African-American and Hispanic employees are overwhelmingly absent from other management- and supervisor-level positions. For example, on the "pin jig" project, out of fourteen Manager/Foreman/Superintendent positions, only one was African-American (roughly 7%). Ex. 120, Def. Supp. Resp. to Crawford's Interrog. No. 20 (Chart of Foreman Assigned to Pin Jig).

In response to Plaintiffs' Interrogatory concerning the number of African-American Superintendents from 2009 to present, NNI identified only Derrick Coates, who served as "acting Superintendent" from 2007 through 2009. Plaintiffs have identified, at least, ten Caucasian Superintendents6 during the same time frame. (*e.g.,* one "acting" out of, at least, ten total, or approximately 10%*). Compare* Ex. 121, Def. Resp. to Frantz Edouard's Interrog. No. 3 (indicating that NNI has had one African-American Superintendent since 2009) *with* Ex. 181, NNI-2_0144472 (indicating Paul Hendricks, Richard Tally, Scott Jones, and Joanne Blanchette as Superintendents); *and* Def. Supp. Resp. to Crawford's Interrog. No. 20 (indicating Blanchette, Daniel Meadows, and Al Wagner as Caucasian Superintendents); *and id.* at No. 7 (indicating Tim Ginger and Corey Beddingfield as Superintendents) *and* Ex. 90, Pruden Dep. 66/5-6

---

6 Caucasian Superintendents include: Paul Hendricks, Al Wagner, Scott Jones, Corey Beddingfield, Tim Ginger, Daniel Meadows, Isaac Pruden, Richard Tally, Ryan Scott, and Joanne Blanchette.

(Superintendent).  Plaintiffs understand Ryan Scott (Caucasian) has recently been promoted to Superintendent.

NNI identified six African-American Foreman—four of whom obtained position their position after NNI received a Document Preservation Letter in this case—out of 32 (roughly 18%), Ex. 121, Def. Resp. to Frantz Edouard's Interrog No. 4.7/8

Prior to January 1, 2013, NNI could identify 14 African American Make-up Supervisors, Ex. 121, Def. Resp. to Edouard Interogg. No. 7, out of a total of seven-hundred ninety unique employees that NNI hired prior to 2013. No less, Foreman may appoint as many Make-ups as they wish on their crew at a given time, with some Foreman, maintaining three Make-ups. See Ex. 94, Ryan Scott Dep. 34-36 ("Is there a limit how many make-ups you can have? A. No. Q. Can your whole crew be make-ups? A. If I wanted to."); *see also id.* at 34 (three Make-ups for one Foreman).

In terms of "Job Family Reclassifications"—the only avenue for raises/job changes within the Mech Tech family—where, for example, an employee reclassifies from Mech Tech II to Mech Tech III, there is significant under-representation as well. Prior to December 31, 2014,

---

[7] Ex. 120, Def. Supp. Responses to Crawford's Interrog. Nos. 17 & 18 (indicating Caucasian Foreman: Robert Slaughter, Kevin Angle, Wayne Bacon, Carl Bradshaw, Phillip Brewer, James Buffin, Mike Deboard, James Hilbourn, Thomas Hines, Thomas Howell, Wayne Jackson, Thomas Jaffeux, Ronald Johnson, Doug McCercher, Keith Meadows, Dan Purcell, Robert Rileee, Mike Shultz, Ruel Scott, Tracy Spencer, Doug Todd); Ex. 182, NNI-2_0144480 (Ryan Scott); Ex. 177, NNI-2_0144323 (Daniel Cummings); Ex. 342, Excerpts of NNI139690.1 (Foreman) (Mike Williams, Donald Harwick, Hugo Belfiore, Ronald Joynson, Randy Mason, Clem Stewart, Donald Hensley, Brian Penny, Kevin Gambill)

[8] NNI promoted Lisa Lindsay, who is African-American, was promoted for less than 24 hours to Acting General Foreman, but immediately removed her from the position as not having the requisite qualification; NNI chose to promote Wayne Jackson in her stead. Ex. 358, Email re Lisa Lindsey promotion/demotion. Two other Caucasian employees, Doug Todd, and Doug McKercher, have been Acting Superintendents.

shortly after Plaintiffs' suit was filed, and approximately two years after Plaintiffs' Document

Preservation Letter, only three out of twenty-one Job Family Reclassifications since 2009 had

gone to African-Americans. Ex. 329, Excerpts of NNI139690.1 (Job Family Mech Tech).

Seventeen went to Caucasians, and one went to an Hispanic employee. *Id.* Three of the eight Job

Family Reclassification received by African Americans have been since 2014—after Plaintiff's

Document Preservation Letter. Ex. 329, Excerpts from NNI139690.1 (Job Family Mech Tech).

     This evidence allows Plaintiffs' claims, especially but not limited to, failure to promote,

failure to reclassify, and failure to appoint to make-up supervisor, to go to a jury. *See Chan*,

*supra*, (citing *McDonnell Douglass*).

     **v.**    **Comparitor Evidence Strongly Supports Plaintiffs' Claim**

     Finally, while not required to survive summary judgment in light of the other evidence,

Plaintiffs point to comparators who were treated more favorably, who were equally or less

qualified than they. *See Chan, citing Oncale; see also Haywood, supra.* As Plaintiffs elaborate in

Section III, similarly situated Caucasian employees often started at higher rates with the same or

less experience, were timely evaluated, received higher raises, and overall were given more

opportunities for advancement (eg being made make-up supervisor, training, qualifications, and

the like). The following employees were routinely treated better than Plaintiffs, despite having

similar (or fewer) qualifications:

**TABLE ONE**[9]

| 1 | Name | Race | Hourly Rate of Pay | Job Title | Years of Experience When First Hired |
|---|------|------|--------------------|-----------|--------------------------------------|
|   |      |      |                    |           |                                      |

---

[9]All of the supporting material/citations for the information found in Table One is attached to a footnoted version of the instant chart, at Ex. 158.

| 2 | James Adams | Caucasian | 2/20/12: $18; 3/26/12:$19; 4/20/12:$20; 5/15/12:$21; 6/8/12:$22.50; 10/7/2013: $23.25; 3/24/14: $23.25 2/23/15: $23.85 2/22/16: $24.62 | 1/14/13: Fitter – structural (temp) 3/24/14: Mech Tech 2 | no fitter experience |
| 3 | Brian Briggs | Caucasian | 12/2/13: $12 1/13/14:$13.50 3/7/14:$17.50 3/23/14: $17.50 2/23/15: $18 2/22/16:$20 | 12/3/13: laborer 3/23/14: Mech Tech I 2/22/16: Mech Tech II | 5 years carpentry; no fitter experience |
| 4 | John Bundy | Caucasian | 2/17/14:$14 3/21/14: $16.50 2/23/15: $17.12 2/22/16: $17.75 | 2/17/14: laborer 3/24/14: Mech Tech I | Graphic designer; no experience in trades |
| 5 | Brandon Burton | Caucasian | 2/20/13: $12 11/25/13: $13 1/17/14:$17 1/13/14: $18 | 2/20/13:laborer 1/13/14: fitter | Landscaper; no experience in the trades |
| 6 | Levi Cluts | Caucasian | 11/4/13:$13 12/9/13:$13.50 1/7/14:$14.50 2/3/14:$15.50 3/4/14: $16.50 3/23/2014: $16.50 2/23/15: $17.12 2/22/16: $17.65 | 11/4/13:Laborer 3/23/2014: Mech Tech I | Medical transport; no prior experience in the trades |
| 7 | Clinton Combs | Caucasian | 2/25/13: $13 4/1/13:$13.50 5/6/13: $14 6/3/13:$15 6/24/13:$16 8/21/13:$18.50 9/30/13:$19 11/4/13:20 11/19/13: $21 2/23/15: $21.86 2/22/16: $22.90 | 2/25/13: laborer 2/23/14: fitter | No prior experience in the trades. |
| 8 | Daniel Cummings | Caucasian | 12/27/09: $13 1/24/10:$14 4/18/10:$16 | 12/27/09: Laborer 9/2010: Mech Tech 2 | No prior experience in the trades; previously |

| | | | | | |
|---|---|---|---|---|---|
| | | | 5/23/10:$17<br>6/27/10:$18<br>9/20/10: $18.75<br>2/28/11: $19.55<br>2/27/12: $20.40<br>2/25/13:$21.19<br>2/24/14: $22<br>2/23/15:$24<br>2/22/16:$25.12 | 3/2015: Mech<br>Tech 3 | a line cook. |
| 9 | John Fannin | Caucasian | 2/7/10: $13<br>4/18/10:$14.50<br>5/16/10:$15.50<br>5/1/11:$16.50<br>5/29/11:$17<br>10/2/11:$25<br>11/21/11:$21<br>9/10/12:$21.52<br>10/11/13:$22.09 | 2/7/10: laborer<br>11/21/11: Mech<br>Tech 3 (fitter) | Automotive<br>mechanic prior to<br>NNI; no fitter<br>experience |
| 10 | Joseph Gibson | Caucasian | 2/3/14:$12<br>3/3/14:$15<br>2/3/15:$15.48 | 2/3/14: Laborer<br>3/23/14: Mech<br>Tech I | No prior<br>experience in the<br>trades; worked as<br>a cook. |
| 11 | Ronald Gobble | Caucasian | 8/5/12: $21<br>9/9/12:$22<br>10/14/12: $23.50<br>11/18/2012:$25<br>12/9/12:$26<br>5/19/13:$27 | 7/30/2012: Temp<br>3/23/2014: Mech<br>Tech 3b | |

| 12 | Matt Grams | Caucasian | 4/12/12: $17<br>5/30/12:$18<br>8/6/12:$18.75<br>10/1/12: $19.50<br>4/29/13:$20.50<br>7/22/13:$21.50<br>8/26/13:$22.50<br>9/30/13: $23.50<br>10/21/13:$24.50<br>3/24/14: $24.50<br>2/23/15:$25.05 | 4/12/12: Tool room attendant<br>3/23/14: Mech Tech 2A (fitter) | Engineer technician prior to NNI; no prior fitting experience. |
| 13 | Timothy Hill | Caucasian | 3/6/2011: $13<br>4/10/11: $13.50<br>5/15/11:$14<br>7/24/11: $15<br>3/25/12:$16<br>6/10/12:$25<br>7/8/12:$19.25<br>8/19/12: $19.75<br>10/7/12:$20<br>2/9/14:$21<br>2/23/14: $21.65<br>1/11/16: $22 | 2/28/11: Temp<br>3/24/14: Mech Tech II | |
| 14 | James Knick | Caucasian | 4/24/12: $21<br>6/4/12:$22<br>7/6/12:$23<br>8/20/12:$24<br>10/15/12:$25<br>2/11/13: $26<br>5/20/13: $26<br>2/23/15:$26.97<br>2/22/16: $27.98 | 4/24/12: Structural Welder<br>3/23/14: Mech Tech 3 | Approx. 5 years of experience welding |
| 15 | Ricky Penrod | Caucasian | 11/17/08: $24<br>1/9/12: $25<br>2/23/15: $25.62<br>2/22/16:$26.26 | 11/17/08: Temp.<br>12/14/09: Fitter<br>3/24/14: Mech Tech 3 | 25 years in 2016 |
| 16 | Evan Reams | Caucasian | 2/12: $13<br>3/12:$13.50<br>4/12: $14.50<br>5/12: $15<br>6/12:$16.50<br>7/12:$18<br>9/12:$18.50<br>9/12: $19<br>11/12:$20<br>3/13:$20<br>8/13: $22<br>9/13: $24 | 2/3/12: Laborer<br>12/5/12: Fitter<br>3/32/14: Mech Tech II | No prior experience |

| 17 | Jesse Smith | Caucasian | 10/2011:$18<br>3/12: $20<br>7/12:$21.50<br>8/12: $22<br>9/12: $23<br>9/13: $24.50<br>3/14: $26<br>2/15:$26.65<br>2/16:$27.31 | 10/24/2011: Fitter<br>3/23/2014: Mech<br>Tech III | Approximately<br>3-5 years |

| 18 | Quesenberry | Caucasian | 7/12: $18<br>11/13: $18.50<br>1/14: $19.50<br>3/14: $20<br>2/15: $20.50 | | |
|---|---|---|---|---|---|
| 19 | Josh Vanderberry | Caucasian | 4/19/10: $24<br>5/24/10:$26<br>7/22/10:$26.25<br>8/30/10:$26.50<br>10/14/13:$27.50<br>2/23/15: $28.60 | 4/19/10:<br>Structural Welder<br>3/23/14: Mech<br>Tech 3 | Approx. 6 years<br>at hire |
| 20 | Ben Vogel | Caucasian | 2/25/13: $14.50<br>4/1/13: $15<br>4/30/13:$15.50<br>6/4/13:$16.50<br>7/5/13:$17.50<br>8/19/13: $20<br>9/20/13: $22<br>10/25/13:$24<br>12/7/13: $26<br>2/23/15: $26.62 | 2/25/13: Laborer<br>7/5/13: Fitter<br>12/9/13:<br>Fitter/Welder<br>3/23/14: Mech<br>Tech 2A | 1 year of<br>experience fitting<br>prior to hire |
| 21 | Mark Yanarella | Caucasian | 2/18/13: $23<br>3/25/13: $24<br>4/22/13:$25<br>5/21/13:$25.50<br>3/24/14: $26.50<br>2/23/15:$27<br>2/22/16: $27.70 | 2/18/13:<br>Structural Welder<br>3/23/14: Mech<br>Tech 3b | 23 years<br>experience at hire |

