# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

| | |
|---|---|
| **JAMESINA CRAWFORD, *et al.*,** | |
| | |
| **Plaintiffs,** | |
| | |
| **vs.** | **Case No. 4:14-cv-00130–AWA-LRL** |
| | |
| **NEWPORT NEWS** | |
| **INDUSTRIAL CORPORATION** | |
| | |
| **Defendant.** | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AS TO DISCRIMINATORY DISCHARGE, RETALIATORY DISCHARGE, RETALIATION AND CONSTRUCTIVE DISCHARGE

Friedman & Houlding LLP
1050 Seven Oaks Lane
Mamaroneck, NY 10543
Tel (212) 308-4338 x 5
Fax (866) 731-5553

**On the briefs:**
Joshua Friedman
Effat Hussain
Jesse Centrella
Rebecca Houlding
*Admitted Pro Hac Vice*

James H. Shoemaker, Jr.
Virginia State Bar No. 33148
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone:  (757) 223-4500
Fax:  (757) 223-4518
*Local Counsel to Plaintiffs*

**TERMINATION CLAIMS**

I.   **RACE PERVADED DECISION MAKING AT NNI INCLUDING TERMINATION DECISIONS FOR JAMESINA CRAWFORD, JOHN HARRIS, LAMAR JOYNER, REGGIE HOLLIMAN, DENNIS SMITH,  THEO PIERCE, FRANZ EDOUARD, AND MARK BARNETT**

The same legal analysis applies to NNI's motions to dismiss the discriminatory and retaliatory discharge claims of Jamesina Crawford, Dennis Smith, John Harris, Lamar Joyner, Reggie Holliman, Theo Pierce, Franz Edouard and Mark Barnett. Genuine disputed issues of fact preclude summary judgment.

A.   **Standard for Termination Claims**

Discriminatory discharge claims may be proved with direct or circumstantial evidence sufficient to raise a genuine issue of fact as to whether discrimination played a role in the decisions, or by the burden shifting formula set out initially in *McDonnell Douglas, infra.* The ultimate issue is whether the defendant intentionally discriminated against the plaintiff.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248  (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792  (1973). The methods of proof applicable to Title VII are the same for Section 1981 claims. *Goode v. Cent. Va. Legal Aid Soc'y*, 2014 U.S. Dist. LEXIS 111650, *8-9 (E.D. Va.  2014). To establish a claim of race discrimination, a plaintiff may either follow the burden-shifting framework of *McDonnell Douglas Corp,* at 802, or offer other sufficient evidence that gives rise to an inference of discrimination, in other words, "under conditions which, more likely than not, were based upon impermissible racial considerations." *Gairola v. Commonwealth of Virginia Department of General Services*, 753 F.2d 1281, 1286 (4th Cir. 1985); *Young v. Lehman*, 748 F.2d 194, 196 (4th Cir. 1984).

The burden of showing a prima facie case is not an "onerous" one.  *Burdine,* at 253. Once

1

the plaintiff shows that an adverse event occurred "under circumstances which give rise to an inference of unlawful discrimination," *id.*; *Young,* at 197, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. *Burdine,* 450 U.S. at 254. If the defendant meets this burden, the plaintiff must then show that the legitimate reasons offered by the defendant were not true and were merely a pretext for discrimination.  *McDonnell Dougla*s, 411 U.S. at 802.

The prima facie case is flexible and fact dependent. *Laudenslager*, 1996 U.S. Dist. LEXIS 16632, at *8 citing *McDonnell Douglass,* 411 U.S. at 802 n.13; *see also Burdine*, 450 U.S. at 253 n.6; *Alvarado v. Board of Trustees*, 928 F.2d 118 (4th Cir. 1991) (prima facie test varies).  The essence of the court's inquiry should be whether the plaintiff has made a prima facie case which "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254 (quotation omitted).

There is no requirement to demonstrate a similarly situated person was treated better to make out a discrimination case. *Haywood v. Locke*, 387 F. App'x 355, 358-60 (4th Cir. 2010), citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc*., 333 F.3d 536, 545 (4th Cir. 2003). It is where a plaintiff seeks to rely *exclusively* on a comparitor to raise a presumption of discrimination that they must be sufficiently similar. *Id.*

In *Haywood,* Plaintiffs argued that the district court had incorrectly found that the comparitor's position and job duties were substantially different and therefore was not similarly situated. *Id.,* at 358. Whether someone is similarly situated *may* include evidence that they dealt with the same supervisor, were subject to the same standards and engaged in similar conduct

2

"without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id., citing Mitchell*, 964 F.2d at 583 (emphasis added). In a failure to promote claim, the Court upheld the district court's analysis where plaintiff's position belonged to a separate job family and series, had different responsibilities, and was at a substantially higher grade.

> Though a comparator need not be an exact match, the only similarities between the comparitor and the plaintiffs are that they all worked for the USPTO in the early 2000s and applied for accretion-of-duties promotions. This is simply not enough. There are by no means 'enough common features between the individuals to allow [for] a meaningful comparison.'

*Id.,* at 359-360 *quoting Humphries v. CBOCS West, Inc*., 474 F.3d 387, 405 (7th Cir. 2007), aff'd on other grounds, 553 U.S. 442 (2008). It is important to assess *all* the circumstances in determining whether someone is similarly situated, not apply a rote test. Indeed, whether someone is a proper comparitor is ordinarily a jury issue. *Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.,* 2011 U.S. Dist. LEXIS 47125, at *11 (W.D. Va. May 2, 2011), *citing George v. Leavitt,* 407 F.3d 405, 414, 366 U.S. App. D.C. 11 (D.C. 2005) (*quoting Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000)).

Where there is sufficient evidence of discrimination, however, Plaintiff need not rely on the *McDonnell Douglas* burden shifting. *See Worldwide Network Servs., LLC v. DynCorp Int'l, LLC*, 365 F. App'x 432, 442-43 (4th Cir. 2010). There, the Court upheld a plaintiff's verdict, finding that § 1981 liability required proof that race actually motivated the decision to terminate, that is, that race "'actually played a role in the . . . decisionmaking process and had a determinative influence on the outcome.'" *Id., quoting Reeves*, 530 U.S. at 141. The Court upheld the verdict because there was sufficient evidence from which a reasonable jury could conclude

that four people collectively made the adverse decisions, and two of them harbored racial

animus. That evidence included one of the four's use of a racial slur, among other things. *Id.* In

other words, a decision maker's use of a racial slur provided evidence of race-based decision

making, without resorting to the *McDonald Douglas* analysis.

Further, for status-based discrimination claims like these, the employee must only "show

that the motive to discriminate was one of the employer's motives, even if the employer also had

other, lawful motives that were causative in the employer's decision." *Guessous v. Fairview

Prop. Invs., LLC*, 828 F.3d 208, 216-17 (4th Cir. 2016), *citing Univ. of Texas Sw. Med. Ctr. v.

Nassar*, 133 S. Ct. 2517, 2523 (2013).

Discriminatory decisions must be evaluated to determine whether there are circumstances

giving rise to an unlawful inference of discrimination. *Chan v. Montgomery Cty. Md.*, 2013 U.S.

Dist. LEXIS 58449, at *12-15 (D. Md. Apr. 24, 2013). Evidence that may be probative includes:

> (I) stereotypical remarks, code words, or other communication probative of ... animus,
> see *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S. Ct. 1775, 104 L. Ed. 2d 268
> (1989) (plurality opinion); *Tasciyan*, 820 F. Supp. 2d at 674; (ii) under-representation, see
> *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S. Ct. 1817, 36 L. Ed. 2d 668
> (1973) (citations omitted); (iii) statistical evidence and/or analysis, see *Int'l Bhd. of
> Teamsters v. United States,* 431 U.S. 324, 339, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977);
> (iv) evidence of discrimination against employees based on the same protected trait (i.e.,
> "me too" evidence), see *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388, 128
> S. Ct. 1140, 170 L. Ed. 2d 1 (2008); and, of course, (v) comparative evidence, see *Oncale
> v. Sundowner Offshore Servs*., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2D 201
> (1998).

*Chan*, at *12-15;  *Moore v. Nat'l Tire & Battery*, Civil Action No. 13-cv-01779 AW, 2013 U.S.

Dist. LEXIS 145805, at *6 (D. Md. Oct. 9, 2013) (reciting types of evidence).

Pretext may be shown in myriad ways. Changing explanations for an adverse action is

one. *See  EEOC v. Sears Roebuck & Co,  infra.* A plaintiff is not required to disprove each

"legitimate" asserted reason, where there is more than one. *Fuentes v. Perskie*, 32 F.3d 759, 764 n.7 (3d Cir. 1994)("We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available."); *Tyler v. Re/Max Mountain States Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) ("[W]e are unwilling to apply that rule as rigidly as RE/MAX would like, recognizing that when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility. See Chapman, 229 F.3d at 1049–51 (Birch, J., concurring in part and dissenting in part) (discussing cases from the Third, Sixth, and Seventh circuits). Under those circumstances, the jury need not believe the employer's remaining reasons. 'This is but common sense: if a person is shown to be a liar in an outrageous manner or is shown to have lied about a number of issues, the inference that the person is non-credible, and should not be believed as to other issues, is a reasonable one.' Id. at 1050.) *citing Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir.1998) ("an employer's strategy of simply tossing out a number of reasons ... in the hope that one of them will 'stick' could easily backfire....a multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable that any application of the 'honest belief' rule is inappropriate.")(internal quotations omitted).

**B.**      **Standard for Retaliation Claims**

At summary judgment, a plaintiff may either produce sufficient direct or circumstantial evidence that a materially adverse action was because of an employee's protected conduct, OR where there is evidence  (i) that he engaged in protected activity, (ii) that the employer took adverse action against him, and (iii) that a causal relationship existed between the protected activity and the adverse employment activity. *Guessous*, 828 F.3d at 217, citations and quotations omitted. Once met, the burden shifts to defendant to produce a legitimate, non-retaliatory reason for the adverse employment action. If the burden of production is met, it shifts back to plaintiff to show this reason was a pretext to disguise the true retaliatory reason. *Id.*

In contrast to discrimination claims, retaliation claims ultimately require a "but-for" showing[1]. *Guessous,* at 417*, quotations omitted.* However, a cause need not work in isolation to be a "but-for" cause. *Id., citing Burrage v. United States*, 134 S. Ct. 881, 888 (2014) ("Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived."). In other words, the burden is only to show that the protected activity was a but-for cause of her termination, not that it was the sole cause. *Id.,*at 218 (reversing summary judgment where there was evidence that even if defendant did not need an assistant bookkeeper, a jury could find the protected activity was the final straw motivating termination), *citing Foster*, 787 F.3d at 252. Where the evidence puts defendant's explanation in doubt, it is sufficient to survive summary judgment. *Id.* at 219.

