IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

| | |
|---|---|
| JAMESINA CRAWFORD, *et al.*, | |
| Plaintiffs, | |
| vs. | Case No. 4:14-cv-00130–AWA-LRL |
| NEWPORT NEWS INDUSTRIAL CORPORATION | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT RE:
MARSHALL AND HARRIS AS TO JOINT EMPLOYER
STATUS; AND MARSHALL, K. SMITH, R. PAYTON,
M. SMITH AND CHISMAN AS TO BANKRUPTCY PROCEEDINGS**

Friedman & Houlding LLP
1050 Seven Oaks Lane
Mamaroneck, NY 10543
Tel (212) 308-4338 x 5
Fax (866) 731-5553

**On the briefs:**
Joshua Friedman
Effat Hussain
Jesse Centrella
Rebecca Houlding
*Admitted Pro Hac Vice*

James H. Shoemaker, Jr.
Virginia State Bar No. 33148
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone:  (757) 223-4500
Fax:  (757) 223-4518
*Local Counsel to Plaintiffs*

# INTRODUCTION

Plaintiffs Harris and Marshall may proceed with their claims against NNI. Steel America ("SA") provided leased labor to NNI, including Harris and Marshall. NNI jointly employed Harris and Marshall because NNI exercised significant control over their work; it had the authority to hire and fire, supervised day to day employment, provided the place and means of work, maintained certain personnel records, and tracked time, among other things. Plaintiffs were exclusively assigned to work at NNI and worked alongside NNI employees. Defendant's motion to dismiss their claims on standing grounds should be denied.

Plaintiffs Marshall, Kevin Smith, Marvin Smith, Richard Payton and Keith Chisman may proceed with their claims as well; their bankruptcy filings do not judicially estop them from proceeding where in all cases they lack any bad faith or intent to defraud, and where Marshall and Kevin Smith's claims have been reopened and therefore their claims have not been "accepted," where Marvin Smith and Richard Payton's bankruptcy petitions were dismissed and not discharged, so there was no court acceptance, and where Chisman was not yet represented by counsel in the instant case during his bankruptcy and lacked any intent to conceal. NNI's motion to dismiss their claims based on judicial estoppel should be denied.

I. **PLAINTIFFS HARRIS AND MARSHALL HAVE STANDING BECAUSE THEY WERE JOINTLY EMPLOYED BY NNI AND STEEL AMERICA**

NNI argues Plaintiffs Harris (dkt. 168) and Marshall (dkt. 13) lack standing; however, there is abundant evidence from which a jury could determine that NNI, along with Steel America, jointly employed Plaintiffs. As such, they have standing to sue under 42 U.S.C. 1981.

The Fourth Circuit recently officially adopted the joint employer doctrine in the Title VII

1

context. *Butler v. Drive Auto. Indus. of Am.*, 793 F.3d 404, 409-10 (4th Cir. 2015)[1]. "The doctrine's emphasis on determining which entities actually exercise control over an employee is consistent with Supreme Court precedent interpreting Title VII's definitions. … The joint employment doctrine captures instances in which multiple entities control an employee." *Id.,* at 409. The court noted, "the joint employment doctrine also recognizes the reality of changes in modern employment, in which increasing numbers of workers are employed by temporary staffing companies that exercise little control over their day-to-day activities." *Id.,* citing multiple sources, including *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) ("The joint employer doctrine has been applied to temporary employment or staffing agencies <u>and</u> their client entities.") (emphasis added). "The joint employment doctrine thus prevents those who effectively employ a worker from evading liability by hiding behind another entity, such as a staffing agency." *Id.,* citing *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1341 (D.C. Cir. 1973).

"[T]he joint-employer-status inquiry is a fact-laden one." *Bile*, 2015 U.S. Dist. LEXIS 82106, at *8. "[T]wo parties can be considered joint employers and therefore both be liable under Title VII [or Sec. 1981] if they share or co-determine those matters governing the essential terms and conditions of employment." *Butler*, 793 F.3d at 408. *Butler* adopted the "hybrid" test for

