**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | |
|---|---|
| **JAMESINA CRAWFORD, *et al.*,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )      **CIVIL ACTION NO. 4:14-cv-130** |
| | ) |
| **NEWPORT NEWS INDUSTRIAL** | ) |
| **CORPORATION,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## REPORT AND RECOMMENDATION

A Second Amended Complaint was filed in this Court on May 4, 2015 by thirty-eight Plaintiffs against Defendant Newport News Industrial Corporation. ("NNI"). ECF No. 15. The Second Amended Complaint asserts various claims of employment discrimination, retaliation, and hostile work environment by welders, fitters, and laborers employed at or by NNI. NNI filed separate Motions for Summary Judgment against thirty-seven Plaintiffs.[1] As the Court has noted previously, this matter is not a class action suit under Federal Rule of Civil Procedure 23, but rather each plaintiff has their own separate claim or claims. *See* ECF Nos. 59, 188 and 290. In Plaintiffs' Second Amended Complaint, the Plaintiffs asserted various combinations of the following seven counts against NNI: Hostile Work Environment in Violation of 42 U.S.C. § 1981 (Count I), ECF No. 15 at ¶¶ 1238-41, Disparate Treatment regarding pay, promotion, overtime, and training based on Race, in Violation of 42 U.S.C. § 1981 (Count II), *id.* at ¶¶ 1242-45, Termination based on Race, in Violation of 42 U.S.C. § 1981 (Count III), *id.* at ¶¶ 1246-50, Retaliation in Violation of 42 U.S.C. § 1981 (Count IV), *id.* at ¶¶ 1251-56, Gender

---

[1] On January 5, 2016, the parties stipulated to the dismissal of one Plaintiff. ECF No. 56.

Discrimination in Violation of Title VII of 42 U.S.C. § 2000(e) ("Title VII") (Count V), *id.* at ¶¶ 1257-62; Retaliation in Violation of Title VII (Count VI), *id.* at ¶¶ 1263-67, and Violation of 29 U.S.C. § 2601 et seq., the Family Medical Leave Act ("FMLA") (Count VI), *id.* at ¶¶ 1268-73.

Before the Court are thirty-one Motions for Summary Judgment and accompanying memoranda, filed by NNI on August 30, 2016.[2] ECF Nos. 109-112, 115-126, 129-136, 139-156, 159-170, 173-178, and 181-182. On October 26-27, 2016, Plaintiffs filed responses to NNI's Statement of Undisputed Material Facts regarding each Plaintiff, ECF Nos. 198, attachs. 1-10 and 199, attachs. 1-27, as well as omnibus responses to the Defendant's legal arguments, ECF Nos. 200-201, and supporting appendices, ECF Nos. 202-215.[3] NNI filed its replies on December 13, 2016. ECF Nos. 232-266, 268-269. On December 14, 2016, this matter was referred to the undersigned United States Magistrate Judge ("the undersigned") from the United States District Judge. 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); E.D. Va. Local Civ. R. 72. After reviewing the thousands of pages of briefs and exhibits, the undersigned disposes of the Motions on the papers without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). The matter is now ripe for recommended disposition.

## I. STANDARD OF REVIEW

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate when the Court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party, finds there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Scott v. Harris*, 550 U.S. 372, 378 (2007). A court should grant

---

[2] The Court addressed the summary judgment motions with respect to the remaining six plaintiffs in two separate Reports and Recommendations. ECF Nos. 293, 294.
[3] NNI argued that Plaintiffs' summary judgment responses were due on October 26, 2017, but that some were filed after midnight and thus on October 27, 2017, and were therefore untimely, entitling NNI to judgment on this basis, *inter alia. See, e.g.,* ECF No. 257 at 2 n.2. The Court declines to recommend judgment on this basis.

summary judgment if the nonmoving party, after adequate time for discovery, has failed to establish the existence of an essential element of that party's case, on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat a motion for summary judgment, the nonmoving party must go beyond the facts alleged in the pleadings and instead rely upon affidavits, depositions, or other evidence to show a genuine issue for trial. *See id.* at 324. Conclusory statements, without specific evidentiary support, are insufficient. *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998). Rather, "there must be evidence on which the jury could reasonably find for the [party]." *Anderson*, 477 U.S. at 252.

While there exists "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim," nonetheless "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56) (emphasis in original).

Ultimately, cases are not to be resolved on summary judgment where "the depositions [and affidavits] of principal witnesses present conflicting versions of the facts which require credibility determinations." *Nilson v. Historic Inns Group, Ltd.*, 903 F. Supp. 905, 909 (D. Md. 1995) (citing *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986)).

## II. LEGAL STANDARD

### A. Count I: § 1981 Hostile Work Environment

Title VII prohibits employers from discriminating "against any individual with respect to

3

his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Because an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013) (internal quotation marks and citation omitted). The Plaintiffs in this case have brought suit for a hostile work environment based upon their race under 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right…to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

The Fourth Circuit has recognized that employees can bring suit against their employers for a racially hostile work environment under § 1981 and that the same test used for Title VII cases also applies. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). A "discriminatorily hostile or abusive work environment" occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). For Plaintiffs to survive NNI's Motion for Summary Judgment, they must set forth evidence on which a reasonable jury could rely to find NNI created a hostile work environment, through its agents, by showing the following elements: "(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011); *see also, Boyer-Liberto v. Fontainebleau Corp.*, 786

4

F.3d 264, 271 (4th Cir. 2015).

The Court's analysis of the third element examines "[w]hether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998)). The Court is to consider the "totality of the circumstances including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Okoli*, 648 F.3d at 220 (quoting *Harris*, 510 U.S. at 23). As the Supreme Court has noted, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris,* 510 U.S. at 21) (citations omitted).

Furthermore, "[t]he status of the harasser also is relevant to element four of a hostile work environment claim, which necessitates proof that the harassment is imputable to the employer." *Boyer-Liberto*, 786 F.3d at 278. "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.,* 133 S.Ct. 2434, 2439 (2013). "On the other hand, where the harasser is the victim's supervisor, 'different rules apply': The employer is strictly liable for the supervisor's harassing behavior if it 'culminates in a tangible employment action,'" unless the employer prevails on its affirmative defense by showing "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Boyer-*

*Liberto*, 786 F.3d at 278 (citations omitted).

Finally, hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment. *See Faragher v. Boca Raton*, 524 U.S. 775, 786–787, and n.1 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66–67 (1986).

## B. Count II: § 1981 Disparate Treatment

"The framework of proof for disparate treatment claims—that is, whether the employer intentionally discriminated against the employee—is the same for actions brought under Title VII, or § 1981, or both statutes." *Mallory v. Booth Refrigeration Supply Co., Inc.*, 882 F.2d 908, 910 (4th Cir. 1989); *see also, Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). Plaintiffs must either demonstrate direct evidence of race discrimination or follow the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Derrickson v. Circuit City Stores, Inc.*, 84 F. Supp. 2d 679, 693 (D. Md. 2000).

Plaintiffs here have brought § 1981 claims for disparate treatment in the form of disparate pay, promotion, overtime and training compared to their white counterparts. Through their briefing, Plaintiffs advocate that they can establish their disparate treatment discrimination cases with direct evidence by relying on the expert report of their labor economist expert Dr. Mark Killingsworth, who performed a statistical regression analysis purporting to show that African American workers were treated less favorably than Caucasian workers at NNI, and by relying on the alleged discriminatory animus of supervisors and others at NNI, thereby raising the inference that all pay, promotion, overtime and training decisions were discriminatory. Alternatively, Plaintiffs also attempt to identify similarly situated workers outside the protected class who they contend were treated more favorably, thereby arguing that they also satisfy their burden under the *McDonnell Douglas* analysis.

To establish a *prima facie* case for their pay disparity claims, each Plaintiff must show the following: "(1) that [he or] she is a member of a protected class; (2) [he or] she was paid less than an employee outside the class; and (3) the higher paid employee was performing a substantially similar job." *Davis v. S.C. Dep't of Health & Envtl. Control*, No. 3:13-CV-02612-JMC, 2015 WL 5616237, at * 3 (D.S.C. Sept. 24, 2015); *see also*, *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994). For their promotion claims, each Plaintiff must show that he or she (1) is a member of a protected class; (2) the employer had an open position for which he or she applied or sought to apply; (3) was qualified for the position; and (4) was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959-60 (4th Cir. 1996). For their overtime claims, each Plaintiff must demonstrate: (1) they are members of a protected class; (2) they are performing their jobs satisfactorily; (3) they were "not offered the opportunity to work overtime"; and (4) "similarly-situated individuals outside of [their] protected class received more favorable treatment." *Guion v. Mabus*, No. 4:11-CV-159-F, 2012 WL 1340117, at *4 (E.D.N.C. Apr. 17, 2012). Lastly, to prevail on their training claims, each Plaintiff must show: "(1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination." *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002) (citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998)).

"Once the plaintiff establishes a prima facie case, the defendant may articulate a legitimate, non-discriminatory reason for its action." *Derrickson*, 84 F. Supp. 2d at 693. "[I]f the defendant meets this burden of proffering a nondiscriminatory reason, the plaintiff is given

7

the opportunity to show the justification is merely a pretext for discrimination." *Id.*

## C. Count III: § 1981 Termination

Like with disparate treatment claims under § 1981, plaintiffs may establish their case either by direct evidence of discrimination or by following the *McDonnell-Douglas* framework. *Derrickson*, 84 F. Supp. 2d at 693. To prove their case by direct evidence, plaintiffs must show that they were terminated on account of their race by "detail[ing] the events leading to [their] termination, provid[ing] relevant dates, and includ[ing] the [races] of at least some of the relevant persons involved with his termination." *Goode v. Cent. Virginia Legal Aid Soc.*, No. 3:14CV281, 2014 WL 3945870, at \*3 (E.D. Va. Aug. 12, 2014), *affirmed* 807 F.3d 619 (4th Cir. 2015). At a minimum, they must demonstrate facts showing they were discharged because of their race. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom., Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012). Alternatively, in order for the Plaintiffs to prove their prima facie cases, they must show: (1) they are members of a protected class; (2) they performed their job satisfactorily; (3) they were terminated; and (4) similarly situated employees outside their protected class were not terminated. *Id.* If they can do so, the burden shifts to NNI to proffer a legitimate nondiscriminatory reason for their terminations, which if it can do so, the burden shifts back to the Plaintiffs to show that the reasons were pretextual. *Derrickson*, 84 F. Supp. 2d at 693.

Plaintiffs who were not actually terminated by NNI can still make out their prima facie case if they were constructively discharged through proving that NNI "deliberately ma[de] [their] working conditions 'intolerable' in an effort to induce [them] to quit." *Amirmokri v. Baltimore Gas and Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995). To do so, they must show both that NNI's actions were deliberate and that the working conditions were intolerable. *Id.*

8

## D. Count IV: § 1981 Retaliation

To prevail on a claim of retaliation under § 1981, each Plaintiff must prove a three-part prima facie case: "(1) the plaintiff 'engaged in a protected activity'; (2) 'the employer took a materially adverse action against' the plaintiff; and (3) a causal link 'between the protected activity and the adverse action.'" *Emami v. Bolden*, 241 F. Supp. 3d 673, 680–81 (E.D. Va. 2017) (quoting *Mascone v. Am. Physical Soc'y, Inc.*, 404 F. App'x. 762, 765 (4th Cir. 2010)). *See also Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 824 (E.D. Va. 2016), *motion to certify appeal denied,* No. 3:15CV569, 2016 WL 3922053 (E.D. Va. July 20, 2016) (observing that "[a]s with discrimination claims, retaliation claims may proceed under the direct method or under the prima facie method") (citing *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015); *Lee v. Wade*, No. 3:15CV37, 2015 WL 5147067, at \*4 (E.D. Va. Aug. 31, 2015)). Importantly, unlike an "adverse employment action" in the discrimination context, which requires an ultimate employment action affecting the terms and conditions of employment, a "materially adverse action" such as required for a retaliation claim requires only such action as might deter an employee from making or supporting a charge of discrimination. *See, e.g. Mascone,* 404 F. App'x. at 765 (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). In addition, since the *McDonnell Douglas* burden shifting scheme applies to retaliation claims as well, "[o]nce Plaintiffs establish this prima facie case, the Defendant may rebut by offering a legitimate nonretaliatory reason for the adverse action." *Derrickson*, 84 F. Supp. 2d at 694 (citing *Williams v. Cerebonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). "[A]fter Defendant offers a nonretaliatory reason, the burden of proof rests with Plaintiffs to establish by a preponderance of the evidence that the proffered reason is pretextual and the real reason for the action was retaliatory." *Id.* (citing *Williams*, 871 F.2d at 457).