Both individually and globally, this evidence (when compared to Plaintiffs and/or African-American employees) easily allows a jury to find in Plaintiffs' favor on their claims and summary judgment should be denied. *See also, infra.*

II.     **THE MULTIPLIER EFFECT OF DISCRIMINATION IN TRAINING,**

**EVALUATIONS, MAKE UP APPOINTMENTS AND OTHER PRACTICES
COLLECTIVELY HAD SIGNIFICANT IMPACT ON PLAINTIFFS'
EMPLOYMENT**

The effect of Defendant's discriminatory practices are  actionable on their own, but the

effect is multiplied when considered together. *See generally, Brown v. Nucor, supra.* Plaintiffs'

claims of disparate training, evaluations, write ups, failure to appoint as make-up supervisor, and

other forms of discrimination, form part of their hostile work environment claims, and should not

be evaluated in isolation. See *Guessous v. Fairview Prop. Invs.,* 828 F.3d 208 (4th Cir. 2016).

While NNI attempts to isolate the disparities, doing so unfairly deprives Plaintiffs of the

opportunity to demonstrate that wholistically, not only was the environment hostile, but racially

biased decision making that did not always rise to the level of a discrete act on its own, built up

over time to magnify the impact of the bias. In other words, while a racially biased evaluation

might not rise to the level of an adverse action on its own (or <u>might,</u> due to a direct impact on

raises), the biased evaluation might lead to that employee not having the opportunity to be

designated a make-up supervisor, which could in turn impact that employee being considered for

an open supervisor position. *See also, Williams, infra,* discussing inability to apply for a job

because discriminatory evaluation resulted in ineligibility for position. Similarly, biased training

decisions impact an employees' ability to gain relevant experience, which affects their ability to

be made permanent, or rise from a Mech Tech I to II to III.

By way of illustration only, NNI asserted that "some work performed at NNI requires

American Society of Mechanical Engineers ("ASME") welding qualifications, while other work

requires American Welding Society ("AWS") welding qualifications. Gordon only holds AWS

qualifications, while Crowder holds both AWS and ASME qualifications. As such, Crowder is

qualified to perform a much wider range of work than Gordon. In fact, Crowder is one of the

23

most qualified workers in the shop. (Ex. K, Debord Decl., ¶¶ 9–11)." While Plaintiff admits these facts, it is also true that to earn a qualification a worker is merely required to pass a test to demonstrate a skill (Ex. 76, Hines Dep. 10/20-22; 36/5-37/3 ), and Gordon, for example, was not offered the opportunity to test for an ASME qualification. Ex. 41, Gordon Decl. "Smaller" less obviously impactful decisions nevertheless multiplied in their effect, over the course of months and years, resulting in growing disparities between Plaintiffs and their Caucasian counterparts. *See Section I,* supra. Thus, NNI's attempt to minimize these experiences, and the impact, should be rejected because they all connect together.

### III. NNI'S INDIVIDUAL ARGUMENTS DO NOT UNDERMINE PLAINTIFFS' CLAIMS[10]

NNI makes a variety of claims as to individual Plaintiffs' claims for pay, promotion and other discrimination. It argues that various pay claims are time barred, or plaintiff did not experience a tangible action, or s/he cannot show an appropriate comparitor. It did not move on Plaintiff Alvarez' pay claims, Edouard's discriminatory promotion and training opportunity claims, Gordon's discriminatory pay, promotion and permanency claims, and Lamar Joyner's disparate pay claims, which must be submitted to a jury.  Its motions should be denied.

### A.    NNI's assertion that pay claims of Barnett, Blow, Crawford, D. Pierce, and K. Smith are time barred fails because of the Fair Pay Act.

In connection with Plaintiffs Barnett, Blow, Crawford, D. Pierce, and K. Smith, NNI argues that pay decisions are time barred. It argues that the four year statute of limitations for

---

[10] As with the hostile environment and termination arguments, NNI asserts as to Cross and Wiltz that pay discrimination was "less likely" because the decision-maker is the same race fails. It is simply not an accurate statement of the law. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001 (1998)

Section 1981 claims does not save pay claims where the pay decision was made more than four years prior to their Complaint being filed. It argues that the Ledbetter Act (Fair Pay Act), which explicitly amended Title VII such that claims accrue each time a discriminatory pay check is received, does not apply to Section 1981. Defendant's argument has been rejected by a number of courts and should be rejected here because "the express purpose of the FPA was 'to reinstate the law regarding the timeliness of pay compensation claims as it was prior to the Ledbetter decision, which Congress believed undermined statutory protections against compensation discrimination by unduly restricting the time period in which victims could challenge and recover for discriminatory compensation decisions.'" *Johnson v. Fed. Express Corp.*, 996 F. Supp. 2d 302, 325-26 (M.D. Pa. 2014)(emphasis added) *quoting Mikula v. Allegheny County of Pa.*, 583 F.3d 181, 184 (3d Cir. 2009); *and citing* Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, § 2, 123 Stat. 5 (2009); 155 Cong. Rec. H546-03 (daily ed. Jan. 27, 2009); 155 Cong. Rec. S212-03 (daily ed. Jan. 8, 2009) (Sen. Ted Kennedy) ("[The Lilly Ledbetter Fair Pay Act] will restore the basic right of all workers, regardless of their race, sex, religion, national origin, age, or disability, to be paid fairly, free from discrimination. It will restore workers' rights to challenge ongoing discrimination and hold unscrupulous employers accountable [and] . . . [it] will restore the long-standing rule that each discriminatory paycheck is a separate wrong that may be challenged by workers within the required period after receiving the check.").[11]

---

[11]*See also Groesch v. City of Springfield, Ill.,* 635 F.3d 1020, 1026 (7th Cir. 2011) (extending the paycheck accrual rule to equal protection claims under 42 U.S.C. § 1983 because the FPA "remov[ed] the Ledbetter decision as an obstacle to following our earlier precedents, which recognized the paycheck accrual rule for all allegations of unlawful discrimination in employee compensation"); *Johnson v. Fed. Express Corp.*, 996 F. Supp. 2d 302, 326 (M.D. Pa. 2014) (FedEx has failed to establish that the court committed a clear error of law or fact in applying the paycheck accrual rule to Johnson's Section 1981 claim) (collecting cases); *Connelly v. Steel Valley Sch. Dist.*, No. 11-851, 2011 U.S. Dist. LEXIS 121339, 2011 WL 5024415, at *3 (W.D.

Further, prior to Congress legislatively overruling *Ledbetter,* courts routinely applied the

Supreme Court's reasoning from the *Ledbetter* decision, a Title VII case,  to Section 1981 claims.

*See eg Proctor v. United Parcel Serv.,* 502 F.3d 1200, 1207 (10th Cir. 2007)(applying *Ledbetter*

in analysis regarding the timeliness of ADA claims); *Webb v. Deluxe Fin. Servs.,* No. 05-2137-

CM,  2008 U.S. Dist. LEXIS 67123, at *11-12 (D. Kan. Aug. 15, 2008) (because racial elements

for racial discrimination claims are the same under Title VII and Sec. 1981, applies *Ledbetter* to

bar claims). It would be illogical to have relied on *Ledbetter* to dismiss Sec. 1981 claims as time-

barred but refuse to apply Congress's reasoning when it overruled the decision.

**Section 1981 and Title VII are interpreted consistently, and the Ledbetter Act**

**overruled the line of reasoning of the Supreme Court when it held that discriminatory pay**

**claims accrued when the pay rate was set. *See, supra.* The claims of Plaintiff  Barnett (for**

**paychecks received after October 1, 2010), Blow (for pay checks received after February 11,**

**2011), Crawford (paychecks received after September 30, 2010), D. Pierce (paychecks**

**received after February 11, 2011), and K. Smith (same) are all timely.**

---

Pa. Oct. 20, 2011) ("Because the [Third Circuit] Court of Appeals has historically treated Title
VII and section 1983 actions uniformly, the paycheck accrual rule applies in this case."); *Summy-
Long v. Pa. State Univ.*, No. 1:06-CV-1117, 2010 U.S. Dist. LEXIS 27953, 2010 WL 1253472, at
*12 (M.D. Pa. Mar. 24, 2010) (analyzing Title IX and Sections 1983 and 1985 claims under the
paycheck accrual rule because all three statutes rely on Title VII case law for statute of
limitations issues); *Aspilaire v. Wyeth Pharms., Inc*., 612 F. Supp. 2d 289, 303 n.6 (S.D.N.Y.
2009) (assuming without deciding that FPA applies to Section 1981 claim because Title VII and
Section 1981 claims are frequently analyzed under the same framework); *Shockley v. Minner,*
No. 06-478 JJF, 2009 U.S. Dist. LEXIS 31289, 2009 WL 866792, at *1 (D. Del. Mar. 31, 2009)
(concluding that the FPA "explicitly overruled the decision and logic" of the Ledbetter decision);
*Vereen v. Woodland Hills Sch. Dist.*, No. CV-06-462, 2008 U.S. Dist. LEXIS 23075 (W.D. Pa.
Mar. 24, 2008); *Bradley v. Phillips Petroleum Co*., 527 F. Supp. 2d 661, 684 n.108 (S.D. Tex.
2007); *see also Johnson v. Portfolio Recovery Assocs., LLC*, 682 F. Supp. 2d 560, 586-87 (E.D.
Va. 2009) (declining to decide whether Ledbetter Act applied to Sec. 1981 claims on a 12(b)(6)
motion where the statute of limitations affirmative defense did not clearly appear on the face of
the complaint).

### B.    Plaintiffs' Pay, Promotion and Other Forms of Disparate Treatment Claims[12], Individually and Collectively, Survive Summary Judgment

In connection with many of the Plaintiffs' claims, Defendant argues that their pay claims are speculative or fail because Plaintiffs themselves have not always identified a similarly situated comparitor. As described in connection with Defendant's arguments about certain Plaintiffs' discriminatory termination claims [Pl. MOL-DISC/RETAL], Plaintiffs are also not constrained to rely on their own observations when proving pay or promotion claims. Thus, while Plaintiffs may not rely on speculation, they are similarly not limited to their own personal knowledge of comparitors. The question is whether Plaintiffs have obtained sufficient evidence of discrimination, which they have.