---

1  Plaintiffs need not demonstrate "but for" causation at the *prima facie* stage – causation at the prima facie and pretext stage are not identical standards. *Foster v. Univ. Of Maryland-Eastern Shore,* 787 F.3d 243, 251 (refusing to set aside 40 years of precedent).

**C.    Plaintiffs' discriminatory and retaliatory discharge  claims survive summary judgment.**

**1.    Harris' claims should be heard by a jury to determine NNI's intent.**

In responding to Plaintiffs' Interrogatories requesting the reason for any Plaintiff's termination of employment, NNI provided a sworn answer; here, it verified that Mr. Harris was discharged because he was reminded not to park in the NNI parking lot, was given a suspension for parking in the wrong parking lot after the warning in January 2015, to which Harris responded in an aggressive way, and by telling Dale Spilker, not to talk to him any more. When leaving the meeting in which Plaintiff received his suspension, Harris told an external inspector that weld metal was being issued by unqualified individuals, which NNI then investigated, and which it asserts it found to be incorrect. NNI also claimed that Jones had been informed that Harris had stated to others that he would not do what was expected of him. NNI contends that as a consequence it discharged Harris in January 2015. Ex.120, Supp. Crawford Rogg 7. Although NNI is bound to view the evidence in the light most favorable to Plaintiff, its explanation for discharging Harris has morphed over time, and it ignores that Plaintiff complained about racial discrimination before he was fired. See infra. The facts are disputed. As explained below, Plaintiff Harris has evidence that his discharge was discriminatory and/or retaliatory, preventing summary judgment.

**a.    Harris Demonstrates Sufficient Evidence of Discriminatory Discharge**

In moving for summary judgment, NNI argues that Harris' termination claim should be dismissed because he cannot identify a similarly-situated comparitor, and therefore cannot establish a prima facie case of discriminator discharge. Dkt. 168, p. 25. As explained *supra*,

Plaintiff is not required to identify a similarly situated comparitor to survive summary judgment. *Haywood*, 387 F. App'x at 358.[2] However, even if he were, he is not limited to producing evidence of one comparitor similar in all respects. For instance, Caucasian employees placed by SA who parked in the NNI lot were not disciplined: when an SA employee provided a ride to an NNI employee or rode to work with an NNI employee, the SA employee was permitted to park in the NNI parking lot. Ex. 14, Harris, J. Dep. 18/16-26, 189/17-20, 233/11-14, 233/21-234/7, 301/-6; Ex. 324, SA SUB 0112. Plaintiff did not violate the rule because he was transporting an NNI employee, Leon Parker, whose vehicle was not working.  Ex. 99, Spilker Dep. 27/2-13. Harris drove to work with Leon Parker, but was disciplined for anyway. Pl.SOF 84, 86, 87.

Moreover, NNI terminated Harris after Harris told Treat that that he was being racially discriminated against and Treat provided him with  no reason or violation of policy.  [Ex. 314, Bates No. P001824 (Harris UI Claimants Statement)]. Plaintiff has never made a verbal threat to an NNI employee. Plaintiff did not have any performance issues, either. [Ex. 325, SA SUB 0134.] SA advised against termination. [Ex. 321-323, SA SUB 0107-109]. P. SOF 95. Further, Defendants have offered a litany of inconsistent and changing reasons as bases for Harris's termination, including: false accusations to a customer [Ex. 256, NNI0021133]; making a scene, false accusations leading to investigation requiring use of man-hours hours and poor attitude [Ex. 200, NNI001445-46; Ex. 314, P001829]; disruptive activity and "approaching client's supervisor" and an investigation resulting in (NNI) requesting the removal of Plaintiff [Ex. 314, P01827]; threatening a supervisor (and admitting to it) [Ex. 91, Puckett Dep., 25/19-25; 47/10-

---

2       NNI argues that Harris "offers his own legitimate, non-discriminatory explanation" as to why his comparator may have been treated better. However, Harris' own speculation is not relevant to whether Held is actually a good comparator or to whether a comparator is necessary to survive summary judgment.

49/3, 74/4-12]. Changing explanations are evidence of pretext. *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001).

Plaintiff has demonstrated disputed issues of material fact demonstrating that Harris was discharged under circumstances giving rise to an inference of discrimination where he submitted evidence that he did not violate the parking policy, that NNI disparately enforced rules (e.g. Held picked the lock of the metal shack and was not disciplined versus Harris' treatment), and NNI's explanations for separating Plaintiff have changed over time, all of which allows a jury to infer the real reason was discrimination.

In addition, Steel America previously recommended termination of Slack's employment for making a noose in front of an African-American employee, but it was not done (Ex. 349, Weiters ex. 13; Ex. 355, SA SUB 97-98; Ex.348, Weiters ex. 11), and SA advised against Harris' discharge, (Ex. 321-323, SA SUB 0107-109), but NNI rejected its recommendation, which furthers the inference of discrimination.

> **b.    Harris' survives summary judgment as to retaliatory discharge**

NNI also moves to dismiss Harris' retaliatory discharge claim. It argues that while there was protected activity – complaining that discipline was discriminatory – Plaintiff cannot show that Superintendent Treat knew of the complaint at the time of the decision, and therefore, cannot demonstrate pretext. Defendant's argument fails for several reasons. First, the timing of the decision compared to the termination decision clearly raises a question of fact as to the motive, where the termination followed the discrimination complaint by mere weeks. P. SOF 84, 88, 96 (complained about discrimination in January 2015; fired in January 2015); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015) (reversing summary judgment where plaintiff's

evidence of temporal proximity relevant to the prima facie case also tends to show causation in the pretext analysis, where plaintiff terminated a month after protected activity), *citing King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (finding that a two-and-a-half month gap between protected activity and an adverse employment action was sufficiently narrow to establish the causation prong of the prima facie case solely on the basis of temporal proximity); see also *Dyer v. City of Gastonia*, 164 F. Supp. 3d 777, 786 (W.D.N.C. 2016) (denying summary judgment as to retaliation where plaintiff alleged defendant's reasons were pretext based on the temporal proximity of written complaint of discrimination on April 13, 2013, and Defendant deciding to eliminate Plaintiff's position "between May and July 2013." The court found that the timing of events created an issue preventing summary judgment.) Moreover, changing explanations – even pieces of them – raises a question of fact on pretext. *Sears Roebuck & Co.*, 243 F.3d at 852-53. In Interrogatory responses, NNI did not claim it fired Harris for a "false report;" when he was fired he was not told why; as time has passed, NNI has simply added "reasons" for his discharge. Pl. SOF 94, 95, 96. Third, as described above, other people who did not complain were not disciplined or discharged for e.g. parking in the NNI lot.

Moreover, people with knowledge of the protected activity participated in or influenced the termination decision. *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011) (adopting, in USERRA, a statute very similar to Title VII, "cat's paw" theory of liability, i.e., that, "if a supervisor performs an act motivated by . . . animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable," even if the ultimate decision maker as to the adverse action did not have a discriminatory animus) (emphasis in original); *see also Vance v. Ball State Univ.*,

10

133 S. Ct. 2434, 2439, 2443 (2013) (holding that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim," i.e., "to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits'") (quotation omitted); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004) (en banc) (An employer cannot insulate itself from discrimination on the part of a supervisor and dominant decision-maker through the use of a "formal decisionmaker who merely rubber-stamped or acted as a cat's paw" for the supervisor's decision). H, ere, the decision to fire Harris was made after discussions between Spilker and Treat. Pl. SOF. 84, 86, 87, 88, 91, 94, 95, 96. Thus, whether or not Treat was aware of Harris' protected activity, where the evidence shows, as it does, that people with knowledge caused or contributed to his discharge, NNI may not obtain summary judgment. *Staub, Hill.*

### 2. Jamesina Crawford's Retaliatory Discharge and "Blackballing" Claims Easily Withstand Summary Judgment

#### a. Retaliatory discharge

Crawford has substantial evidence that her discharge was retaliatory and that NNI effectively "black balled" her from jobs. NNI argues that she cannot demonstrate a causal connection between her complaints and discharge, that it offered a legitimate, non-retaliatory reason for firing her, and that she allegedly cannot point to similarly situated comparitors, and therefore, her claim fails. While NNI doesn't clearly articulate its argument (and appears to concede, by failing to argue pretext, that if Plaintiff has made out her prima facie case of retaliation then her claim survives summary judgment), it is apparent that its motion must be

denied because the temporal proximity is sufficient to make out a prima facie case and because timing along with other evidence is sufficient to show pretext (which NNI does not contest).

First, NNI argues that she cannot rely on temporal scope to establish causation where she was complaining in an ongoing manner. However, causation may be established through temporal proximity alone, by looking at the last act of protected activity[3]. *Rhodes v. Comcast Cable Communs. Mgmt., LLC*, 2016 U.S. Dist. LEXIS 108898, at *19-20 (D. Md. Aug. 17, 2016) (where plaintiff complained in May, June, and July and was fired in August, court held that the temporal proximity between the last complaint and termination gave rise to an inference of causation, *citing King, supra*). Here, Crawford's discharge (decision made in January, executed February 3, 2012; Crawford SOF 89-94) came approximately or less than two and a half months after she complained to Napiecek that Jackson called her a "bitch" and that Rilee talked about "African built shit" (Crawford SOF 37, 44 – complained after her injury in November 2011), and her complaints about the bathroom were ongoing protected activity, which under *King,* and *Rhodes*, is sufficient to raise an inference of causation. *King*, 328 F.3d at 151 & n.5 (two and a half months sufficient).

Next, NNI claims that "intervening acts of misconduct" "sever" any causal connection. Here, NNI conflates "intervening acts" with the so-called "legitimate" reason it offered for her discharge. In any event, Crawford does not rely solely on temporal proximity to show causation. For instance, NNI treated a Caucasian male employee better than it treated Crawford, an African American woman. Tony Ware, a white male, complained he was being picked on; he had a history of poor attendance and poor work product, and complained about it; NNI did not

---

3  NNI does not offer legal support for its implicit argument that by repeatedly engaging in protected activity, the temporal proximity is measured from the *first* complaint.

substantiate his complaint; HR (Beale) extended Ware's 110 day evaluation an extra thirty days to give him time to improve regarding attendance, and welding. Ex. 120, Crawford Supp. Roggs 4; Ex. 250, Bates No. NNI005858; Ex. 266, NNI024028-024032. Beale explained that "I can't remember the source of the original complaint, if it was protected activity or not, … And even though shortly thereafter he failed another test, he would draw a nexus presumably to the fact that he is being retaliated against. So we wanted to be sure, **being the caring employer that we are, that we gave him additional opportunity**, which as evidenced by here, the quality nor behavioral things, attendance improved." Ex. 57, Beale Dep. 85/4-23. Ware, like, Crawford was a temporary employee, and had attendance issues. *Id.* Unlike Crawford who complained about Jackson and Rilee's sexist and racist harassing comments to the Vice President, and about the lack of women's room throughout her employment, Ware was given an extra 30 days to try to address attendance and performance issues; a jury could find that NNI is "caring" towards Caucasian male employees. Rather than treating Ware's "intervening" performance as severing a retaliatory connection, it chose to extend the time for him to comply with company rules. Not so Plaintiff Crawford.