---

[1] "Joint employer" status is equally applicable to claims brought under 42 USC 1981. *See Bile v. RREMC, LLC,* Civil Action No. 3:15CV51, 2015 U.S. Dist. LEXIS 82106 (E.D. Va. June 24, 2015); *Murry v. Jacobs Tech., Inc.,* 2012 U.S. Dist. LEXIS 48169 (M.D.N.C. Apr. 5, 2012) (implicitly adopting joint employer test to Sec. 1981 claims where Plaintiff brought both Title VII and 1981 claims; court denied motion for summary judgment as to certain claims against defendant AT&T, where the evidence supported joint employer liability, even where it was undisputed that co-defendant paid plaintiff, plaintiff did not consider AT&T to be his technical "employer," and the contract between AT&T and the co-defendant disavowed any employment relationship that could exist between AT&T and Jacobs employees, but where AT&T supervisors clearly exerted control over the manner and means of Mr. Murry's employment, including day to day supervision and control of projects, assigned work and various teams, and occasionally issued discipline, and had the ability to terminate plaintiff's access to the worksite).

evaluating joint employers:

> (1) authority to hire and fire the individual;
>
> (2) day-to-day supervision of the individual, including employee discipline;
>
> (3) whether the putative employer furnishes the equipment used and the place of work;
>
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
>
> (5) the length of time during which the individual has worked for the putative employer;
>
> (6) whether the putative employer provides the individual with formal or informal training;
>
> (7) whether the individual's duties are akin to a regular employee's duties;
>
> (8) whether the individual is assigned solely to the putative employer; and
>
> (9) whether the individual and putative employer intended to enter into an employment relationship.

*Butler,* at 414. No one factor is dispositive; the "common-law element of control remains the "principal guidepost" in the analysis." *Id.* The Fourth Circuit also explained that three factors are of primary importance: which entity or entities have the power to hire and fire the putative employee, to what extent the employee is supervised, which is useful for determining the day-to-day, practical control of the employee, and finally, where and how the work takes place, which is valuable for determining how similar the work functions are compared to those of an ordinary employee. *Id.* at 415.

In *Akwei v. Burwell*, Civil Action No. DKC 15-1095, 2016 U.S. Dist. LEXIS 81638, at *13-19 (D. Md. June 23, 2016), a case with many similarities to the instant one, the court denied summary judgment as to joint employer status. Pursuant to *Butler,* the court focused on the first

three factors, and noted that the ninth factor, subjective intent of the parties, was typically of little consequence. *Id.,* at *13, citing *Butler* at 414-415. In *Akwei,* although another entity had ultimate authority to hire and fire plaintiff, defendant had a significant role in plaintiff's selection and removal. Defendant determined what positions contractors would fill and what the requirements were for the positions; defendant's approval was required for plaintiff to work; individuals at defendant were "instrumental" in the termination of plaintiff's performance. *Id.,* at *14. Further, even though the contracting agency supervised, evaluated and disciplined plaintiff, there was also evidence of day to day supervision by defendant. Plaintiff also provided administrative support to defendant employees and his tasks were directed and coordinated by defendant supervisors. *Id.* at *16. He received some on the job training from defendant employees, and was required to coordinate leave with defendant. Defendant was in the position to assess whether plaintiff met job requirements. Plaintiff worked side by side with defendant employees, used defendant's supplies and phones, and there was little difference between the work performed by plaintiff and other defendant employees. Those factors, which were most important, weighed in favor of joint employer status. *Id.,* at *17.

      The fourth "Butler" factor weighed against joint employment, as the contractor maintained the employment records, and responsibility for payroll and taxes. The duration of employment weighed in favor of joint employment, where the contract was renewable annually. *Id.,* at 18. The sixth factor was somewhat neutral, where both the contractor and defendant provided some training to employees, but the seventh and eighth factors weighed in favor joint employment status, because the plaintiff was assigned only to work at defendant and his duties were like those of a regular employee. Additionally, his work was integral, not peripheral to

defendant's business. *Id.* While the final factor, subjective intent, was inconclusive, it was also minimally significant. *Id.* at *19 Thus, while "plaintiff was technically a contractor, the Fourth Circuit's test 'specifically aims to pierce the legal formalities of an employment relationship to determine the loci of effective control over an employee, while not discounting those formalities entirely. Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity.'" *Id., quoting Butler* at 415.