9

**E. Count V: Title VII Gender Discrimination**

Jamesina Crawford is the only Plaintiff to bring a gender discrimination claim under Title VII. To do so, in the absence of direct evidence of discrimination she must demonstrate that she (1) is a member of a protected class; (2) performed her job satisfactorily; (3) suffered an adverse employment action; and (4) similarly situated employees outside her protected class were treated differently. *Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015). Like with race discrimination claims, if she can meet her *prima facie* case, the burden shifts to NNI to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Lettieri v. Equant, Inc.*, 478 F.3d 640, 646 (4th Cir. 2007). If NNI meets its burden of production, Crawford can offer evidence that NNI's reasons are mere pretext. *Id.*

**F. Count VI: Title VII Retaliation**

In addition, Crawford is the only Plaintiff to bring a Title VII retaliation claim. In order to prevail on her retaliation claim, Crawford must show she (1) engaged in protected activity; (2) that resulted in NNI taking a materially adverse employment action against her; and (3) there is a causal connection between the protected activity and the adverse employment action. *Id.* at 650. Like with Crawford's gender discrimination claim, if she can make her *prima facie* case, the burden shifts to NNI to produce a legitimate, nondiscriminatory reason, and if it can do that, Crawford must show the reason is mere pretext. *Id.* at 650-51.

**G. Count VII: FMLA Violation**

Under the FMLA, employees are "entitled to a total of twelve workweeks' leave during any twelve-month period because of a serious health condition that makes the employee[s] unable to perform [their] job." *Wright v. Southwest Airlines*, 319 Fed. Appx. 232, 233 (4th Cir. 2009). When an employee returns to work, "the employer may require such employee to transfer

10

temporarily to an available alternative position offered by the employer for which the employee is qualified" so long as it "has equivalent pay and benefits and better accommodates recurring periods of leave than the regular employment position of the employee." 29 U.S.C. § 2612(b)(2). The statute also provides that "[i]t is unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. §2615(a)(1). Dennis Smith is the only Plaintiff to bring a claim under the FMLA. "[T]o state a claim under the FMLA, [a] plaintiff must establish that [he] is entitled to the protections of the FMLA and that [his] employer interfered with, restrained, or denied the exercise of [his] rights under the Act." *Dawson v. Leewood Nursing Home*, 14 F. Supp. 2d 828, 832 (E.D. Va. 1998) (citations omitted).

## III. DISCUSSION[4]

Each of these thirty-one Plaintiffs has asserted claims for hostile work environment based on race, and disparate treatment based on race. In addition, some of the Plaintiffs have asserted additional claims for wrongful discharge, retaliation in violation of 42 U.S.C. § 1981, retaliation in violation of Title VII, gender discrimination, and/or violation of FMLA. This Report and Recommendation will address the hostile work environment claim based on race collectively with respect to all plaintiffs, and then address by individual plaintiff their remaining claims. Pursuant to Fed. R. Civ. P. 56 and EDVA Local Civil Rule 56, the Court will rely on Defendant's Statement of Material Facts ("SOF") where admitted by Plaintiffs, or, if only admitted in part, just that part of the SOF so admitted.[5]

---

[4] Given the volume of claims and corresponding motions addressing each, in order to avoid unnecessary repetition and added length, the undersigned notes that in its analysis of each claim it did not reproduce a full restatement of controlling case law or fully articulate all elements, but fully incorporates such as articulated in previous sections. The absence of such repetitive information from subsequently addressed motions should not be construed as a failure to consider or apply the same.

[5] The Court notes that many of Defendant's SOFs are "Disputed in part" by Plaintiffs, who then either add additional facts of their own, or purport to dispute the fact to the extent it "implies" a particular conclusion. Facts

## A.    Hostile Work Environment Claims

Plaintiffs seek to oppose NNI's Motion for Summary Judgment on their hostile work environment claims, at least in part, through a pleading captioned: "Plaintiffs' Opposition to Defendant's Motions for Summary Judgment as to Hostile Work Environment Claims," and subtitled "Plaintiffs' Statement of Material Facts." ECF No. 201, attach. 1. Further, in a footnote, Plaintiffs "incorporate by reference their statements of disputed fact set forth in response to Defendant's individual Rule 56(b) statements into each of their memoranda of law opposing summary judgment." *Id.* at 2 n.1. This manner of addressing summary judgment is inconsistent with the requirements of E.D. Va. Local Civil Rule 56(b) (requiring "[a] brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute."), because it presents the disputed facts in a narrative form with inconsistent citations to the record. *See* ECF No. 201, attach. 1, *passim*. Nonetheless, between the Memorandum and the deposition transcripts submitted by Plaintiffs, the undersigned does have sufficient evidence to make a determination regarding the viability of claims for hostile work environment. Thus, through the evidence proffered in response to Defendant's Motions for Summary Judgment, and assuming the truth of such evidence as this Court is required to do, Plaintiffs here, with the exception of Ronald Robinson,[6] have demonstrated facts sufficient for a reasonable jury to conclude that their "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' which is 'sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment." *Nat'l R.R. Passenger Corp.,* 536 U.S. at 116. Plaintiffs, largely

---

are either admitted or not; to the extent they "imply" any particular conclusion is argument, and the Court will treat such responses by Plaintiffs accordingly. *See* E.D. Va. Loc. Civ. R. 56(B).

[6] *See* Section II.C.13, *infra*, for the Court's analysis of why Plaintiff Robinson's claim fails as a matter of law.

12

through their deposition testimony submitted in opposition to Defendant's summary judgment motions, have alleged facts tending to show discriminatory and abusive treatment of minority workers at NNI by both supervisors and nonminority co-workers with the knowledge and/or forbearance of supervisors. For instance, Plaintiffs proffered the following factual averments.[7]

**1. Anthony Alvarez**

Alvarez was hired as a structural fitter October 2014. ECF No. 110, attach. 2. In 2014 and 2015, Supervisor Wayne Jackson would task Alvarez, who is Hispanic, with menial jobs such as sweeping the floor and grinding while not requiring the same of white workers. Jackson would refer to Alvarez as "boy," deny him breaks, micromanage his work and that of other minorities, but not do the same for white workers. Jackson would tolerate lackadaisical behavior from white workers ("let them huddle up, talk, talk to each other, get on the phone, all that, go in the computer room, sit there for a long time") but keep a strict eye on minorities. When Alvarez began to report to another supervisor in February 2015, Jackson would make unfounded accusations about Alvarez to his new supervisor to get him in trouble.

Alvarez witnessed racist graffiti in the bathroom ("NNiggers get out") and confederate flags were displayed on automobiles and toolboxes of various workers. Alvarez complained about discrimination to Superintendent Doug Todd, but he did nothing about it. ECF No. 202, attach. 1, Ex. 1.

**2. Ian Blow**

Jackson supervised Blow between 2010 and 2012. Jackson called him "stupid," and denied him breaks yet permitted white workers stand around, even fall asleep in front of him. Blow was cursed at and called "a dumb ass n*****" by Jay Adams, another employee, and when

---

[7] As a preliminary matter, with the exception of Alvarez, all of the other plaintiffs are African American, or black. *See* Answer, ECF No. 27 at 2 (admitting the pertinent Plaintiffs are African American). Alvarez testified in his deposition that he is half Hispanic, half white. ECF No. 110, attach. 3 at 3-4.

Blow complained about it to Wayne Jackson, he just laughed. Blow averred that Jackson made racially inappropriate comments to him, such as referring to how Jackson's grandfather "had lots of black women." Supervisor Jeff Rilee made mocking comments to Blow about the "black people walk," taunted him that "white welders were better than black welders," and him that "most black guys have the best drugs" so he asked Blow "to bring him an 8 ball of powder cocaine" and in exchange he would get Blow into a training class. Blow witnessed a noose hung in the workplace, Confederate flags and stickers were prevalent on vehicles in the parking lot of white workers. Blow made Scott Jones aware of some of the discriminatory behavior of others but nothing was done about it. ECF No. 202 attach. 1, Ex. 3.

In April 2016, Blow found that someone had written "fuck you nigger" on the inside of his unlocked tool box. ECF No. 212, attach. 1 at 41, 43, Exs. 424-25. An investigation conducted by Defendant did not uncover who had written the comments. ECF No. 210, attach. 1, Ex. 120.

**3. Ernest Chesson**

Chesson worked as a welder at the Shipyard and was supervised by Jackson. Jackson would condescendingly speak down to the black workers, "as if he needed to dumb down what he was saying,' but not to the white workers. Jackson treated Chesson as if he was inferior. Ruel Scott also supervised Chesson for a time, and treated him the same way, speaking in a condescending fashion, calling him "dummy," and ridiculed him in front of others. He was denied the opportunity to get a forklift certification but he was told he would be put on a list, but there never was any list and two white employees were given the opportunity instead. He also saw Confederate flags regularly displayed on cars and clothing. ECF No. 202, attach. 1, Ex. 6.

**4. Marchello Fields**

14

Fields worked at the Shipyard from June 2012 to August 2013 as a welder. He was supervised by Jackson, who would follow him and other black workers around every day, but not white workers. This included following Fields and others to the rest room, where he would wait outside and then go in to hurry them along. He never did this to white workers. Jackson's behavior intimated Fields, because he saw how poorly Jackson treated black workers who got on his bad side. Jackson would give different odd jobs such as picking up trash and grinding to black workers that he would not give to white workers. Jackson ordered the black workers not to wear clothing with President Obama's picture on it, but white workers were permitted to display Confederate flags on their vehicles, a tool box and clothing. He observed racist graffiti in the bathroom more than once but supervisors never held a meeting to put a stop to it. Supervisor Tom Jaffeux would commonly refer to black workers as "you people" and single them out and call them "brain dead." ECF No. 202, attach. 1, Ex. 12.

**5. Willie Kershaw**

Kershaw worked as a laborer at the Shipyard, and during his tenure was supervised by three white men, Jackson, Jaffeux, and Jeff Rilee. Jackson spoke in a disrespectful and demeaning manner, including the use of profanity, that he did not use with white workers. Jackson segregated Kershaw from white workers when assigning him work, and gave him less important and menial jobs than he gave to white workers. Jackson followed Kershaw around, even to the bathroom, which he did not do to white workers. Rilee mocked Kershaw on a daily basis because of race, as "[h]e would turn his hat to the back, talk with a street slang, walk with a bebop style attitude. He would say things in a street slang, ebonics style manner when he communicated with [Kershaw], and he didn't do these things with other white people. [I]f he did those things in front of other supervisors, they would -- they would really think it was funny, and

15

they would laugh about it." A white coworker shared a racist joke with Rilee in front of Kershaw. ECF No. 202, attach. 1, Ex. 20. Other employees and vendors made racist jokes or comments and wore clothing with a racist depiction in Kershaw's presence.[8] ECF No. 120, attach. 3 at 65-70.

## 6. Derrick Cross

Cross was a welder. Leary, a white supervisor, would closely monitor where the black welders were working, and make sure they were always on task, but around the white welders he would chat for fifteen to twenty minutes without them doing any work. Cross and the other black workers were monitored so closely that they would be followed to the bathrooms and told to get back to work, but white workers were permitted to leave their work space any time, go to the break area, or take fifteen or twenty minute smoke breaks without complaint. A white worker named Benny was permitted to wear a tee shirt with a racist depiction for three to four months. Cross regularly saw confederate flags on vehicles, and heard a white employee make a comment about lynching to a black worker. Racist graffiti on the bathroom wall was there when he began his employment at the Shipyard and not removed until 2015. He and other black workers were referred to as "boys" and "you people." ECF No. 202, attach. 1, Ex. 9.