In addition, where NNI has failed to show there are no disputed issues of fact, its motion must be denied. It is insufficient to simply assert that a Plaintiff has not proved a claim. It must demonstrate an absence of disputed fact, and if it does not, its motion fails. Similarly, for claims brought by Plaintiffs that NNI fails to address at all, it has waived any argument in favor of summary judgment, and those claims must be submitted to a jury.

Further, as set forth repeatedly, Plaintiffs are not constrained to prove their claims via a similarly situated comparitor, although as set forth, they can. They are similarly not required to adduce evidence of *multiple* similarly situated comparitors.  *See supra,* Section I; *see also, Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000) (*infra*).  Importantly, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.,* 2011 U.S. Dist. LEXIS 47125, at *11

---

[12]Any Plaintiffs' discriminatory discharge, retaliatory discharge, or retaliation claim is treated in a separate memorandum of law.

(W.D. Va. May 2, 2011), *citing George v. Leavitt,* 407 F.3d 405, 414, 366 U.S. App. D.C. 11 (D.C. 2005) (*quoting Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000)).

      In *Graham,* the Court assessed who should be considered "similar" in material respects noting that a plaintiff may raise such an inference (of discrimination) by comparison to "a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (emphasis added). Indeed, it would pose an unnecessary and unsupported burden at the "not onerous" prima facie stage to require proof of multiple comparitors. Moreover, whether a comparitor is similar in "all material respects" "varies somewhat from case to case and, ...must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer [eg] imposed discipline was of comparable seriousness. ...In other words, there should be an "objectively identifiable basis for comparability." *Graham*, at 40 (approving an Eighth Circuit decision rejecting a requirement of showing "exact same offense" which could produce "a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination."). The Court went on to assess whether comparitors were similarly situated in discipline; importantly it did not look at whether supervisors issuing discipline were the same, but rather looked at the company policies applicable to the type of discipline being issued. *Id.,* at 40-43. Here, while NNI argues at times that Plaintiffs are not similarly situated to a given comparitor because of different supervisors, or similar distinctions, the pay, promotion and other decisions are all based on policies applicable to all. (See eg Ex. 62, Blount Dep. 27/13-31/17).

For the reasons set forth supra, and infra, NNI's motions in connection with disparate pay[13], promotion, permanency, and other disparate treatment should be denied.

Finally, as explained *supra,* Plaintiffs have adduced other evidence of discrimination, such as statistical evidence, "me too" evidence, discriminatory bias of decision makers, and the like,  as set forth in Section I, which for the sake of brevity will not be repeated in connection with each Plaintiffs' claims described below, but is incorporated by reference. Plaintiffs only address *additional,* but unnecessary, evidence, and any additional specific arguments NNI makes.

Alvarez

NNI contends that Alvarez did not experience an adverse action. Alvarez did experience adverse actions when he was constructively discharged and/or terminated, as set forth in Pl. MEM-DISC/RETAL. In addition, he survives summary judgment on his discriminatory pay claim, which was not addressed by NNI and therefore any argument is waived. (See eg SAC pars. 576-578.[14]

Barnett

---

[13]NNI repeatedly attempts to minimize certain claims by calling them "raise" claims and asserting that failure to give a raise is not sufficiently adverse to be actionable. This is wrong, both on the law – failing to give a raise is an adverse action (infra) – but also on the facts; while some of the disparity in Plaintiffs' pay stems from discriminatory raises at the 30/60/90/100 mark for pre-rollover claims, at the end of the day the claim is for discriminatory pay decisions.

[14]Even if NNI had argued for dismissal, based both on the evidence set forth in Section IA(1-5), and based on specific comparitors, his claim survives. Alvarez began at NNI with four years of fitter experience. He was hired October 2013 at $17.50, received less than $5.00/hour raises over the course of two years. Clinton Combs started at NNI in February 2013 with no experience in the trades, Ex. 158, par. 6,  at $13/hour, and shockingly quickly rose to $21/hour within nine months – also under Jackson. Similarly,  Burton began in February 2013 with no experience in the trades, id. par. 4, and quickly obtained $6.00/hour in raises in less than one year. John Fannin began in February 2010, at $13.00/hour, with no experience in the trades, id., par. 8, and quickly rose to $22/hour within in three years. Alvarez' pay discrimination claim (which was not addressed by NNI) survives summary judgment.

NNI argues that Barnett cannot prevail on a discriminatory pay claim because he cannot show he was paid less than a similarly situated co-worker. However, Barnett was told that he would get regular raises associated with all of his evaluations, but did not receive the same until his 90-day (on 106th day) and 110-day (on 168th day) evaluations. Prior to that time, Barnett complained to Hines about not receiving a pay increase with his 30-day evaluation. Other white employees were paid more than Barnett's starting rate. Pl. SOF 41. NNI did pay Caucasian welders more money than Plaintiff: Matthew Knight paid $23/hour in 2009; Stephen Malinchock paid $25/hour in 11/2008; Jamie Carter $25/hour in 2009. Pl. SOF 41.

Crowder actually received that rate in 2006 as a temporary employee for approximately one year (which was a raise from his starting rate of $18/hr in 2003); he started at $25/hr when he returned as a full time employee in June 2010, received a merit increase approximately nine months later and currently earns $30/hr. Pl. SOF 42. Vanderberry (white, 32 years old) started learning welding in 2007; three years later, Defendant hired him on April 19, 2010 at a rate of $24/hr and by his 110-day evaluation on August 27, 2010, he was being paid $26.50/hr. Pl. SOF 43; ex. 158, par. 18. Compared to Barnett's starting rate of $22/hour with many years of experience, a jury could find discrimination.

NNI also argues that Barnett cannot point to adequate comparitors concerning his 30-60-90-110 day pay increase claim. First, NNI refused to respond to an interrogatory requesting comparitor information for those who received their 30/60/90/110 evaluations more than a month after the required interval, between 2009 and March 30, 2014, claiming the request was unduly burdensome and stating it did not maintain the information in data base form. Ex.121, Edouard Rogg. 17. It now complains that Plaintiffs lack evidence of comparitors, a tactic that should be rejected. In any event, his 30/60 day raises were not given until his 90-day (on 106th day) and

110-day (on 168th day), Pl. SOF 41, compared with[15] Caucasian employee Jay Adams, who received his evaluations remarkably timely: Adams was hired February 20, 2012, and received his 30 day on March 26, his 60 day on April 20, his 90 day (early) on May 15, and his 110 day (early) on June 8, 2012. Ex. 158, par. 1.

NNI claims Barnett cannot show that NNI passed him over for a permanent position because of race, arguing that Barnett did not apply for permanent positions despite being available. Thus, it argues he can not demonstrate a prima facie case, and cannot defeat NNI's "legitimate" reason for not hiring him – lack of application, citing *Williams v. Giant Food, Inc.*, 370 F.3d 423, 431-34 (4th Cir. 2004). However, as *Williams* makes clear, an employee cannot be expected to apply for positions or status of which he was not made aware – ie that were not advertised. *Id.,* at 431, *citing Mauro v. Southern New Eng. Telcomms., Inc*., 208 F.3d 384, 387 (2d Cir. 2000) (per curiam) (stating that the application requirement did not apply where "the plaintiff indicated to the employer an interest in being promoted to a particular class of positions, but was unaware of specific available positions because the employer never posted them"); *EEOC v. Metal Serv. Co*., 892 F.2d 341, 349 (3d Cir. 1990) (stating that "relaxation of the application element of the prima facie case is especially appropriate when the hiring process itself, rather than just the decision making behind the process, is implicated in the discrimination claim or is otherwise suspect"); *Box*, 772 F.2d at 1376 (stating that "when an employer uses a

---

[15]For purposes of being similarly situated, whether Barnett or anyone else had the same supervisor is not dispositive because Blount tracked all of the 30/60/90/110 evaluations and had oversight for ensuring they were timely done. Ex.62, Blount Dep 44/24-47/18. He did not compare timing within a supervisor's purview but looked at timeliness across the board by position type, e.g. laborer.  Id., 47/19-22. The purpose of his tracking was to ensure they were being done in an equal way, thus any disparities are clearly intentional. Id., 47/24-48/4. Further, he never rejected a raise as too low. Id., 49/5-7; 49/23-50/1.

promotion system in which employees do not apply for promotions but rather are sought out by managers, the application requirement of the prima facie case is loosened somewhat"). Here, there is evidence that NNI simply asked certain people to apply for positions, such as permanent positions, raising a question of fact as to the promotion process. Notably, the job board should contain only open positions; however, often times, jobs would be posted that were already filled or Barnett was told that they decided to fill the job internally. Pl.SOF 40. For instance, Jaffeux told Cummings there was a permanent position available and asked Cummings to apply. Unsurprisingly, he got the job. Ex. 70, Cummings Dep., 90/7-91/11.

<u>Blow</u>

First, NNI argues that discriminatory raises are not actionable because a raise is not an "adverse action," citing *Simms v. Navy Fed. Credit Union.* Although *Simms* uses those words, it cites to *McCann v. Fairfax County,* 32 F.Supp. 2D 365 (E.D.Va. 1998). *McCann* did not assess whether discriminatory raises were actionable but rather whether a negative evaluation that resulted in a merit increase was adverse. *Id.,* at 368. Using Defendant's logic, an employer could hire every worker at the same rate and then immediately engage in intentionally discriminatory – but unreviewable – practices by raising all Caucasian workers' salaries but not African-American workers'. In any event, denial of a raise is an adverse employment event. *Smyth-Riding v. Sci. & Eng'g Servs.*, No. WDQ-11-0558, 2014 U.S. Dist. LEXIS 138940, at *28 (D. Md. Sep. 29, 2014), citations omitted. Here, as set forth below, there is evidence that NNI gave raises in a discriminatory manner that affect Plaintiffs, including Plaintiff Blow. Moreover, at the end of the day the issue is discriminatory pay.

Proof of Blow's discriminatory pay increase claim is also not limited to Blow's personal

knowledge of Vanderberry's pay increases,[16] but their pay was disparate, *See* Pl. SOF 94-97, and Blow's pay claim goes forward. *See also,* Table One, par. 13 (Knick's pay was riased to $26 in February 2013, well before Blow's, $26.97 in February 2015, and $27.98 in February 2016). NNI's motion should be denied.

Bostic

Plaintiff's failure to accommodate claim under 42 USC 1981 survives summary judgment. Here, Bostic has evidence that raises an inference of discrimination as to his disparate treatment/harassment claim. He has not alleged that he was discriminated against because of a disability, but because of his race. In other words, he is alleging that NNI discriminated against him because of his race when it failed to actually allow him to use breaks, whereas it allowed Caucasian workers to use the accommodations they had been granted. This is distinctly a race-based claim, not one being brought under the ADA.

NNI also claims that failing to give a diabetic employee breaks that were necessary to maintain his blood sugar and work safely in his environment somehow does not constitute an adverse action.[17] Given that a "failure to accommodate" claim is inarguably actionable in the ADA context, it is insincere to assert that failing to accommodate someone does not detrimentally affect the conditions of employment. It is also absurd to argue that failing to allow someone to take breaks to accommodate a diabetic condition that could cause physical harm to either the Plaintiff or those around him is not 'adverse.' (Ex.4, Bostic Dep 59/3-6).

---

[16]NNI gratuitously mentions Blow's separation for an issue with a criminal background check to portray Plaintiffs in a negative light. Blow was hired back shortly after. Blow is not alone in having a conviction; Scott Jones has one too. Pl. Nichols SOF, par. 55.

[17]Even if it were not an "adverse action" it would be and is actionable as part of his hostile work environment claim. *See Guessous, supra, infra.*

NNI implies his claim cannot go forward because eventually Jackson began allowing him breaks. However, it fails to address that Jackson initially prevented him from taking the needed breaks, and fails to acknowledge the evidence that Jackson continued to monitor and harass him in connection with the breaks. P.SOF 47, 22, 23 (Ex. 4, Bostic Dep. 130/11-15 ("Q. Well, was there -- was there anything else you were asking Scott Jones to do, other than approve your breaks? A. Yes, to keep Wayne Jackson from harassing me when I did take my breaks."); id., 127/17-128/3 (describing complaint made when he resigned); id., 130/16-132/3 (describing continuing harassment).