NNI's changing explanations also allow a jury to find causation and pretext. *Sears Roebuck & Co.*, 243 F.3d at 852-53. In its own paperwork, it provided no reason for her discharge. Dkt. 166, Ex. HH. In fact, it showed a "RIF" - Reduction in Force. Ex. 57, Beale 112/14-19. In answering an interrogatory as to the reason for her discharge NNI claimed: Ms. Crawford was terminated for repeated unexcused absences. EX. 120, Supp. Crawford Rogg 7. In its motion, it twists the reason it advanced, now claiming that a comparitor would be someone who was "released to work failed to come to work for nearly a month, and, yet, kept their jobs."

13

Dkt. 166, p.30. These shifts are indicative of dissembling and allow a jury to find pretext.

Further, Plaintiff is not required to point to comparitors to make out a prima facie case of retaliation. Plaintiff offers abundant evidence of pretext allowing a jury to disbelieve NNI's stated reasons for her discharge. In addition to the differential treatment provided to Tony Ware, and the changing characterization of reasons for her discharge, there is other evidence that supports a retaliatory motive. First, she did not have an unexcused absence problem: Ex. 191, NNI00984- NNI00985 (Plaintiff received a rating of 4 out of 5 for attendance in her evaluations, except for one 30 day period of evaluation where she received a 3 because she had issues with daycare for her daughter). Plaintiff was never written up for being absent.  Ex. 8, Crawford Dep. 75/16-21. Further, the majority of her absences occurred after her injury, and were excused. Ex. 258, NNI022166; Ex. 8, Crawford Dep. 73/10-13; 137/4-11. In fact, when Plaintiff applied for unemployment, the commission found that "Plaintiff's absences were due to her injury and were reported to her employer," though NNI contested Plaintiff's unemployment because of her absences. Ex. 162, NNI-2_110818.

In addition, Napiecik, the VP of NNI to whom Crawford complained about Jackson and Rilee, went out of his way, after she was fired and Steel America wanted to bring her in to weld, to ask, "Please tell me we marked do no re-hire?????"[4] Crawford SOF 95. In fact, she had not been marked "no rehire," but NNI changed her paperwork to prevent it. Id. Being discharged for cause – if it had legitimately done that – would not automatically bar rehire. Id. Beale, who was copied on Napiecik's email, could not remember any instance of the VP being involved in a similar way or being as concerned about whether someone was eligible to return to work. Ex. 57,

_____

4  A jury could easily find that this reaction is wholly inconsistent with the reaction one would expect for someone simply fired for absenteeism.

Beale 111/16-21.

NNI's subsequent job reference for Crawford, *infra,* is also direct evidence of a retaliatory motive; NNI stated: "**A weakness is she stirs up a lot of commotion,**" Ex. 350, Crawford Reference (NNI-2_0144378). The only "commotion" Crawford stirred was engaging in protected activity. A jury could <u>easily</u> determine that NNI viewed Crawford as a troublemaker who complained about discrimination, and discharged her to avoid further complaints, particularly because, as it acknowledges, "Her Strengths include being a good welder." Id.

### b.      Plaintiff's "black-balling" claim is based on evidence

Crawford alleges she was black balled by NNI after her discharge. Although NNI argues that Crawford could not describe the evidence supporting her claim, Plaintiff herself is not required to marshall all the evidence demonstrating retaliation. In fact, despite possessing the evidence, NNI ignores it and fails to meet its burden at summary judgment. Here, NNI possessed the evidence of "black-balling" as Plaintiff faxed the evidence to NNI pre-litigation, requesting NNI cease providing the negative reference, which stated in response to the question "Could you describe any strengths and/or weaknesses of this individual?: Her Strengths include being a good welder. **A weakness is she stirs up a lot of commotion**." Ex. 350, Crawford Reference, (NNI-2_0144378), (emphasis supplied). Blount sent an internal email asking whether anyone in his department had given the reference. Ex. 178, NNI-2_144369. At summary judgment, she need not show more.

### 3.      Lamar Joyner's Claims Survive Summary Judgment

Defendant claims it terminated Lamar Joyner on April 15, 2015 for taking pictures in the NNI facility. Ex. 120, Crawford Supp. Rogg 2. While it is undisputed that Joyner took

photographs, it is also undisputed that he believed – and there is no contradictory evidence that he was wrong for doing so – that as a member of the "safety committee" he could take pictures where he observed things that he believed raised safety concerns, which is what was documented. Ex. 19, Joyner, L Dep. 242/8-14 (taking pictures to report safety hazards); Ex. 213, NNI002073-2074 (pictures taken of tripping hazards and sleeping employee consistent with safety concerns). It is also undisputed that he did not provide the pictures to anyone outside of NNI – and certainly did not "leak" them on the internet.  It is further undisputed that the photographs  revealed no NNI or government secrets.

NNI makes three superficial arguments. First, it claims Joyner cannot make out a prima facie case because, it argues, Plaintiff's comparitor is not proper. Second, it argues that the supervisor and HR representative who issued the termination memo are both African-American and therefore racial animus cannot be inferred, citing *Williams,* 2004 WL 3258906. Third, NNI contends that even if Joyner makes out a prima facie case he cannot show pretext because NNI argues it cannot risk having sensitive information leaked onto the internet.  NNI's motion fails.

### a.      Joyner's Discriminatory Discharge Claim Survives

First, as set forth above, Plaintiff is not required to identify a comparitor to make out a claim for discrimination, but he identifies three (*infra*), and makes out a prima facie case. Matt Gram, a white co-worker, texted a photo taken at work to a *supervisor,* Clem Stewart, and was not discharged (or disciplined, or counseled, or warned). Jackson took photographs. So did Nick Whitehurst. Alvarez R56, par. 1 (*citing* Ex. 38, Hooker Decl. ¶3, with text, 38-A; Ex. 73, Gram Dep. 41/15-20; Ex. 78, Jackson Dep., 110/21-111/6; 111/19-112/9. Ex. 7, Chisman Dep. 317/3-7); Ex. 19, Joyner, L. Dep. 210/12-15 (I saw Nick [Whitehurst] take a couple of pictures...I seen

him take pictures of people asleep. And Clark seen him. And nothing was said."). The fact that NNI has not discharged others for the same/similar infractions allows a reasonable jury to find that Joyner was not discharged because he took pictures. Thus, while this is not the only means of showing a prima facie case, Plaintiff's evidence is sufficient at this "not onerous" stage. *Burdine, supra.*

Second, as set forth in Plaintiffs' MOL concerning their hostile environment claims, the line of reasoning that an African-American presumptively would not discriminate against another African-American worker simply does not belong in a summary judgment motion. *See Oncale; see also* Pl. MOL-HWE. It is also undermined by the evidence here, considering Joyner and others' testimony about Clark discriminating against them. Ex. 19, Joyner, L. Dep. 87/2-5, 20-5; 66/2-16; 80/13- 80/23; 84/16- 85/3;  80/24-81/4 (Clark "was <u>always</u> on me, as far as I couldn't even use the bathroom for less than five minutes without him saying something. He was <u>always</u> trying to belittle me in front of my crew; he always thought it was a joke"; Doug Todd pressured Clark to monitor African American workers more closely); P.SOF 19-24.

Third, as to the prima facie case and as to discriminatory intent generally, Clark -who was the decision maker[5] – had a discriminatory animus that is reflected in his comment about Plaintiffs: Ex. 23, Payton, C Dep. 160/21-23 (Daniel Clark stated "Cats' got a lot to say but won't say nothing to my face, but they rather go put it on paper, that all I do for these n*ggers)."

NNI's failure to discipline or fire Caucasian workers for taking pictures is also evidence of pretext. Jackson took multiple pictures at NNI without consequence.  A jury is permitted to find discrimination where plaintiff makes out a prima facie case, and the jury rejects defendant's

---

5  D.SOF. Par 70, Ex.U (NNI2527 accepting manager Clark's recommendation to terminate employment).

"explanation," which it can here, where there is evidence that Caucasian employees – Gram, Jackson and Whitehurst – violated the policy but were not discharged. *Supra.* Differential treatment of comparitors, combined with the evidence of racially disparate treatment by the decision-maker who discharged Joyner, easily allows a jury to find in his favor as to his discriminatory discharge claim.

### b.      Lamar Joyner's Retaliation Claim

Joyner's retaliation claim should be heard by a jury. NNI's argument that he is foreclosed from disputing his discharge because he "approached Clark and basically turned himself in" is wrong, factually and legally. First, the assertion is not supported by the record, or defendant's citation to D.SOF. 71. Further, Joyner did not independently approach Clark, but rather, Joyner believed he was going to be interviewed as a witness to Payton being assaulted; instead he was asked for his cell phone and he complied. P. SOF 71-73. Further, it is illogical to claim that it forecloses his retaliation claim: Plaintiff's burden is to show that he was discharged because of his protected activity; here his discharge followed his joining the instant suit by approximately two months. D.SOF 69, 70. The temporal proximity raises a question of fact as to causation. *Foster, supra; King v. Rumsfeld*, 328 F.3d at 151 & n.5 (two and a half months). Moreover, the fact that three other employees also took photographs provides evidence of pretext. Moreover, Clark's offensive comment about the Plaintiffs who brought suit (referring to them as n*ggers for "putting it on paper") provides direct evidence of a retaliatory motive.  Summary judgment is due to be denied.

### 4.      Dennis Smith's Discriminatory and Retaliatory Discharge Survive

NNI claims it discharged Dennis Smith because it allegedly conducted an investigation

and determined that Smith had assaulted his co-worker, and lied about his wife being in an accident, and then admitted he had lied. Ex. 120, Crawford Rogg. 2. Contrary to NNI's assertion that there is no dispute regarding the facts, there are underlying disputes as to the incident but more importantly, disputes as to NNI's motivation in discharging him. His discriminatory and retaliatory discharge claims survive summary judgment.

### a.   Discriminatory Discharge

Defendant argues that Plaintiff Dennis Smith cannot make out a prima facie case contending he cannot identify a similarly situated worker. However, Plaintiff survives summary judgment because he shows that NNI treated a similarly situated co-worker differently, giving rise to an inference of discrimination, and the comparitors NNI cites to are not similarly situated.