Here, the evidence indisputably supports a finding of joint employment, and is *easily* sufficient for a jury to find NNI was Plaintiffs' joint employer. As in *Akwei,* NNI had authority to hire contractors. Ex. 87, Napiecek Dep. 56/7-60/3 (NNI runs background checks on employees prior to SA hiring them, and refused to hire Plaintiff Crawford back through Steel America after her initial discharge; Napiecek emailed Beale and Lynn re Crawford, "Please tell me we marked do not rehire?????"); Ex. 190, NNI00918 ( Email from Scott Jones:"SA called me stating they had a welder they wanted to bring in…[Beverly Simmons, NNI administrative supervisor] questioned this and I stated we cannot hire [the welder]"); Ex. 96, Slack Dep. 55/23- 56/4 (NNI interviews workers prior to SA hiring them); Id., 55/10 - 50/22 (NNI issues badges to SA workers to allow them access to NNI).

NNI also has authority to fire too. Ex. 320, SA SUB 99 (Jones email to SA requesting removal of Harris: "I do not want this gentleman back in my facility to work."); Ex. 81, Kemp 234/16-18 (NNI can ban contractors like Steel America); Ex. 97, T.J. Smith 155/24-159/15 (describing investigation conducted by NNI in connection with sexual harassment of NNI direct employee by contracted worker, working with the NNI leadership, and deciding to terminate the contracted worker's position at NNI, removing him from site and revoking his access to

5

premises). Indeed, NNI was integral in firing Harris. Ex. 14, Harris Dep. 142/11-18 ("[I was]... really [terminated] from NNI because NNI was the one that released me and told Steel America that they didn't want me anymore"); see also D.SOF dkt. 168, par. 74 (asserting that NNI superintendent told Harris "if you have a problem following procedures, we do not need your services."); see also Ex. 21, Marshall Dep. 147/23-148/3 ( "[Mel, a SA Supervisor, indicated that] we was warned that we wasn't, you know, supposed to park there, we'll get disciplinary action from Scott Jones).

    NNI supervisors provided day to day assignments to plaintiffs and supervised Plaintiffs in addition to Steel America's on site supervisors. Ex. 85, McKercher Dep.31/2-23 (describing how Steel America was "in there long term and they were the trades production employees with our welders, and discussing his authority over both NNI supervision and Steel America foreman, "and what tasks the were to be accomplishing. SO I was responsible for all of production, contractor or not..."); Ex. 103, Treat Dep. 45/20-25 (Scott Jones provides assignments/instructions to SA); Ex. 14, Harris Dep. 52/20-53/25 (describing working directly for NNI supervisors); Ex. 21, Marshall Dep. 13/14-20; 19/12-21/15 (Marshall reported to Scott Jones, NNI operations manager, and "[NNI supervisors] Wayne Jackson, sometimes Scott Jones, sometimes Tommy Hines, sometimes Kevin Angle, and sometimes Astro [communicated job assignments]; NNI gave assignments at morning meetings; he asked questions of both NNI and SA supervisors); Ex. 99, Spilker Dep. 19/7-19/17; 21/6-18; 22/11-23/5 (SA workers were supervised by both NNI and SA supervisors; both SA and NNI at morning "take 5" meetings run by NNI; NNI management emailed SA their tasks/assignments); Ex. 262, NNI 23607 (Jones email to Beale, "although [Brian Treat] is a Steel America employee he is still considered

management" );  Ex. 99, Spilker Dep. 19/9-14. (Q: "When you were a supervisor for Steel America at NNI, were there time periods when some of your crew was loaned out to work for other NNI supervisors?" A: "They worked on other [NNI] supervisors' jobs…."); Ex. 99, Spilker Dep. 23/22-24/23 (SA workers required to follow NNI policies); Ex. 311, NNI154476, 154484 (investigation into racist graffiti in bathroom noting Jackson assigning sweeping work or sending home to contracted employees); Ex. 14, Harris Dep. 50/16-22; 52/3-7 (describing morning safety meeting with NNI); Ex. 95, Ruel Scott 94/17-94/22 (NNI, SA and CTR guys on the same crew); *see also* Ex. 81, Kemp Dep. 141/9-13 (agreeing that if there were an issue involving a leased employee with harassment/discrimination it would fall under her umbrella).

Moreover, NNI controlled the quality of Plaintiff Harris and Marshall's (and SA's) work, assessed it and could require it be redone or done differently. Ex. 85, McKercher 31/2-31/23; Ex. 103, Treat Dep. 51/16- 51/18; 54/19-24 (NNI checks the quality of SA's work and corrects it); see also Ex. 103, Treat Dep. 45/20-45/25 (Scott Jones, Operations Manager, sets the number of hours that SA workers work); Ex. 183, NNI-2_0144558-59 (NNI controlled SA workers' schedules); Ex. 99, Spilker Dep. 23/22-24/23 (SA workers required to follow NNI policies).