## 7. Ronald Valentine

Valentine was a welder who was often supervised by Jackson on an interim basis. However, even when Jackson was not supervising Valentine, Jackson would routinely stop Valentine and ask him what he was doing and whether he was working. Jackson followed him to the bathroom several times, threatened his job and called him a gang member. Valentine

---

[8] A white employee wore a tee shirt captioned "Redneck Fishing" which depicted a white man fishing by holding a black man under water by his feet and legs.

complained about Jackson to Superintendent Richard Talley. When Talley came around the shop, he would stop black workers if they were standing in a group, but would not say anything if it was a group of white workings standing around. Valentine has heard mocking comments made to black workers, such as asking them if they were going to get fried chicken and watermelon. Valentine also experienced a coworker—Tom Castle—make a racist joke in front of him, and saw a white coworker wearing the tee shirt with the racist depiction, and another with a hat with the Confederate flag. Valentine witnessed a noose hanging from a vent in 2015, and still sees Confederate flags on vehicles in the parking lot. ECF No. 202, attach. 2, Ex. 33.

**8. Jonathan Dantes**

Dantes was a welder and supervised by Jackson and Mike Schultz. Jackson would be very friendly with the white workers but not at all with Dantes. Schultz would follow Dantes to the bathroom and time his bathroom breaks. Schultz would challenge Dantes about taking too long almost every other day, but would never challenge the white workers. Schultz would complain to Dantes that he was taking too long of a lunch break three or four times a week, but would permit the white workers to take extended lunch breaks. He saw Confederate flags on vehicles and clothing. White employees were permitted to sleep on the job, but he was terminated for sleeping during his lunch break. ECF No. 202, attach 1, Ex. 10.

**9. Frantz Edouard**

Edouard was a welder who worked under Tom Jaffeux. Jackson, who was not Edouard's direct supervisor, would pace around and harass him. Jeff Rilee would ridicule his dreadlocks, call him a thug, and mimic racially stereotypical behavior where he would "grab his crotch and … be walking like – like with his pants sagging or something like that." White workers were permitted to get coffee and take breaks while black workers were chastised to get back to work

17

when they do so. Confederate flags were displayed on vehicles and caps of white welders. ECF No. 202, attach. 1, Ex. 11.

## 10. Reggie Holliman

Holliman was a fitter who worked under Jackson and Jaffeux. Holliman and other black workers were regularly threatened with their jobs, when white workers were not. Supervisors would speak to him and other black workers derogatorily, but did not speak that way with white workers. He and other black workers were regularly given menial jobs, like sweeping floors, when white workers were not. Jaffeux referred to the black workers as "y'all people," and called them stupid. In safety meetings, he would dismiss the white workers and then chastise the black workers. Jaffeux warned them against going to management with any complaints under threat of termination. He observed a Confederate flag displayed on a worker's vehicle. Jeff Rilee used to mock black workers, and a white coworker would regularly tell racist jokes. ECF No. 202, attach. 1, Ex. 16.

## 11. Lamar Holloman

Holloman was a welder who was supervised by Steve Scheg and others. Scheg would use the word "n****r" or "n***a" with him sometimes. Schag would make offensive comments to him incorporating race, such as "Bring your black ass over here." Schag hounded him out of the bathroom on one occasion, but he did not treat white workers that way. Jackson, who supervised Holloman for a brief period of time, would permit white workers to take breaks and chat for as long as thirty to forty-five minutes, but if black workers stopped working to chat even briefly, Jackson would intervene. If Holloman was talking to a white worker, Jackson would leave him alone, but if two black workers were talking, Jackson would demand that they get back to work. Holloman noticed Confederate flags in vehicles, in a locker or tool box and on the

18

clothing of white workers, and one white worker in particular wore the racially offensive "Redneck fishing" tee shirt. Holloman complained to Richard Talley about the discriminatory conduct but nothing happened. ECF No. 202, attach. 1, Ex. 15.

**12. Alfred Joyner, Jr.**

Joyner was a welder who worked for several supervisors, including Jeff Rilee, Tom Jaffeax, Mike Schwartz and Wayne Jackson. He began working at NNI as a temporary employee in 2002 and became permanent in 2004. Rilee would mock him by mimicking racially stereotypical behavior. Rilee used the N-word daily, and called Joyner and other black workers that word to their faces.[9] Joyner reported this behavior on the NNI "hotline" but nothing was done about it. A white coworker who worked sometimes as a make-up supervisor would also mock Joyner and other black workers by using racially offensive stereotypes. Joyner observed a noose hanging from a work unit, and saw a picture of another noose that had been hung in the workplace. He has seen racist graffiti on bathroom walls. He observed the "Redneck fishing" tee shirt worn by a white worker and Confederate flags displayed on vehicles, tool boxes and clothing. He and other black workers were harassed when they went to get coffee, but not white workers. ECF No. 202, attach. 1, Ex. 18.

**13. Willie Nichols**

Nichols was hired as a fitter at NNI but worked as a burner before training as a welder. At some point he was supervised by Rilee. Rilee would routinely mock him by mimicking racially stereotypical behavior ("he would try to pull his pants down and walk like a – a black person, you know, what they call pimping …") and remarks ("you're not going to get your wife

---

[9] After first testifying that he did not hear Jackson use any slur other than "stupid," ECF No. 136, attach. 2 at 15-16, Joyner subsequently testified he heard Jackson direct the N-word towards him once and towards other black workers approximately once a week, *id.* at 74-75.

19

to fix no collard greens and chicken and watermelon?"). Jackson denied Nichols the opportunity for certain training in favor of a less experienced white employee, telling him "black people's brains is not developed enough to pass that." Jackson said the same thing about why did not put up black workers for supervisory positions. Nichols reported this to Scott Jones. At the same time Jackson stopped Nichols and two other black workers who were taking a break, he permitted a group of five white workers to congregate outside to look at a new motorcycle. Jackson would check on black workers using the bathroom but never white workers. Nichols observed the Confederate flag on clothing. Another white worker addressed Nichols daily as "his favorite n***a", which he reported to supervisor Purcell. Other whites also used racially derogatory language in the workplace. ECF No. 202, attach. 1, Ex. 22.

## 14. Roderick Waddell, Sr.

Waddell was a laborer and blaster who was supervised by Jaffeux, Doug McKercher, and others, including Jackson when Waddell worked weekends. Jaffeux would refer to Waddell and other black workers as "boy" or "you boys." When Waddell protested, Jaffeux laughed it off.[10] Jaffeux followed Waddell and other black workers into the restrooms at least once a week, and would stand by the stand by the stalls or peek under them. McKercher would do the same thing. A group of black workers and one white worker used to eat lunch in the conference room, but McKercher one day told them they could not eat lunch in there anymore, yet permitted the lone white worker to continue to do so.[11] At a morning meeting Clem Stewart threatened to have Waddell's son fired if he saw him sleeping, yet seated next to Stewart was Ricky Penrod, a white

---

[10] Unfortunately, neither party included the full discussion of this circumstance in their submissions, providing to the court instead only pieces. NNI filed pages 207 and 210-211 of Waddell, Sr.'s deposition, while Plaintiff provided pages 208 and 212-215. It does not go unnoticed that each side only submitted that part of the testimony which advantaged their side. Since the entire exchange on pages 207-215 is relevant to the supervisor's potential pejorative treatment of this Plaintiff, better and more fair practice would have been for the parties to have each submitted the entire exchange.

[11] While NNI posits that it had good reasons for prohibiting lunch in the conference room yet nevertheless permitting the white worker to remain, ECF No. 144 at 7-8, this merely creates a question of fact in dispute.

20

worker, who was asleep. Waddell has seen Confederate flags on vehicles. ECF No. 202, attach. 2, Ex. 35

## 15. Brandon Walker

Walker was a laborer who was supervised by Jackson between September 2013 and February 2014, and thereafter became a welder. Jackson would refer to him as "boy," assign him either menial jobs, like sweeping floors or painting, while not assigning the same jobs to white workers, and order him to turn down his music but not do so to white workers. He would task Walker with jobs by himself but permit white workers to work in groups. Walker complained to Scott Jones that Jackson had assigned him to sweeping floors for two months straight. Jackson would rush Walker back to work when he used the bathroom. Jackson tolerated white workers using "the N-word," and a white worker named Levi Clutz frequently referred to Walker that way. Clutz sent Walker an extremely racist video,[12] and would tell him racist jokes. Supervisor McKercher banned black workers from eating lunch in a break room but permitted a white worker to continue to do so. Walker has seen Confederate flags on the vehicles and clothing of white workers. Walker saw a doctor for the stress he felt at work, and was prescribed Trazodone. ECF No. 201, attach. 2, Ex. 36.

## 16. Richard Bostic

Bostic was a welder who was supervised by Jackson. From his first day of work in 2012 he observed Confederate flags on vehicles in the parking lot, and he and a group of other black welders were referred to as "you people" by Tommy Hines, a white worker who was the gang leader. Bostic reported Jay Adams, a white worker, to Jackson for calling him a "dumb ass n****r" but Jackson laughed it off. After that, Adams repeatedly referred to Bostic as "boy."

---

[12] The video showed a group of whites country line dancing and smiling to a song with extremely racist lyrics called "N****r-Hatin' Me."

Bostic complained about this racial harassment to Scott Jones but it continued. Bostic heard racist language on a daily basis from white workers. Bostic observed in the workplace a rope tied into what looked like a hangman's noose. Bostic, a diabetic, required breaks to monitor his blood sugar and eat something if necessary to keep it under control. Jackson would follow him around and harass him about his breaks, and after Bostic complained to Scott Jones and was authorized to take what beaks he needed, Jackson continued to follow him around and bother him. White workers were not bothered whenever they took breaks. ECF No. 201, attach. 1, Ex. 4.

## 17. Herbert Broughton

Broughton was a welder who was supervised by Jackson. Every day, when groups of black welders and white welders were working in the same area, Jackson would only confront and correct the black workers, not the white workers. Jackson would refer to black workers as "boy" and the white workers as "man." When white and black workers would take smoke breaks, Jackson would break up the black workers but allow the white workers to continue on their breaks, sometimes for as long as thirty to forty-five minutes. Jackson would confront black workers on their use of the bathroom, but not do so to white workers. Broughton observed the Confederate flag on many vehicles, clothing, and lockboxes. White workers regularly used the word "n***a" and n****r." He observed a white worker wearing the racist "Redneck fishing" tee shirt. ECF No. 202, attach. 1, Ex. 5.

## 18. Steven Gordon

Gordon was a welder who was supervised by Jackson and Ruel Scott. Jackson accused Gordon of being a gang member because he signed his welds "Black Ice." Black workers would be disciplined for minor infractions while infractions committed by white workers would be

swept under the rug. Gordon's work would be nitpicked by Ruel Scott, but Scott would not criticize the work of white welders. Gordon lodged a complaint against a white worker named Slacker[13] for shoving him from behind, but despite the fact that an independent eyewitness corroborated the confrontation, nothing happened to Slacker. Gordon was aware of the complaint against Slacker where he climbed a ladder with a rope shaped into a noose and taunted a black worker, but nothing happened to Slacker. Gordon observed the Confederate flag on vehicles in the parking lot, and also on a hat worn by Slacker. ECF No. 202, attach. 1, Ex. 13.

**19. Chris Payton**

Payton was hired as a laborer in late 2013, and began being supervised by Mike, a white male. Payton started at or about the same time as two white workers and they were all assigned to sweeping and inspecting welds, however Payton was assigned a larger area to sweep and more welds to inspect than the white workers. After Payton had been at NNI for a month or month and a half, Mike promised to get back to Payton about submitting paperwork to obtain welding training, but he did not do so and instead assisted Joey Gibson, a white worker who had started employment two weeks after Payton whose prior experience was as a cook. At one point Payton was supervised by Brad Penny, who often referred to him as "boy' or "you people" if he was with other black workers. Penny would refer to a group of white workers as "guys." Penny would stand by the bathroom time the black workers on going to the bathroom but not the white workers. Payton was then supervised by Donald Harwick. Harwick used the term "n****r" in his conversations with Payton and others. When challenged for using that word the first time in Payton's presence, Harwick responded "It's cool. It's a term. It's a word" and did not back down. Although another employee complained to management about it, Harwick confirmed that no one spoke with him about it. Later, Harwick formed a piece of rope into a noose and

---

[13] Apparently the employee's correct name is "Slack."

displayed it to Payton, laughing. ECF No. 202, attach. 1, Ex. 23.