Jackson's previously described discriminatory animus (see Pl. MOL-HWE, and Section I, above), combined with the manner in which he harassed Bostic, even after being instructed by Jones to give Bostic's needed breaks, allows Bostic's claim to go forward.

Notably, NNI objected to Plaintiffs' Interrogatory requesting information on individuals whom Jackson supervised who requested or were provided accommodations. NNI objected and refused to search for information stating it was unduly burdensome. It answered based on *Jackson's* recollection only, and referred to Bostic and Sean McGinnis (Caucasian.) Ex. 121, Edouard Rogg. 16 but produced no documents relating to McGinnis.

<u>Broughton</u>

NNI argues that Plaintiff Broughton cannot show that he was not given a 30-day pay increase because of his race. It argues that Broughton had no experience when he began at NNI, and cannot personally identify similarly situated employees. It further argues that its "legitimate" reason for not providing a 30-day pay increase was because it converted him to a permanent employee and gave him health benefits, and because there was a pay freeze that occurred during the temp-to-perm worker rollover process.  However,  workers who were brought in near the

same time as Broughton [February 2014, P.SOF.4, when he was told he would receive 30/60/90 day raises, P.SOF. 6,] even though NNI apparently knew it was rolling people over in March 2014, and received 30 day evaluations before the rollover. Indeed NNI offered evidence that those raises and evaluations continued leading up to the March 2014 rollover. See eg Dkt. 162, Ex. I (Wiltz' 30 day raise, 2/27/14) (NNI00401); (Probationary Review Form – T. Pierce, 30 day raise; March 8, 2014) (NNI002908); see also Ex. 287, NNI145015-145016, NNI145020; (Steve Choa receiving 110 day raise and evaluation on 3/23/2014 signed by Kevin Angle). Thus, a jury could find NNI's "explanation" for refusing to give the evaluation to be pretextual.

It also contends that Broughton's claim regarding discriminatory benefits package is vulnerable to dismissal, asserting that there is no evidence of comparitors who received more favorable benefits at the rollover. Dr. Killingsworth statistical analysis makes clear, African American employees like Broughton were substantially more likely to be kept on in a temporary rather than permanent capacity (until the March 2014 rollover). For instance, in Table 3 of his report, he assesses "the numbers and proportions of persons, by race, who held "temporary" titles at each year-end date between 2008 and 2013.  Table 3 shows that, relative to whites, a greater percentage of blacks were in temporary job titles in four out of the first six years of the relevant time period (2008-2013).  In 2008, the ratio of white to black permanent employees was 3.4 to one (24/7), whereas the ratio of white to black temporary employees was somewhat less, 2.8 to one (14/5).  In contrast, by 2013, there were four white permanent employees for every black permanent employee (48/12), whereas the ratio of white to black temporary employees had actually fallen to slightly under two to one (77/39). Ex. 116 Killingsworth Report, par. 14. Further, it is undisputed that the benefits for those people made permanent before the rollover were better than the benefits provided to those made permanent as part of the rollover.  Ex. 80,

Jones, S. Dep. 32/1-32/12. (Q. Are there classes of benefits and – A. There is a legacy status. And then when we – when we eliminated all temporary workers, there is another benefit structure and there is – they are all the same. Q. Okay. So could you explain what the legacy benefit structure is compared to the benefit structure that was created in the rollover? A. The legacy benefits structure is the same as the shipyard's salary workers, and the new benefits structure is the benefits they designed. I am not sure exactly what it entails.); Ex. 57, Beale Dep. 159/19-160/13 ("Q. And from a cost perspective, cost of the company, did the benefits package provided to the permanent employees prior to the rollover cost the company more than what was provided to people who rolled over? A. It was less of a cost to the company for people that rolled over for the new system.") NNI's efforts to dismiss this aspect of his claim must be rejected where there is significant evidence of racial bias in whether an African-American employee like Broughton became permanent, which in turn determined his benefits package.[18]

<u>Chesson</u>

Chesson's claim of discriminatory evaluation/raise and discriminatory overtime survive summary judgment. NNI argues that Plaintiff Chesson cannot show that similarly situated employees, like Fannin, were treated better than he was, arguing that although Fannin did not wear eye protection, he was not disciplined whereas Chesson was disciplined, which affected his raise. Plaintiff is not limited to his personal knowledge in identifying comparitors. Further, a jury could find that Fannin, who did not wear eye protection but was not disciplined, was similarly situated. Defendant has offered no evidence that Jackson did not see him. Moreover, Jackson testified that there was no specific correlation between amount of raise and evaluation,

---

[18]His disparate training constitutes part of his hostile work environment. See also Pl. Broughton SOF.

thus the ESHOR issue NNI raises is irrelevant. Pl. SOF 11. As described in Plaintiff's SOF, Chesson complained about his discriminatory evaluation and raise, did not need to make a "turnaround" and therefore, should not have been penalized, and other Caucasian employees were treated better in connection with their raises and evaluations. Pl.SOF 11-22 (including that Chesson should have received $1/hr raise at each of his 30-60-90-110 day evaluations and earning $22/hr; but it only increased $2 from $18/hr to $20/hr, or a 11% increase. However, white co-workers received higher percentage of raises during their first 4 evaluation periods: Evan Reams, 13.5%; and John Fannin, 19%. Dkt. 128-2 (Reams). See Ex. 158, par. 8, 15. Both Reams and Chesson earned the same rate of $20/hour in 11/2012, though Reams had no prior experience fitting. Id.

Moreover,  Plaintiff can demonstrate a prima facie case of discrimination in overtime by virtue of his testimony concerning lack of overtime under Jackson's supervision as well as observations by his co-worker (who, despite not knowing the names of Caucasian workers observed them working overtime). See Pl. SOF 59-61.

Chisman

NNI moves to dismiss Chisman's discriminatory pay claims. Chisman asserts that Caucasian employees received higher raises in a timely manner. Summary judgment should be denied for the reasons set forth above. Further, NNI concedes that Cummings and Reams are similarly situated but argues they were not treated better than Chisman.  Chisman had much greater experience compared to these Cummings, Reems, and John Fannin. Pl. SOF 31. John Fannin (who Chisman identified as John Fenner), was promoted to Mech Tech III with approximately one and a half years of experience as a fitter and an automotive background. Pl. SOF 28; see also Ex. 158, par. 8, 15. Cummings was promoted to Mech Tech 2A, within 143

37

days of being hired, with a cooking background. SOF 28; Ex. 158, par. 7.

In addition, although Fannin was hired on February 10, 2010 at a rate of $13/hour; he received the following raises: 4/04/10: $13.50/hr; 4/18/10, $14.50/hr; 5/16/10, $15.50/hr. Pl.SOF 29. In sum, these workers received the following % pay increases: Chisman, 7%; Reams, 13.5%; Cummings, 28.5%; and Fannin, 19%. Ex. 158, par. 7, 8, 15; Pl.SOF 29. Reams received his 90-day evaluation at 98 days and his 110 day evaluation at 211 days. Ex. 158, par. 15; Pl. SOF 28. His pay claim goes to a jury.

<u>Crawford</u>

Plaintiff's discriminatory pay and overtime claims should go to the jury. NNI argues that Plaintiff's discriminatory pay claim should be dismissed because Crawford speculated about starting pay of two comparitors. Crawford is not limited to proving her claim that way. It is undisputed that Crawford was an excellent welder, if not the best. She has evidence of discriminatory pay; besides what is listed in Section I, Crawford earned $20/hr at hire in August 2010; when she was fired, she was earning $24.50/hr (February 2012). Similarly situated, Cuacasian welders were treated better. For instance, James Knicks had approximately four and a half years' experience when he started at NNI. He started in April 2012 shortly after Ms Crawford was fired, earning $21.00/hr as a welder; within four months he was earning $24.00; less than a year after starting he was earning $26.00, more than Crawford was making when she was fired. Ex. 158, par. 13. Josh Vanderberry came in with significantly less experience than Crawford, who had been welding since the early 1990s. In 2003, Vanderberry was an office clerk; thus when he started at NNI in 2010, he had less than ten years of experience in any trade. Like Crawford he was supervised by Rilee; he started at $24.00/hr, nearly what Plaintiff Crawford had been earning; within 30 days, he was earning $26/hr - $1.50 more an hour than she

had been at her highest pay; by early 2015, he was earning $27.50/hr. Ex. 158, 18; see also, D.SOF Crawford; P. SOF. Her pay claims survive summary judgment.

Her overtime claim also survives summary judgment. NNI argues that the "legitimate" reason for denial of overtime was her "terrible" attendance. Ultimately, its argument is that a jury should believe that NNI would have given her overtime in weeks that she worked full time, but did not because in other weeks, where she was injured, she could not. Essentially, NNI appears to be arguing that it discriminated against her for being out on workers' compensation or disabled. In any event, a jury is not required to believe NNI's unsupported arguments; further, NNI contends that it did not discriminate her in overtime because Jaffeux and Jackson supervised Chisman as well, and he received overtime. However, when Crawford was at NNI, from August 2010 to February 2012, Chisman worked only 33 weeks of overtime, similar to Crawford's 29. Pl.SOF. 58. In addition, treating someone in the protected class well does not mean it did not treat Plaintiff Crawford poorly because of her race (or gender).

Cross

NNI argues that Cross cannot show that a delay in receiving an increase is pay is adverse.[19]  Denial of a raise is an adverse employment event. *Smyth-Riding ,* 2014 U.S. Dist. LEXIS 138940, at *28, citations omitted. Although Leary told that Cross his pay would remain at $25 because NNI was not giving raises, there is evidence that this is untrue, where Mark Yanarella stated that he had gotten his 30 day raise on May 2013, and documents show an increase in Yanarella's pay by $1/hour in April, and $0.50 in May 2013. Pl. SOF 101; Ex. 158, par. 20.

---

[19]Actually, NNI increases the burden and suggests that he cannot show that it was "significantly detrimental."

NNI contends that Cross's failure to train claim should be dismissed. Regardless of whether it independently constitutes an adverse action, it is actionable as part of his hostile work environment claim. Further, Plaintiff Cross has sufficiently adduced evidence that the delay in training was discriminatory, where Cross and Yanarella both were supervised by Schultz until Cross was transferred to Leary's crew; NNI did not have a specific procedure for training workers prior to March 2014, and when Plaintiff was hired, he interviewed with Schultz, and indicated to him his interest in TIG welding and worked under Schultz's supervision until he was transferred to Leary. Pl. SOF 105-11.

Cross' claim for failure to reclassify to Mech Tech 3 succeeds because there was no formal application process for a raise to a higher salary grade. *Williams,* 370 F.3d at 431-434; Cummings 17/18-18/10 (testifying he was "bumped up" from a Mech Tech 2 to a Mech Tech 3. There was no application.) Moreover, while Cross did not need to apply – because there was no application – he *requested* to be reclassified by Jackson, which is sufficient. *Williams*. NNI's assertion that Cross' concession that he did not know if there were any Mech Tech 3 "positions" open is fatal is simply wrong. Defendant has not shown that it was unable to promote him to Mech Tech 3 at any time. NNI has not met its summary judgment burden.

In addition, there is evidence from which a jury could find the failure to reclassify Cross was discriminatory. Plaintiff inquired into the status of becoming a Mech Tech 3. He had all the qualifications. Jackson denied Plaintiff the reclassification, and gave no explanation of why it was being denied, though Ricky Burke was made Mech Tech III. Between December 2015 to March 2016 NNI hired at least ten Mech III B workers. P. SOF 96-99. A jury could find that NNI's explanation is a pretext for discrimination.