First,  NNI claims it discharged him for "assaulting" a co-worker, but the evidence is clear – or at least there is a genuine dispute - that he did not engage in an intentional act. D. Smith SOF 28-33. Both Smith and Young concurred that it was an accident, and therefore not an "assault." Id. NNI was aware that it was not intentional.  Ex. 28, Smith, D. Dep. 201/1-204/9; 205/12-206/17; Ex. 236, NNI003151- 3152 (Young told his NNI supervisor the night of the incident that it was an accident). Thus, a jury could conclude that NNI did not discharge him for intentionally assaulting a co-worker.

Despite knowing that neither Young nor Smith believed it was intentional, and there was no other evidence that it was, NNI fired Smith. The two "comparitors" NNI relies on (Arbogast and Lahocki) are not similarly situated, because they both *actually* engaged in intentional acts. D. Smith SOF 34. A true comparitor, Caucasian SA worker Brandon Slack (who had just been counseled but not fired for putting a noose around a co-workers' neck in front of an African-

American colleague), whom NNI claims unintentionally pushed Plaintiff Gordon, was not

discharged or disciplined, even though witnesses confirmed Slack had at least "bumped"

Gordon, (Ex XX NNI 149814), and Gordon believed it was intentional. This differential

treatment allows a jury to find the alleged reason for Smith's discharge to be pretextual.

A jury could also consider that when D. Smith reported that one Caucasian employee had

threatened to shoot another one, which another worker corroborated, it was deemed

"uncorroborated", but NNI fired Smith even though it was not corroborated – let alone argued by

anyone – that his action was intentional. D.Smith SOF 86. This evidence allows a jury to find

that he was discharged because of his race.

### b.      Retaliatory Discharge

Plaintiff also has adduced sufficient evidence of retaliation to allow his retaliatory

discharge to go to the jury. As NNI acknowledges, he was fired less than two months after

joining the instant lawsuit, which it admits is sufficient at least for this motion, to demonstrate

causation. It claims however that he cannot establish pretext. First, the temporal proximity may

allow a jury to find pretext. *Foster,* 787 F.3d at 253. Second, a comparitor is not required to

demonstrate pretext; rather, any evidence that tends to show that the asserted reason was not the

real reason for the decision will suffice. *See id.,* at 253-254 (evaluating evidence of pretext). As

set forth above, Slack engaged in physical conduct that NNI deemed unintentional (soon after

engaging in racially offensive behavior) but was not discharged[6], whereas Young admitted that

Smith's contact was unintentional, yet NNI fired Smith, who had recently joined the instant suit.

Further, Artis is a valid comparitor, who did not engage in protected activity, but was not

---

6  Should NNI try to argue that it could not 'discharge' Slack, it is undisputed that it had the
   ability to ban SA placed labor from its facilities. See also Pl. MEM-JE.

discharged after assaulting Chris Payton.  Ex. 103, Treat Dep. 114/19-116/15. L. Joyner

witnessed the assault. Ex. 19. L. Joyner Dep. 212/7-213/5 ("Artis hauled off -- he punched him in

the face.") The fact that Artis was also employed by Steel America is irrelevant to whether he is a

valid comparitor, as NNI has conceded multiple times that it had the authority to bar Steel

America labor. See Pl.MOL-JE. A jury could reasonably conclude that Plaintiff D. Smith

engaged in protected activity by joining the instant suit and was fired soon after for conduct for

which it did not discharge other workers, where they had not engaged in protected activity (Artis,

Slack) and where they were determined to have engaged in an unintentional act despite evidence

to the contrary (Slack).

**5.     Theo Pierce**

Defendant argues that Theo Pierce's discriminatory discharge claim should be dismissed.

It asserts that he cannot demonstrate a prima facie case, contending he cannot show he performed

his job, or identify similarly situated comparitors who were treated less harshly. Because NNI

does not challenge his ability to show pretext, and because he makes out a prima facie of

discrimination, NNI's motion must be denied.

NNI claimed in its interrogatory responses that he was discharged because a) in late 2014

he  allegedly stopped speaking with his supervisor, Slaughter, and was then insubordinate to a

make up supervisor, Doug Todd; b) In November 2014, Pierce was allegedly asleep at work, and

received a final written warning; c) in December 2014, Pierce allegedly stopped communicating

with Slaughter again, and when confronted, he allegedly stated "fuck you," when a supervisor

did not provide him with information he needed. Ex.120, Supp. Crawford Rogg. 7. In its

Summary Judgment motion it claims it discharged him in December 2014 for "violating NNI's

yard rules" relating to intimidation and abuse and indecent language. D.SOF 19. NNI claims

Plaintiff cannot point to any similarly situated employees who cursed at their supervisor, and on

this basis moves for summary judgment.

Plaintiff has substantial evidence of NNI treating similarly situated workers differently,

by not disciplining and/or discharging them, which is sufficient to make out a prima facie case.

Caucasian employee Chris Barefoot cursed at Slaughter –the same supervisor Pierce was accused

of swearing at-- and was not fired for cursing. Ex. 88, Oswald Dep. 104/21-5.  Ricky Penrod

(who referred to an African-American worker as "colored" in his deposition, Ex.89,  Penrod Dep.

38/8-15) called Wayne Jackson an "ass" and was not disciplined or terminated. Ex. 89, Penrod

Dep. 65/3-14, 79/8-13 ( Q. Did you actually tell Mr. Jackson he was being an ass? A. Yes. Q.

And he didn't write you up for that,  right? A.  No.). Robert Slaughter cursed out Donald

Harwick to Doug Todd, and threatened Harwick, and nothing was done. Ex. 102, Todd Dep.

65/7-21. See also Ex. 61, Blanchette, Dep. 94/11-12, 95/14-20 ("[Supervisor Wade Lynn] would

use foul language. He would belittle. That was his temperament.").

Penrod and others have not been fired for sleeping on the job because it is not a fireable

offense [for Caucasian workers][but see Dantes, infra]. Ex. 93, Scheg, Dep. 101/23-5 ("Q. And is

sleeping on the job a fireable offense? A. I don't think so....Penrod. He ain't got fired. And I can

almost bet you other supervisors have seen that....he sleeps out in the open"). Penrod slept on the

job and was not terminated. Ex. 89, Penrod, Dep. 31/21-3 ("Q.  Have you fallen asleep at work

when you weren't on break? A. Yes."); see also T. Pierce SOF 12-13, 16-19. Penrod, Barefoot,

Slaughter and Lynn are all Caucasian. Slaughter and Stewart have both made racial remarks (see

generally Pl. MOL-HWE), which allows a jury to find racial animus as well. A reasonable jury

could find that discrimination played a determinative role in Pierce's discharge where Pierce has demonstrate a prima facie case of discrimination because NNI treated similarly situated NNI employees better than it treated him and the decision makers have demonstrated racial animus.

**6.    REGGIE HOLLIMAN**

NNI argues that Reggie Holliman's racially discriminatory termination cannot proceed. Defendant's burden is to demonstrate the absence of material, disputed facts. That Holliman was told he was being discharged for failing a drug test is not the same as actually firing him for that reason, and does not end the issue.

NNI argues Plaintiff cannot make out a prima facie case because he cannot show a similarly situated White employee who was treated differently and because NNI has "articulated" a legitimate reason for his discharge. According to NNI, however, discharge for failing a drug test is not automatic. Ex.86, Meadows 24/1-24/3 (Manager of Environmental Health and Safety) ("Q.  So it's not mandatory that somebody be terminated if they fail a drug test? A. Not to my knowledge, no.") Second, NNI has not offered a written policy concerning when an accident leads to mandatory drug testing; it claims it distinguishes between Osha recordable injuries versus "incidents," which can involve minor injuries but not be "Osha recordable," see e.g. Ex. 58, Beddingfield Dep. 147/11-148/3 (First aid only is an "incident"), and it claims to drug test for OSHA recordable injuries. This policy is not supported by record evidence. See also Pl. Holliman SOF Par. 27 and infra.

Because Plaintiff has evidence that similarly situated Caucasian workers were treated differently, and because NNI has not submitted undisputed evidence that it mandated drug testing for all OSHA recordable incidents, or that any policy mandated discharge, he makes out a prima

facie case. Further, "other people got in accidents at work and got swept under the rug. They

didn't go down and get urine tests or anything like that."). Ex. 16, Holliman Dep. 144/3-6;144/7-

145/25 (detailing how Caucasian employee, Jarvis, totaled a company vehicle and did not have

to submit for drug testing); see also id, 133/4-14; 140/2-10; 141/15-142/8; 144/1-146/4

(indicating Jackson, who is white, caused Plaintiff's injury and was not drug tested).

NNI also argues that other white employees were also terminated for failing post accident

drug tests, citing SOF 34.  This argument fails. That NNI may have fired Caucasian employees

who failed a drug test, does not answer the question whether NNI fired Holliman because of his

race. An employer may not avoid liability merely because it treats some members of the

protected class favorably or treats some members outside the protected class similarly to the

plaintiff/employee.  *Compare Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702

(1978); *Connecticut v. Teal*, 457 U.S. 440 (1982); *Brown v. Henderson*, 257 F.3d 246, 252 (2d

Cir. 2001) ("the courts have consistently emphasized that the ultimate issue is the reasons for the

individual plaintiff's treatment, not the relative treatment of different groups within the

workplace"); *Diaz v. Kraft*, 653 F.3d 582, 588 (7th Cir. 2011) ("the employer cannot satisfy its

burden by identifying a person within the protected class who was not similarly discriminated

against"); *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 323 (3d Cir.2000) ("an

employer does not have to discriminate against all members of a class to illegally discriminate

against a given member of that class"). Moreover, the evidence on which NNI relies does not

support its claim that the white coworker NNI cites as a comparitor, Labelle, ever failed or even

had to take a drug test following his workplace accident. Dkt. 132-3. Defendant did not maintain

accurate records, and produced evidence that it did not drug test at least two workers who had

accidents at work, demonstrating it did not have a "policy" of drug testing for accidents. Ex. 351, NNI-2_134396.  This sufficiently raises an inference of discrimination. Plaintiff has set forth sufficient evidence of a prima facie case and pretext, where discharge is not automatic, NNI has not shown it fired another worker for failing a drug test, and there is evidence that it did not drug test two Caucasian workers who had workplace accidents.

> 7. **A Jury Could Find Kershaw's Transfer Was Retaliatory and his Discharge was Discriminatory and Retaliatory**

NNI argues that Plaintiff Kershaw cannot demonstrate disputed issues of fact as to his retaliation claims, asserting he did not engage in protected activity.  Further, it claims that his transfer was not a materially adverse employment action, and finally that his discharge was taken for a legitimate, non-retaliatory reason and Kershaw cannot show pretext. These arguments should be rejected at summary judgment.