NNI furnished the place of work. Ex. 96, Slack Dep. 55/10-22  (NNI issues badges to SA workers to allow them access to NNI); Ex. 14, Harris Dep. 45/20-46/15 (badging at NNI); Ex. 99, Spilker Dep. 25/13-21 (SA employees work on-site at NNI Plaintiffs could not be on NNI property without receiving clearance from and badges to access NNI facilities, which were restricted); Ex. 99, Spilker Dep. 26/3-4 (SA employees receive email addresses through NNI); Ex. 107, Weiters 28/1-8 (1/3 of SA works only at NNI).  These most important factors weigh heavily in favor of joint employment. *See Butler; Akwei.*

The fourth factor supports or at least is neutral as to joint employment. NNI maintained personnel records for SA labor, recorded time and set schedules. E.G. Ex.214, NNI 2243-2248; Ex. 173, NNI-2_0138903 (NNI signed off on SA timesheets); Ex. 21, Marshall Dep. 24/22-25/6 ("We had a time clock in Newport News…[where]You would come in.  [NNI] had time cards on the time clock.  You punched the time cards in. You give them to your supervisor, and they give them back to you at the end of the day."); see also supra. Further, NNI participated in investigations and discipline related to contracted employees. Ex. 97, Smith, TJ Dep. 155/24-159/15.

The fifth factor weighs in favor or joint employment, as Plaintiffs could have remained at NNI for years, considering the five year renewable contract between SA and NNI. Ex. 345, NNI 32430; Ex. 85, McKercher 31/2-31/23(describing long term, integrated relationship); Ex. 103, Treat 31/9-10 (The SA contractors were [at NNI] long term); Ex. 107, Weiters 28/1-8 (approximately 1/3 of SA workforce worked at NNI).  The sixth factor strongly favors joint employment: NNI provided training to Plaintiffs including welding and other qualifications testing. Ex. 103, Treat Dep. 42/4-9  ("[Steel America workers] would have to pass their classes that they originally give all of their employees. So through the NRC, understand their tags and their processes, and then we would have to take a weld test over there to meet their qualifications."); Ex. 96, Slack 56/-57/4 (provides training and qualifications to SA employees without which workers cannot work at NNI); Ex. 14, Harris Dep. 26/5-10 (NNI training/orientation); Ex. 255, NNI 15965 (email from Scott Jones to Bev Simmons, relating to new employee orientation training "For the Steel America welders they can come to training and get qualified, but they cannot be put to work until they have their badge per Steve Napiecek");

8

Ex. 81, Kemp Dep. 30/21-32/9 (All employees at NNI, leased, temporary and permanent, receive new orientation training which includes training in NNI's policies, including harassment and discrimination); Ex. 99, Spilker Dep. 23/15-18 (SA underwent NNI training); Ex. 255, NNI015964 (Email noting that SA workers are scheduled for NNI's New Orientation training).

Plaintiffs and other SA employees worked side by side with NNI employees; their duties were similar or co-extensive with NNI employees. Ex. 99, Spilker Dep. 25/13-21 (SA employees work side-by-side with NNI employees); Ex. 14, Harris 54/14-55/3 (NNI needed help catching up on welding, brought in SA). Finally, Plaintiffs worked exclusively at NNI. Ex. 21, Marshall Dep. 12/13-18 ( When given job offer in 2013, Marshall was specifically told he would be working at NNI); Ex. 14, Harris Dep. 16/5-9. These factors all favor joint employment. The ninth factor, like in *Akwei,* is of minimal importance, and NNI has offered no evidence on this factor.

Under *Butler and Akwei,* NNI clearly exercised substantial control over Plaintiffs Harris and Marshall, where it made hiring decisions, supervised Plaintiffs' day to day, made overtime and scheduling decisions, required Plaintiffs follow its policies, provided Plaintiffs' tools, maintained time records, provided the worksite and tools/equipment, and because Plaintiffs performed the same job as "direct" employees, did not work at other employers, and SA employees also often worked at NNI for years, and importantly, because Plaintiffs were subject to NNI's control, and could be terminated by NNI, among other factors. Thus, Plaintiffs were jointly employed by NNI, and summary judgment should be denied. *Butler*, 793 F.3d at 415-16[2]