**20. Dennis Smith**

Smith was a welder and was supervised for a time by Jackson. He made several reports to the NNI hotline complaining of abusive behavior by supervisors, including one conversation between two white supervisors referring to another black worker as a "m****r f****r n****r." Smith observed racial epithets written in the bathroom that were eventually painted over. He also observed white workers, including supervisor Penny, wearing clothing with Confederate symbols and displaying Confederate flags on their vehicles. ECF No. 202, attach. 2, Ex. 28.

**21. David Swain**

Swain was a welder who was supervised by Jackson when working overtime and on other occasions. Jackson would constantly look over the shoulder of black workers watching what they were doing and questioning them about what they were doing, but he never did so with white workers. This scrutiny included black workers who were not part of Jackson's crew. Jackson liked to refer to himself as "General Jackson,' after the Civil War General Stonewall Jackson. He would follow Swain into the bathroom, sometimes peeking into the stall, demanding to know if Swain was sleeping. Confederate flags were displayed on vehicles, skull caps, and lunch boxes. Swain observed a rope hanging from a beam that had been braided into a noose, and he was in a group that reported it on the hotline. Swain also observed the racist video that had been sent by a white worker to Brandon Walker. ECF No. 202, attach. 2, Ex. 32.

**22. Gilbert Wilz**

Wilz was a welder who began working at NNI in January 2014. When Doug Todd, a white night superintendent took over, Wiltz was at his work station with several white coworkers who were all waiting for a quality control inspection. While Todd ignored the white workers

being idle, he demanded Wiltz "act like you are doing something." Similarly, when a group of black and white workers were outside while a crane was being moved, Todd cursed and hollered and demanded the black workers get back to work, but did not say anything to the white workers. In the shop Todd acted like an "overseer" – "he loitered over the black people to make sure they stayed to work and did not do that to white workers." Wiltz observed a noose from one of the air breathers, and was told it had been hung by Doug Harwick, his white supervisor. Wiltz had seen Harwick with the rope earlier in the day. Wiltz observed Confederate flags on vehicles, toolboxes, shirts, and a welding shield. ECF No. 202, attach. 2, Ex. 37

## 23. Mark Barnett

Barnett was a welder primarily supervised by Tommy Hines and Jeff Rilee, but occasionally by Wayne Jackson. Hines would threaten Barnett's job on a daily basis, but did not do so to white workers; instead, he would laugh with them. Hines would "com[e] around the corner, run[] up on the job like he [was] trying to catch [Barnett] doing something." But Barnett did not ever see Hines do this to white workers. Barnett observed Confederate flags on vehicles and hats. Barnett was supervised by Rilee after Hines. Rilee would regularly talk about and stereotype black people as a whole with comments such as "why y'all black people got knotty hair," "why y'all black people ... got to get that cheap Boone Farm wine." Rile would tell racist jokes, and mock black workers by mimicking racial stereotypes and using offensive and racist language. When Barnett objected, Rilee did not take the objection seriously. Barnett tried to talk to Mike Lynn, a production manager, several times about Rilee's comments, but was always told Lynn was too busy to see him. Barnett did not seek out other supervisory personnel to complain to because he had seen how Jackson had gotten so many people fired and therefore was intimidated. ECF No. 202, attach. 1, Ex. 2.

25

**24. Jamesina Crawford**

Crawford was a welder who worked under supervisors Jackson and Rilee. At one point she suffered a work-related injury to her shoulder and was tasked with other jobs, including desk work, handing out tools, and sweeping. Jackson would constantly follow her and watch her work as if he was a warden, and at one point ordered her to sweep the floor using a paintbrush. At one point Jackson told her he was going to "have a little fun' with a male welder who was going to be trained by Crawford by telling him "you learning how to weld from a bitch." Rilee commented to her once "that's some African-built shit" regarding some work she had done. Crawford complained about both comments to the vice-president of the company who said he would take care of it.[14] Rilee would mock black workers by mimicking racial stereotypes. When Crawford objected, Rilee did not take the objection seriously. For a period of time, Crawford worked in a facility called the Swiss Log building. That facility did not have a women's bathroom, necessitating Crawford either using the bathroom in the main building across the street, or use the men's room in the Swiss Log building while asking a male employee to stand guard at the door. ECF No. 202, attach. 1, Ex. 8. Crawford witnessed Confederate flags displayed daily on vehicles, tee shirts and other items. ECF No. 202, attach. 2, Ex. 40.

**25. John Harris**

Harris was a welder with Steel America, a company NNI contracted with to provide certain services, and he worked at NNI during the relevant time for SA. Harris had been eating lunch in a conference with other black SA employees for months when white supervisor Doug Kercher told them they were not allowed to eat in that room anymore, however a white worker was permitted to remain. On one occasion Harris observed a noose hanging in the workplace.

---

[14] According to Jackson, NNI Vice President Napiecek spoke to Jackson about Crawford's complaint, but Jackson was not counseled or disciplined and suffered no adverse consequences. ECF No. 203, attach. 1, Ex. 58 at 137-38.

26

He has seen the N-word and "go back to Africa" written in the bathroom stalls. White co-workers have displayed the Confederate flag and listened to music with racist lyrics. ECF No. 202, attach. 1, Ex. 14.

## 26. Tourke Hooker

Hooker was a welder who supervised for a time by Jackson and others. Jackson was aggressive towards black workers, standing over them while they worked and admonishing them to hurry up, but he did not do this to white workers. When a black worker and a white worker both had welds rejected during inspection, Hooker witnessed Jackson repeatedly criticize the black worker over a period of three weeks, but not the white worker, eventually assigning the black worker to sweep the floors while permitting the white worker to continue to weld. White coworkers referred to Hooker and other black workers on his crew as a "brown posse," and Hooker has heard white workers use the "N-word" two or three times. He has been called a "black ass bitch" by a white worker, and white coworkers such as Stan Maddox and Levi Clutz have told racially offensive and racist jokes to him. Hooker observed Confederate flags on vehicles in the parking lot and on metal buckets in the shop. ECF No. 202, attach. 1, Ex. 17. Hooker observed racist graffiti in the bathroom that read "Nelson Farrar is a lying nigger" and reported it to NNI. ECF No. 202, attach. 2, Ex. 38.

## 27. Theo Pierce

Pierce was a laborer hired in February 2014 as temporary, converted to regular, full-time shortly thereafter, and was terminated from employment in December 2014. ECF No. 174, SOF Nos. 4, 7, 19. Pierce observed white workers return to lunch late on several occasions between October and December 2014 without consequence, but he was reprimanded for doing so. Pierce was called "boy" by a white worker in front of a white supervisor, who did nothing to correct or

27

reprimand the white worker, and by a white make-up supervisor. Confederate flags were displayed on vehicles, shirts and toolboxes. Two white workers were permitted to use their cell phones on the floor of the shop, but not Pierce. ECF No. 202, attach.2, Ex. 26.

## 28. Lamarr Joyner

Joyner was a welder who was supervised by Daniel Clark, an African-American. Clark would regularly break up Joyner and other black workers who were on their break, but not do the same to white workers. Joyner worked first for supervisor Ruel Scott, who refused to acknowledge him but would strike up conversations with white workers. Scott would assign welding jobs to white workers before black workers, resulting in Joyner and other black workers often being assigned merely to sweep. Joyner was then supervised by Donald Harwick, who would refer to Joyner and another black worker as "boy," wore clothing with the Confederate flag, and once tied a string about as thick as a microphone cord into a noose and swung it around in front of Joyner and two other black workers while laughing. Joyner did not report these events because he feared for his job. Joyner weekly observed Confederate flags on vehicles, shirts and hats. ECF No. 202, attach. 1, Ex. 19.

## 29. Ronald Stewart

Stewart was a welder who was supervised by Angle. Steward heard a white co-worker used racially offensive language with other black workers every week, saw a white worker wear the "Redneck Fishing" tee shirt, and observed Confederate flags on boxes, cars and hats. Stewart complained to Supervisor Angle about what he perceived as racial discrimination, but nothing was done about it. After suit was filed, Stewart saw a noose hanging in the workplace. ECF No. 202, attach. 2, Ex. 31.

## 30. Roderick Waddell, Jr.

28

Waddell, Jr. was a laborer who was supervised by Jackson and McKercher, among others. Waddell, Jr. would be monitored by McKercher and Jackson when he used the bathroom, but white workers were not. Jackson would complain about the rap music Waddell Jr. played on his radio, but would not complain to the white workers who played the same music. ECF No. 202, attach. 2, Ex. 34. Waddell Jr. was watched by supervisors throughout the day, but white workers were not. He complained to supervisors McKercher and Slaughter about being followed to the bathroom and watched closely throughout the day, but nothing was done about it. ECF No. 182, attach. 11 at 11-12.

## B.  Hostile Work Environment Discussion

As noted, in evaluating a motion for summary judgment, the Court is required to view the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-50 (1986); *Scott v. Harris*, 550 U.S. at 378. Only after such review, if the Court finds that there is no genuine issue of material fact should the Court grant summary judgment. *Id.* Also as noted, to establish a hostile work environment claim based on race, a plaintiff must show: "(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011). Further, "[w]hether the alleged harassment is severe or pervasive discrimination has both subjective and objective components." *Bland v. Fairfax Cty., Va.*, 2011 WL 2490995, at *2, No. 1:10CV1030, (E.D. Va. June 20, 2011) (citing *Ziskie v. Mineta,* 547 F.3d 220, 227 (4th Cir. 2008)). "The plaintiff's perception must be reasonable, and '[t]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the

circumstances.'" *Id.* To one degree or another, for each Plaintiff, NNI challenges these elements as being unsupported by the undisputed material facts, arguing that the conduct alleged was not severe and pervasive, was not based on Plaintiffs' race, and is not imputable to NNI, the employer.

Plaintiffs here have described a work environment where, as between black workers and white workers, certain supervisors have applied double standards as to their expectations as to worker performance, the standards to which workers were held, and the manner in which workers were supervised. In their depositions, black workers described white supervisors as micro-managing their work, looking over their shoulders and regularly challenging them and upbraiding them for their performance, when they did not do these things to white workers. The black workers described being followed to the bathroom and timed in their bathroom use when white workers were not so treated. If black workers were on break, the white supervisors would chastise them to get back to work, while at the same time ignoring white workers who were permitted to continue on break. Many of the black workers described being upbraided for cell phone use while white workers were permitted to use their cell phones in front of the white supervisors. Several of the black workers were banned from using a conference room for lunch, when a white worker was permitted to continue doing so. Several of the black workers objected to supervisors to the differences in treatment accorded them versus the white workers, but those objections went unheeded. Accepting these representations as true, as this Court is required to do, these Plaintiffs have portrayed a workplace where they were subjected to hostile and unfair treatment to which white workers were not.

In addition, the black workers have further described a workplace where the use racial slurs and racially offensive conduct by both white coworkers and supervisors was not

uncommon. Specifically, black workers reported being called or hearing other black workers called or referred to as "n****r" and "n***a," being called "boy," hearing racist jokes told to and in front them, observing a white worker freely wearing a tee shirt with racist imagery, seeing racist graffiti in the bathrooms and nooses hung in the workplace on at least two occasions, and seeing Confederate flags displayed on vehicles, tool boxes, clothing and hats. These observations and experiences would permit a reasonable jury to conclude that black workers faced unwelcome conduct based on the plaintiffs' race. *Okoli*, 648 F.3d at 220,

While not disputing that the afore-described evidence could reasonably be considered unwelcome conduct, and Defendant challenges the conclusion that such conduct was based on Plaintiffs' race, Defendant's primary arguments focus on the latter two elements set forth in *Okoli*: that plaintiffs' allegations, even if true, fail to establish that conditions in the workplace were sufficiently severe or pervasive to alter plaintiffs' conditions of employment, and that such conduct is imputable to NNI. As part of their argument, Defendant focuses on the claim that, for each individual Plaintiff, any adverse experiences were fleeting, minor, isolated, or otherwise merely the type of petty annoyances or rudeness one might expect in any work environment. Further, Defendant contends that individual Plaintiffs may not rely on the experiences of other Plaintiffs to establish a hostile work environment if they do not have personal knowledge of such experiences.[15] Defendant contends that the cases relied on by Plaintiffs to support their argument that individual Plaintiffs may rely on the experiences of other Plaintiffs are class actions, which are the only occasions wherein "pattern and practice" evidence is allowed. The Court will address the latter argument first.