Dantes

NNI moves to dismiss only Plaintiff Dantes' claim for discriminatory pay, where he did not receive an increase when he became TIG qualified. It argues that it cannot be held responsible for the determination because Ameri-Force, his placement agency, gave him his raises. It also argues that no welder received a pay increase when they became TIG qualified. As described in Section II supra, the training and qualifications plaintiffs received affected their ability to earn overtime, gain experience, and eventually receive promotions. Whether looked at as part of his hostile environment and/or as a separate instance of disparate treatment, the training and qualification issues go to a jury. As described in Pl. SOF 42-56, Schultz insisted that Plaintiff practice TIG welding even after Plaintiff assured Schultz that he already had TIG experience and didn't need to practice, and Schultz nevertheless made him practice alongside a white employee who did not know how to TIG.  Plaintiff took and passed his TIG test at the same time as a White employee, yet Schultz kept from Plaintiff that he passed for two months, forcing Plaintiff to continue the more strenuous and dangerous fluxcore process in the meantime, but Schultz gave the White employee his pass directly after the test, which enable him to start TIG welding two months before Plaintiff. It wasn't until Plaintiff followed up with Schultz that he learned he had actually passed the test. The more qualifications a welder has, the more likely the welder is going to be utilized for overtime and TIG is a more advanced form of welding that is beneficial for a worker's career advancement, evaluations, and potential merit pay increases. NNI -not AmeriForce- determined the hours that Plaintiff worked, the qualification that he received, and whether Plaintiff was afforded overtime, all of which impact pay. Id.; see also, par. 10.

Edouard

NNI argues that the only disparate treatment claims Edouard brings are for disparate pay

and discriminatory termination. However, Edouard also brought claims of discriminatory promotions and training opportunities, which NNI has not addressed, and therefore, survive summary judgment. SAC 324-327.

As to his disparate pay claims, NNI contends that Edouard has only identified on comparitor, and that one comparitor is insufficient. As previously set forth, Edouard is not limited to proving his case with evidence of which he has personal knowledge. Indeed, Edouard has evidence of discriminatory pay, in addition to the statistical and other evidence described in Section I. Specifically, Edouard, who began in July 2010, with approximately 2 years experience, started at $18/hr, Pl. SOF 4, 7, did not receive a 90 day raise, and was making $22/hour as of the time that he was discharged. P.SOF 11, 13, 15, 18.  Vogel started at NNI with three months of experience, in 2013, as a laborer making $14.50, but in under a year was making $24/hr, more than Edouard at his highest, with years more of experience. Within two years of starting Vogel was making $27/hr. Pl. 158, par. 19.

Fields

NNI has not met its burden at summary judgment to show the absence of disputed facts as to Fields' discriminatory pay and overtime claims. It argues only that Fields speculates that others were paid more and consequently contends that summary judgment must be granted. NNI does not point to any evidence at all to support its contention that summary judgment should be granted.

In fact, there is evidence of discriminatory pay and overtime. In addition to that set forth in Section I, Fields began at NNI in June 2012 making $18/hr as a fitter. By the time he resigned in August 2013, he was only making $20.75/hr. Pl. SOF 3-21. Fields had 8 years of experience as a machinist and two years fitting experience when he started. Ex.123, Fields Rogg. 10. Fannin,

on the other hand, had no experience when he began at NNI; while he started at $13/hr, with two

years he was making well more than Fields was making when he left, $22/hour, Ex. 158, par. 8,

further demonstrative of discrimination.

Gordon

NNI argues that Plaintiff's overtime claims should not go to a jury because it does not

constitute a "significant detrimental effect," citing *Clark.* That is not the standard for disparate

treatment, where adverse actions are actionable. Even if it were not an adverse action, it would

nevertheless comprise part of his hostile environment, *see Guessous, supra,* which NNI does not

address.

NNI also does not address, and therefore waives any argument in connection with his

discriminatory pay, promotion and permanency claims, which therefore go to the jury.

Harris

NNI argues that Plaintiff's disparate pay claim and discriminatory training decisions

should be dismissed.  It claims first that he cannot show a valid comparitor from Steel America,

and that a co-worker, Anderson, is not a valid comparitor. Second, it argues that he cannot show

disparate training because a Caucasian employee and an African American employee were

allowed to get their TIG certification before him. In fact, Plaintiff is not limited to these proofs.

In addition to the evidence in Section I, NNI has not demonstrated that there are no issues

of fact as to whether it impacted his pay, or his ability to get a 90 day raise to $23/hour. Pl. SOF

64-66. Further, while the discriminatory decisions to get less senior Caucasian employees their

TIG welding certification before him is also part of his hostile environment, Harris's claim

survives summary judgment where less senior white workers were able to take welding tests

before he was and NNI decided or influenced the order of certification. Pl. SOF 68-73.

43

Holloman, L.

Lamar Holloman's pay discrimination, training and promotion/transfer claims should not be dismissed. First, as Plaintiffs have explained, Holloman need not rely on a comparitor to survive summary judgment or have personal knowledge of a similarly situated employee. Evidence that NNI discriminated against Holloman in pay determinations is set forth in Section I. In addition, Caucasian employee, James Knick was hired as a welder, with five years experience, making $21/hr, hired in April 2012, compared to Holloman, who had 11 years of experience, yet made $20/hr, Pl. SOF 4, 52; Ex. 158, par. 13. Within a year, Knick was up to $26/hr, compared to Holloman, who was making $22.50 by the time he was forced to leave for a higher paying job. Pl. SOF 54, 5, 6; ex. 158, par. 13.

In connection with his failure to train claim, which is also part of his hostile work environment claim and which NNI does not address in that context, there is no legal requirement that Plaintiff "apply" or "officially request" crane training – there is no application process, and NNI has pointed to none. There is evidence demonstrating a disparity in providing training based on race, which a jury is entitled to rely on in connection with Holloman's claims. See Pl. SOF 68-72 (describing being dissuaded by Kevin Angel).

Finally, in connection with his failure to promote claim, he is not required to show an open welding position where workers were appointed to welding or other laborer positions without applying for an "open" position. *Williams,* 330 F.3d at 431-434. He clearly actually expressed his interest in obtaining a welding position, which is sufficient even if there were "advertisements" for "openings." *Williams;* Pl. SOF 70, 71. Further, Plaintiff "was pretty much told...if you're black you probably won't be able to get in that position." Pl. SOF 71. While Plaintiff did not know the name of the person or whether the employee had applied to the

position, he did know that Caucasian employee did not have welding or inspecting experience. Pl SOF 76.

Holloman, R.

NNI has not met its burden at summary judgment to show entitlement to dismissal as to Plaintiff Reggie Holliman's pay claims where NNI fails to show an absence of disputed fact. NNI's entire argument is that Holliman himself could not identify a similarly situated comparitor in his deposition. He was not required to. In any event, in addition to the "Section I" evidence above, Holliman came in to NNI with approximately 10 years' of fitter experience, but started at $18.00/hr. D.SOF 3; Ex.126, Pl. Rogg Response 2. By the time of his discharge, he was earning $22.00/hr, D.SOF 3, 9-14, compared to for example, James Adams, who came in to NNI with no fitting experience, but was referred by Jackson's wife, also started at $18.00/hr, which was raised to $22.25 within six months. Ex. 158, par. 1. Within about a year he was bumped up to $23.25. Id. Similarly, Ricky Penrod came in with two years fitter experience in 2005 for a year, and by the time he was rehired for a second stint, in 2008, he was earning $24.00, although by then he had only six or seven years fitting experience – well under Holliman. Id., par 14. His pay claim easily survives summary judgment.

NNI also fails to meet its burden as to his overtime claims arguing that R. Holliman only speculates about discrimination. However, Holloman testified that under Jaffeaux, he did not receive as much overtime as Caucasians, including Daniel Cummings and Ricky Penrod. Ex.16, Holliman Dep. 107/16-109/23.

Hooker

NNI argues that Hooker cannot make out a disparate pay claim because it contends he does not have evidence that similarly situated employees were given more timely evaluations

and raises, and that Matt Grams is not a good comparitor because it claims that he worked under a different supervisor. Plaintiff has offered evidence of discrimination in addition to Section I.

Plaintiff's 30-day evaluation did not occur until February 27, 2012 – nearly 8 months after he was hired. Pl.SOF 69. In July 2012, Plaintiff received a $2 per hour increase. Plaintiff's 90-day evaluation was issued in September 2012, over a year after he was hired. He was given a 25 cent increase. Unlike Hooker, Micah Battalio, Caucasian, who also received evaluations from Jaffeux, was hired February 22, 2011, received his 30 day on March 28 and his 60 day on May 9, 2011. Ex.359, NNI_2-133303.

On February 17, 2014, Plaintiff was reclassified from laborer to tool room and received a $2.25 raise to $16.50 per hour. As of December 2015, Plaintiff earned approximately $18.25 per hour. Pl. SOF 69. Matt Grams was hired at $17 per hour and after his probationary 30-60-90-110 raises, he was earning $19.50 per hour. Ex. 158, par. 11. Grams probationary raises were completed within six months of his hire. By the time of the rollover in March of 2014, Grams was earning $24.50 per hour. Id. In comparison, Plaintiff was hired at $13 per hour in 2011 and by March 2014 was earning only $18.50 per hour. Daniel Cummings, whose prior work experience was that of a cook, was hired in December 2009 at $13/hr. Ex. 158, par. 7. By the time Cummins was made permanent, he was earning $18 per hour.  Id. Within six months, Cummings was earning $18.00. Id.; Pl. SOF 70, 71. That they had different supervisors does not dispel the inference of discrimination, in light of Blount's admission that he reviewed the timing and amount of raises to check for consistency across job titles, not supervisor.   Ex.62, Blount Dep 44/24-47/19-22; 49/5-7; 49/23-50/1.

Scott Jones testified that when an employee does not have experience working at NNI,

that worker's skill set cannot be evaluated.  As such, Grams prior experience, because it was not at NNI, would not determine his classification or pay at NNI. Pl. SOF 72; see also Ex. 158, par. 11. Thus, any argument NNI might make about Grams skill set before arriving – to the extent it seeks to argue they are not similarly situated – should be rejected.

Moreover, NNI has not met its burden at summary judgment when it argues that Hooker has not presented evidence that he was performing at a level where he should have been given a raise. NNI is required to demonstrate the absence of disputed facts. It is not sufficient to argue for dismissal simply by claiming that Plaintiff did not prove his case, but rather must point out where it contends there are no genuine, disputed issues of fact by pointing to the record.

NNI also argues that Hooker has not established his pay claim because Grams is not sufficiently similar, however, it does not point to evidence in the record to support this claim, and its citations in its SOF 71 do not support this assertion.

NNI moves to dismiss Hooker's claim that he should have been promoted to a Fitter position. NNI does not meet his burden at summary judgment. As set forth in Pl.SOF 66, he has shown that Fannin was promoted to fitter quickly with less experience. See also, Ex. 158, par. 8.

Hooker's disparate training claims, which is also part of his hostile environment claim, succeeds, because he has produced evidence that Jaffeux refused to send him from training, where Jaffeux's racial animus was manifested by discriminatory comments. Pl.SOF  40, 49-51.

Joyner, Al

NNI's argument that Plaintiff Al Joyner was required to apply for a Mech Tech III fails here as it did in connection with Plaintiff Cross and others, as there was no official application process (*see Cummings,* who was "bumped up") and as Joyner actually requested to be considered for Mech Tech III. Pl.SOF 39-42.

Joyner, L.

Lamar Joyner's discriminatory pay increase claims and discriminatory discipline claims survive summary judgment[20]. Notably the latter is also part of his hostile environment claim.