Jackson did not tell Kershaw, when he fired him, the reason for his discharge except to say they were letting him go. Ex. 20, Kershaw 35/5-12. Talley told Kershaw he was discharged for disagreeing with his supervisor (Jackson), which Kershaw understood to mean he was fired for complaining about Jackson. Id. 39/10-43/20. In its interrogatory response, NNI now claims Jackson fired Kershaw for repeatedly failing to "clean slag off of his welds. In addition, Mr. Kershaw would leave the floor for 30 to 45 minutes at a time. When Mr. Jackson would speak with Mr. Kershaw, he would be ignored and Jackson would have to get other employees to clean up his work." Ex.120, Supp. Crawford Rogg. 7. Plaintiff can make out a prima facie as to a discrimination claim, by showing his discharge took place under circumstances giving rise to an inference of discrimination. *Supra.* Here, the decision maker, Jackson, made racial remarks to many Plaintiffs including Kershaw (*see* P.SOF, *see also,* Pl. MOL-HWE); and, according to NNI,

leaving slag on a weld is not a terminable offense, nor has NNI fired any Caucasian workers for

doing so. Ex. 58, Beddingfield, Dep. 126/14-16 ("Q. Are you aware of any white workers who

have been fired for leaving slag on a weld? A. No. No, ma'am."); Ex. 66, Clark Dep. 162/13-15

(same); Ex. 100, C. Stewart Dep. 94/10-12 (same); Ex. 104, Tucker Dep. 59/23-25 (same); Ex.

101, Tally Dep. 75/19-24 (same); Ex. 90, Pruden Dep. 173/3-13 (same; "I have never known it to

be a firing offense.  It would be something that somebody either overlooked or something, 'Go

clean your slag up' and move on.").

      A jury could also find that Jackson did not actually fire him for "repeatedly" leaving slag

on a weld because Kershaw did not actually do so: indeed, Plaintiff disputes that Jackson spoke

with him on more than one occasion regarding slag on welds, that Plaintiff ignored Jackson when

he did speak with him, or that Jackson had to get another worker to do Kershaw's work. Ex. 20,

Kershaw Dep. 66/21-68-19. ("Q. Are you saying that you only performed welding three days

under Wayne Jackson, out of the roughly three or four months you worked for him? A.

Exactly. . . . A. So those two days, in those two days he came to me one day and told me to clean

the slag off of my work in mid shift. I was still at work. So he just -- it wasn't something that was

ongoing. He just came to me and told me to do it. Q. And you failed to follow his instructions?

A. No. I did it. Q. Okay. So if he said that he told you on-- at least on six separate occasions to go

ahead and clean your slag, you would say that that's untrue? A. Absolutely.").

      Further, a similarly situated Caucasian worker who was working next to/with Kershaw,

was not fired by Jackson even though they were doing the same thing. Ex. 20, Kershaw Dep.

83/15-84/7 ("He gave me this job to do along with this other white employee on a Friday. We did

this. We did this work together. . . . So when we came back the next day, he fired me for what

was stated as insufficient . . . And the white employee didn't get fired for the same work that we were both on...); *id.* at 802/2-9 ("A. I feel that -- I know that it was -- it was racially motivated. Q. How do you know that? A. Because I don't -- for the reasons that I was fired, I don't know any white workers that were fired for or written up for the things I was fired for.").

A jury could disbelieve Jackson's now-stated reason for discharging Kershaw where he treated Kershaw's Caucasian co-worker differently, leaving slag on a weld is not a terminable offense, no Caucasian worker has been fired for doing so, and Jackson only gave Kershaw welding work briefly and thus could not have counseled him six times. That there is abundant evidence in the record of Jackson's racial animus also provides a basis for denying summary judgment. *See Chan, supra.*

Plaintiff's retaliation claims succeed as well. A jury could easily find that within days of complaining about Jaffeux's mistreatment, he was transferred to Jackson, who was known to fire people [Ex. 79, Jaffeux Dep. 120/2-4 ("Q. Did you understand Wayne Jackson to be the person that does the firing at NNI? A. He fired a lot of people."); Ex. 20, Kershaw Dep. 103/6-8 ("Tom Jaffeux came to me and told me that I shouldn't had went and told on him . . . So at this point I shouldn't have went over there, and there was nothing that he can do at that point. Now I'm going to fall victim to Wayne Jackson.")[7]], and that when he complained about Jackson's racially harassing language, he was fired for pretextual reasons. Pl. Kershaw SOF 80-81. Adverse actions within two and a half months after protected activity are sufficient at summary judgment to show

---

7 Jackson was notorious for carrying a "black book" for terminations. Ex. 70, Cummings Dep. 103/3-21 ("Q Did you ever hear about Wayne having a "black book"? A Yes. Q What was -- what is your understanding of the "black book"? A It just has documentation of the people that he has reprimanded, I believe.") Jackson admitted he carried one. Ex. 78 Jackson 146/18-147/1 ("Do you have a physical book like a small black book or something like that that you used to make notations in? A Yes."). It was never produced in discovery despite its relevance.

causation; here, Kershaw's discharge was almost immediate, establishing both a prima facie case and causation for purposes of summary judgment. *Foster supra.* In addition, Talley expressed that Kershaw was being discharged <u>because he had challenged Jackson's mistreatment</u>. Pl.SOF 81. This is direct evidence of retaliatory motive; his claim goes to the jury. *See Chan.* Finally, for the same reasons that a jury could find pretext in connection with his discriminatory discharge claim, it could find that pretext as to retaliation.

### 8. Chris Payton's Discriminatory and Retaliatory Discharge Claims Survive

In its Interrogatory response concerning the reason for Payton's discharge, NNI asserted it was because it became aware that Payton took a picture of himself at work and posted it on social media, and that Payton was aware of a prohibition against photography but took pictures nonetheless.  As a result, NNI claims, he was fired. Ex. 120, Crawford Supp. Rogg. 7. NNI now argues that in addition to discharging him for taking photographs, he was also discharged for receiving a warning relating to his attendance, using a phone in the bathroom, and for sleeping on the job. Dkt. 154, p. 29/30. Summary judgment as to his discharge claim should be denied because changing explanations is evidence of pretext and similarly situated employees were treated better for engaging in the same/similar behavior. Further, there is strong evidence of retaliatory motive.

### a.    Retaliatory Discipline

The sole basis for NNI's motion to dismiss Payton's retaliatory discipline is its contention that Payton cannot show that written warnings for sleeping and attendance standing alone are materially adverse actions. D.Mol. 27-28. However, while a warning with no consequences may not be materially adverse, here, according to NNI's Motion, Payton's warnings *did* contribute to

his discharge. Dkt. 154, p.29-30 (discussing discharge). Thus, a jury may find that the written warning, which according to NNI had collateral consequences, would have dissuaded a reasonable worker from complaining. *See Hinton v. Va. Union Univ.*, 2016 U.S. Dist. LEXIS 60487, at *51 (E.D. Va. May 4, 2016) (where write ups cause "no detriment - employment-related or otherwise - besides the bruised feelings which 'all employees experience' on occasion", it will not be materially adverse "without collateral consequences")[8]

### b.      Retaliatory Discharge

NNI claims there is no causal connection between Payton's discharge and his protected activity. First, NNI argues that "intervening" acts severed the inference of causation arising from the temporal proximity between the protected action of joining the complaint, and the discharge, which was two months. Dkt. 7 (2/11/15); D.SOF 74, Ex. CC (4/15/15). Under *Foster,* and *King, supra,* the timing along satisfies the prima facie test on causation. As with Crawford, the "intervening acts" are simply NNI's asserted "legitimate reasons" for discharge. However, in addition to the timing, Plaintiff can show that NNI's "legitimate, non-retaliatory" reason asserted for his discharge is but a pretext for retaliation. As discussed *supra* in connection with Lamar Joyner's discharge claim, Caucasian workers took photographs at NNI but were not disciplined or discharged.[9] Further, Clark made the recommendation to fire Payton, and there is evidence of Clark's both discriminatory and retaliatory animus. *See* Sec. I(C)(3)(a), supra, and Clark's

---

8  Although not argued by NNI, a jury could find the write ups were retaliatory. P.SOF 63-67 (Clark, who had expressed retaliatory animus, involved in issuing discipline; others not disciplined for being on the phone in the bathroom; Plaintiff did not engage in all of the behavior alleged; documentation NNI relies on no longer exists relating to Sunday availability). Additional protected activity occurred during the time of the discipline. Id.

9  Defendant's attempt to insert an additional hurdle into retaliation claims is not supported by law; there is no requirement to identify a similarly situated comparitor in a retaliation claim, although it can serve as evidence of pretext. *Foster,* at 253-254.

comment about "n*ggers" putting it "on paper." *Supra.* In addition, to the extent NNI is now asserting that his discharge resulted not only from taking photographs, but for his attendance and sleeping warnings, these constitute new/different reasons, which is evidence of pretext. *See Sears Roebuck, supra.*

**c.**     **Discriminatory Discharge**

For similar reasons, Payton's discriminatory discharge claim survives where a jury could find NNI's reasons for discharge were but a pretext for discrimination, given that other workers were not fired for taking pictures at work (Jackson, Gram, Whitehurst), and because of Clark's discriminatory animus. Consequently, Payton's discriminatory discharge survives NNI's motion.

**9.**     **Jonathan Dantes Discriminatory Discharge and Retaliation Claim**

**a.**     **Dantes Discriminatory Discharge**

Although Defendant did not move to dismiss it, Plaintiff alleged a discriminatory termination claim in Plaintiffs' filed Second Amended Complaint. *See* SAC, Dkt. 15 paras. no. 1094-1104. NNI claims it discharged Plaintiff for sleeping during his lunch break, in August 2014. Ex. 192, NNI 1190. But "you are allowed to sleep during lunch." Ex. 90, Pruden Dep. 88/4; *see also* Ex. 68, Coates 71/4-5 ("You are allowed to sleep at lunch? It is lunch, yes."). White employees sleep at work even during their shift but do not face similar consequences. Ex. 89, Penrod Dep. 31/16-25 ("Q. Have you ever fallen asleep at work? A. Yes. Q. How many times? A. I don't really know. Q. Have you fallen asleep at work when you weren't on break? A. Yes. Q. Has a supervisor ever woken you up? A. Yes. And wrote me up."); Ex. 35, Waddell, Sr., Dep., 319/4-9 (testifying that his son Waddell, Jr., had been threatened with termination for sleeping but that he and others observed Penrod sleeping at nearly every morning meeting); Ex.