---

[2] Defendant's reliance on *El v. Lucent Tech. Inc.*, No. 3:02CV627, 2003 U.S. Dist. LEXIS 28387, at *5-6 (E.D. Va. Mar. 4, 2003) to support its claim that Plaintiffs lack standing is not persuasive. That case, which was decided well before *Butler,* appeared to place the burden on plaintiff to *establish* he was an employee of defendant, where summary judgment assesses whether there are disputed issues of fact as to joint employer status. *Id.,* at *5.  That is most likely because it applied *Farlow v. Wachovia Bank of North Carolina, N.A.,* 259 F.3d 309 (4th Cir. 2001), which did not assess joint employment but rather independent contractor versus employee. *Id.* The hy-

(court inappropriately "discounted several considerations" in favor of joint employer status, particularly high degree of control over terms of employment; defendant caused discharge).

## II. Plaintiffs Marshall, Chisman, R. Payton, K. Smith and M. Smith May Proceed with Their Claims, Which Are Not Barred By Judicial Estoppel[3]

NNI argues that Plaintiffs Chisman, Kevin Smith, Marvin Smith, Marshall and Richard Payton may not recover for racial harassment and discrimination because of previously filed bankruptcies. Judicial estoppel does not prohibit them from maintaining this action, where among other reasons there was no court "acceptance," or where NNI has not shown (and can not) that any plaintiff acted intentionally and they did not.

In the Fourth Circuit, a party may be judicially estopped from asserting a claim when: (1) the party to be estopped is advancing an assertion that is inconsistent with a position taken during previous litigation, (2) the position is one of fact instead of law, (3) the prior position was accepted by the court in the first proceeding, and (4) the party to be estopped has acted intentionally, not inadvertently. *King,* 159 F.3d at 196. To satisfy the final prong, the party "must have intentionally misled the court" for purposes of "gain[ing] unfair advantage." *Whitten v. Fred's, Inc.*, 601 F.3d 231, 241 (4th Cir. 2010), *abrogated in part on other grounds*. "This bad

---

brid test adopted in *Butler* differs somewhat from the considerations and particular focus in *Farlow. See Butler,* 793 F.3d at 415 distinguishing considerations focused on in *Farlow.* In any event, there, plaintiff was not supervised by defendant, did not receive work assignments from defendant, performance was not enforced by defendant, and plaintiff had limited contact with defendant managers, which had to be approved in advance by the contracting company. *Id.,* at *5. The contracting company set pay, was responsible for taxes, and restricted employment with defendant. Importantly, defendant could not assign work to plaintiff. These factors, the court held, "point to a finding" that defendant did not employ plaintiff. *Id.,* at *6. *El* is not dispositive because it weighs the factors at issue inconsistently with *Butler,* and because the facts are not analogous.

[3] Even if any of the instant Plaintiffs' claims are dismissed, their testimony is nevertheless relevant to the remaining plaintiffs' claims. *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 388 (2008) (evidence of discrimination against employees based on the same protected trait (i.e., "me too" evidence))

faith requirement is the determinative factor." *Id.*

> A. **Naseer Marshall, through counsel, informed attorney of claims while bankruptcy was open, Marshall's claims were reopened, Plaintiff's counsel has been appointed by the trustee to represent him in the instant case, and he is not estopped from proceeding.**

Marshall joined the instant suit in February 2015, dkt. 7, which was a matter of public record. In September 2015, he filed for Chapter 7 bankruptcy. Ex. 21, Marshall Dep 225/2-7. Plaintiff's counsel wrote to bankruptcy counsel on December 8, 2015, alerting him of the claim to be included in the petition. Ex. 111, Hussain Letter to Counsel. Plaintiff's counsel wrote the bankruptcy attorney again in January 2016, at which point the bankruptcy had been discharged. Ex. 159, Hussain Letter to Counsel, emailed. Marshall subsequently sought to have his bankruptcy reopened, which it was on April 4, 2016. Ex. 160, Order granting motion made after notice by debtor's counsel. Plaintiff's counsel has been appointed by the trustee to represent the estate. Ex. 112, Order appointing counsel. NNI's motion fails where it has not demonstrated undisputed facts as to the four prongs.

Where there has been no "final acceptance" by the bankruptcy court because the bankruptcy has been reopened, judicial estoppel is not appropriate. *See Collucci v. Tyson Farms, Inc.*, Civil Action No. 3:14-cv-397-JAG, 2014 U.S. Dist. LEXIS 168207, at *5 (E.D. Va. Dec. 4, 2014). The bankruptcy has been reopened, and counsel appointed to represent the estate. Thus, NNI's motion fails on this element.