Individual Plaintiffs do indeed rely on the experiences of other Plaintiffs to attempt to establish that a hostile work environment existed for all black workers at NNI. Indeed, Plaintiffs

---

[15] Sometimes referred to as "me, too" evidence.

rely on the way all black workers were treated to attempt to establish that their workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment …'" *Nat'l R.R. Passenger Corp.*, 536 U.S. at 116 (citing *Harris,* 510 U.S. at 21) (citations omitted).  Contrary to NNI's argument, however, Plaintiffs may rely on such "me, too" evidence to establish the objectivity prong of in determining whether the conduct occurring in the workplace is sufficiently severe or pervasive to alter the plaintiff's conditions of employment.  Such evidence is permissible even in non-class action pattern and practice cases.  Several cases are especially illustrative of this point.  In *King v. McMillan*, 594 F.3d 301 (4th Cir. 2010), a sheriff's deputy brought a sexual harassment action against, *inter alia*, former Sheriff McMillan of the City of Roanoke, Virginia, in his official capacity.  Deputy King was permitted at trial to offer evidence of Sheriff McMillan's harassing behavior towards other female deputies.  The Fourth Circuit, in denying the defendant's claim of error for permitting such evidence, noted first that "[t]estimony from other employees describing their own experiences of harassment by the defendant is often relevant to a plaintiff's hostile work environment claim." *King*, 594 F.3d at 310 (citing *Fox v. GMC*, 247 F.3d 169, 179 (4th Cir. 2001)).  The *King* Court went on to find that the testimony of other employees "was relevant to two elements of King's hostile work environment claim: (1) whether McMillan's unwelcome conduct was because of sex, and (2) whether the unwelcome conduct was sufficiently severe or pervasive to create a hostile work environment." *Id.* (citing *Ziskie v. Mineta,* 547 F.3d 220, 224 (4th Cir. 2008)).  Similarly here, the experiences of other black workers can be used to show that the unwelcome conduct of white workers and supervisors at NNI was because of Plaintiffs' race, and that such conduct was sufficiently severe or pervasive to alter the conditions of their

employment, and thus created a hostile work environment.

Similarly, the use of "me, too" evidence was further analyzed in *Bland v. Fairfax Cty.,
Va.*, 2011 WL 2490995, at *2, 1:10CV1030 JCC/JFA, (E.D. Va. June 20, 2011). In *Bland*, a
female firefighter in Fairfax County, Virginia brought sexual harassment suit against her
employer alleging sexual harassment by a supervisor, Lieutenant Young. For the same reasons
as NNI asserts here, Fairfax County filed a motion in limine to preclude Bland from offering
evidence of "events and incidents [to Bland's coworkers] that occurred after Young's conduct
directed at Bland had ceased, or that occurred without her knowledge or awareness." *Id.* at *1.
Fairfax County argued that such evidence was "not be admissible as evidence of Bland's
perception that he work environment was hostile." *Id.* The court denied the motion and ruled
that such evidence was admissible, explaining:

> Whether harassment is severe or pervasive discrimination "depends on a
> constellation of surrounding circumstances, expectations, and relationships."
> *Jennings v. Univ. of N. Carolina,* 482 F.3d 686, 696 (4th Cir. 2007) (citing *Davis
> v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 651 (1999)). "All the circumstances
> are examined." *Id.* (citing *Davis,* 526 U.S. at 650–51). Significantly, "[e]vidence
> of a general atmosphere of hostility toward those of the plaintiff's gender is
> considered in the examination of all the circumstances." *Id.* (citing *Harris,* 510
> U.S. at 19).
>
> Defendant argues that "Bland cannot rely on incidents and events that she did not
> witness and that she was not aware had occurred to establish that Young's
> conduct was sufficiently severe or pervasive." (Mem. at 6.) The Court disagrees.
>
> Whether the alleged harassment is severe or pervasive discrimination has both
> subjective and objective components. *Ziskie,* 547 F.3d at 227. The plaintiff's
> perception must be reasonable, and "[t]he objective severity of harassment should
> be judged from the perspective of a reasonable person in the plaintiff's position,
> considering all the circumstances." *Id.* Thus, evidence of incidents and events
> illustrating a general atmosphere of hostility has a tendency to make the existence
> of a severe or pervasive environment, *from an objective perspective,* more
> probable or less probable than it would be without the evidence. Fed. R. Evid.

33

401. Indeed, as the Fourth Circuit has stated, "[e]ven if [the plaintiff] did not witness the conduct ... it is nonetheless relevant because it could contribute to the evidence offered to show that the workplace environment ... was indeed a hostile one." *Ziskie,* 547 F.3d at 225. "Evidence that ... [the plaintiff's] co-workers experienced treatment similar to that claimed by [the plaintiff] could lend credence to [the plaintiff's] claims about her own treatment, show that the harassment she alleges was indeed pervasive, or support a finding that she was treated badly by co-workers because of her gender, and not some other reason ." *Id.* at 225–26. The *Ziskie* court stated that "conduct experienced by the plaintiff may well be *more probative* of a hostile workplace than is conduct *the plaintiff did not herself witness.* But that *goes to the weight* evidence should be given, *not its relevance or admissibility.*" 547 F.3d at 225 (emphasis added). Accordingly, evidence that Plaintiff's co-workers experienced treatment similar to that alleged by Plaintiff is relevant and admissible as to the *objective* portion of the severe or pervasive element, unless there is another exception barring its admission.

*Id.* at \*2 (alterations in original). Under this standard, Plaintiffs are permitted to rely on observations and experiences of their coworkers to demonstrate both that the unwelcome conduct was directed at them because of their race, and that objectively the harassment created a severe and pervasive environment.

After the United States Supreme Court declared in *Harris*, 510 U.S. at 23, that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances" the Fourth Circuit established the principle that conduct other than that directed at the plaintiff employee can be considered in evaluating a hostile work environment claim because it constitutes a consideration of "all the circumstances." *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 184 (4th Cir. 2001) ("Although [Defendant] contends that conduct targeted at persons other than [Plaintiff] cannot be considered, its position finds no support in the law. We are, after all, concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and his supervisor."); *Jennings v. University of North Carolina,* 482 F.3d 686, 696 (4th Cir.

34

2007) (in banc) (holding that, in reviewing hostile environment cases "[a]ll the circumstances are examined.... Evidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances); *E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 317 (4th Cir. 2008) (holding that testimony by the defendant's customers that the workplace in question was rife with hostility to Muslims was relevant to the plaintiff's hostile work environment claim despite that fact that the plaintiff had not experienced the specific conduct at issue in the customers' testimony because their statements were relevant to support the plaintiff's claims); *Ziskie v. Mineta*, 547 F.3d 220, 225 (4th Cir. 2008) ("When examining all the circumstances of a plaintiff's workplace environment, evidence about how other employees were treated in that same workplace can be probative of whether the environment was indeed a sexually hostile one, even if the plaintiff did not witness the conduct herself. Hostile conduct directed toward a plaintiff that might of itself be interpreted as isolated or unrelated to gender might look different in light of evidence that a number of women experienced similar treatment.").

The Court next addresses NNI's argument that the unwelcome conduct in the workplace constituted, as a matter of law, nothing more than minor workplace annoyances, ordinary rudeness, or other isolated instances of "rough edges and foibles" of supervisors. *See e.g.*, ECF No. 174 at 20 (citing *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 282 (4th Cir. 2002)). The Court is not persuaded. In all or nearly all of their Motions, NNI cites to the Seventh Circuit case of *Deavis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 782 (7th Cir. 2004) for the proposition that each individual Plaintiff has "collected the sum total of all unpleasant events in [their] work history ... dumped them into the legal mixing bowl of this lawsuit, set the [Section 1981] blender to puree and poured the resulting blob on the court." *See, e.g.* ECF No. 148 at 2-3.

35

While vivid in its imagery, the Court is more persuaded by the Fourth Circuit's more thoughtful explanation of why conduct such as the type asserted by these Plaintiffs, assuming as true the facts alleged and giving the Plaintiffs the benefit of all reasonable inferences—as the Court is required to do at this stage of the proceedings—does establish a workplace "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  In *Spriggs*, the Fourth Circuit articulated

> Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African–Americans. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."

242 F.3d at 185 (quoting *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993)) (citation and internal quotation marks omitted).  Apart from this racial epithet, Plaintiffs provided examples of racist jokes, racist graffiti in the bathroom, racist imagery and nooses hung in the workplace, and being referred to as "boy."  Many of the Plaintiffs witnessed these alleged affronts first-hand; others learned about them from their fellow workers.  Conduct such as this, allegedly perpetrated by both white supervisors and white coworkers, could permit a reasonable jury to find that each Plaintiff in this lawsuit was exposed to a hostile work environment based on their race.  Moreover, the double standards testified to by these Plaintiffs, where they were treated much less favorably than white workers by being more closely monitored, followed around, and timed in the bathroom, adds to the plausibility that the NNI work environment was racially hostile to black workers.

NNI also contends that Plaintiffs cannot meet the fourth element of a hostile work environment claim—that the unwelcome conduct is imputable to NNI—and, relatedly, that it is

36

entitled to the *Ellerth/Faragher* affirmative defense that it took steps to prevent and correct harassment, and that Plaintiffs failed to avail themselves of available remedies to address the harassment. This affirmative defense is summarized by NNI in its brief in support of their motion directed to Plaintiff Crawford:

> For supervisor conduct, NNI can establish an affirmative defense by showing: (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

ECF No. 166 at 23 (citing *Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742, 762-63 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

The United States Supreme Court has provided the framework for determining when harassing conduct in the workplace can be imputed to the employer. An employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the unlawful behavior. *Faragher*, 524 U.S. at 789. Where the harasser is the employee's supervisor, the employer may be liable for the supervisor's creation of a hostile work environment under a theory of vicarious liability. *Ellerth*, 524 U.S. at 755. The Supreme Court then established what kind of employee qualified as a supervisor in *Vance v. Ball State Univ.*, and further defined the framework for determining when employer liability could attach for a hostile work environment claim:

> Under Title VII, an employer's liability for such harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or

corrective opportunities that the employer provided. … Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

We hold that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim.

570 U.S. 421, 133 S.Ct. 2434, 2439 (2013) (internal citations omitted). As the *Vance* court noted, this is an affirmative defense.

In its briefs, NNI generally argues that some of the supervisors whose conduct is at issue either did not take or were not empowered to take tangible employment actions against the Plaintiffs, and therefore it is not vicariously liable for such conduct under *Ellerth*. Further, or in the alternative, NNI contends it is entitled to judgment under the *Ellerth/Faragher* affirmative defense. In support of this position, NNI proffers its promulgation of an anti-harassment policy, including a written handbook which the employees acknowledged in writing having received, and its establishment of a Hotline to which complaints could be reported anonymously. Further, it identified examples where the various Plaintiffs failed to take advantage of preventative or corrective opportunities provided by NNI.

Plaintiffs contend that much of the unwelcome conduct was perpetrated by supervisors, or committed in their presence,[16] and that many of these supervisors had the authority to discipline or terminate them, or affect their promotion and pay raise potential. Additionally, Plaintiffs contend they are entitled to pursue a negligence theory of liability against NNI because

---

[16] For instance, several of the Plaintiffs testified that some of the supervisors either called them "n****r", "n***a", or "boy", or tolerated other white workers in their presence using those racial slurs. *See, e.g.*, Holloman deposition, ECF No. 202, attach. 1, Ex. 15; A. Joyner deposition, ECF No. 202, attach. 1, Ex. 18; Walker deposition, ECF No. 202, attach. 2, Ex. 36; C. Payton deposition, ECF No. 202, attach. 1, Ex. 23; D. Smith deposition, ECF No. 202, attach. 2, Ex. 28. Moreover, almost all of the Plaintiffs testified that black workers were routinely harangued by white supervisors in a way that white workers were not, such as watching over their shoulders constantly, following them to the bathroom and timing their use of it, breaking them up when they were on breaks or otherwise together at the same time white workers were not so treated. The obvious double standard in treatment, especially when combined with threats to fire black workers for claimed offenses for which white workers were not chastised, arguably constitutes harassing treatment of black workers by white supervisors.

the employer knew or should have known of the harassing environment propagated at NNI but failed to correct it.