Joyner can show that the failure to provide the 30-60-90-110 raises was discriminatory because a jury could find NNI's explanation – that it had begun the rollover process – is not true and the real reason was discrimination. Notably, the rollover did not take effect until March 2014. NNI has not offered evidence that it stopped providing the 30/60/90 day raises **four** months before the rollover actually occurred, when Joyner was hired. D.SOF 4, 6.  Indeed NNI offered evidence that those raises and evaluations continued leading up to the March 2014 rollover. See eg Dkt. 162, Ex. I (Wiltz' 30 day raise, 2/27/14) (NNI00401); (Probationary Review Form – T. Pierce, 30 day raise; March 8, 2014) (NNI002908); see also Ex. 287, NNI145015-145016; NNI145020; (Steve Choa receiving 110 day raise and evaluation on 3/23/2014 signed by Kevin Angle). Consequently, a jury can disbelieve NNI's explanation[21].

In addition to forming part of his hostile work environment claim, Joyner has evidence of disparate discipline, where supervisors had discretion in determining whether to write employees up for tardiness/attendance, Pl.SOF 55, Todd made racially discriminatory comments, Pl. SOF 27, 29, 30. Plaintiff disputes the conduct for which he was written up, Pl. SOF 57, 58, and Todd treated people outside Joyner's protected class better than Plaintiff, including Lee Jarvis. Pl. SOF 60. Plaintiff has evidence from which to disbelieve NNI's assertions in connection with Leary's discipline, where the discipline is contested factually, where Clark influenced the discipline, Pl.

---

[20]NNI did not move for summary judgment as to Plaintiff L. Joyner's disparate pay claim, which therefore goes to the jury. SAC 1122.

[21]That some of the people who received evaluations prior to the rollover were African-American does nothing to change that NNI's explanation is false.

SOF 62-68, and there is evidence of Clark's animus. Pl. SOF 34, 36, 38, 78. These facts allow a jury to find NNI's assertions made in support of discipline and the true reasons are discrimination and/or retaliation.

<u>Kershaw</u>

NNI moves to dismiss Plaintiff Kershaw's discriminatory evaluation/pay claim, and argues that NNI's failure to send him for more outages, where he could have earned more money, was not discriminatory. NNI has not asserted any non-discriminatory reasons concerning his pay, lack of evaluations, or refusal to send him on more outtage work, and its motion should be denied. Further, there is evidence that NNI discriminated against him where he began working at NNI in April 2010 as a laborer, making $13/hour, which was raised to $17/hour after five months. He came in with laborer experience. D.SOF 4-8. He got welding training and qualifications. D.SOF 10, 13 ("I paid that money out of my pocket . . . I went through work assessment . . . passed the test . . . I brought that assessment back . . . It was nothing offered to me, no kind of training, no nothing offered to help me move forward. . . .  I have children, other financial obligations, so I couldn't afford it at the time . . . So the money was loaned to me by another black employee. . . . So later down the line . . . there was an employee that they were trying to push into being a welder, and they was offering him training . . . which I thought was unfair. You . . . train this white employee, but I had to pay and go and find training outside of NNI to -- to progress within the company. . . . I asked Wayne [Jackson]. I asked Jeff Riley about it, and he kind of just looked like, I don't know."). Jackson fired him in December 2011. D.SOF. 16. He had not received other raises despite his training. Pl. SOF 8.

Brian Briggs (Caucasian)  started at NNI in December 2013 with essentially no experience, at $12/hour, but quickly jumped to $17.50/hour by March 2014, when he was

reclassified as a fitter. Ex. 158, par. 2. Within a year he was earning $18.50. Id. Compared to

Kershaw, who received a $4/hour raise, came in with some experience, and got welding

certifications shortly after being hired, Kershaw never received another raise; Briggs did. Id.

John Bundy, Caucasian, was brought in as a laborer with no experience, starting at $14/hour;

within one month he was bumped up to $16.50/hour. Id., par. 3. These comparitors allow a jury

to find NNI discriminated against Kershaw in his pay. See also, Burton, $12/hour start as a

laborer with no experience, bumped to $18/hour within a year, reclassified as a fitter. Id., par. 4.

Marshall

NNI argues that it cannot be held liable for discriminatory pay decisions relating to

Plaintiff Marshall because it was not his employer, and (while it does not specifically argue in the

alternative) contends that even if it jointly employed him, there is no evidence of pay

discrimination because Steel America set his pay rate. NNI further argues that Plaintiff Marshall

has not identified similarly situated comparitors, contending that Snead and Hill are not adequate

because Snead had more work experience and Marshall could not identify how long Hill worked.

However, Plaintiff has adduced sufficient evidence that he was paid less than Snead and Hill, and

that his experience level (seven years) was known. Pl. SOF 53-57. His claim survives.

Nichols

NNI moves to dismiss Plaintiff Nichols' discriminatory raise claim, discriminatory

overtime, discriminatory training, discriminatory promotion claims and disparate assignment

claim. Notably, Plaintiff's discriminatory training and grinding assignments also contributed to

the hostile environment to which he was exposed.

NNI claims that he cannot make out a discriminatory pay claim, asserting that a raise is a

"benefit," and therefore not adverse. As set forth above, discrimination in raise determinations is

actionable, *Smyth-Riding, supra,* as is a disparate pay claim. Moreover, Nichols is not limited to proving his claim via comparitors.[22] As set forth in Section I, there is substantial evidence of discrimination. Vogel for example, was hired in 2013, with only three months of experience. Ex. 158, par. 19. While he started at $14.50 an hour, within two years he was making nearly what Nichols earned, $27.00/hour, yet had less than two and half years of experience, and held laborer, fitter and welder positions. Id.

Both Nichols' claims concerning discriminatory training decisions and disparate grinding work form part of his hostile environment, and are considered as such. [23]

Nichols' claim that the failure to select him as make-up supervisor is supported by evidence that make-up supervisors were predominantly Caucasian as described in Section I, ("under-representation"), supra. That evidence alone is sufficient to raise an inference of discrimination. In addition, that Nichols' had substantially more experience than Cummings, who was selected over him, also allows a jury to find the decision was discriminatory. Ex. 158, par. 7, demonstrating Cummings had no experience when he started at NNI in September 2010, compared with Nichols, who started a month before Cummings, D.SOF 9, but had substantial experience before he started, and was converted to a structural welder based on training and experience. D.SOF 12; ex. 158, par. 7.

Moreover, he can make out a failure to promote to a supervisor position. First, although

---

[22]NNI's assertion that Nichols was "happy" with his pay rate is neither here nor there for a discriminatory pay claim. In any event, he was not asked whether he was "happy" to experience discrimination.

[23]Once again NNI argues, inappropriately at summary judgment, and inappropriately at all, that because Jimmy Leary, the decision-maker, is African-American, it makes discrimination "much less likely." *Oncale, supra, infra,* and the fact that the evidence is viewed in the light most favorable to plaintiffs, dispose of the issue.

NNI does not contest that Nichols applied, it produced no paperwork and no "rejection" documentation – in other words, although it now suggests that its "legitimate" reason for failing to select Nichols is that he did not have a high school degree or GED and could not get security clearance, it cannot point to any record evidence that it rejected him – for these or other reasons. Moreover, NNI welding supervisor Tommy Hines did not have a diploma or a GED. Pl. SOF 55, 56. His security clearance also was not a reason for not promoting him where only the prior 7 years are assessed and his conviction was well before. Jones also had a misdemeanor conviction and Scheg, another supervisor, was also charged. Pl. SOF 55. These reasons do not provide NNI with "cover" as to his failure to promote claim. (Nor does NNI's attempt to point to others who were hired, as again, NNI has no paperwork concerning the selection for those individuals over Plaintiff.  Pl. SOF 58.)

Payton, C.

Chris Payton's pay discrimination and failure to promote claims survive summary judgment. He is not limited to proving his claims through comparitors and he is not limited to comparitors about whom he has personal knowledge. NNI concedes Gibson's raise was larger than Payton, his discrimination survives because disparate raises are actionable,  *see Smyth-Riding, supra,* as of course, are disparate pay claims. See also, Ex. 158, par. 9. NNI cannot avoid liability by pretending that a pay differential is not actionable simply because Payton received a raise. As Defendant's SOF demonstrates, NNI perpetuated the discrimination when it raised Gibson to $15.48hr, but Payton to $14.63. D.SOF 51, 52, 53; ex. 158, par. 9. In addition, Brian Briggs, Caucasian, began as a laborer about the same time as Payton, December 2013, with little to no experience. Ex. 158, par. 2. He began at $12/hr (without having to complain about his pay like Payton, to get that amount), but within for months was bumped up to $18/hr, and given a

52

Mech Tech I classification at the rollover. Id. John Bundy, Caucasian, started as a laborer in February 2014, with no experience at $14/hour, and was bumped up to $16/hour at the rollover, and made Mech Tech I. Id., par. 3. Brandon Burton started as a laborer in February 2013 with no experience, at $12/hour, but NNI promoted him to $18/hour in less than a year. Id., par. 4. This evidence is more than sufficient to raise an inference of discriminatory pay.[24]

NNI's failure to make Payton a welder in 2015 is actionable. Plaintiffs are not required to prove job openings or applications where similar decisions are made by the proverbial shoulder tap, or otherwise are not the result of an application process. *Williams,* 370 F.3d at 431-434. NNI concedes that Payton expressed interest in and was promised a promotion to welder in 2015. P. SOF 59. Moreover, there is disputed evidence as to the availability of welding trainee positions being available, Pl.SOF 62, and the evidence in Section I above undermines that Mech Tech job reclassifications were done in a non-discriminatory fashion. His claim should not be dismissed.

Payton, R

Richard Payton's pay and overtime claims survive NNI's motion[25]. In addition to the Section I evidence, Plaintiff points to evidence of additional similarly situated comparitors who were treated better. For instance, for the period prior to being made a fitter, Brandon Burton earned substantially more than Payton. While starting at $12/hour, Burton quickly rocketed up to $18/hour, *supra, at* ex. 158, par. 4, unlike Payton who topped out at $15.50 as a laborer. Clinton Combs started as a laborer-with no experience- also at $13/hr, and skyrocketed to $21/hour, more than Plaintiff earned when he became fitter, in well under a year. Id., par. 6. Plaintiff's discriminatory pay claim survives summary judgment.

---

[24]Plaintiff Chris Payton's disparate training claims are part of his hostile work environment.
[25]Plaintiff Richard Payton's disparate training claims are part of his hostile-environment.

<u>Pierce, D.</u>

NNI argues that Plaintiff D. Pierce's failure to promote, disparate assignments, and disparate pay, and disparate training claims are time-barred to the extent that they arose prior to February 2011.[26] As described in Section III(A), his pay claims are timely. Moreover, as described in Section I, the claims survive summary judgment. Additionally, he can show similarly situated comparitors were treated better. For example, James Adams also began as a fitter (with no experience) in February 2012 at $18/hour, yet within four months was making more than Payton, earning $22.50/hour. Ex. 158, par. 1. Within two years, Adams was earning $23.25. Id. Jesse Smith, Caucasian, was hired as a fitter in October 2011,  earning $18/hour, but within a year, he was at $23/hour and within two years he was up to $24.50, id., par. 16, well more than Pierce.

His disparate assignments and training  claims are part of this hostile work environment, are timely as part of a continuing violation, and are treated in his discussion of that claim.

<u>Pierce, T</u>.

NNI argues that Plaintiff cannot survive summary judgment as to his discriminatory pay benefits and training. Plaintiff's discriminatory training claims are addressed in connection with his hostile work environment claim. His pay claim survives, where Plaintiff  was hired at $12/hour and received one .50/hr raise. D. SOF. 4, 6. Similarly situated comparitors were paid more. While starting at $12/hour, Burton quickly rocketed up to $18/hour, Ex. 158, par. 4, *supra,* unlike Payton who topped out at $15.50 as a laborer.  Clinton Combs started as a laborer-with no experience- also at $13/hr, and skyrocketed to $21/hour, more than Plaintiff earned when he

---

[26]NNI never actually states that the statute of limitations on discrete acts for Plaintiff D. Pierce extends back to February 11, 2011, which is a sufficient basis on which to deny its motion.

became fitter, in well under a year. Ex. 158, par. 6. John Bundy, also Caucasian, was brought in as a laborer with no experience, starting at $14/hour; within one month he was bumped up to $16.50/hour. Id., par. 3. These comparitors allow a jury to find NNI discriminated against Pierce.