30

3, Blow, Dep., 19-23 and 140/8-12 (testifying that he saw Penrod sleeping on the job and that the

supervisor didn't say anything to Penrod); and *id*., at 210 (identifying a photograph of Caucasian

employee Dudley sleeping at the job). On Plaintiff's termination sheet, it states "Released for

Cause" and "If released for cause, please explain: Caught on numerous instances sleeping on the

job." Ex. 192, NNI001190. No other cause was given for Plaintiff's termination. *Id.* However,

there is no evidence that Plaintiff had ever been "caught" sleeping on the job before and Plaintiff

had not previously received any warnings. Plaintiff had never slept during work hours: "Q. So

you slept during lunch, but have you ever slept during working hours? A. No. Q. Never even let

your eyes fall, you know, a period of time? A: I answered that. No." Ex. 10, Dantes 99/11-17. As

Dantes noted, "My situation it was not just about me getting fired, getting caught sleeping six

times, okay? Because like I said before, there was numerous occasions where the white guys

would sleep on, like I said, next to the little office and would go to sleep on their lunch. And I

was the only one got fired on my lunch I was sleeping." Ex. 10, Dantes Dep. 128/14-25. *See also*

Pl. Dantes SOF, par. 26. A reasonable jury could find that his discharge was discriminatory

where he was not previously written up for sleeping on the job, and was not sleeping during

working hours, whereas other Caucasian workers have been observed sleeping, including

Penrod, and not fired.

### b.   **Dantes Retaliation**

Plaintiff also has made out a prima facie retaliation claim, which was asserted in the

SAC. *See* SAC, Dkt. 15, par. 1094-1104. NNI contends Dantes was terminated for sleeping on

his lunch break, which he is allowed to do, as described above. Following Plaintiff's termination

he filed a charge of discrimination against NNI with the EEOC. Ex. 120, Crawford Supp. Resp.

No. 2. Following Plaintiff's EEOC charge, Plaintiff was prevented from working at Newport News Shipyard, a sister company of NNI. *See* Ex. 10, Dantes Dep. 188/9-18 ("I am a black man. I got fired from NNI for doing the same thing that the Caucasian guys was doing. . . . [O]n top of that, add on insult to injury, . . . the man prevent me from working in a place [Shipyard] that I work before I work at NNI, a place where everybody respect my work and respect me, period. Prevented me from working there. Whatever issue he had, he had an issue. It was because the color of my skin."). A jury could find based on the timing that NNI prevented Plaintiff from working at the Shipyard in retaliation for Plaintiff's charge of discrimination filed against it.

### 10.   **Edouard's termination was racially motivated**

NNI moves to dismiss Edouard's discharge claim, arguing that he requested to be laid off and NNI marked him as a voluntary quit. However, viewing the evidence in the light most favorable to Edouard, a jury could find that Edouard was laid off for discriminatory reasons. As Edouard testified, the majority African-American employees on the Pin Jig project were laid off, when NNI told them there was no more work for them, and they could work for a temporary agency of NNI's choosing. P.SOF. 18-23. Plaintiff was not told that NNI "would" bring him back, but that it would "try" to bring him back. P.SOF 21. Plaintiff was not given a choice between remaining and working at NNI or resigning. Rather he was separated, given only the choice of working for NNI's choice of agency. Edouard did not want to be treated like property who was "loaned out" to another company. P.SOF 21-22. At a minimum there is a genuine issue of fact as to whether he was involuntarily separated (although NNI does <u>not</u> claim he could have continued working for it, at the time of his separation).

Discriminatory comments and animus, which infected Edouard's environment while on

the Pin Jig project, are also sufficient evidence on which to find that race was a determinative factor in his separation. P.SOF 25-33. Moreover, a Caucasian worker, "JJ," who was assigned to the Pin Jig, was not voluntarily or involuntarily discharged at the end of the project, and maintained his position at NNI. (Ex. 336, Excerpts of NNI134678 (Navision Personnel data) (indicating that "JJ" (James Johnson) continued to be employed by NNI when the Pin Jig ended); *see also* Ex. 11, Edouard Dep. 98/7-20 (indicating the Pig Jig project ended in January of 2011). Consequently, a jury could find race played a role in the decision to separate Edouard.

### 11.   A Jury Could Find Barnett's Lay Off Was Racially Motivated

Like Edouard, NNI dismissed Barnett at the end of the Pin Jig project. NNI moves to dismiss Barnett's discriminatory discharge claim, arguing that he resigned[10], but that even if he was laid off, a "lack of work" is a legitimate non-discriminatory reason for conducting a layoff. The evidence at summary judgment must be taken in the light most favorable to the non-moving party, Barnett, whose testimony that he was laid off due to lack of work prevails.

Moreover, Barnett has evidence that his lay off was race-related. As an aside, contrary to NNI's arguments that the evidence that his reason for believing the lay off was race-related was based on rumor and hearsay, Barnett himself is not required to know or marshall all the facts that support a decision that his discharge was discriminatory. He has sufficient evidence to allow the jury to decide whether race contributed to his discharge. As with Edouard, his environment was infected with discriminatory animus, and "JJ" a Caucasian worker who was also on the Pin Jig with him, was not laid off at the end of the assignment (Ex. 336, Excerpts of NNI134678 (Navision Personnel data) (indicating that "JJ" (James Johnson) continued to be employed by

---

10 NNI implicitly asserts that he was not permanently laid off because there was nothing preventing him from re-applying. D. SOF. 45-46. Whether he could re-apply for work is completely irrelevant to whether he was laid off for a discriminatory reason.

NNI when the Pin Jig ended); *see also* Ex. 11, Edouard Dep. 98/7-20 (indicating the Pig Jig

project ended in January of 2011); consequently, Barnett has made out a prima facie case of

discriminatory discharge, and a jury could find NNI's explanation is pretextual.

III. **PLAINTIFFS BOSTICK, C. PAYTON, L. HOLLOMAN, VALENTINE, HOOKER, SWAIN, D. PIERCE, D. SMITH, AND NICHOLS' CLAIMS FOR RETALIATION SURVIVE SUMMARY JUDGMENT**

At summary judgment, as described above, courts typically follow the burden-shifting

format for evaluating retaliation claims. In addition to the discharge claims described above,

Plaintiffs may bring actionable retaliation claims where a defendant has taken a materially

adverse action, because of protected activity. *Burlington Northern & Santa Fe Ry. Co. v. White,*

548 U.S. 53, 68 (2008) (action that "might have dissuaded a reasonable working from making or

supporting a charge of discrimination.")[11]

---

11 Notably, in some of its motions NNI correctly cites the "materially adverse" standard for retaliation claims; in others it attempts to impose a more stringent requirement of "adverse employment action," citing *Coleman v. Md. Court of Appeals,* which in fact does not apply. In *Hinton v. Va. Union Univ.,* Judge Payne provides a thorough analysis of the distinctions between "materially adverse" actions and "adverse employment actions," which distinctions can be important in evaluating retaliation claims. *Hinton v. Va. Union Univ.,* Civil Action No. 3:15cv569, 2016 U.S. Dist. LEXIS 60487, at *48-49 (E.D. Va. May 4, 2016) *34-64 (discussing the "non-negligible subset of cases on which the broader standard of *White* covers some actions but not others," particularly where the impact of the adverse action is not felt in the employment setting or does not affect the conditions of employment. "Thus, it is necessary, in this case, to come to terms with the effect of conflicting circuit precedent. Ordinarily, the only way to resolve such conflict is an en banc decision by the Fourth Circuit. However, considering that the Supreme Court has already decided the issue in *White* and that the Fourth Circuit has followed *White* in a sizeable set of cases, the correct course in this case is to follow the explicit holding of the Supreme Court in *White*, along with the decisions of the Fourth Circuit that note and apply the *White* decision as the law of the circuit. In sum, to state a prima facie case for retaliation under *White*, a plaintiff must allege: (1) engagement in protected activity, (2) "materially adverse action ... which ... might well have dissuaded a reasonable worker form making or supporting a charge of discrimination," and (3) causality. *White*, 548 U.S. at 68; Mascone, 404 F. App'x at 765.")

A.     **NNI Retaliated Against Swain**

NNI argues that Swain cannot point to evidence of materially adverse actions after the protected activity of filing the instant lawsuit, and further, to the extent his constructive discharge is materially adverse, there is no causal connection.  A retaliatory hostile work environment is actionable. *Settle v. Balt. Cnty.*, 34 F. Supp. 2d 969, 994 (D. Md. 1999) ("Certainly harassment in retaliation for an employee's protected activities could constitute an 'adverse employment action.'") (collecting cases). Here, after Plaintiff's complaints, the hostile environment intensified and worsened. P. SOF 88, Ex. 32, Swain Dep. 265/24-266/5 ("[H]ow often did you experience some form of discrimination or harassment during, you know, your time at NNI? . . . A. About every, every day, or every other day of some sort. . . .") *and id.* at 245/8-11 ("Then, after dealing with the people there and seeing other people climb and move up, and you were being held back when you know your skill level is at a certain level, that inclined even more."). He need not offer more specific testimony to support his assertion that the already hostile environment became more so. Moreover, he engaged in protected activity beyond the filing of the instant lawsuit; he complained throughout his employment. P.SOF 17, 40, 42, 45, 50 (describing how tired he was of the harassing environment and preparing to leave). Because a hostile environment based on retaliation is a materially adverse action, and because Plaintiff testified despite complaints and notice to NNI it remained hostile or worsened, his retaliation claim survives.[12]

B.     **NNI Retaliated Against T. Hooker**

NNI suggests that Plaintiff Hooker does not have a viable retaliation claim, asserting that his only protected activity is the lawsuit, the only adverse actions are sponge-blasting assignments (McKercher) and Stewart's attendance counseling, and that the adverse actions

---

12  His constructive discharge claim is discussed below.

occurred prior to the lawsuit. It implies that those are not materially adverse. However, Defendant incorrectly implies (D.SOF 8) that Plaintiff joined the instant suit in May of 2015. Plaintiffs' First Amended Complaint, which was filed on February 11, 2015, identified Hooker as a Plaintiff. Doc. 7, ECF p. 2. Plaintiffs' Second Amended Complaint, in which Hooker was also listed as a party, was filed on May 4, 2015. Doc. 15. Both adverse events cited by NNI actually occurred after February 11, 2015 when Plaintiff joined the lawsuit. Pl.SOF 76.

Further, Defendant omits that Stewart retaliated against Plaintiff after he spoke up about McKercher's mistreatment. Plaintiff raised his complaint against Stewart with Human Resources, after which he was falsely written up for attendance issues. P.SOF 76. Hooker also engaged in other protected activity (than the filing of the lawsuit) when he complained to Stewart about Matt Grams racially offensive notes, P.SOF 27, 28, 37, 39, 41, and to Human Resources that he was being "targeted," P.SOF 76. The timing of Plaintiff's protected activity allows a jury to find a causal connection between the complaints (both the lawsuit and his internal complaints), and the adverse conduct, including a false write up and disparate assignment to sponge-blasting. P.SOF 39, 79, and identifying comparitors. His retaliation claim should not be dismissed as NNI has not established that there no genuine, disputed issues of fact, and only suggests that the conduct was insufficiently material. Retaliatory harassment is actionable. *Settle*, 34 F. Supp. 2d at 994.