Additionally, the fourth element is disputed and precludes summary judgment. In *Payne*, the Court held: "The fourth factor—whether the litigant intentionally misled the court to gain unfair advantage—is the determinative factor in the application of judicial estoppel to a particular case." *Payne*, 606 F. Supp. 2d at 616 (emphasis added). Where there is insufficient evidence of

intentional concealment, judicial estoppel should be rejected. *In re Padula*; *see also Royal v. R&L Carriers Shared Servs., L.L.C.,* No. 3:12-cv-00714, 2013 U.S. Dist. LEXIS 57416, at *19-21 (E.D. Va. Apr. 22, 2013) (As long as the bankruptcy proceedings continue, rather than granting judgment to a defendant on the basis of a plaintiff's inconsistency, a court acts in the greater interest of equity by allowing a plaintiff an opportunity to amend his or her bankruptcy petition and thereby allowing for additional recovery by the plaintiff's deserving creditors. One might object that permitting amendment rewards plaintiffs who have attempted to conceal their bankruptcy status in civil suits. But even more importantly, it protects the parties whose interests truly hang in the balance when a bankruptcy debtor pursues litigation, even if that debtor might have acted unjustly in some sense."); *Ruffin v. Lockheed Martin Corp.,* No. WDQ-13-2744, 2015 U.S. Dist. LEXIS 1534, at *14 (D. Md. Jan. 7, 2015) ("estoppel will not apply if the inconsistent positions resulted from inadvertence or mistake.") (citations and quotations omitted). Here, there is no evidence of intentional concealment. His employment counsel alerted his bankruptcy attorney while the bankruptcy was open initially. While there was initially a court acceptance of his bankruptcy, having reopened the bankruptcy at Plaintiff's instance, NNI cannot demonstrate the absence of disputed facts as to Marshall's intent. Finally, with his bankruptcy reopened, and having Plaintiff's counsel appointed to represent him, Marshall and the trustee are back in the same position as if he had amended his petition or included his claim from the outset. *Collucci,* 2014 U.S. Dist. LEXIS 168207, at *5. Marshall had no intent to conceal claims that he did not know he had to disclose. *See* Ex. 21, Marshall Dep 257/5-7.

Further, where a claim is exempt, "the debtor lacks a motive to conceal the existence of the claims from her creditors." *Id.,* (accepting plaintiffs testimony as credible, concluding she did

12

not understand the need to amend schedules and had disclosed bankruptcy to two personal injury attorneys and personal injury case to bankruptcy attorney), *citing Payne v. Wyeth Pharm*s., Inc., 606 F. Supp. 2d 613, 616 (E.D. Va. 2008). Personal injury claims are exempt under Virginia law. *In re Padula,* 542 B.R. 753, 761-62 (Bankr. E.D. Va. 2015).[4] Hostile work environment damages fall within the "personal injury" exemption from income in bankruptcy. *In re Webb,* 214 B.R. 553 (E.D.Va. 199). Considering that his claims against NNI were already a matter of public record, personal injury claims like these may be exempt, and he sought to and did reopen the bankruptcy, he could hardly have been attempting to conceal an asset. NNI adduced no contrary evidence of intend to deceive or withhold.

NNI should not get a "free pass" to discriminate where NNI has not demonstrated entitlement to judicial estoppel and there are no equitable reasons favoring it. Either the discrimination claim is exempt from the bankruptcy estate and recovery here would never have been distributed to creditors, or, if it is not, and there is a recovery, where there was no intent to mislead, creditors should have access to it. The only "winner" in accepting judicial estoppel would be NNI.

  B.  **Kevin Smith moved to reopen his bankruptcy, which was granted.**

At the time Kevin Smith filed his bankruptcy he believed he was not part of the instant case, and believed he did not have to list any claims against NNI because he was not on the case

---

[4] Defendant cites to *Vanderheyden* to support its motion. However, there, the district court, overruling objections to the magistrate's recommendation, found that Plaintiff had failed to respond to Defendant's motion for summary judgment, and therefore, the facts Defendant presented were taken as true; thus, consideration of Plaintiff's intent was not viewed as here in the light most favorable to the non-moving party who presents evidence that bad faith was lacking. 2013 U.S. Dist. LEXIS 399, at *36. Further, *Vanderheyden* does not appear to give sufficient weight to the Fourth Circuit's requirement of the need to specifically find bad faith by the debtor.

at the time. Ex. 29, K. Smith Dep., 182/12-183/3. His bankruptcy was discharged in November 2014. Id, 193/20-22. He asserted claims as part of the Amended Complaint filed on February 11, 2015. Dkt. 7. Like Marshall, Kevin Smith moved to re-open his bankruptcy, which was granted on October 7, 2016. Ex. 114, Docket 14-14-51091.