Recognizing that the Court is required to view the record as a whole and draw reasonable inferences in the light most favorable to Plaintiffs, the Court cannot say that Defendant is entitled to judgment as a matter of law because material facts are in dispute regarding 1) the question of strict liability based on a supervisor's harassment which may have culminated in a tangible employment action; 2) NNI potential negligence in failing to control working conditions; and 3) the application of the *Ellerth/Faragher* affirmative defense to the vicarious liability theory.

First, six Plaintiffs[17] herein assert claims for constructive discharge based on race, and the question of whether the supervisor's harassment culminated in such a tangible employment action in any particular case remains a fact in dispute. Inasmuch as the Court has determined that whether the Plaintiffs were subject to a hostile work environment based on race is a jury question, with the exception of Robinson, *see* Section III.C.13, *supra*, whether that culminated in their constructive discharge necessarily is also a jury question.

Second, Plaintiffs have asserted many examples of racially discriminatory harassment not necessarily tied to the conduct of supervisors but rather to that of white coworkers. Plaintiffs testified that they were called "n****r*", "n***a", and "boy"; that racist graffiti and racist messages were written on bathroom walls and, in one case regarding Plaintiff Blow, inside his unlocked toolbox; that nooses were found hanging in the workplace; that a coworker mimicked lynching a black worker; that clothing with racist imagery was worn without consequence; that a racist video was sent to a Plaintiff Walker; and that racist jokes were openly told to and in front of Plaintiffs. An employer can be negligent if it "knew or reasonably should have known about the harassment but failed to take remedial action." *Vance*, 133 S. Ct. at 2441. This is a question

---

[17] Chesson, Fields, Holloman, Robinson, Bostic, and Swain. ECG No. 15 at ¶ 1248.

of fact, and Plaintiffs testified that they made complaints about their treatment, yet the unwelcome conduct persisted. For instance, many of the Plaintiffs complained about racist or otherwise discriminatory behavior to various supervisory officials or through the "Hotline." *See, e.g.*, Alvarez deposition, ECF No. 202, attach. 1, Ex. 1 (reported to Superintendent Doug Todd); Blow deposition, ECF No. 202, attach. 1, Ex. 3 (reported to supervisor Jackson); Valentine deposition, ECF No. 202, attach. 2, Ex. 33 (reported to Superintendent Richard Talley); Holloman deposition, ECF No. 202, attach. 1, Ex. 15 (reported to Talley); A. Joyner deposition, ECF No. 202, attach. 1, Ex. 18 (reported on the Hotline); Nichols deposition, ECF No. 202, attach. 1, Ex. 22 (reported to Scott Jones); Swain deposition, ECF No. 202, attach. 2, Ex. 32 (part of a group that reported noose on Hotline); Crawford deposition, ECF No. 202, attach. 2, Ex. 40 (reported to Vice President Napiecek). Although NNI acknowledges some of the incidents occurred and some complaints were made, it contends that it took appropriate action in response. Nonetheless, whether NNI "knew or should have known" of the harassment and the allegations of hostile work environment, and whether NNI responded appropriately, are material facts in dispute, and thus summary judgment is not appropriate at this juncture.

Finally, NNI asserts that it is entitled to summary judgment based on its affirmative defense under the *Ellerth/Faragher* doctrine. As discussed, this affirmative defense entitles an employer to summary judgment if the undisputed material facts establish that it took steps to prevent and correct harassment, and that plaintiffs failed to avail themselves of available remedies to address the harassment. To establish the first "prong" of the defense, NNI points to its written anti-harassment policy that every employee acknowledged in writing having received, which provides multiple avenues for employees to report instances of harassment, including through an anonymous "Hotline." NNI then asserts that Plaintiffs failed to avail themselves of

these corrective remedies to address the harassment, citing to the multiple instances where plaintiffs testified that they did not report, either to a supervisor, the HR department, or through the "Hotline," specific instances of harassment. However, material facts about the viability of these preventative and corrective measures, and the extent to which Plaintiffs actually attempted to avail themselves of remedies, is in dispute.

Certainly, the testimony of the Plaintiffs in their depositions establishes that they did not individually report each and every instance that they believe they experienced unwelcome conduct based on race.[18] Nonetheless, as enumerated, *supra*, many Plaintiffs reported many instances of harassment to many supervisors through many vehicles. Sometimes the supervisor laughed it off, as Jackson purportedly did to Blow and Bostic, Jaffeuz did to Waddell, and Rilee did to Crawford. Barnett attempted to meet with Production Manager Mike Lynn about his complaints, but was repeatedly rebuffed. Importantly, Plaintiffs all testified that the harassing conduct at NNI, including the double standard treatment the black workers faced, continued to occur. Even after this lawsuit was filed, Stewart observed a noose hanging in the workplace. Further, several Plaintiffs testified they did not complain for fear of losing their job or of other retaliation from the supervisors about whom they had complaints. Indeed, Holliman testified that Jaffeux warned them against going to management with any complaints under threat of termination. Consequently, Plaintiffs contend that the fact that every occurrence of unwelcome conduct was not reported is of no moment under these circumstances, especially inasmuch as the conditions at NNI did not improve even after many complaints were made.

As Plaintiffs point out, determining the applicability of the *Ellerth/Faragher* affirmative defense "is especially fact intensive." *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 184 (4th Cir. 1998) (Michael, J., concurring). As Judge Michael observed:

---

[18] Although, the Court notes, often Defendant's counsel did not ask why a Plaintiff did not make a complaint.

To prove the defense, [the employer] must show (a) that it "exercised reasonable care to prevent and correct promptly any [] harassing behavior" and (b) that [the employee] "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [the employer] or to avoid harm otherwise." *Ellerth*, 118 S.Ct. at 2270. Nowhere does the Supreme Court suggest summary judgment as a shortcut in dealing with this new defense. Rather, the Court recognizes the factual nature of the defense by emphasizing that it is "subject to proof by a preponderance of the evidence." *Id.* Moreover, by employing terms such as "reasonable care" and "unreasonably failed," the defense focuses on the reasonableness of conduct on the part of both the employer and the employee. When the reasonableness of conduct is in question, summary judgment is rarely appropriate because juries have "unique competence in applying the reasonable person standard" to the facts of the case."

*Id.* (citation omitted). Whether NNI's preventative and corrective measures were *reasonable*, and whether Plaintiffs *unreasonably* failed to avail themselves of those measures is a question of fact best left to a jury to determine. Given Plaintiffs' testimony that threats were made if misconduct was reported, harassing conduct continued despite the complaints they did make, and their awareness that, despite the complaints of others, the unwelcome conduct did not diminish, a reasonable jury could conclude that the "corrective measures' offered by NNI were empty gestures and thus not reasonable, and that taking advantage of them presented much more risk than potential reward, so that their failure to pursue those corrective opportunities was not unreasonable.

In sum, granting Plaintiffs the benefit of reasonable inferences drawn from the evidence submitted, material facts remain in dispute as to whether the thirty-one Plaintiffs subject to this Report and Recommendation were victims of a hostile work environment at NNI on account of their race, and therefore the undersigned **RECOMMENDS** that Defendant NNI's Motion for Summary Judgment on this claim be **DENIED** for each Plaintiff.

**C.    Individual Claims**

In addressing each Plaintiff's individual discrimination claims, the Court begins by noting that Plaintiffs' manner of proving their cases relies first on the proposition that, rather than necessarily following the *McDonnell Douglas* burden shifting framework, they claim they have adduced sufficient independent evidence to give rise to an inference of discrimination, in that the adverse employment actions they complain of occurred "under conditions which, more likely than not, were based upon impermissible racial considerations." ECF No. 200, attach. 1 at 2. To establish this "sufficient independent evidence," Plaintiffs rely heavily on the regression analysis performed by their expert, Dr. Mark Killingsworth. *Id.* at 6-13. In addition, they rely on the alleged discriminatory animus of NNI supervisors as reflected in their hostile work environment claims. *Id.* at 13-15. They also seek to rely on their allegations of discrimination against other Plaintiffs, hoping, for instance, that the Court will use evidence of discrimination against one plaintiff as evidence that all other Plaintiffs were also discriminated against. *Id.* at 15-19. In the alternative, Plaintiffs do attempt to point to comparators outside the protected class to show that they were treated less favorably as would be required under the *McDonnell Douglas* analysis. *Id.* at 19-23.

NNI objects to Plaintiffs' purported manner of proving their cases, arguing that their approach is one only proper in a "pattern and practice" case brought as a class action under Federal Rule of Civil Procedure 23. ECF No. 231. NNI notes that, under a pattern and practice case, once class action treatment is deemed warranted under Rule 23, the class must establish that "racial discrimination is the company's standard operating procedure—the regular rather than the unusual practice." *Id.* at 3. If plaintiffs can show that a pattern or practice exists, then a presumption is created that each individual class member was a victim of the discriminatory

practices. *Id.* at 3-4. Since this cause of action is not a class action, however, NNI argues that Plaintiffs cannot proceed under their pattern and practice method of proof.

The Court agrees with NNI. In the first instance, the undersigned has repeatedly reminded Plaintiffs that this is not a class action, but rather one cause of action involving thirty-seven plaintiffs, each with their own individual claims. *See, e.g.*, ECF Nos. 59, 188. Each Plaintiff must individually establish that they were discriminated against based on their specific claims in the Second Amended Complaint. NNI is correct that most of the case law relied upon by Plaintiffs in their global opposition memorandum are "pattern and practice cases." *See* ECF No. 200, attach. 1, *passim*. To the extent Plaintiffs seek to rely on such methods of proof in a disparate treatment claim, i.e., evidence of discriminatory conduct allegedly direct towards *other* Plaintiffs, that evidence generally will not establish discrimination against the offering Plaintiff.

Additionally, Dr. Killingsworth and his analysis have been stricken pursuant to NNI's motion, and Plaintiffs did not appeal that decision under Fed. R. Civ. P. 72, so the Court will not consider his evidence in support of Plaintiffs' claims. *See* ECF No. 290. Further, while the undersigned has found that most of the Plaintiffs' hostile work environment claims should survive summary judgment, that finding is insufficient to establish direct evidence of discrimination such that the Court should circumvent the *McDonnell Douglas* burden shifting framework. Indeed, after reviewing the voluminous evidence and argument submitted by the parties, it is the Court's judgment that it must apply the *McDonnell Douglas* analysis to each of these individual Plaintiffs' claims.

## 1. Anthony Alvarez

In addition to his claim for hostile work environment, Alvarez was included among those Plaintiffs asserting a claim for disparate treatment in the Second Amended Complaint. ECF No.

15 at 230 (Count II).[19]

### a. Factual Background

Alvarez is a half-Hispanic, half-white man, ECF No. 110, attach. 3 at 4, who began working for Defendant as a structural fitter on October 14, 2013 at a pay rate of $17.50 per hour, *id.*, attach. 2 at 2. The employment offer to Alvarez provided, *inter alia*: "Attendance: You are responsible to report to your supervisor at the designated time and location and if for some reason you will be tardy or unable to report for the day, you must notify your supervisor prior to your reporting time." *Id.*, attach 2 at 2. Avarez signed the employment offer on October 8, 2013, and by his signature "indicate[d his] acceptance with all terms and conditions of th[e] Agreement." *Id.*

Alvarez received two written warnings based on his absences from work in July 2014, and a Final Warning from supervisor Leary on September 3, 2014 after he was absent from work six days between August 20 and September 2, 2014. *Id.*, SOF Nos. 21-25; attach. 3 at 43-48; and attachs. 7-9. Alvarez voluntarily quit his job at NNI when he did not show up for work for ten days between May 6 and May 29, 2015 without calling in or providing any explanation. *Id.*, attach. 3 at 34-35, 49-50.

In his response in opposition to NNI's motion for summary judgment, Alvarez identified three white fitters who were given more substantial raises than he was: Clinton Combs, Brandon Burton and John Fannin. ECF No. 200, attach. 1 at 19-20, 29 n.14, and ECF No. 204, attach. 1, Ex. 158.

### b. Disparate Treatment Claim

In his Second Amended Complaint, Alvarez asserts a claim for disparate treatment in pay. ECF No. 15, ¶¶ 576-578. The entirety of the claim avers:

---

[19] Count II is asserted on behalf of "all plaintiffs." *Id.*, ¶ 1242.