His discriminatory benefits claim survives as well, based on evidence in Section I(A)(i), demonstrating that white employees were more frequently/more likely to be made permanent (prior to rollover) than African-Americans, and it is undisputed that the benefits package for employees who became permanent after the rollover were less valuable than the package provided to people made permanent before.

Robinson

Plaintiff Robinson has sufficiently adduced evidence of discriminatory pay, where NNI failed to provide 30/60/90/110 day evaluations in a timely manner or give him corresponding raises, and where there is evidence – aside from the 30/60/90 day issue – that he was paid in a discriminatory way. First, whether NNI stopped the 30/60/90 day evaluations after the rollover, or whether it had a policy concerning relocation, are separate questions from what he was promised.[27] Pl. SOF 5-7, 8, 10, 12. Moreover, his pay was discriminatory, putting aside step raises. Evan Reems, Caucasian, started at NNI as a laborer with no experience in February 2012, earning $13.00/hr. Ex. 158, par. 15. By October 2012, he was earning over $40,000, approximately $5,000 more than Plaintiff, as a fitter. Id. By March 2013, approximately a year into being hired, he was classified like Robinson as a Mech Tech 2, and paid $45,700, $10,000 more than Plaintiff Robinson. Id.; see also D. SOF 3.

Plaintiff's discrimination in connection with pipe-welding position should proceed. First,

---

[27]Plaintiff Robinson's relocation pay claim may proceed where a Caucasian worker received such pay at around the same time as he was denied it. Pl. SOF 6.

there need be no formal opening or application where such positions were filled by a supervising

asking a worker to apply or take a position. *See Williams, passim.* Robinson clearly expressed

interest in the position, and NNI even made a discriminatory remark in discussing it, telling him

that his skills were better than "other blacks," but the position was very "challenging." Pl. SOF

25, 26. This is sufficient to survive summary judgment where NNI has not offered any reason,

legitimate or otherwise, for failing to give him the position, and in conjunction with the evidence

set forth above, the denial gives rise to an inference of discrimination.

Smith, D.

Dennis Smith's discriminatory pay claim should go to the jury. Although NNI argues that

Smith lacks evidence of a similarly situated comparitor, as explained, he is not so limited in his

proof. When Smith began, he was earning $21/hour, which went up to $24/hour. When he

became permanent in March 2014, he became a Mech Tech 3 and was earning $27.50. He

received a raise a year later to $57,200, in April 2015. Pl. SOF 12, 15, 19, 21, 23, 49, 51.Josh

Vanderberry, however, came in higher than Smith, at $24/hour in April 2010, bumped up to

$26.50 in September 2011, and again to $27.50 in October 2013. Ex. 158, par. 18. He received

another raise to $28.60 in February 2015. Id.

 NNI fails to show undisputed facts about its failure to make him Make-Up Supervisor as

there was no requirement to apply for the position – it was simply a decision made by his

supervisor. The evidence set forth in Section I raises disputed issues of fact as to discriminatory

decision-making in connection with make up supervisors. See also Pl. SOF 55.

Smith, K.

Plaintiff K. Smith's pay claims are timely as described in Section III(A) (and in any event

Defendant's argument about a statute of limitations defense would only apply to the initial pay

decision in December 2010. However, all other pay determinations, even assuming the Lilly Ledbetter Act did not apply, would be timely. In addition, he has evidence that pay decisions were discriminatory as well.

Kevin Smith was hired in 2010 as a fitter, which was raised to $21/hour by May 2011. D.SOF 74; after a hiatus he returned in 2013 as a fitter, at a lower rate than when he left ($18.00), which was raised to $23.00 over the following year. In March 2015, he received a raise to $23.57, and another in 2016 to $24.12. D.SOF. 75-78. NNI discriminated against him in his pay as described in Section I, and as manifested by the differential treatment between Smith and James Adams. Although Smith came in at $18/hour in 2013, he had significant experience, some at NNI, yet when Adams started in 2012, he had none, but started at the same rate. Ex. 158, par. 1. Within four months, he was earning $22.25; id; although Smith eventually was bumped up to $23/hour, he had accumulated even more fitter experience than Adams. Within a year of starting, Adams was earning $23.25, essentially the same as Plaintiff, who was more experienced. Id., par. 1. Jesse Smith, a Caucasian fitter, began in October 2011. He started at $18/hour as well but within two and a half years was making $26/hour, well over what Smith earned. (He was earning more than Smith before he had finished two years at NNI).Id., par. 16. A jury could determine Kevin Smith's pay was discriminatory.

Smith, M

NNI argues that Marvin Smith cannot show that NNI discriminated against him in pay, evaluation, training or overtime, or if he can make out a prima facie case, NNI argues that it had legitimate reasons for its decisions, citing that it no longer had 30/60/90 day evaluations, there was only one spot on the evening shift for TIG welding, he was paid the same as experienced welders, and he was still new, at the time Angle was assigning overtime. Plaintiff M. Smith's

57

discriminatory training claim is part of his hostile work environment; whether or not NNI was still providing 30/60/90 day raises (which it was still providing, Pl. SOF 8) is immaterial to whether M. Smith can demonstrate a prima facie case and evidence of pretext in connection with his pay claim, and overtime claim, which he can.

As to overtime, NNI's own records show that similarly situated employees received more than he did. Pl. SOF 29. (Moreover, NNI has cited to no evidence in support of its "legitimate" reason for the differential.)

Smith was paid $23.00 as an experienced welder. Although  Knick, a Caucasian welder, started at $21.00, he was quickly moved up to $23/hr within a few months, and then surpassed Smith, earning $24/hour within four months of starting, up to $26/hour with in a year. Ex. 158, par. 13. This disparity, along with Plaintiffs' evidence, is sufficient at summary judgment.  (NNI's "legitimate" reason is just that it paid other experienced welders the same – but Knick was paid substantially more; Plaintiff has shown disputed issues of fact as to its "reason.")

Stewart

Stewart's claims easily get to a jury. He earned less than similarly situated co-workers, should have been reclassified up from a Mech Tech II, was not required to "apply" to be made Mech Tech II, there is no evidence workers were even required to express interest in same – white co-workers have testified that it just happened (*see passim*) – and his overtime claims also survive summary judgment.[28]

Stewart's pay and job classification claims easily survive where there is substantial

---

[28]As described in Pl. MEM-HWE, Plaintiff Stewart's hostile environment claim encompasses conduct prior to 2011, and is actionable, including the night shift assignment, pump house change, and similar claims. Non-discrete acts are actionable as part of a continuing violation when they otherwise would precede the statute of limitations.

evidence of disparate treatment. As set forth in Pl. SOF 67-93, which will not be repeated at length for the sake of brevity, job classification changes, eg from Mech Tech 2 to 3, are not promotions in the traditional sense; people can but are not required to express interest; however, there is no application or opening; supervisors may put employees in for the change. Pl. SOF 74. NNI discriminated against Stewart in connection with this process and in connection with his overall pay as described in his response to Defendant's SOF, in particular, but not limited to Pl. SOF 68, 69, 70, 71, 72, 73, 74, 76,  77, 80, 81-85, 87-90, 93. He has identified similarly situated comparitors who were treated better, but outside his protected class. Id. NNI's motion to dismiss his pay and job reclassification claim should be denied.

His overtime claims survive as well, as set forth in Pl.SOF 94-102, demonstrating a racial disparity in overtime pay and that he had to complain about it to get more overtime, after which the disparity continued.  NNI's motion should be denied.

Swain

Plaintiff Swain survives NNI's motion to dismiss his pay claims, where there is abundant evidence of discrimination and similarly situated Caucasian workers made more. Further he has evidence that make up supervisor decisions were discriminatory as were promotion decisions. He was not required to apply for positions about which he did not know, and make up supervisor positions were not "open" and there was no application. *See passim.*[29]

As set forth more fully in Pl. SOF, pars. 78-82, Plaintiff was paid less than Vanderberry, and Vogel. See also Ex. 158, pars. 18, 19. Vanderberry received a raise of $2 per hour in May 2010 and Vogel received a raise of $2.50 per hour in August 2013. Id. Defendant implies that

---

[29]Discriminatory training and assignments are part of Swain's hostile environment.

Vanderberry was not earning $1.50 per hour more than Plaintiff at the time of Plaintiff's

departure from NNI. Id; see also Pl.SOF 81. Where Plaintiff was earning $25/hr when he left,

Vogel was earning $26 by December 2013, and $27/hour by February 2015,  and Vanderberry

was earning $26/hour by May 2010, and $27.50 by March 2014. Ex. 158, par. 18, 19. These are

clear disparities and prevent summary judgment.

   Additionally, his promotion claim succeeds as well, as set forth more fully in Pl. SOF 60-

68, describing how he applied for promotions, NNI cannot claim to have rejected him for

"legitimate" reasons where it claims to have no record of his applications, he should have been

made Make Up Supervisor, but was not, did not have to apply to be a make-up, and those

decisions were made in a discriminatory, discretionary way, as demonstrated in Section I, above.

<u>Valentine</u>

   NNI moves to dismiss Plaintiff Valentine's discriminatory pay claims. As is typical, NNI

characterizes the claim as one of discriminatory raises *only* as opposed to discriminatory pay.

Valentine experienced both disparate raises but overall disparate pay, based on race. As described

in detail in opposition to Defendant's Statement of Facts, similarly situated Caucasian welders

were paid better than he was both overall and in connection with raises throughout his

employment. He need not show that each individual raise was discriminatory – but rather that

other workers were treated better with respect to their pay, due to race.

   Valentine was promised more than $18/hour; he began work on NNI's records indicate

that Plaintiff began employment at NNI on March 3, 2006. Pl SOF 7.  Vanderberry testified that

he was hired at NNI through Ameriforce in 2008. Vanderberry was making $26.50 by August

2010. Ex. 159, par. 18 (compare January 2013, per D.SOF 23). Within six months of hire, by

August 2013, Combs was earning $18.50/hour, an over 40% increase in pay. Pl.SOF 28; Ex. 158,

par. 6. In addition, James Knick, who had only five years of experience coming in to NNI, started as a welder at $21/hour in April 2012, but quickly moved past Valentine, to $26.00/hour in May 2013, earning more than Valentine by that time.  Ex. 158, par. 13. A jury could find in his favor on his pay claim.

Waddell, Jr.

Plaintiff Waddell Jr.'s pay, overtime, refusal to give light duty, and training and assignment claims go to a jury. His training, assignment and light duty claims are part of his hostile environment and will not be addressed here except to refer to Pl.SOF 70-79; 90-94. Further, his pay claim easily gets to a jury. He was paid $10/hr starting in September 2013 as a labor. Eventually he became full time and by the time of his separation he was earning $14/hr, in February 2015. Pl. SOF 8, 10, 11, 17. On the other hand, Caucasian worker Brandon Burton came in with no experience as a laborer at $12/hour, but in less than a year he was earning $17/hour, still as a laborer. Ex. 158, par. 4. Levi Cluts was hired as a laborer in November 2013, with no experience, at $13/hour, and increased to $16.50 an hour in four months, in March 2014; he was made permanent as a Mech Tech I (welder) at $17/hour, less than three weeks later. Id., par. 4. Contrary to NNI's argument, where it misleadingly claims that Cluts did not earn $17.50 an hour until after Plaintiff Waddell Jr had left, it ignores that he was earning *substantially more* as a laborer than Plaintiff for the majority of their employment, beginning in March 2014. Id., par. 5. NNI's motion should be denied.

 Waddell, Sr.