C.    **NNI Retaliated Against W. Nichols**

NNI argues that Plaintiff cannot establish a prima facie case because it contends there is insufficient evidence of a link between the lawsuit and NNI's actions concerning his carpel tunnell injury or final written warning. NNI wrongly contends that absent a similarly situated comparitor being treated better, he cannot demonstrate that NNI's actions were because of

retaliation rather than the reasons provided. So long as Plaintiff Nichols can show a causal connection between his protected activity and adverse action, he makes out a prima facie case. In any event, the retaliatory conduct also is part of his hostile environment claim and will not be addressed separately here.

     **D.**     **NNI Retaliated Against Valentine**

NNI's retaliation claim for withholding overtime in retaliation for Plaintiff Valentine's lawsuit. NNI argues that Valentine received overtime and therefore, there is no adverse action, and further, that Tucker was not aware of the lawsuit. Further, NNI claims that Valentine did not receive overtime because he kept "disappearing" and that he could have received overtime if he became TIG qualified. Each of NNI's arguments fail; at a minimum there are disputed issues of fact. See generally Pl. Valentine SOP 71-93.

First, Plaintiff's overtime was substantially reduced or non-existent under Tucker's leadership after the Complaint was filed, yet prior to the lawsuit he consistently received overtime. Pl. SOP 73. This reduction in pay was a materially adverse act, contrary to NNI's suggestion that because by averaging the overtime in the 34 weeks prior to and 34 weeks after the lawsuit was filed, the numbers were not starkly different. D.SOF 90-92. Defendant's method of averaging overtime does not account for the loss of overtime immediately following the filing of this suit, and for the six pay periods thereafter through March 2015. Pl. SOF 73.

A jury could also find that Tucker was aware of the lawsuit, despite claiming not to have heard about it for several months after it was filed: a jury is always entitled to disbelieve testimony. There was Daily Press front page news coverage when the case was filed. Pl. SOF 74. Additionally,  Jones instructed managers/supervisors not to discuss or allow it to be discussed at

work. Pl. SOF 74. Similarly, Pruden testified that everyone in the shop talked about it when it first was publicized: "Q. How did you hear about the lawsuit?A I first heard about it when an article came out in the Daily Press. Q Did you talk to anyone at NNI about the article? A There was talk among the majority of us, "What is this," of course, but other than that nothing in particular. ...Q Sure. When you say "the majority of us," who are you referring to? A The whole shop. The whole entire organization. Of course there was talk about an article that came out about our company in the paper, so..." Ex.90, Pruden Dep. 8/24-9/12. Tucker was unsure when he first learned about it, and a jury could believe he found out about it when it was filed.

Considering that the diminished overtime began immediately after the suit was filed and announced, a jury could find causation from the temporal proximity. Defendant's explanation that Valentine kept "disappearing" is not true, and pretextual. Pl. SOF 78, 79 (detailing how Plaintiff did not walk off his job, and no one complained that he had contrary to Tucker's claim, and that Tucker never wrote Valentine up for walking away from his job). Valentine's retaliation claim should go to the jury.

### E.    NNI Retaliated Against Bostic

NNI moves to dismiss Bostic's retaliation claim, re-casting it completely. Bostic had a solid career in law enforcement prior to joining NNI.  Ex. 4, Bostic 163/6-10; 161/12-15.  He has no prior disciplinary history at NNI. Ex. 131, Bostic Rogg. 23. In the SAC, Bostic alleges, and still does, that as a result of the hostile work environment he resigned from NNI in December 2013, and went and spoke with CTR, his temporary agency, complaining about the racially hostile environment he had endured. When he returned home, his home was swarmed by police. NNI had claimed that he had made some claims against this company that were unfounded, but

they said they had to investigate. The police had to detain him for evaluation.  P.SOF 76; *see also*

Ex. 279, Police Incident Report at 132548 (stating "AN ECO WAS OBTAINED AND THE

**WARRANT WAS DENIED**. REQUEST **CASE CLOSED**") (emphasis supplied).

NNI argues that Bostic cannot show a link between his protected activity and Wade

Lynn's reporting a threat of violence, and that NNI simply acted on a report of violence. That

"simple act" had a profound effect on Bostic: " A. Well, you're traumatized.  You are worried

about these crazy people doing bodily harm. There -- all types of scenarios run through one's

mind  because you've never been in this situation before,never been in trouble, never -- any legal

proceedings I've never had in my life until this incident at NNI when somebody lied on me and

got me incarcerated, so it was very traumatic, and then they put you in with crazy people, which

even adds to the initial traumatic  stress that you suffered, that you have never been locked up

any way, shape or form, so to get all this happen within a 24-hour period does stress one out. Ex.

4, Bostic 173/15-174/6. NNI's claim that it had to act on Wade's accusation rings hollow when

other employees have made threats of physical violence at NNI, including Justin Harris and

Donald Harwick, both white, neither of whom engaged in protected activity, yet the police were

not sent to their house or pursued in any way. Pl. SOF 77. His retaliation claim survives.

**F.      NNI Retaliated Against L. Holloman**

NNI claims that Plaintiff Lamar Holloman's retaliation claim should be dismissed

because his complaints were not sufficiently specific to constitute protected activity. Plaintiff

Holloman complained multiple times about harassment. As Harris testified, there are no magic

words required to trigger an investigation under the EEO policy (see Pl. MOL-HWE); using

NNI's own understanding of what constitutes protected activity, Holloman's complaints of

harassment (Pl. SOF 30, 31) satisfies the standard. NNI's other assertion that Holloman admits that Scheg did not act in retaliation for his complaints but for not buying Scheg's car may also be rejected by a jury: Scheg denied trying to sell Plaintiff a car, and Holloman did not concede that Scheg was retaliating for refusing to do so. Pl. SOF 28, 79.[13]

### G.     NNI Retaliated Against D. Pierce

NNI argues that Plaintiff Pierce cannot show an adverse action causally connected to his protected activity because it argues that a transfer to work in the tool room cannot be an "adverse employment action," despite that the standard is "materially adverse action," *Burlington, supra,* in other words, an action that would cause an employee to think twice about complaining. However, where a transfer has collateral consequences, it can be materially adverse. *Hinton*, 2016 U.S. Dist. LEXIS 60487, at *51. Here, where Pierce was not gaining experience within the scope of his position, it affected his ability to get raises and experience that would allow him to be promoted. That is a collateral consequence. In any event, whether the transfer was sufficiently materially adverse, it nevertheless contributed to his hostile environment.

## IV.    NNI DID NOT DEMONSTRATE AN ABSENCE OF DISPUTED ISSUES OF FACT AS TO PLAINTIFFS SWAIN, MARSHALL, EDOUARD, ALVAREZ, L. HOLLOMAN, FIELDS, BOSTIC, CHESSON, ROBINSON AND THEO PIERCE'S CLAIMS OF CONSTRUCTIVE DISCHARGE; ITS MOTIONS ARE DUE TO BE DENIED.

### A.     A Constructive Discharge Claim Survives Summary Judgment Where There Was Severe or Pervasive Harassment That Went Unremedied.

NNI's motions to dismiss claims for constructive discharge by Swain, Marshall, Edouard, Alvarez, L. Holloman, Fields, Bostic, Chesson, Robinson and T. Pierce should be denied because it has failed to demonstrate the absence of disputed facts. *See Amirmokri v. Balt. Gas & Elec.*

---

13 Plaintiff's constructive discharge is treated separately, infra.

*Co.*, 60 F.3d 1126, 1132-34 (4th Cir. 1995). Plaintiffs survive a summary judgment motion as to claims for constructive discharge where there is evidence from which a jury could find NNI deliberately made working conditions "intolerable" in an effort to induce them to quit. *Id., citing Martin v. Cavalier Hotel Corp*., 48 F.3d 1343, 1353-54 (4th Cir. 1995). In *Amirmokri,* in which the Court reversed a district court's grant of summary judgment as to constructive discharge, the plaintiff's testimony was sufficient to raise a factual issue about whether his working conditions were intolerable where he was subjected regularly to epithets about his national origin, and co-workers tried to embarrass him in public. The stress caused him to get an ulcer and resign. *Id.* These facts allowed a fact-finder to determine the conditions were intolerable. *Id*., at 1132. While the question of "deliberateness" by the employer was a closer call, the Court held that "intent may be shown by evidence that an employee's resignation was the reasonably foreseeable consequence of the employer's conduct. *Id.,* at 1132-33. "[I]ntent may be inferred from a failure to act in the face of known intolerable conditions." *Id.,* at 1133. Notably, plaintiff is not required to show that the employer completely failed to act; rather, the "reasonably foreseeable consequence of token action by the employer would still be that the employee resign. In other words, the employer's response must be reasonably calculated to end the intolerable working environment." *Id.,* citing *Landgraf v. USI Film Prod*s., 968 F.2d 427, 430-31 (5th Cir. 1992). In essence, where the employer acts negligently when it knew of harassment, a jury could also find that resignation is a reasonably foreseeable consequence. *Id.*

Despite evidence that the employer investigated plaintiff's allegations, referred him to a psychologist, and offered to discuss performance evaluations, the Court found disputed issues of fact as to intent where it was unclear when, if ever, an investigation took place, the investigation

41

that took place was cursory at based and did not end the harassment, and fell short of the types of responses other courts have held to be adequate. *Id.,* at 1133-34 (citing cases). Thus, summary judgment was reversed.[14]

Importantly, an employee is not required to quit the moment she feels that environment is intolerable. *Green v. Brennan*, 136 S. Ct. 1769 (2016): "An employee who suffered discrimination severe enough that a reasonable person in his shoes would resign might nevertheless force himself to tolerate that discrimination for a period of time. He might delay his resignation until he can afford to leave." *See also Delville v. Firmenich, Inc.,* 920 F. Supp. 2d 446 (S.D.N.Y. 2013). "[T]he passage of time [prior to resignation] is not dispositive," and that "a constructive discharge need not follow immediately upon the heels of an offensive incident." *Dortz v. City of New York*, 904 F. Supp. 127, 160 (S.D.N.Y. 1995) (internal quotation and citation omitted); *see also Barbetta v. Chemlawn Servs. Corp.*, 669 F. Supp. 569, 572 (W.D.N.Y. 1987) (that the plaintiff "felt constrained to continue working for a period in an environment which may objectively be found to be 'intolerable'… could be seen as a tribute to her perseverance rather than as a bar to relief"); *Lockheed Martin v. Administrative Review Board,* 717 F.3d 1121, 1135 (10th Cir. 2013) (attempts to stay at defendant employer are irrelevant to the question of whether conditions were so intolerable that she had no alternative but to quit. *See EEOC v. PVNF, L.L.C*, 487 F.3d 790, 806 n.10 (10th Cir. 2007) (noting the constructive discharge "standard cuts both ways--just as an employee's subjective feelings that her working conditions

---

14 In moving for summary judgment defendant at times relies on *Puckett v. City of Portsmouth.* It quotes the case as stating "there is no evidence that [the plaintiff's employer] created these conditions to pressure [the plaintiff] to resign [as the plaintiff's] complaints revolve around the conduct of [and individual who] wielded no supervisory or managerial power". Plaintiffs can not find that language in the case and do not find support for defendant's attempt to raise the level of proof needed for a constructive discharge claim where the harassment is by a co-worker as defendant implies.

were intolerable is not controlling in the constructive discharge analysis, neither is an employee's desire to continue working despite conditions so intolerable any reasonable employee would have long since quit").