As with Plaintiff Marshall, NNI cannot demonstrate the elements of judicial estoppel. At the time he filed for bankruptcy, K. Smith was not part of the instant lawsuit and did not believe he had to include potential claims in his bankruptcy petition, which was discharged before he became a Plaintiff. Moreover, any discrete legal claims that arose after the bankruptcy discharge could, in no event, be subject to the bankruptcy. His motion to reopen was granted on October 7, 2016. Thus, as with Marshall, the court has not "accepted" his filing as the case has been reopened; *see Collucci, supra,* and NNI has not demonstrated that he acted with the requisite "bad faith" intent, *see In re Padula*; *see also Royal v. R&L Carriers Shared Servs., L.L.C.,* where he was not even a Plaintiff at the time he filed, voluntarily moved to reopen, and did so. Thus, he is not judicially estopped from proceeding.

C.  **Richard Payton and Marvin Smith's Chapter 13 bankruptcy claims were dismissed and not "accepted", and neither received any "benefit" of bankruptcy, nor were creditors affected.**

NNI's motions to dismiss Richard Payton and Marvin Smith's claims based on judicial estoppel fail for the same reasons as the motions fail in connection with Marshall and M. Smith, and for additional reasons as well. Both dismissed their Chapter 13 bankruptcy filings before there was any court "acceptance," a fact which NNI ignores. Ex. 113, Payton Docket; Ex. 115, M. Smith Docket. In other words, no debt was discharged. *Royal v. R&L Carriers Shared Servs., L.L.C.*, No. 3:12-cv-00714, 2013 U.S. Dist. LEXIS 57416, at *17-18 (E.D. Va. Apr. 22, 2013)[5].

---

[5]  NNI misleadingly cites to *Vanderheyden* for the principal that the bankruptcy court "accepted"

14

"Courts have repeatedly emphasized that "acceptance" in this context means that the bankruptcy court has not merely confirmed the debtor's bankruptcy plan but has also taken the ultimate step of granting the debtor relief (i.e., discharge or repayment)." *Id., citing In re DiVittorio*, 430 B.R. 26, 48 (Bankr. D. Mass. 2010) (emphasis added), aff'd, 670 F.3d 273 (1st Cir. 2012). The court held the "lack of prior acceptance actually proves dispositive." *Id.* Neither Plaintiff had debts discharged; their bankruptcies were closed, not "accepted." Ex. 113, R. Payton Docket; Ex. 115, M. Smith Docket. As such, as a matter of law NNI cannot demonstrate judicial estoppel, because there was no court "acceptance.*"*

NNI can also not show intent to defraud or bad faith. Both M. Smith and R. Payton filed their bankruptcies before they began working and NNI, when they could not yet have had claims against the company. M. Smith's bankruptcy petition was filed on September 17, 2013; he began working at NNI on February 3, 2014; his bankruptcy was dismissed in January 2016.[6] D.SOF 3; Ex. 115, Smith Docket.  R. Payton's petition was filed August 2013, Ex. 113 Payton Docket, but he began working at NNI on October 21, 2013 (through July 2014). D. SOF, par. 8. Thus he also did not have a claim against NNI to list in his petition. Thus, <u>no debt was concealed at the outset of filing, inadvertently or otherwise.</u>

NNI's motions fail because it has not shown that either is judicially estopped: first, as to prong (1), as there was no inconsistent positions when Plaintiff Payton and Smith did not even work at NNI when they filed their petitions and therefore did not take inconsistent positions at

---

Smith and Payton's position when it approved of a repayment plan. Dkt. 114 at 12; Dkt 180, p. 21. Vanderheyden does not support NNI's claim. It found that court approval occurred when the debtor's  debts were <u>discharged, dismissed the trustee and closed the case</u>, not when the plan was accepted. *Vanderheyden,*  2013 U.S. Dist. LEXIS 399, at *35.

[6] Thus even if he were judicially estopped, which he is not, his hostile environment claims and any other claims continuing after dismissal of his petition could not be barred/affected.