45

Disparate Pay, Promotion, Overtime and Training

576. When Mr. Alvarez started as a fitter in September 2013, at $17.50 an hour, he had four years of previous fitter experience.

577. When Brandon Burton started as a laborer, in about November 2013, on information and belief, he had no prior experience as a fitter. He made $12 per hour. During his first two months on the job he frequently came to work high on drugs and/or alcohol. One day he curled up on top of Operations Manager Wade Lynn's desk and fell asleep.

578. Nonetheless, after two months, he was promoted to Fitter, at $18 an hour.

*Id.* In addition, although the Second Amended Complaint asserts a claim for "Termination Because of Race in Violation of 42 USC 1981" on behalf of sixteen Plaintiffs, Alvarez is not one of them. *Id.* at 231 (Count III).

NNI moves for summary judgment "on all counts" of the second amended complaint. ECF No. 109. At the beginning of its memorandum in support, NNI argues that Alvarez "fail[ed] to identify a single adverse employment action that he believes was discriminatory." ECF No. 110 at 1. It then acknowledges that Alvarez has asserted claims for hostile work environment and "race discrimination." *Id.*, SOF No. 6. However, the remainder of NNI's memorandum does not address in any respects the disparate treatment in pay claim. *Id.*, *passim.* Yet, after pointing out that Alvarez never asserted a termination claim in the Second Amended Complaint, NNI nonetheless argues that the undisputed material facts in any event do not support a claim for wrongful termination, and cites, *inter alia*, Alvarez's deposition testimony wherein he declared that he voluntarily quit the employ of NNI by failing to come to work or call in his absences. *Id.*, SOF 26 (citing ECF No. 110, attach. 3 at 34-35: "Q: Now, do you view your termination, do you view that you quit your job or do you view that NNI terminated your employment? A: I look at it like I quit, you know, within, when I came back – because I came

46

back to get my tools. And then when I came back, that's when they handed me the termination papers. Q: Because you left for about six days without -- A: Yeah. Q: -- calling in or showing up or telling anybody what was going on? A: Correct. I was. I was AWOL.").

Alvarez argues in his part of Plaintiffs' global response regarding disparate treatment claims that NNI should be considered to have waived any argument for summary judgment on the disparate pay claim because it failed to address this claim in its motion. ECF No. 200, attach. 1 at 24, 29. He then argues in a footnote that three other workers received larger raises over time than Alvarez did during his tenure at NNI. *Id.* at 29 n.14 (citing ECF No. 204, attach. 1, Ex. 158).

NNI's reply, ECF No. 239, argues that Alvarez failed to assert facts in support of his claims, and instead merely provided argument in its submission, ECF No. 200, attach. 1. NNI further argues that in his deposition Alvarez never identified pay disparity as a claim of discrimination. Finally, NNI posits that Alvarez did not identify any employees hired at a higher rate of pay than he, but complained only of employees receiving larger pay raises over time. Defendant then argues that raises are determined by performance, and Alvarez failed to identify any employee who was paid more than he who had performance issues.

Alvarez is correct that NNI failed to actually move for summary judgment on the pay disparity claim. *See* ECF No. 110, *passim*. While acknowledging in its Motion that Alvarez asserted this claim, it then failed to address any facts regarding the pay issue. Even in its reply, although NNI argues that Alvarez never claimed in his deposition that he believed he had been discriminated against on the issue of pay, it did not include the entire deposition transcript that

would have been evidence on this point, so the Court has no evidence that this is so.[20] Further, although NNI argues that Alvarez did not show that the purported comparators lacked the performance issues that Alvarez had, Alvarez did provide evidence that other white fitters received much larger raises than he did. Having provided at least a prima facie case under *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d at 343, it was incumbent *on NNI* to produce admissible evidence of the legitimate, non-discriminatory reasons for the pay disparity under the *McDonnell-Douglas* framework, i.e., that Alvarez had performance issues and the white comparators did not, and that is why they received larger raises. It was not Alvarez's burden to eliminate all possible reasons for that disparity. Of course, Alvarez's burden to show pretext does not arise until after NNI produces evidence meeting its burden. Consequently, summary judgment on this claim simply is not available.

On the other hand, the undersigned agrees with NNI that summary judgment should be granted to the extent Alvarez seeks to pursue a termination claim. Plaintiffs' Second Amended Complaint, at 237 pages, 1274 paragraphs and seven Counts, asserted a myriad of facts and legal theories of recovery. One Count specifically asserted a termination claim, and sixteen Plaintiffs were identified as having claims under that Count. Alvarez was not one of them. Moreover, none of the facts asserted in the Second Amended Complaint would appear to support a claim that Alvarez was either constructively discharged or actively terminated by NNI in his employment, as Alvarez never even mentions his discharge in the complaint.[21] Alvarez never sought to amend his complaint to assert a discharge claim. "A plaintiff may not amend his

---

[20] NNI only included excerpts of the deposition transcript attached to its memorandum in support of its motion for summary judgment, *see* ECF No. 110, attach. 3, and did not include the remainder of the transcript, or any other exhibits, when it filed its reply, *see* ECF No. 239.

[21] Alvarez's contention that he has *both* a constructive discharge claim *and* a discriminatory/retaliatory termination claim because he didn't know he was terminated before he quit is nonsensical. *See* ECF No. 200, attach. 2 at 46, n.15. Alvarez provides no legal authority for this proposition.

48

complaint through arguments in his brief in opposition to a motion for summary judgment." *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984). Consequently, Alvarez is entitled to pursue neither a wrongful termination nor a constructive discharge claim.

As a result, the undersigned **RECOMMENDS** that NNI's Motion for Summary Judgment on Alvarez's disparate treatment claim be **DENIED**, but to the extent Alvarez purports to assert an unlawful termination claim, that the summary judgment motion be **GRANTED**.

**2. Ian Blow**

In addition to his claim for hostile work environment, Blow asserted a claim in the Second Amended Complaint for disparate treatment in pay. ECF No. 15 at 230 (Count II).

**a. Factual Background**

Blow is an African-American man, ECF No. 27 at 2, who began working for NNI as a temporary welder on March 10, 2010, ECF No. 112, attach. 2 at 3. In March 2014, NNI instituted a process to convert Blow, and other temporary employees, to permanent, full-time positions. ECF No. 112, SOF. No. 27. A background investigation performed as part of that process revealed that Blow had a prior criminal conviction that he had not disclosed on his employment application, and he was terminated. *Id.*, SOF No. 31 and attach. 2 at 61-65. In May 2014 and at the request of Scott Jones, Blow was rehired as a fulltime employee. *Id.*, SOF No. 34 and attach. 2 at 86.

Blow started his employment at NNI earning $18 per hour, which was less than he made at a previous employer. *Id.*, SOF No. 90. At his first 30, 60, 90 and 120 days of employment, Blow received $1 per hour raises to $22 per hour. *Id.*, SOF No. 91. Blow's pay was raised to $23 per hour on September 18, 2011, to $24 per hour on February 26, 2012, and to $25 per hour on October 13, 2013. *Id.*, attach. 19 at 7, 9, 15. After Blow was rehired as permanent on May

18, 2014 he was paid at a rate of $24 per hour, and then on June 1, 2014 his pay was increased to $25 per hour. *Id.*, attach. 22 at 2. His pay was subsequently increased to $25.70 per hour on March 8, 2015, and to $26.24 per hour on March 6, 2016. *Id.*, at 2, 3. Between the time of his hire in March 2010 and March 6, 2016, Blow received $8.34 in raises.

Blow identified Joshua Vanderberry, a white male, as a comparator. Vanderberry was hired at a pay rate of $24 per hour in April 2010. ECF No. 112, SOF No. 94, and attach. 19 at 18. His pay was increased to $26 per hour on May 30, 2010, to $26.25 on July 25, 2010, to $26.50 on August 29, 2010, and to $27.50 on March 17, 2013. *Id.*, attach. 19 at 18, 19, 28. Vanderberry's pay was increased again to $27.50 on April 6, 2014, to $28.60 on March 8, 2015, and to $29.53 on March 6, 2016. *Id.*, attach. 22 at 4-5. Between the time of his hire in April 2010 and March 6, 2016, Vanderberry received $5.53 in raises.

### b. Disparate treatment claim

In his Second Amended Complaint, Blow asserts a claim for disparate treatment in pay. ECF No. 15, ¶¶ 661-665. Blow identified Clinton Combs and Vanderberry as white comparators, and bases his claim of pay discrimination on the contention that they received larger pay raises then he did. *Id.* Defendant advances three arguments in its motion for summary judgment: 1) that any pay decisions prior to February 11, 2011 are untimely because the Lilly Ledbetter Fair Pay Act ("Lilly Ledbetter Act"), which provides that each discriminatory pay check is an adverse event for statute of limitations purposes under Title VII, does not apply specifically to claims under 42 U.S.C. § 1981; 2) that "pay increases" are not adverse actions under the law based on cases such as *Simms v. Navy Fed. Credit Union*, 2002 WL 32971969, at \*6, Case No. Civ.A 02-0900-A (E.D. Va. Aug. 27, 2002); and 3) that in any event, the only white comparator who might be substantially similar to Blow—Vanderberry—actually received

less raises than did Blow, and thus Blow did not suffer any discrimination on the basis of pay. ECF No. 112 at 23-26.

Blow disputes NNI's claims on several fronts. He argues that pay claims prior to February 11, 2011 are timely because the greater weight of case law supports extending the application of the Lily Ledbetter Act to § 1981 claims in addition to those brought under Title VII. ECF No. 200, attach. 1 at 24-26. In addition, he argues that pay raises can be adverse actions, relying on *Smyth-Riding v. Sci. & Eng'g Servs., Inc.*, 2014 WL 4899573, Case No. WDQ-11-0558 (D. Md. Sept. 29, 2014), and pointing out that if pay raises could never be discriminatorily applied, then an employer could hire black and white workers at the same rate and then immediately engage in discriminatory practices by raising the wages of white workers excessively over that of black workers. ECF No. 200, attach. 1 at 32. Blow further claims that the law does not require him to identify similarly situated comparators in order to advance a discriminatory pay claim, and relies extensively on both evidence of the alleged hostile work environment and, more significantly, the regression analysis performed by his expert labor economist Dr. Mark Killingsworth purporting to demonstrate statistically significant pay disparities between all black and white workers at the Newport News Shipyard. *Id.* at 2-12. Further, he contends that he has demonstrated that there are such comparators in any event, and identifies Vanderberry and James Knick as white welders who were paid more than Blow. *Id.*, at 32-33.

The courts appear split as to whether the Lilly Ledbetter Act's principle that a claim accrues each time a discriminatory pay check is received (as opposed to when the original pay decision is made) applies to § 1981 pay claims. *Compare, e.g., Johnson v. Portfolio Recovery Assoc., LLC*, 682 F.Supp.2d 560, 585 (E.D. Va. 2009) (declining to consider whether the

Supreme Court's decision in *Ledbetter* still applies to § 1981 pay discrimination claim after passage of the Lilly Ledbetter Act, but applying the four year statute of limitations), *with Johnson v. Fed. Express Corp.*, 996 F.Supp.2d 302, 326 (M.D. Pa. 2014) (holding that applying the paycheck accrual principle was not clear error, and collecting cases demonstrating divided authority on this proposition). Inasmuch as courts have consistently applied the same test used for Title VII claims to claims brought pursuant to § 1981, *see, e.g.*, *Spriggs*, 242 F.3d at 184; *Gairola v. Virginia Dept. of Gen. Serv.*, 753 F.2d 1281, 1285 (4th Cir. 1985), Blow's argument that the Lilly Ledbetter Act should apply to § 1981 claims has some merit. Nonetheless, the Court does not need to reach this question because of its findings, *infra*.