NNI acknowledges that Plaintiff Waddell Sr has never been disciplined or written up. It claims that he cannot assert an adverse employment action that was discriminatory, and that even if Jaffeux's delays in completing his 30/60/90/110 day reviews and raises were adverse, he

cannot show they were discriminatory. However, the delay in providing the evaluations and raises affected the terms and conditions of his employment: discriminatory raise and evaluation decisions together are adverse. *Hinton v. Va. Union Univ.*, 2016 U.S. Dist. LEXIS 60487, at *51 (E.D. Va. May 4, 2016) (where write ups cause "no detriment - employment-related or otherwise - besides the bruised feelings which 'all employees experience' on occasion", it will not be materially adverse "without collateral consequences"). In addition, NNI ignores the fact that Plaintiff Waddell Sr. never received his 110 day evaluation or raise. Pl. SOF 10. It further misstates the evidence in that Plaintiff Waddell, Sr.'s raises were substantially later (and his 110 day never came) than e.g. Jesse Smith, one of the three Caucasian comparitors. Pl. SOF 11, 12, see also Ex. 158, par. 16. Characterizing an evaluation and raise as a "slight delay" when it took 121 days to get a 30 day review; 246 days to get a 60 day review; 281 days to get a 90 day review, and forever, to get a 110 day review, is unsupportable. A substantial delay in a raise easily counts as an adverse action, and in comparison to Smith, Hill and Skinner, those Caucasian employees received their raises substantially quicker. Pl. SOF 11, 12. NNI has not demonstrated that there are no disputed issues of fact as to his discriminatory pay claims.

Walker

Plaintiff Walker's pay claims survives summary judgment. NNI argues that he cannot demonstrate that one comparitor whom Walker identified was treated better. Walker is not limited to proving his claim with evidence of which he was personally aware, or through evidence of similarly situated employees at all. There is substantial evidence of discriminatory bias in pay at NNI, set forth in Section I(A)(1-5) and no more is required. In any event, he can also show that there are comparitors who were paid more than he was who were similar to him.

Notably, Walker complained that his raises were discriminatory. Pl. SOF 48.

62

Levi Cluts is similarly situated. Walker need not show that he and Cluts were similarly situated down the specific ratings on an evaluation. Rather, they shared a supervisor, experience level and position, which is more than required, particularly when Plaintiff alleges that Jackson's evaluations were discriminatory and are contested. Pl. SOF 35, 43, 44. Further, NNI's "statements of fact" as to the import/impact of the ratings is contested. Pl. SOF 44, 45.

Cluts started two months after Walker, at the same rate, $13.00. Ex. 158, par. 5. He quickly moved up to $16.50/hour, within four months of starting at NNI. Id.[30] Cluts received the following: Hire (11/10/13 @ $13) (12/15/13 @ $13.50); (1/19/14 @ $ 15.50); (3/9/14 @ $16.50); (Rollover @ $16.50); (6/14/15 @ $17.13). Id. Walker however received: Hire (9/8/13 @ $13); (10/20/13 @ $13.50); (11/17/13 @ $14.50); (1/12/14 @ $15.50); (Rollover: @ $15.50); (3/8/15 @ $16.13). Pl SOF 8, 38, 45.

Jackson testified that he did not believe raises were correlated to the evaluations. Ex. 78, Jackson Dep. 93/6-11. NNI has offered no legitimate reason for the difference in Cluts' pay that is supported by the record. In conjunction with the statistical evidence, and evidence of Jackson's animus, as well as the difference in treatment with Cluts, Plaintiff Walker's pay claim should go to the jury.

As to Jackson's discriminatory failure to provide an opportunity for qualifications, Plaintiff's claims survive summary judgment either as part of his hostile work environment and/or disparate treatment claims. Based on racially discriminatory statements by Jackson, a jury

---

[30]NNI's argument that Jackson must not have discriminated against Walker because Payton received more money is a red herring. The Supreme Court has made clear that an employer need not discriminate against every member of a protected class in the same way; the question here is whether NNI acted in a discriminatory manner towards Walker. *Connecticut v. Teal,* 457 U.S. 440 (1982)

could find that race played a role in failing to provide Walker with opportunities for

qualifications that would have advanced Walker's skills, promotability and eventually, pay. As

Plaintiffs describe in Section II, above, the discriminatory decisions built on one another and

impacted Plaintiffs in myriad ways. While there may be less of a direct line between a

qualification and a raise, the ability to better oneself, and be more promotable, ultimately affects

Plaintiffs' pay.

<u>Wiltz</u>

NNI's effort to dismiss Plaintiff Wiltz' pay claims should be rejected. First, it claims that

the failure to give him his 30, 60, 90 and 110-day evaluations were not race related, but rather, a

result of the March 2014 rollover. Wiltz should have received his 30 and 60 day evaluations prior

to being rolled over, but he did not; he also received only one pay increase and no reviews. Pl.

SOF 27-37. He did receive a raise but it was a month late. Pl. SOF 32. When Defendant did

evaluate, post-rollover, raising pay rates for employees who did not receive all evaluations and

corresponding raises, Wiltz did not receive the suggested increase to $26/hr (an 8% increase).  Pl.

SOF 34. Instead, he received a 2.25% pay increase on Feb. 23, 2015. Id.

Defendant contends that other Caucasian employees who were affected by the rollover

also did not get all of their 30/60/90 day evaluations or received them late. Yet <u>none</u> of these

employees had to wait 56 days, like Wiltz, to receive their first 30-day evaluation and pay

increase (Barefoot, Gibson and Burton, 29 days; Cluts, 30 days; Chao, 40 days; Briggs, 42 days;

Quesenberry, 52 days). Pl. SOF 35; Ex. 158, passim. Further, all of these white employees

received significant pay increases prior to the rollover compared to Wiltz' 4% pay increase:

Barefoot, 25%; Briggs, 45.8%; Burton, 41.6%; Chao, 17%; Cluts, 26.9%; Gibson, 25%;

Quesenberry, 11%. Pl. SOF 35. See also, generally, Pl. SOF 27-37, reflecting differential

64

treatment of Caucasian employees in receiving their evaluations timely, and receiving high raises.

NNI argues that even if he could establish the conduct was race related, he cannot make out a prima facie case arguing that the failure to give an evaluation is not an adverse action. As set forth *supra,* decisions that have collateral consequences, and failure to provide raises, are "adverse actions."[31] Evaluations are the method by which raises are provided at the outset of employment (and throughout), and failure to provide a raise has a material and indisputably adverse effect on ones employment. *Hinton, supra.* Wiltz' complaints about not getting his evaluation and raises timely are also indicative of the adverse nature of Defendant's failure. Pl. SOF 31.

NNI next tries to avoid liability by claiming that Wiltz did receive a raise around the time he should have gotten his 30 day evaluation. Defendant omits that Wiltz should have received his 30 and 60-day reviews prior to the rollover, but he did not, he only received one pay increase and no reviews; further, Plaintiff's raise was approximately one month late. Pl. SOF 30, 32. Finally, NNI argues that it is speculative what raise Wiltz would have gotten at an evaluation, and therefore it cannot be a tangible employment action. The evidence, however, belies NNI's contention. In addition to the statistical evidence demonstration statistically significant disparities in pay between Plaintiffs like Wiltz and Caucasian NNI employees both before and after the roll-over, Plaintiff has demonstrated -at a minimum disputed facts- that Caucasian employees (P.SOF 35) received substantially higher raises at their evaluations. The disparity is even more evident by virtue of the recommendation for an 8% raise he should have received,

---

[31]Perhaps $1 or $2 hour is not material to Scott Jones or Steve Napiecek, but to workers like Plaintiffs, it is significant.

compared to the 2.5% raise he actually got. Pl. SOF 34. See also, Ex. 158, passim.

Wiltz also has discriminatory evaluation claim based on Clarks' rating him a 2. First, as with all the other times NNI argues it, the fact that a supervisor is also African American DOES NOT MEAN as a matter of law that he cannot discriminate. *See Oncale, supra.* In any event, as NNI concedes the rating provided impacts the merit raises provided. Consequently, Wiltz can show that the "2" rating had a "collateral consequence," making it actionable. *Hinton*, supra.

Wiltz' classification level was also discriminatory. One breath after NNI contends that Plaintiff's performance review is not actionable as not adverse, it relies on it to justify his Mech Tech 2B classification. Clearly, a 2 rating by its own admission had consequences. Wiltz can show that the Mech Tech 2B/3B decision was discriminatory as well, because Defendant's explanations are pretextual. Defendant's citations do not support the statement that Gobble was promoted to Mech Tech 3B based on experience or performance. Pl. SOF 52. Gobble is a proper comparator: Gobble is now 27 years old and had less than ten years' experience at the time of the decisions. Wiltz had many more years of experience.  Pl. SOF 41. See also, Ex. 158, par. 10 (reflecting starting pay of $21/hour in August 2012, prooted to Mech Tech 3 at the Marh 2014 rollover, earning more than $27/hour. Moreover, Wiltz was recommended for an 8% raise based on his skills and experience (although he only received 2.5%) Pl. SOF 34. Compare Pl. SOF 50: Jones' Declaration references "Id." but there are no attachments that confirm Gobble's evaluations. Gobble received 23.8% increase in pay through the 110-day evaluation period, compared to Wiltz' 4% pay increase. See Ex. 158, par. 10. Moreover, Clark recommended Wiltz be reclassified to MechTech 3, but was rejected. D.SOF. 41. Thus he must have had the experience and skills.

James Woodfin, Jr., a caucasian employee, was hired at the same time as Wiltz as a temp

and rolled over, so using NNI's argument, his experience should be counted the same as Wiltz; yet he was paid $25/hour, and rolled over as a Mech Tech III. Ex. 142, 690.1 Excerpt. A jury could reject NNI's explanation of relying on experience at NNI in connection with the job family reorganization.

Further, the significant disparity in the race of those who were given a job family reclassification (Mech Tech 3), along with the statistical evidence of discrimination, allow a jury to find the refusal to give Wiltz a job family reclassification was discriminatory.

Finally, for the reasons described in Sections I(A)(1)-(5), a jury could find NNI discriminated against Wiltz in connection with his pay. Wiltz himself is not required to identify comparitors himself, but did. Pl. SOF 46. Plaintiff had many more years of experience than Gobble, but was paid substantially less. Ex. 158, par. 10. Further, James Woodfin, Jr. was paid $25/hour and rolled over to Mech Tech III, compared to Wiltz, who received a raise *to* $24.00. Even after Wiltz' 2015 raise, he was still making less per hour than Woodfin. D. SOF 40.

<u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs have demonstrated disputed issues of fact as to their pay, promotion, and other disparate treatment claims. NNI's motion for summary judgment as to those claims should be denied.

Dated: October 26, 2016
         Mamaroneck, NY 10543

                         Respectfully Submitted,

                              By: ___*/s/ Joshua Friedman*_____
                                   Joshua Friedman
                                   Rebecca Houlding
                                   Effat Hussain
                                   Jesse Centrella
                              Law Offices of Joshua Friedman

1050 Seven Oaks Lane
Mamaroneck, NY 10549
Tel (212) 308-4338 x 5
Fax (866) 731-5553
rebecca@joshuafriedmanesq.com
*Admitted Pro Hac Vice*

By: ____/s/ James H. Shoemaker, Jr.
      James H. Shoemaker, Jr.
Virginia State Bar No. 33148
Patten, Wornom, Hatten
& Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone:  (757) 223-4500
Fax:  (757) 223-4518
jshoemaker@phwd.com
*Local Counsel for Plaintiffs*

68

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2016, I will electronically file the foregoing Substituted and Corrected Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment as to Plaintiffs' Disparate Treatment Claims  with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Scott Kezman
Virginia State Bar No. 36831
Burt Whitt
Virginia State Bar No. 18308
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169

Nikki Howell
Nicholas Walker
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, MO 64108
Telephone: (816) 472 6400
Facsimile: (816) 472 6400

*Counsel for Defendant*

By: ____*/s/ James H. Shoemaker, Jr.* _____
         James H. Shoemaker, Jr.
    Virginia State Bar No. 33148