NNI failed to demonstrate a lack of disputed facts as to Plaintiffs Swain, Marshall, Edouard, Alvarez, L. Holloman, Fields, Bostic, Chesson, Robinson and T. Pierce on their constructive discharge claims.

**B.     Plaintiffs' Claims Survive Summary Judgment**

1.     **Marshall**

NNI argues that nothing "triggered" his resignation and therefore, he cannot make out a claim for constructive discharge. As set forth above, an employee need not quit the moment it becomes difficult; where an employee makes out a claim for a hostile environment, as he has done, (see Pl. MOL-HWE; Pl. SOF passim), and where NNI negligently allowed the environment to persist upon notice (id.), a constructive discharge claim should go to the jury. *Green,* 136 S. Ct. 1769 (okay to wait until employee can afford to leave); *see also Delville,* 920 F. Supp. 2d 446 (S.D.N.Y. 2013) ("a constructive discharge need not follow immediately upon the heels of an offensive incident.); *see also,* Sec. IV(A), *supra.* Being called "boy" in February 2015 was essentially the "final straw" for Marshall, after experiencing a hostile environment for his employment at NNI, about which he complained, and nothing changed.  Pl. SOF 18, 20, 24, 25, 29-37, 41-46, 58, 50.

NNI's assertion that Marshall admitted that he did not suffer harassment or discrimination of any kind in the four to five months preceding his resignation, other than hearing "boy" at work in February 2015, is wrong. P.SOF. 61. Further, it has not offered any evidence as to why

Marshall did not accept the position he was offered in September 2014, but it does not undermine or change the fact that after continuing to endure a hostile environment for five more months, he could not take any more. Pl.SOF 58.

### 2. Holloman, Lamar

As with Plaintiff Marshall, Lamar Holloman makes out a claim for constructive discharge that survives summary judgment based on the hostile environment he endured and the fact that it went un-remedied despite notice. See Pl. SOF; see also Pl. MOL-HWE. NNI again argues that Plaintiff L. Holloman lacked a "trigger" and waited to find new employment. This does not defeat summary judgment. *Green,* 136 S. Ct. 1769 (okay to wait until employee can afford to leave); *see also Delville,* 920 F. Supp. 2d 446 (S.D.N.Y. 2013) ("a constructive discharge need not follow immediately upon the heels of an offensive incident.); *see also,* Sec. IV(A), *supra.*

### 3. Fields

NNI reiterates the same argument as with Marshall and Lamar Holliman in moving to dismiss Plaintiff Fields' constructive discharge claim. For the same reasons, his claim survives summary judgment where a pervasive hostile environment that did not abate despite notice, which is sufficient to create an issue of fact. See Pl. SOF; see also Pl. MOL-HWE.

NNI's argument that Fields was actively looking for work soon after he began, and left only after he found another position, supports rather than undercuts his constructive discharge claim, underscoring the need for a jury trial: as the Supreme Court has made clear, an employee can wait until s/he is financially able to afford to leave. *Green,* 136 S. Ct. 1769. An employee should not have to jeopardize his financial stability by quitting a job and potentially exposing himself and his family to serious consequences by quitting without other work, simply to make

out a constructive discharge claim.  By working to get out of an intolerable situation by finding alternative employment, Plaintiff also minimized his economic damages, which NNI is otherwise responsible for in the event of a liability verdict in his favor.

### 4.  Alvarez

Plaintiff Alvarez similarly makes out a constructive discharge claim.[15] He testified about the environment and the effect it was having on him; while Jackson was not directly supervising Plaintiff at the time he resigned, as with so many Plaintiffs, Jackson nevertheless managed to negatively impact his work environment. Pl. Alvarez SOF 8, 9, 11, 19, 20, Moreover, he had recently complained explicitly (January 2015) about Jackson's racial harassment, yet nothing was done – it was not even treated as a complaint under NNI's EEO Policy, and he was left to fend for himself. Id., par. 11, see also Pl. MOL-HWE. Because he has demonstrated a hostile environment, about which he complained, he can also survive summary judgment as to constructive discharge. Pl. SOF INSERT; see also Pl. MEM-HWE.

### 5.  Bostic

NNI's motion to dismiss Plaintiff Bostic's constructive discharge claim is due to be denied based on the myriad factual disputes, which prevent summary judgment. NNI misstates Bostic's testimony as to the reasons for his resignation. He testified: "Well, it . . . was the whole racial environment at NNI. It was a racially-fueled atmosphere there, and I just got tired of being in that atmosphere. I was stressed. I had physical ailments from all of this, and I'm having to drive

---

15 Plaintiff Alvarez was already fired by the time he was constructively discharged (Pl. Alvarez SOF 11, 20, 22-26)  NNI simply had not told him yet, which is why he has both a constructive discharge and a discriminatory/retaliatory discharge claim. Alvarez was constructively and/or actively discharged within months of complaining about Jackson making racist comments to him; he was written up in a discriminatory fashion for absences, which were often excused; NNI moved to discharge him at the same time as he resigned due to the intolerable conditions. See id, and see infra.

an hour-plus one way. I just got tired of being subject to all of this discrimination stuff . . . I was tired of going through the harassment, putting my life on the line for the job. I just mentioned all of this." Ex. 4, Bostic Dep. 151/18-152/1; 153/13-15. In addition to the fact that NNI has not demonstrated that not liking the commute would be a reason to grant summary judgment on this claim, a jury could find that the physical ailments that were not being accommodated were worsened by having an hour commute each way, which contributed to his decision.

NNI's motion is also misleading because it argues that once Bostic complained about Jackson's failure to accommodate his breaks, he was permitted to take them, but omits the fact that Jackson continued to excessively monitor and hound Bostic once Jackson was forced to allow them. See Pl. SOF 19-27. For the same reasons that NNI's motion to dismiss his hostile environment claim fails, so does its motion to dismiss his constructive discharge claim.

### 6.  Chesson

Similar to Bostic, NNI argues that because NNI changed the start time of his shift, which affected Chesson, his constructive discharge claim cannot go forward. However, as he explained, the work place was intolerable, and the change in time,-which occurred two years prior, only added to the burden.  Pl. Chesson SOF 35. There is no "sole cause" requirement in a constructive discharge claim. Where Plaintiff Chesson has demonstrated a racially hostile environment that NNI advanced by failing to address it despite notice, he makes out a claim. See Pl. SOF generally, and see Pl. SOF 34 (describing seeking counseling to deal with hostile environment), 35 (describing that the shift change/start time occurred two years prior to the constructive discharge, [which a jury could understand was, therefore, not "the" reason for it]); see also Pl. MOL-HWE.

46

### 7. **Robinson**

NNI argues that Robinson's e-mails and resignation letter show that the work environment to which he was subjected was not so intolerable that a reasonable person would have had no choice but to resign. NNI ignores his testimony about the resignation letter, in which he explained the context and discussed that after many complaints about the environment and discriminatory pay, nothing changed. See Pl. SOF 15 (When this email resignation letter was drafted, if I can remember correctly . . . it was after my conversations to them about certain racial harassments . . . When I drafted the resignation or the email, it was not along the lines of I love it here; it was more along the lines of, how can I put it, I guess I can try to say it was sarcasm. It was a way of trying to, not necessarily kiss up, but -- how can I explain, . . . It's like if you want something to change from my perspective, after already having this conversation with them, I wanted this resignation letter to let them know I'm thinking about quitting; can something change in the aspect of that. This wasn't my direct feelings towards the job; it was more sarcasm during the job." Ex. 27, Robinson Dep., 120/22-123/14. This is quintessentially a jury issue as to what caused him to resign. As NNI acknowledges, the resignation letter itself raises issues concerning his pay, which he had been complaining about. The ongoing racial harassment that was not corrected despite notice permits a jury to find in his favor on his constructive discharge claim. See Pl. SOF 15, 38; see also Pl. MOL-HWE.

### 8. **Swain**

Swain's resignation letter articulates clearly his reasons for his resignation, which indisputably would allow a jury to find the conditions were so intolerable that he was forced to

resign. Pl. SOF 88; Ex. 272, Resignation letter. His testimony concerning his environment, along with the letter, allows a jury to find that the conditions were intolerable, and as the Supreme Court has made clear, there is no need to quit immediately. That Plaintiff Swain found alternate/better employment to get out of the environment supports rather than undermines his claim. Pl. SOF 10, 11. He was not required to quit before he found an alternative way to support himself. NNI's motion should be denied.

**CONCLUSION**

For all the foregoing reasons, and those set forth in Plaintiffs' Rule 56 Statements, Plaintiffs' MOL-HWE, Plaintiffs' MOL-DISC/RETAL, and Plaintiffs' MOL-JE, Defendant's Motions to dismiss Plaintiffs' claims for discriminatory discharge, retaliation and constructive discharge, should be denied.

Dated: October 26, 2016
        Mamaroneck, NY 10543

                                    Respectfully Submitted,

                            By:    _/s/ Joshua Friedman_____
                                    Joshua Friedman
                                    Rebecca Houlding
                                    Effat Hussain
                                    Jesse Centrella
                            Law Offices of Joshua Friedman
                            1050 Seven Oaks Lane
                            Mamaroneck, NY 10549
                            Tel (212) 308-4338 x 5
                            Fax (866) 731-5553
                            rebecca@joshuafriedmanesq.com
                            *Admitted Pro Hac Vice*

                            By:    _/s/ James H. Shoemaker, Jr._
                                    James H. Shoemaker, Jr.
                            Virginia State Bar No. 33148
                            Patten, Wornom, Hatten

& Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone:  (757) 223-4500
Fax:  (757) 223-4518
jshoemaker@phwd.com
*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2016, I will electronically file the foregoing PLAINTIFFS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO DISCRIMINATORY DISCHARGE, RETALIATORY DISCHARGE, RETALIATION AND CONSTRUCTIVE DISCHARGE with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Scott Kezman
Virginia State Bar No. 36831
Burt Whitt
Virginia State Bar No. 18308
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169

Nikki Howell
Nicholas Walker
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, MO 64108
Telephone: (816) 472 6400
Facsimile: (816) 472 6400

*Counsel for Defendant*

By: ___*/s/ James H. Shoemaker, Jr.*_____
James H. Shoemaker, Jr.
Virginia State Bar No. 33148