15

that time; second, there was no "acceptance" by the bankruptcy court, because their debts were never discharged and instead Payton moved to dismiss; and third, NNI cannot show bad faith/intent, because they were not obligated to list claims that did not exist yet, and have not shown that a failure to amend to include the claims was intentional in any way; both caused or allowed their claims to be dismissed; they received no benefit of bankruptcy. As with K. Smith and Marshall, dismissing their claims would benefit no one but NNI. As no creditors were affected by Plaintiff R. Payton and M. Smith's filings, there is no basis to estop them here.

        D.    **Keith Chisman joined the instant suit in 2015, after his bankruptcy had already been discharged**

Plaintiff Chisman filed for bankruptcy in August 2014. Ex. 7, Chisman Dep. 220/12-14. His bankruptcy petition was closed, on December 1, 2014. Id., 227/3-5. He knew he had been discriminated against but did not know he had a legal claim at the time, id., Chisman Dep. 224/3-7; 225/1-7, before he retained counsel and joined the instant lawsuit, in February 2015. Ex. 110, Chisman Docket; Dkt. 7; Ex. 7, Chisman Dep. 190/10-21; 192/11-21. He did not intentionally wait to have his debts discharged and then file or join the instant suit. Ex. 7, Chisman Dep. 228/20-229/11 ("it wasn't intentional whatsoever.")

NNI has not established either that Chisman took an inconsistent position or acted in bad faith. His testimony directly contradicts any intent to deceive; he did not have counsel for the instant case when he filed his bankruptcy. Nor has NNI established that he was required to disclose claims when all it has shown was that Chisman believed he had experienced harassment, and did not have legal counsel or knowledge of actionable claims. PNNI never asked him whether he knew whether believing he had been discriminated against was the same as having a contingent or unliquidated asset. Ex. 7, Chisman 232/17-234/4. Chisman testified that he did not

understand how the bankruptcy proceedings worked. Ex. 7, Chisman Dep. 237/1-8. Further, the Petition required Chisman to disclose all "suits or administrative proceedings to which [he] was a party within **one year** immediately preceding the filing of the bankruptcy case." Dkt. 128-18, Ex. P, Petition at 39, #4 (emphasis in original). But, he did not join this suit until February 11, 2015, he had no prior administrative proceedings within one year before filing his petition (or at all regarding the present claims). *Supra*. NNI simply has not demonstrated an absence of material fact as to the elements of judicial estoppel. Mr. Chisman had no bad faith in not listing an unfiled claim against NNI for which he was not represented, in his petition for bankruptcy.

WHEREFORE, Plaintiffs respectfully request that Defendant's Motion concerning Plaintiffs' Harris and Marshall as to joint employer status, and Plaintiffs Marshall, K. Smith, M. Smith, R. Payton and Chisman, as to judicial estoppel, should be denied.

Dated: October 26, 2016
       Mamaroneck, NY 10543

Respectfully Submitted,

By: __/s/ Rebecca Houlding__
    Rebecca Houlding
    Joshua Friedman
    Effat Hussain
    Jesse Centrella
Law Offices of Joshua Friedman
1050 Seven Oaks Lane
Mamaroneck, NY 10549
Tel (212) 308-4338 x 5
Fax (866) 731-5553
rebecca@joshuafriedmanesq.com
*Admitted Pro Hac Vice*

By: ___/s/ James H. Shoemaker, Jr.___
    James H. Shoemaker, Jr.
Virginia State Bar No. 33148
Patten, Wornom, Hatten

17

& Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: (757) 223-4500
Fax: (757) 223-4518
jshoemaker@phwd.com
*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

      I hereby certify that on October 26, 2016, I will electronically file the foregoing PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT: MARSHALL AND HARRIS AS TO JOINT EMPLOYER STATUS;  MARSHALL, K. SMITH, R. PAYTON, M. SMITH AND CHISMAN AS TO BANKRUPTCY PROCEEDINGS  with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Scott Kezman
Virginia State Bar No. 36831
Burt Whitt
Virginia State Bar No. 18308
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169

Nikki Howell
Nicholas Walker
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, MO 64108
Telephone: (816) 472 6400
Facsimile: (816) 472 6400

*Counsel for Defendant*

                      By:  */s/ James H. Shoemaker, Jr.*
                           James H. Shoemaker, Jr.
                        Virginia State Bar No. 33148