Addressing the question of whether a pay raise can be an adverse action, the Court notes that there is authority for the proposition that increases in pay are not adverse actions. *See McCann v. Fairfax Cty. Gov't.*, 32 F.Supp.2d 365, 368 (E.D. Va. 1998) ("A pay increase obviously is a benefit, not an adverse action."). Moreover, *Smyth-Riding* is not particularly applicable here for several reasons. First, the plaintiff therein claimed she was denied a raise and bonus, not that it was less than similarly situated comparators. While denial of a pay raise can constitute an adverse employment action, *see, e.g. Flateau v. South Carolina Comm'n for the Blind,* 50 F. App'x 653, 654 (4th Cir. 2002) (holding that the denial of a pay increase may constitute an adverse employment action), of course that is not what happened here. Second, the *Flateau* Court there found that denial of a raise could be considered an adverse employment action only in the context of plaintiff's retaliation claim. The law is quite clear that an adverse employment action in the discrimination context requires an ultimate employment action affecting the terms and conditions of employment, whereas a materially adverse action such as required for a retaliation claim requires only such action as might deter an employee from

52

making or supporting a charge of discrimination. *See, e.g., Mascone v. Am. Physical Soc'y, Inc.*, 404 F. App'x 762, 765 (4th Cir. 2010) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). One Court in our sister Division has found that "[a]bsent a very large disparity between the raise given a claimant and the raises given to valid comparators, which is not the case here, 'it is difficult to see how a raise in one's salary could constitute an *adverse* employment action.'" *Lovell v. BBNT Sols., LLC*, 295 F. Supp. 2d 611, 626 (E.D. Va. 2003) (citing *Milligan v. Citibank*, No. 00–2793, 2001 WL 1135943, \*\*4–5, 2001 U.S. Dist. LEXIS 16105, at \*11–12 (S.D.N.Y. Sept. 26, 2001) (emphasis in original)). In *Lovell*, the Court determined that the plaintiff's receipt of a 1.36% pay raise plus incentive pay amounted to, at most, a failure to receive an additional $3,410. 295 F. Supp. 2d at 626. The Court then held

> While this figure is by no means inconsequential, it does not rise to the level of an adverse employment action. This follows from the sensible principle that "[e]very employment decision that arguably has a negative impact on an individual does not rise to the level of an adverse employment action." *Stringfield v. Chistopher Newport Univ.*, 64 F.Supp.2d 593, 598 (E.D.Va.1999) (citations and quotations omitted). To conclude otherwise would allow employees disappointed over not receiving a higher raise to invoke Title VII to require courts to become involved in the messy business of evaluating employees and making finely-tuned raise determinations. There is no warrant for allowing Title VII to be used in this manner because the magnitude of the raise differential in this case cannot be said to have "*adversely* affected the terms, conditions, or benefits of the plaintiff's employment." *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir.2001) (emphasis added).

295 F. Supp. 2d at 626-27 (emphasis in original). There are circumstances, conceivably, where a disparity in pay raises could constitute a discriminatory act, and Blow's hypothetical might present such a case. This, however, is not that case.

A plaintiff is not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim. *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003). However, he still must point to evidence that the adverse employment action

was taken for discriminatory reasons. If a plaintiff does point to comparators, however, he is

> "required to show that they are similar in all relevant respects to their comparator" and "[s]uch a showing would include evidence that the employees "dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (internal citations omitted).

While claiming that he has identified similarly situated comparators, and thus created a genuine issue of material fact in dispute, Blow contends that he need not be required to do so, since he can rely on general evidence of discriminatory conduct on the part of NNI supervisors, combined with the regression analysis performed by Dr. Killingsworth. This argument is unavailing, as Dr. Killingsworth and his analysis have been stricken by the Court. ECF No. 290 (Memorandum Opinion and Order granting Motion to Preclude Testimony of Dr. Mark Killingsworth). Consequently, Blow may not rely on any such statistical analysis.

Further, Blow may not point to general discriminatory conduct alleged in connection with his and his co-Plaintiffs' hostile work environment claim to prove his pay raises were discriminatory. As Plaintiffs have repeatedly been reminded, they have individual claims, which means Blow has to establish that *his pay* was discriminatory in the manner in which it was applied. To do that, in the absence of any other admissible evidence, he must show that similarly situated white workers were treated more favorably than he was in the manner in which pay raises were allocated. This was his claim in the Second Amended Complaint, and this is what he must prove. *See Davis*, 2015 WL 5616237, at * 3 (requiring that a plaintiff show he was paid less than an employee outside the class and the higher paid employee was performing a substantially similar job). By the record in this case, Blow has failed to demonstrate that material facts are in dispute.

First, the undisputed material facts demonstrate that Blow's raises were not an adverse action. Over the course of six years, from March 2010 to March 2016, Blow received \$8.34 in raises. The primary comparator he points to—Vanderberry—only received \$5.53 in raises over that same general time frame (April 2010 to March 2016). Blow's claim in the Second Amended Complaint—that "he has consistently received smaller raises than less qualified white coworkers"[22]—is belied by the undisputed facts. Receiving more in raises than an employee outside the class cannot be considered adverse. Hence, Blow cannot point to Vanderberry as a comparator who was treated more favorable regarding pay raises.

In addition, although Blow claimed in the Second Amended Complaint that he was paid less than similarly situated white workers,[23] he failed to proffer facts demonstrating that he and Vanderberry were similarly situated at the time they were hired. Absent such proof, the Court cannot speculate as to the reasons why Vanderberry was started at a higher rate of pay than Blow. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992) (finding that unsupported speculation is insufficient to defeat summary judgment). Regardless, Blow has not advanced a claim for disparate treatment in connection with any purported adverse action except for his pay *raises*. In the Plaintiffs' global opposition to NNI's Motion for Summary Judgment, the entirety of Blow's argument for disparate treatment based on race, with respect to his own claim, is limited to a claim for discrimination in connection with pay. ECF No. 200, attach. 1 at 32-33. In the less than one page directed to his claim, Blow makes no other claim of disparate treatment, and his claim is limited to pay raises. *Id.*

Finally, Blow identifies James Knick as a white worker who's "pay was riased [sic] to \$26 in February 2013, well before Blow's, \$26.97 in February 2015, and \$27.98 in February

---

[22] ECF No. 15, ¶ 664.

[23] ECF No. 15, ¶ 663.

2016." ECF No. 200, attach. 1 at 34. Blow also references a chart taken from ECF No. 204, attach. 1, Ex. 158, listing that Knick was paid $21 per hour on April 24, 2012 and received various raises so that he was paid $27.98 on February 22, 2016. *Id.* This information is insufficient to raise a genuine issue of material fact in dispute. First, Blow proffers no evidence demonstrating that he and Knick are similarly situated. Second, Blow still cannot show his raises were an adverse employment action when they were more than this other worker. *McCann*, 32 F.Supp.2d at 368.

As a result, the undersigned **RECOMMENDS** that Defendant NNI's Motion for Summary Judgment on Blow's disparate treatment claim be **GRANTED**.

### 3. Ernest Chesson

In addition to his claim for hostile work environment, Chesson has asserted claims in the Second Amended Complaint for disparate treatment in pay and overtime[24] (Count II), termination based on constructive discharge (Count III), and retaliation based on race (Count IV). ECF No. 15 at 230-233.

#### a. Factual Background

Chesson is an African-American man, ECF No. 27 at 2, who began working for NNI as a temporary structural fitter at the pay rate of $18 per hour on July 2, 2012 through Aerotek, which served as a third party who leased workers to NNI, ECF No. 116, SOF No. 4 and attach. 2 at 2. Chesson received and signed two Environment, Safety, Health Observation Reports ("ESHORs") within his first thirty days of work for failure to wear his safety glasses ("PPE") and failure to wear ear protection. *Id.* SOF Nos. 6-7. At Chesson's thirty day review on August 2, 2012, his

---

[24] Although Chesson averred in the body of the Second Amended Complaint that he was denied training opportunities, ECF No. 15 at ¶¶ 945-946, he omitted any such claim and evidence in his response to Defendant's Motion for Summary Judgment, and thus such claim is abandoned. *See* ECF No. 200, attach. 1 at 36-37 (limiting claims of disparate treatment to pay and overtime only).

supervisor Jackson wrote that Chesson "had two ESHOR's written against him during his first 30 days and has been coached on proper use of P.P.E." *Id.*, SOF Nos. 8-9, and attach. 6 at 2-3. Chesson did not receive a raise after his thirty day review. *Id.*, SOF No. 10. Chesson's pay was raised to \$18.50 per hour following his 60 day evaluation in early September, 2012.[25] *Id.*, SOF No 13, 15 and attach. 6 at 3. Jackson, Chesson's foreman, wrote on the evaluation that Chesson "has made a turnaround on the use of his P.P.E. and has become more proactive." *Id.*, attach. 6 at 3. Chesson received another \$.50 raise after his 90 day evaluation, bringing his pay rate to \$19 per hour. *Id*, SOF No. 19 and attach. 8 at 2. At his 110 review, Chesson received a \$1.00 per hour raise, bring his pay rate to \$20 per hour. *Id.*, SOF No. 22 and attach. 9 at 2. In April 2013, Chesson received another \$1.00 per hour raise, bring his pay rate to \$21 per hour. *Id.*, SOF No. 23 and attach. 10 at 2.

On July 23, 2013, instead of remaining a leased worker through Aerotek, Chesson applied for a position at NNI as a "combonation [sic] welder/fitter." *Id.*, SOF No. 24 and attach 11 at 2. On September 12, 2013 Chesson was offered a position as a structural fitter with a pay rate of \$26 per hour. *Id.*, attach 3 at 20.

Chesson has asserted a denial of overtime claim, which he testified occurred as follows:

> **Q:** [U]nder Wayne [Jackson] you weren't allowed to have [overtime]? Is that you're testimony?
> **A:** There was some, but it wasn't that I wasn't allowed to have it. It was that at times when it was available he would tell us it was not available, and Astro Bren, which is another black welder, he would go over there on weekends to see who was working because he lived right around the corner. Every white welder in our crew was there working numerous weekends, but myself, Astro, Tim Boddie, and who else? There was one other black welder I can't recall. Yeah, we were all told that there was no overtime for that week on numerous occasions –

---

[25] NNI posits that this evaluation occurred on September 4, 2012, and cites to the NNI Probationary Review form, which provides that the due date for the 60 day evaluation was September 4. ECF No. 116, attach. 6 at 2. Chesson proffers that the evaluation occurred on September 6. ECF No. 198, attach. 6 at ¶ 13. While the Probationary Review form does demonstrate that the evaluation was signed by the employee, Superintendent and Operations Manager on September 6, ECF No. 116, attach. 6 at 3, the specific date of the evaluation is not material.

> **Q:** Okay.
> **A:** -- and they were working.

ECF No. 202, attach. 1 at 515-16. Chesson proffered no evidence on this claim other than his own testimony. *See* ECF No. 198, attach. 6, *passim*; ECF No. 200, attach. 1 at 38 (citing to his SOF Nos. 59-61 at ECF No. 198, attach. 6).

Chesson resigned his employment on April 6, 2015. ECF No. 116, SOF No. 33. Chesson testified that he reason he left NNI was because he "had gotten to the point where I just had enough. I didn't want to deal with it anymore. I didn't want to deal with the attitudes anymore. I just didn't want it anymore." ECF No. 202, attach. 1 at 526. The work environment caused him much stress, which when added to the early hour he had to arrive at work, "began to be too much." *Id.*, attach. 1 at 527.

### b. Disparate treatment based on pay and overtime

By Defendant's motion and Plaintiff's opposition, the only disparate treatment claims before the Court are Chesson's claims for disparate pay and denial of overtime. Chesson contends that he was paid lower raises than John Fannin, a white coworker, during Chesson's initial evaluation process in 2012 when he began working at NNI though Aerotek. ECF No. 200, attach. 1 at 37-38. Chesson also points to Evan Reams as a white worker who received a larger percentage increase in pay during the first four evaluation periods, 13.5% to 11%. *Id.* (citing ECF No. 128, attach. 2). Since Chesson did not proffer direct evidence of discrimination, the Court applies the *McDonnell Douglas* framework to evaluate this claim.[26] Chesson is thus required to show that he was paid less than an employee outside the class; and that the higher paid employee was performing a substantially similar job. *Davis*, 2015 WL 5616237, at \* 3. Assuming Chesson and Fannin were performing a substantially similar job, then Chesson has

---

[26] As discussed with respect to Plaintiff Blow, *supra*, Dr. Killingsworth's statistical analysis has been stricken and provides no evidentiary support for the proposition that black workers are paid less than white workers at NNI.